## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEICHA GREENIDGE AND RYAN P. BILLEY, H/W *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> HOMETAP EQUITY PARTNERS, LLC <br><br> and <br><br> HOMETAP INVESTMENT PARTNERS III SPV <br><br><br> Defendants. | C.A. NO. <br><br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT – CLASS ACTION</u>

On behalf of themselves and all others similarly situated, Plaintiffs Keicha Greenidge and Ryan P. Billey, H/W, ("Plaintiffs"), by and through their attorneys, respectfully allege as follows:

## INTRODUCTION

Every few years it seems that a new group of private-money interests finds a predatory and abusive mortgage loan product that they peddle to the most vulnerable consumers, all the while believing that they have created something so original and unique that they can skirt traditional federal and state lending laws.  The Housing Crisis of 2008 displayed the danger of such products through the grotesque collapse of securitized debt obligations. Defendant Hometap's "Home Equity Investment" or "HEI" loan is another iteration of such products. Hometap breaks federal and state lending laws and their protections by ensnaring homeowners with its complex, confusing,

and high-risk HEI loans which Hometap deceptively brands as "Option Purchase Agreements," which state "THIS IS NOT A LOAN".

Broadly, Hometap's HEI operates like any other non-recourse loan. In exchange for a cash advance paid to the consumer, Hometap receives a mortgage-secured right to a percentage of the property's value which its contract describes as the "Hometap Share" or what it calls alternately the "delta". For example, after deducting fees and costs, a homeowner who receives $100,000 in cash from Hometap sells a percentage of their home equity worth nearly twice as much today and more than twice that amount over the ten-year term. Hometap does not adequately disclose the "delta" to consumers like Plaintiffs, but its investor materials tout the HEI's "downside protection, even during times of declining home values," through a "cushion in each property investment to minimize potential losses."

Over the course of the ten-year term, the amount owed on the HEI increases without the homeowner making any monthly payments to the lender but with the interest accruing against the amount borrowed as it would under a reverse mortgage loan but without the legal guardrails consumer protection laws provide to ensure that cash-strapped homeowners are not put in the untenable position of having their loan come due while still living in the home. In such situations, the burden is on the lender to ensure that the homeowner has received disclosures and independent counseling regarding the function and cost of the reverse mortgage.

In contrast to a regulated reverse mortgage, when the HEI settles, the homeowner will need to pay back more than they received from Hometap. But because Hometap insists that its HEI product is not a reverse mortgage, it offers none of the protections of these regulated products. After ten years, the consumer must make a single, large lump sum payment to Hometap to pay the share or delta (called "settlement" in the HEI contract) and, if consumers cannot make that required

payment to Hometap, Hometap can foreclose to collect it, and thereby force consumers out of their homes without any of the protections required of a lender before foreclosing on a traditional mortgage. Worse, because Hometap's HEI transactions are underwritten without regard to consumers' income, assets, or future ability to settle the HEI, a significant subset of homeowners are at risk of being forced out of their homes by the Hometap HEI when their ten-year contracts mature.

Hometap markets to individuals with low credit scores who need to pay off high-cost debt and who are less likely than the general population to be able to refinance later. Further exacerbating their risk is the structure of the HEI product with its single enormous lump sum payment due after a ten-year cliff (which can be extended to 20 years at Hometap's sole discretion). Moreover, at the time of sale, Hometap will take much of the sale proceeds while Plaintiffs will have to cover all of the sale costs, making transition to a new home more onerous.

To disguise that Hometap makes money as a lender and to avoid licensing and substantive controls on its lending, Hometap frames its HEI as an "option agreement" rather than a loan, that is, in exchange for an upfront payment, Hometap receives an "option" to acquire a percentage interest in the consumer's home, which vests after ten years.

This "option" language is mere artifice. It hides Hometap's guaranteed repayment of the entirety of the HEI's principal by the borrower plus significant interest disguised as an equity share all of which Hometap can recoup by forcing sale of the consumer's home as collateral for its mortgage lien. Hometap's own investor materials make clear that exercising its "option" under the contract means Hometap will "either foreclose on the property or force a sale of the property if the homeowner cannot otherwise settle."

No matter how Hometap labels its HEI loan product, the reality is that it provides homeowners with an advance of money for a secured mortgage interest in their home, and then requires repayment with interest within 10 years or less. That is a mortgage loan. Plaintiffs bring this suit to protect their family and others similarly situated from financial harm and to vindicate their rights under state and federal law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District, where Plaintiffs reside.

## PARTIES

3.      Plaintiffs Keicha Greenidge and Ryan P. Billey are adult individuals and American consumers who reside at 6 Cherise Court, Jackson Township, New Jersey 08527.

4.      Defendant Hometap Equity Partners, LLC ("HEP" or "Hometap") is a Delaware Limited Liability Company headquartered in Boston, Massachusetts. HEP is the primary operating entity, employs Hometap's employees, and negotiates and facilitates its real estate transactions. HEP controls subsidiaries which are the contractual counterparties in transactions entered into by Hometap as with Hometap Investment Partners III SPV who entered into the instant HEI contract with Plaintiffs herein.

5.      Defendant Hometap Investment Partners III SPV ("HIP" or when referenced as Defendants "Hometap") is a Delaware-registered, active special purpose vehicle associated with HEP that is HEP's third institutional fund.

## FACTUAL ALLEGATIONS

### A.    Hometap HEIs

6.    Hometap HEIs have the same three core features:

    a.    Fast Cash: The Hometap HEI provides upfront cash to homeowners with no documentation or underwriting of income, job, or assets other than the home itself. Hometap refers to this cash as the "Investment Amount" rather than what it is, the principal amount of a loan.

    b.    Hometap Percentage/Hometap Cap: Hometap purports to cap its return at a 20% compound annual interest rate but as described further below, Hometap's "capped" return routinely exceeds 20% annual interest.

    c.    Ten-Year Balloon: The homeowner is not required to make any payments to Hometap for ten years, but at the end of the ten-year period, the homeowner must make a single, very large payment to Hometap by either selling or refinancing the home to continue living there.

7.    Hometap's form HEI contracts contain the header: "Option Purchase Agreement" wherein the homeowner grants Hometap an option to purchase in exchange for the "Investment Amount" paid to the homeowner. A copy of Plaintiffs' Option Purchase Agreement and accompanying schedules and exhibits is attached hereto as Exhibit A.

8.    Hometap's Investment Amount is a cash payment to the homeowner, less certain fees and costs. While some of these fees and costs are paid to third parties, Hometap retains others, including a 3% "Hometap Fee." Thus, for example, if Hometap offered a $100,000 "Investment Amount" to a homeowner, the consumer would actually receive less than $97,000.

9.    Even some of the so-called "third-party costs," such as appraisal fees and recording fees, are actually retained by Hometap, because Hometap charges the homeowner more for appraisals than the amount it pays to third parties for these services.

10.    Under the terms of the HEI, in exchange for the "Investment Amount," Hometap will receive a payment amount from the homeowner equal to a percentage of the value of the home at the time of repayment (called the "Hometap Percentage"). The actual payment of that amount

by the homeowner (which Hometap refers to in the contract as "settlement"), whether through a voluntary or forced sale, is called the "Hometap Share".

11.    Under the Hometap HEI contract, repayment must occur within ten years, unless unilaterally extended by Hometap, or earlier upon transfer of title or certain other triggering contractual events (such as a default in mortgage payments or property taxes, sale of the home, etc.).

12.    Whenever the Hometap HEI settles, Hometap's profit on an HEI transaction is actually just interest accruing silently against the loaned funds on a scheduled basis as it would in a reverse mortgage loan.

**B.    Hometap Disguises the HEI Loan Contract as an Option Contract**

13.    Rather than disclosing its HEI loan product as a loan, Hometap disguises the interest accrual in its contract as a percentage return on investment in the home's equity in scenarios where the home both appreciates or depreciates.

14.    Contrary to Hometap's advertisements and investor disclosures, its HEI product is not an option because:

   a.    The homeowner has a contractual right to "repurchase" Hometap's purported "option" to acquire a percentage interest in the home which is not a feature of a typical option contract, and reflects Hometap's true intention that consumers pay back Hometap to "buy back" the right to their home.

   b.    A standard option creates a contractual right only, not a property right. Here, Hometap's mortgage on the consumer's home gives it not just a "contractual right" to purchase home equity in the future, but an immediate interest in the property in the present.

   c.    A typical option to purchase real estate involves both consideration for the option agreement, and consideration representing the purchase price if the option is exercised. Here, Hometap has structured the HEI so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Hometap pays the "purchase price" for the consumer's home equity up front, and the "exercise

price" at the end of the ten-year term is either $0 or a nominal 1 % of the cash amount loaned to the consumer (3.1(e)).

**C.    How Hometap's HEI Product Puts Vulnerable Consumers at Risk**

15.    Prior to entering a Hometap HEI, Hometap does not determine whether or not a homeowner can repay the Hometap HEI based on documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though failure to make these payments triggers the homeowner's repayment obligation.

16.    Hometap's only evaluation prior to entering an HEI pertains to a homeowner's ability to repay the Hometap HEI through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

17.    If a homeowner is unable to pay the required percentage of their home's value in cash to Hometap upon expiration of the ten-year term, then Hometap is entitled to "take joint ownership of the Property... and [thereafter] soliciting a Transfer of the entire Property, including [the homeowner's] interest, to one or more Third-Party Buyers..." Ex. A at § 3.1(b).

18.    Thus, the Hometap HEI is a high-cost product which Hometap avoids disclosing by misbranding it as an investment rather than a loan to avoid federal and state loan disclosure laws.

**D.    Plaintiffs' Financial Condition Causes Them to Enter into Hometap's HEI product.**

17.    In 2018, Plaintiffs purchased a home for themselves and their two children at 6 Cherise Court, Jackson Township, New Jersey.

18.    This was the first time Plaintiffs had ever owned their own home and valued the financial security that homeownership would provide for their family.

19.    Prior to taking their loan, Mr. Billey had lost his job of 18 years in 2018, and he thereafter struggled to find permanent employment while Ms. Greenidge's work hours were reduced due to health problems leaving them unable to keep up with household expenses and desperate to find a way to save their home for the family.

20.    Due to Plaintiffs' negative credit rating, conventional loan options were not available to Plaintiffs so they eventually talked to a neighbor who had used Hometap's product.

21.    Plaintiffs contacted Hometap to inquire about its product, and upon its request, sent it certain information requested about their home.

22.    An appraiser selected by Hometap appraised their home at $802,053.

23.    Once Hometap said Plaintiffs were approved, it sent them documents to sign. These included a 33-page Hometap contract entitled "Option Purchase Agreement." Ex. A, Schedule A, "Beginning Home Value".

24.    Plaintiffs never met in person with anyone from Hometap. When they signed the contract on February 14, 2023, only an agent from the title company ClearEdge—not Hometap—was present.

25.    Hometap required Plaintiffs to grant it a mortgage on their home, which secured their obligations under the contract on penalty of foreclosure (the "Mortgage"). Ex. A at § 1.2(a)(iii).

26.    Plaintiffs did not have any opportunity to negotiate the terms of the contract.

27.    Under Hometap's contract, the company gave her an advance payment of $103,575. A copy of the Borrower Closing Statement is attached here as Exhibit B.

28.    This advance or loan amount was equivalent to 13% of the appraised value of the home minus a $3,107.25 "Origination Fee." Ex. A.

29.    The contract characterizes the advance payment not as a loan but as an "investment" jointly made by the contracting parties.

30.    What Plaintiffs did not realize at signing was that if they wished for "settlement" of the HEI loan in 10 years or less after signing, they would be forced to pay Hometap up to twice as much or more than the loan amount's principal.  In other words, in 10 years or less, Plaintiffs will be forced to pay Hometap roughly a third of the value of their home subject to an "annualized rate of return" cap of between 17.936% and 21.523% annual compound interest. This settlement amount is called the "Hometap Share." Ex. A at 4.

31.    The other settlement events in the contract include principally whichever of the following comes first:

    a.  Plaintiffs selling their home;

    b.  Default on property taxes or insurance on the property;

    c.  Plaintiffs passing away; or

    d.  Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

32.    To illustrate, if a Settlement Event happened today, Plaintiffs would owe Hometap in a range of approximately $177,000 if the home depreciates 1% annually and up to approximately $199,000 if the home appreciates 5% annually based on the value of Plaintiffs' home being approximately $800,000 which is an interest rate far higher than the applicable maximum rate permitted under New Jersey law, which is 6%. N.J.S.A. § 31:1-1(a); N.J.A.C § 3:1-1.1

33.    Additionally, Plaintiffs are required to cover 100% of a Settlement Event of sale or refinancing of the home which can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses. Ex. A at 6, § 2.4(g).

34.    Plaintiffs cannot afford to repay that amount of money without either selling their home or sinking deeper into debt.

35.    The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Plaintiffs must either buy out Hometap for hundreds of thousands of dollars that they don't have, or the company will force the sale of her home. Ex. A at 8-9, §§ 2.7, 3.1.

36.    Plaintiffs did not understand that Hometap could force them to sell their home in 10 years and only took out the loan to save their home. If they had understood the consequences, they never would have signed the contract.

37.    Being forced out of their home would be a personal and financial disaster for Plaintiffs having to pay sales costs and fees and then qualify to purchase a new home, while Hometap drained most of the equity from their home.

**E.    Federal and State Laws Protect Homeowners like Plaintiffs from Hometap's HEI Loan**

38.    Congress and the New Jersey legislature have both passed laws to protect homeowners like Plaintiffs from complex and confusing financial products that can cause people to lose their homes.

39.    While the federal Truth in Lending Act, 15 U.S.C. §1602 *et seq*. ("TILA"), protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

40.    For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. Id. at § 1639c(a)(1).

41.     Companies originating mortgages must also be licensed under applicable federal and state laws. Id. at § 1639b(b)(1)(A).

42.     Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." Id. at § 1639c(e)(1).

43.     In addition to these protections for residential mortgage loans generally, TILA includes even further protections for "high-cost mortgage[s]." Id. § 1602(bb). These include pre-loan counseling and additional disclosures. Id. § 1639(a), (h), (u).

44.     New Jersey requires disclosures and protections for mortgages generally, see generally N.J.S.A. § 17:11C-75, as well as special requirements for high-cost mortgages, see N.J.S.A. § 46:10B-26.

45.     A lender cannot charge more than 6% interest if the rate is not specified in the contract (as is the case here, where Hometap's contract falsely claims there is no interest rate). Ex. A at 37 § 21.5; N.J.S.A. § 31:1-1(a); N.J.A.C § 3:1-1.1.

46.     New Jersey also requires that only licensed mortgage lenders can offer these products. N.J.S.A. § 46:10B-18.

**F.    Hometap Does Not Comply with Federal or State Lending Laws**

47.     Hometap claims that it is entirely exempt from any federal and state lending laws discussed above because its HEI product is not a mortgage loan.

48.     Hometap is not licensed to originate and/or make mortgage loans in New Jersey.

49.     But no matter how Hometap labels its product, it is still a mortgage loan because Hometap provides homeowners with an advance of money, receives security through a mortgage on their home, and then requires payment within 10 years or less. Those features create a mortgage loan.

50.     Hometap's primary contention is that its product is not a loan because the company is not explicitly guaranteed to be paid back its initial advance.

51.     In any event, Hometap does ensure that, in practice, it will obtain repayment (plus interest) of its initial advance payment because all of Hometap's "Settlement Events" require Plaintiffs to pay Hometap. Ex. A at 5 §§ 1.8.1(e), 1.8.2 ("On the Settlement Date, Hometap will receive the 'Settlement Payment.'").

52.     In this case, Hometap paid Plaintiffs roughly 12% of the value of their home and Hometap will receive up to 70% (capped at 18% annual compound interest). Ex. A at 4, §2.2.

53.     While Hometap shares in the home's appreciation, if the home loses value, the company does not actually share in a homeowner's losses. The large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Hometap requires at the outset.

54.     To further ensure that nothing will decrease the value of the home or jeopardize its future payment, Hometap requires Plaintiffs to pay for all of the taxes, insurance, and repairs on the home. Ex. A at 17, § 6.1(j); 18, §6.2(e).  Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap cure payments," which themselves accrue interest and have to be paid back. Ex. A at 19, §7.2(b).

55.     Despite the fact that Plaintiffs must make these payments or face foreclosure, Hometap misleadingly advertises its product on its website as being "without payments" and requiring "no monthly payments" until one of the triggering events occurs.  A screenshot of Hometap's webpage is attached hereto as Exhibit C.

56.     Hometap also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Hometap determines that the sale price is too low, Hometap can "in its sole discretion" calculate the value of the "Hometap Share" based on appraisal instead of the sale price. Ex. A at 5, § 2.1(b). Hometap can also effectively delay the sale by requiring sworn documentation from both the owner and buyer.

57.     In sum, Hometap has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus interest.  Hometap touts that: "Embedded downside protection in [the home equity agreement] product structure allows for stable returns across various housing cycles." Investors, Hometap Partnership Solutions, https://perma.cc/Y9EH-Q3T9.

58.     Hometap also tells investors that its "investment returns are uncorrelated with broader markets and inflation-protected."

**G.     Hometap's Own Documentation Refers to its HEI Product as a Mortgage Loan**

59.     While Hometap has gone to great lengths to present its product as not a mortgage loan, its own contract states that Hometap has a mortgage on Plaintiffs' home. Ex. A at 1.

60.     Several of Hometap's other documents for the transaction refer to Hometap as a "lender" (Ex. A, Borrower Closing Statement, Compliance Agreement, Marital Affidavit), the transaction involving a "loan amount", "loan", or  mortgage loan," and Plaintiffs as a "borrower." Ex. A.

61.     As part of the transaction in their case, Hometap commissioned a title search from Clear Edge Title.  It's documents refer to Hometap as the "Lender" and refers to Plaintiffs as the "Borrower."

62.    Hometap also required Plaintiffs to fill out a document called a "Title Borrowers Authorization."

63.    Hometap also required Plaintiffs to carry insurance that protects Hometap. On the insurance policy, Hometap is listed as the "First Mortgagee" and there is also a "Loan Number." Ex. A.

## H.    Hometap Unlawfully Tries to Limits Consumers' Rights

74.    Upon information and belief, Hometap is aware of the serious harms that its product can cause, including forcing people to sell their homes or sink even further into debt. Hometap's conduct in this case was willful and intentional.

75.    Upon information and belief, Hometap has also been aware for years of the risk that its products will be considered loans under federal and state laws. In this regard, Hometap's contract includes a provision that seeks to force homeowners to agree that "to the fullest extent possible … the Hometap Agreement is not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws." Ex. A at 37, § 21.5.

76.    While such a provision is unenforceable, it misleads homeowners about their rights and so can deter them from invoking their rights.

77.    Hometap's contract also contains a number of provisions designed to limit the ability of homeowners to vindicate their rights in court.

78.    The contract includes a mandatory arbitration clause. Ex. A at 34–35 § 20. Yet federal law prohibits arbitration clauses in residential mortgages, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e)(1).

New Jersey law also contains a limit on non-judicial forums for high-cost mortgage contracts. N.J.S.A. § 46:10B-26(e).

79.     The contract also seeks to strip Plaintiffs of her right to statutory remedies, including punitive and consequential damages. Ex. A at 35, § 20.4. No matter how much harm the company causes Plaintiffs or how many laws it violates, the contract provides that "in no event will Hometap's aggregate liability arising out of or related to the Hometap Agreement or the Property exceed the Investment Payment." Id. at 39 § 21.12.

80.     The contract also seeks to immunize Hometap by stating that "Hometap may execute any of its duties under the Hometap Agreement by or through agents," yet "Hometap will not be responsible for the negligence or misconduct of any agent that Hometap selects." Ex. A at 39 § 21.23. Further, the contract purports to require Ms. Roberts to "expressly waive any claims against any of Hometap's agents, assignees, affiliates, employees, directors or funding sources." Id.

81.     The contract's indemnification clause also purports to put Plaintiffs on the hook for Hometap's legal expenses for a wide range of claims, seemingly including claims brought by her, independent of the outcome of the litigation. Ex. A  at 38–39 § 21.12.

82.     The contract also contains a definition of "Event of Default" that threatens to penalize homeowners for filing claims in court or challenging the enforceability of the dispute resolution terms. Id. at 27 § 16. And an "Event of Default" gives Hometap the power to seek damages, injunctive relief, specific performance, or force the sale of the property, among other "cumulative" remedies.  Ex. A at 28–30 § 17.

83.     These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights.

I.    **Hometap's Predatory Business Practices Contribute to its Rapid Expansion**

84.    Hometap is a rapidly growing company, and it now boasts that it has over 12,000 customers in 17 states. About, Hometap, (last updated Mar. 20, 2025) https://perma.cc/U7YX-QSNK.

85.    Getting homeowners to sign these mortgage loans is just the first step in Hometap's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to investors.

86.    These offerings have sold for $197 million and $224 million apiece. Hometap Technologies and Saluda Grade Announce Close of Second Rated Home Equity Agreement Securitization, Hometap Technologies, (Apr. 5, 2024), https://perma.cc/Y9VY-UBAE; Hometap Technologies, Saluda Grade Announce Close of First Rated Home Equity Agreement Securitization, Hometap Technologies (Oct. 5, 2023), http://perma.cc/K8ST-TXXR.

87.    Hometap tells its investors that there is "$9+ Trillion" in home equity that is currently "untapped"—in other words, in the hands of homeowners who paid for it. Investors, Hometap Partnership Solutions, https://perma.cc/Y9EH-Q3T9.

88.    Despite Hometap's assertion that the company is not engaged in mortgage lending, its 2023 security offering was awarded the "Residential Mortgage Backed Security of the Year." Saluda Grade Awarded both RMBS Issuer of the Year and RMBS Deal of the Year at the 2024 GlobalCapital US Securitization Awards, Business Wire, (May 20, 2024), https://perma.cc/ZN6X-TTKY.

**CLASS ACTION ALLEGATIONS**

89.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed classes defined as follows:

**TILA Nationwide Class:** All persons who have entered into an Option Purchase Agreement with Hometap within the time period commencing three (3) years prior to the filing of this action and extending upon through the date of class certification.

**New Jersey Class Declaratory Judgment Class:** All persons who have entered into an Option Purchase Agreement with Hometap at a time when they were residents of New Jersey and/or where the property was located in New Jersey.

**New Jersey HOFA/CFA/TCCWNA Subclass**: All persons in the New Jersey Declaratory Judgment Class who entered into an Option Purchase Agreement with Hometap within the time period commencing six (6) years prior to the filing of this action and extending through the date of class certification.

90.     Plaintiffs reserves the right to amend the definitions of the classes above based on discovery or legal developments.

91.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Upon information and belief based upon publicly disclosed and available materials, Hometap has entered into obtains hundreds if not thousands of Option Purchase Agreements in the State of New Jersey and Nationwide.

92.     **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class, and predominate over the questions affecting only individual members. The common legal and factual questions include, among others:

    a.   Whether Hometap's Option Purchase Agreements are mortgage loans;

    b.   Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

    c.   Whether Hometap's Option Purchase Agreements violate federal and state consumer protection laws such as TILA, HOFA, CFA and TCCWNA;

    d.   Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to rescission of their agreements, as well as statutory, actual and punitive damages;

    e.   Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

17

      f.   Whether Hometap acted willfully, intentionally and/or recklessly in violating federal and state consumer lending laws.

93.    **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiffs's claims are typical of the claims of each Class member. Plaintiffs have the same claims for statutory, actual and punitive damages that they seek for absent class members.

94.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiffs is an adequate representative of the Class. Their interests are aligned with, and are not antagonistic to, the interests of the members of the Class he seeks to represent, he has retained counsel competent and experienced in such litigation, and he intends to prosecute THIS action vigorously. *McIntyre v. RealPage, Inc.*, 2023 WL 2643201, at *3 n.5 (E.D. Pa. Mar. 23, 2023)(noting Francis Mailman Soumilas' "particular skill and efficiency" in prosecuting consumer class actions, as well as "counsel's overwhelming experience in consumer litigation and class actions"); *Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding firm "competent, experienced and well-qualified to prosecute class actions" and noting that class counsel "have done an excellent job in representing the class in the instant litigation."); *Martinez v. Avantus, LLC,* 343 F.R.D. 254 2023 WL 112807, *9 (D. Conn. Jan. 5, 2023)(firm "has substantial experience in class action litigation ….[and] demonstrated proficiency at all stages of suit"); *Ramirez v. Trans Union, LLC*, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022)("Courts have consistently recognized Francis Mailman Soumilas 'for... the high caliber of its work for the classes it represents.'"); *Der Hacopian v. SentryLink*, C.A. 18-3001 (D. Md., Nov. 23, 2020)(firm "many, many times in the past has been found to be not just qualified or competent, but extremely well-qualified and competent to represent consumer classes in many, many other jurisdictions, not only THIS particular jurisdiction"); *Flores v. Express Services, Inc.*, C.A. No.14-3298, 2017 WL 1177098, at *3 (E.D. Pa. March 30, 2017) (firm "has extensive experience in consumer class action litigation); *White v. Equifax Info. Solutions*, No. 05-

18

01070, 2014 WL 1716154, at *13, 19, 22 (C.D. Cal. May 1, 2014), *aff'd sub nom. Radcliffe v. Equifax Info. Sol'ns., Inc.*, 818 F.3d 537, 548 (9th Cir. 2016) (appointing firm and its team as interim class counsel over objections from a competing national law firm (Boies Schiller) because firm's team's "credentials and experience [we]re significantly stronger in class action..."); *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 307 (N.D. Cal. 2015) (FMS "have represented consumer classes in many cases in many districts . . . [and] have shown their proficiency in THIS case[.]"); *Kelly v. Business Information Group*, C.A. 15-6668, 2019 WL 414915 (E.D. Pa. 2019) (firm "qualified and experienced attorneys" … Francis & Mailman, P.C., of Philadelphia…who have substantial experience in class action... and who are qualified to conduct the litigation.") Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

95.    **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## CAUSES OF ACTION

## COUNT 1
### Truth-in Lending Act, 15 U.S.C. §1602 *et seq.*
### (Class Claim)

96.     Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

97.     The loan from Hometap involved an extension of consumer credit as described by TILA, 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

98.     Defendant failed to deliver all "material" disclosures required by TILA for reasons including but not limited to failing to provide a Truth in Lending disclosure at closing which accurately disclosed the loan's finance charge as required by 15 U.S.C. §1635(i) and otherwise failing to provide disclosure of credit terms required under 15 U.S.C. §1638.

99.     Defendant originated a mortgage loan, but is not licensed to originate mortgages in New Jersey, in violation of 15 U.S.C. §1639b(b)(1)(A).

100.    Defendant's HEI loan includes a mandatory arbitration clause in violation of TILA section 1639(e).

101.    Defendant failed to make a reasonable and good faith determination that Plaintiffs had the ability to repay their loan.

102.    The HEI loan that Plaintiffs entered into was a "high-cost mortgage" as defined herein. Defendant failed to comply with TILA's requirements relating to high-cost mortgages.

103.    As a result of the violations of TILA, pursuant to 15 U.S.C. §§1635(i) and §1640, Defendant is liable to Plaintiffs for damages of:

    a.   rescission of their transaction, including a declaration that Plaintiffs are not liable for any finance charges or other charges imposed by Defendant;

    b.   termination of any security interest in Plaintiffs' property created under the transaction;

    c.   return of any money or property given by the Plaintiffs to anyone, including the Defendants, in connection with this transaction;

    d.   actual and statutory damages in an amount to be determined at trial;

    e.   an award of reasonable attorney's fees and costs.

## COUNT 2
### New Jersey Home Ownership Security Act of 2002, N.J.S.A. §46:10B-22 *et seq*.
### (Class Claim)

104.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

105.    The transaction here is subject to the New Jersey Home Ownership Security Act of 2002, N.J.S.A. § 46:10B-22 et. seq ("HOFA").

106.    The transaction at issue is a home loan. Hometap extended credit to Plaintiffs. Their extension of credit was primarily for personal, family, or household purposes. And the loan is secured by a mortgage on real estate in ttheir State on which there is located a dwelling which is occupied by the borrower as the borrower's principal dwelling.

107.    The transaction at issue also meets the definition of an equitable mortgage under New Jersey law.

108.    Hometap's product violates the statute by purporting to charge a fee for payoff information, including but not limited to charging a fee for processing a permitted sale or owner buyout. N.J.S.A. § 46:10b-25f; Ex. A at 54.

109.    Hometap's product is a high-cost home loan as defined in the statute due to its high fees and high interest rate. N.J.S.A. § 46:10B-24.

110.    Hometap failed to comply with the high-cost mortgage requirements of N.J.S.A. § 46:10B-26, including but not limited to failing to provide mandated notices to the borrower, charging fees in excess of those permitted by the statute, and requiring arbitration.

111.    Plaintiffs seeks damages, costs, attorneys' fees, and such other relief as is equitable and just.

### COUNT 3
### New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1 *et seq.*
### (Class Claim)

112.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

113.    The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.*, prohibits unfair, unconscionable, and deceptive conduct, and provides remedies for violations of other statutes.

114.    Hometap engaged in unfair or deceptive practices, including but not limited to claiming that the product is not a loan, there is no interest, there are no payments or monthly payments, and that the company acts as a homeowner's partner. Hometap also either represented or implied by its conduct that it was authorized to engage in their transaction.

115.    The defendants engaged in unconscionable business practices, including but not limited to extending home loans, charging improper fees, failure to disclose or accurately represent fees charged the Plaintiffs, and failure to comply with applicable statutes and regulations.

116.    Hometap imposed an interest rate higher than the rate permitted by New Jersey usury law. N.J.A.C. § 3:15-10.1 (a); N.J.S.A. § 2C:21-19.

117.    The New Jersey Residential Mortgage Lending Act., N.J.S.A. § 17:11C-51 et seq., requires mortgage lenders like Hometap to be licensed to make mortgage loans in New Jersey.

118.    Hometap made a residential mortgage loan to Plaintiffs.

119.    Hometap secured repayment of that loan with a mortgage.

120.    Hometap was not authorized or licensed to make a loan, impose a mortgage, or charge fees or interest to the Plaintiffs.

121.    The transaction at issue also meets the definition of an equitable mortgage under New Jersey law.

122.    The New Jersey Administrative Code prohibits an entity that is licensed or should be licensed under the applicable law from imposing a mortgage that includes claims to personal property. N.J.A.C. § 3:15-10.3 The mortgage here unlawfully imposes a lien on personal goods. Ex. B at 6–7 § 1(g).

123.    The defendants, jointly and severally, violated the applicable section of the New Jersey Residential Mortgage Lending Act, N.J.S.A. § 17:11C-75, including, but not limited to:

   a.   Hometap engaged in unfair or deceptive practices relating to mortgage lending, including but not limited to claiming that the product is not a loan, there is no interest, there are no payments or monthly payments, and that the company is the homeowner's partner. N.J.S.A. § 17:11C-75(d), (e).

   b.   Hometap failed to make disclosures required under federal and state law in connection with the transaction. N.J.S.A. § 17:11C-75(h).

   c.   Hometap extracted a fee not permitted by the applicable statute. N.J.S.A. § 17:11C-75(l).

   d.   ClearEdge unlawfully accepted a fee in return for its assistance in the transaction. N.J.S.A. § 17:11C-75(k)(1).

   e.   ClearEdge aided and abetted Hometap's unlawful conduct. N.J.S.A. § 17:11C-75(c).

124.    These violations caused Plaintiffs an ascertainable loss of money or property, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

125.    Plaintiffs seek damages, costs, attorney fees, recission or voiding of the contract, and such other relief as is equitable and just.

## COUNT 4
## New Jersey Truth in Consumer Contract Warranty and Notice Act, N.J.S.A. §56:12-15
## (Class Claim)

126.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

127.    Under Section 1.5 Option Period. The term of the Option (the "Option Period") … Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "Extension Notice") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period… .

128.    The defendants violated the New Jersey Truth in Consumer Contract Warranty and Notice Act, by offering and entering into consumer contracts that violate state and federal law, including as described above. N.J.S.A. § 56:12-15.

129.    Under N.J.R.S. 46:10B-17, a "Reverse direct payment mortgage" means a mortgage loan secured by unencumbered residential property of the mortgagor, which loan is paid directly to the mortgagor in fixed amounts over the term of the mortgage not to exceed 10 years, or such other term as may be established by the Commissioner of Banking by regulation.

130.    Under N.J.R.S. 46:10B-18 regarding authorization to make reverse direct payment mortgages and conditions thereto:

> Notwithstanding any law, rule, regulation, or opinion to the contrary, it shall be lawful for any institution authorized in the State to make first lien loans secured by a mortgage on real property to make … reverse direct payment mortgages subject to the following conditions:
>
> a. Said mortgages shall be made to a mortgagor who is at least 60 years old; provided, however, that the Commissioner of Banking may by regulation raise or lower the age limit for eligibility. Such mortgages shall not be made in an amount to exceed 70% of the

value of the mortgaged property, or such amount as is established by the commissioner by regulation.

b. Said mortgages shall be made voidable at the option of the mortgagor upon payment of the principal and interest to date, with no penalty.

c. Interest on said mortgages shall not exceed the usury rate.

131.    Plaintiffs is an aggrieved consumer under N.J.S.A. § 56:12-17, in that she acted or forbore from acting or suffered damages due to the improper terms provided in the contract or notice provided by defendants.

132.    Plaintiffs suffered an ascertainable loss of money or property due to the improper terms provided in the contract or notice provided by defendants, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

133.    Plaintiffs seeks damages, costs, attorney fees, injunctive relief, termination or voiding of the contract, and such other relief as is equitable and just.

## COUNT V
### Declaratory Judgment and Injunctive Relief, N.J.S.A. 2A:16-52
### (Class Claim)

130.    Plaintiff incorporates the foregoing paragraphs as though set forth herein.

131.    N.J.S.A. 2A:16-52 provides as follows:

All courts of record in this state shall, within their respective jurisdictions, have power to declare rights, status and other legal relations, whether or not further relief is or could be claimed; and no action or proceeding shall be open to objection on the ground that a declaratory judgment is demanded.

132.    In this action, Plaintiffs, on behalf of themselves and the Class, seek:

a.   to enjoin Defendants from engaging in any collection of their charged amounts;

b.   declarations regarding the respective legal rights of the parties with respect to patients' obligation to pay, and Defendants' legal right to receive payment in the absence of an express contract;

c.  declarations as to whether any contract exists between Defendants and Plaintiff and the Class, and if so, the terms of their bargain;

d.  declarations regarding the legal rights of the Defendants to receive payment from Plaintiff and any Class member;

e.  declarations as to the right of Defendants to initiate and pursue collection efforts with respect to amounts asserted to be owed under an Option Purchase Agreement.

133.  Plaintiff seeks injunctive and declaratory relief for the purposes of determining questions of actual controversy between the Class members and Defendants.

134.  Defendants have acted in a uniform manner by a) inducing Plaintiffs and other consumers to enter into Option Purchase Agreements that are misrepresented as not constituting loans but which in fact they are mortgage loans in violation of federal and state laws and b) attempting to collect and enforcing those loan obligations.

135.  Plaintiffs seeks declarations to determine their rights and the rights of the Class, in particular, that the Court find that Defendants and Plaintiff and the Class did not enter into any legal contract, either express or implied-in-fact, for Plaintiff and the Class to pay the amounts imposed by the Defendants.

136.  Accordingly, Plaintiff and members of the Class respectfully ask the Court to issue an injunction ordering Defendants to (a) cease using their Option Purchase Agreements; b) desist from attempting to collect upon and/or enforce Option Purchase Agreements, and (c) such other necessary and proper relief that may be appropriate following the determination of the declarations made.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the defendants as follows:

      A.      An Order certifying the Classes above;

      B.      An Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contract;

      C.      An Order awarding monetary damages, including but not limited to any statutory, actual, punitive and treble damages, in an amount to be determined by the Court or jury;

      D.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

      E.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

      F.      Such further relief as their Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demands trial by jury as to all issues in the above matter.

By: */s/ James A. Francis*
James A. Francis (NJ Bar #012601996)
**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis (#012601996)
John Soumilas (#020371999)
Lauren KW Brennan (#074202013)
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel:  (215) 735-8600
Fax:  (215) 940-8000
Email: jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Robert P. Cocco*
ROBERT P. COCCO, P.C.
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
bob.cocco@phillyconsumerlaw.com
*Attorneys for Plaintiffs and the Class*

*Pro hac vice petition forthcoming*