# Exhibit A

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEICHA GREENIDGE AND RYAN P. BILLEY, H/W *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> HOMETAP EQUITY PARTNERS, LLC <br><br> and <br><br> HOMETAP INVESTMENT PARTNERS III SPV, <br><br><br> Defendants. | **Case 3:26-cv-01431** <br><br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT – CLASS ACTION

On behalf of themselves and all others similarly situated, Plaintiffs Keicha Greenidge and Ryan P. Billey, H/W, ("Plaintiffs"), by and through their attorneys, respectfully allege as follows:

### INTRODUCTION

Every few years it seems that a new group of private-money interests finds a predatory and abusive mortgage loan product that they peddle to financially struggling homeowners, all the while believing that they have created something so original and unique that they can skirt traditional federal and state lending laws. The foreclosure crisis of 2008 displayed the danger of such products through the grotesque collapse of securitized debt obligations. Defendants' (collectively, "Hometap's") loan is another iteration of such products.

Hometap breaks federal and state lending laws and attempts to avoid their protections by ensnaring homeowners with its complex, confusing, and high-risk loans which Hometap deceptively brands as "Option Purchase Agreements," which falsely claim "THIS IS NOT A LOAN." *See* Ex. A.

Broadly, Hometap's product operates like any other loan. In exchange for a cash advance paid to the consumer, Hometap receives a home mortgage-secured right to a percentage of the property's value which its contract describes as the "Hometap Share." For example, after deducting fees and costs, a homeowner who receives $100,000 in cash from Hometap sells a percentage of their home equity worth nearly twice as much today and more than twice that amount over the ten-year term. Hometap does not adequately disclose the ultimate cost of the loan to consumers like Plaintiffs, but its investor materials tout the product's "downside protection, even during times of declining home values," through a "cushion in each property investment to minimize potential losses."[1]

Over the course of the ten-year term, the amount owed on the contract increases. During this time, the homeowner pays for all upkeep, repairs, improvements, taxes, insurance, and other costs related to the property, but does not pay down the principal to Hometap. When the Hometap loan comes due, the homeowner is required to pay back significantly more than they received from Hometap in one lump sum. If consumers cannot make that required payment to Hometap, Hometap can foreclose or otherwise force a sale to collect it and thereby force consumers out of their homes

---

[1] Hometap is subject to an enforcement action by the State of Massachusetts raising similar claims as those raised herein. The quoted language appears in paragraph 75 the Massachusetts Complaint, which quotes Hometap's representations obtained by the Massachusetts Attorney General. *See Comm. of Mass. v. Hometap Equity Partners, LLC,* Civil Action No. 2584-CV-469-BLS2 (Mass. Sup. Ct. Feb. 19, 2025), *available at* https://www.mass.gov/doc/commonwealth-v-hometap-equity-partners-llc/download (hereinafter "Massachusetts Enforcement Action").

without any of the protections required of a lender before foreclosing on a traditional mortgage. Worse, because Hometap's transactions are underwritten without regard to homeowner's income, assets, or future ability to pay the loan—and because Hometap targets homeowners who cannot qualify for or afford a traditional mortgage—a significant subset of homeowners are at risk of being forced out of their homes by the Hometap loan when their ten-year contracts mature.

Hometap markets to individuals with low credit scores who are less likely than the general population to be able to refinance later. Further exacerbating their risk is the structure of the product with its single enormous lump sum payment due after a ten-year cliff (which can be extended to 20 years at Hometap's sole discretion). Moreover, at the time of sale, Hometap will take much of the sale proceeds while the homeowners will have to cover all of the sale costs, making transition to a new home more onerous—and in some cases, impossible.

To disguise that Hometap makes money as a lender and to avoid licensing and substantive controls on its lending, Hometap frames its product as an "option agreement" rather than a loan, that is, in exchange for an upfront payment, Hometap receives an "option" to acquire a percentage interest in the consumer's home, which vests after ten years. This "option" language is mere artifice. It hides Hometap's guaranteed repayment of the entirety of the loan's principal by the borrower plus a significant finance charge disguised as an equity share, all of which Hometap can recoup by forcing sale of the homeowner's home as collateral for its loan, through operation of the mortgage. Hometap's own investor materials make clear that exercising its "option" under the contract means Hometap will "either foreclose on the property or force a sale of the property if the homeowner cannot otherwise settle." *See* Massachusetts Enforcement Action ¶ 144.

No matter how Hometap labels its loan product, the reality is that it provides homeowners with an advance of money for a secured mortgage interest in their home and then requires

repayment at substantial additional cost within 10 years or less. That is a mortgage loan. Plaintiffs bring this suit to protect their family and others similarly situated from financial harm and to vindicate their rights under state and federal law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District, where Plaintiffs reside.

## PARTIES

3.      Plaintiffs Keicha Greenidge and Ryan P. Billey are a married couple who reside at 6 Cherise Court, Jackson Township, New Jersey 08527, with their daughters.

4.      Defendant Hometap Equity Partners, LLC ("HEP") is a Delaware Limited Liability Company headquartered in Boston, Massachusetts.

5.      HEP is the primary operating entity, employs all natural persons employed by Hometap, and negotiates and facilitates Hometap's real estate transactions.

6.      HEP controls subsidiaries that are the contractual counterparties in transactions entered into by Hometap, such as Hometap Investment Partners III SPV, which entered into the instant contract with Plaintiffs.

7.      Defendant Hometap Investment Partners III SPV ("HIP") is a Delaware-registered, active special purpose vehicle associated with HEP. It is HEP's third institutional fund.

8.      Neither HIP nor HEP are licensed to make mortgage loans in New Jersey.

9.      HEP and HIP have contributed assets to a common undertaking, that is, the transactions at issue.

10.  HEP and HIP both expect profit from the undertaking, and both have a right to participate in the profit.

11.  HEP and HIP are engaged in a joint venture, partnership, and/or civil conspiracy.

12.  Alternatively, HEP is the principal of HIP and exercises control over and directs its actions.

13.  HEP and HIP are thus jointly and severally liable for all conduct herein, or, in the alternative, HEP is liable for all acts of HIP.

14.  HEP and HIP are collectively referred to as "Hometap" herein.

## FACTUAL ALLEGATIONS

### A.  Hometap Contracts

15.  Hometap's contracts are lengthy, convoluted, and extremely difficult—if not impossible—for a lay person to understand.

16.  The documents typically consist of a 33-page "Option Purchase Agreement," a 14-page Mortgage and Security Agreement, and numerous other documents, without any index, and with the specific financial term sheet hidden in a schedule in the middle of the documents. Plaintiffs' documents totaled 69 pages. *See* Exs. A, B.

17.  The documents contain multiple cross-references, use dozens of proprietary defined terms without a glossary, and contain excessively lengthy and confusing sentences and clauses. *See id.*

18.  All Hometap's so-called "Option Purchase Agreements" (referred to herein as the Hometap contract or Hometap product) have the same four core features:

   a.  Cash Advance: They provide upfront cash to homeowners without requiring documentation or underwriting of income, job, or assets other than the home itself. Hometap refers to this cash as the "Investment Amount" rather than what it is, the principal amount of a loan.

b. Equity Devaluation: In exchange for the cash advance, Hometap acquires an interest in a percentage of the homeowner's home equity that well exceeds the percentage of the home value paid to the homeowner via the cash advance.

c. Hometap Percentage/Hometap Cap: Hometap purports to cap its return at a 20% compound annual interest rate but, Hometap's "capped" return routinely exceeds 20% annual interest, because Hometap does not calculate the figure based on the full value of the Investment Amount. *See* Massachusetts Enforcement Action ¶¶ 52(c), 63.

d. Ten-Year Balloon: The homeowner is not required to make any installment payments to Hometap during the loan term. Instead, at the end of the ten-year term, the homeowner must make a single, very large payment to Hometap, unless Hometap decides to extend the term up to twenty years. Most homeowners will have fund this payment by selling their homes.

19. Hometap's form contracts contain the header: "Option Purchase Agreement" and deceptively state "THIS IS NOT A LOAN."

20. Under the contract, Hometap purportedly "pays" (but in reality *loans*) a sum of money to the homeowner, called the "Investment Amount."

21. This amount is paid back through a supposed option to purchase a percentage of the home's value in the future, called the "Hometap Percentage."

22. A copy of Plaintiffs' Hometap contract and accompanying schedules and exhibits is attached hereto as Exhibit A.

23. Hometap deducts certain fees and costs from the Investment Amount before the consumer receives the Investment Amount.

24. Some of these fees and costs are purportedly paid to third parties for typical mortgage closing services, such as for appraisals, title charges, and recording fees.

25. Hometap does not disclose the identity of the entities that provide each of the services, nor the actual amount paid to that entity.

26. Hometap charges the homeowner more for closing services than the amount it pays to third parties for these services.

27. Upon information and belief, the excess of the amount charged for the so-called "third-party costs" are actually retained by Hometap.

28. In addition, Hometap retains a 3% "Investment Fee."

29. Thus, for example, although Hometap offered a $103,575 "Investment Amount" (or elsewhere in the documents "Loan Amount") to Plaintiffs, Plaintiffs actually received $98,193.35. *See* Ex. B at Borrower's Closing Statement.

30. Under the terms of the contract, in exchange for the "Investment Amount," Hometap will receive a payment from the homeowner equal to a percentage of the value of the home at the time of repayment (called the "Hometap Percentage").

31. The actual payment of that amount by the homeowner, which will typically be paid through a voluntary or forced sale of the home, is called the "Hometap Share."

32. Under the Hometap contract, repayment must occur within ten years, unless unilaterally extended by Hometap, or earlier upon transfer of title or certain other triggering contractual events (such as a default in payments on other mortgages, default on property taxes or insurance, sale or transfer of the home, or "any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share"). *See* Ex. A.

33. The Hometap Share is, functionally, repayment of the original Investment Amount plus a profit.

34. The profit to Hometap, its return on investment, is a disguised finance charge for the original amount loaned to the homeowner.

35. Despite what Hometap tells consumers, its products are single-payment mortgage loans with a high rate of effective interest and/or exorbitant finance charges.

**B.      Hometap's Product Misleads Homeowners & Puts Vulnerable Homeowners at Risk.**

36.     Hometap advertises its product to cash strapped homeowners as a means to pay off unsecured debt like credit cards and eliminate bills to enable a homeowner to "get closer to financial freedom." Hometap, https://www.hometap.com/ (last visited May 13, 2026) (hereinafter "Hometap Homepage").

37.     Instead, the product places a homeowner in a financial trap, stripping their most valuable financial asset—their home equity—from them at an extremely high rate of return for Hometap.

38.     Indeed, Hometap's product restricts a homeowner's "freedom" by not allowing the homeowner to rent the house, move, take on additional debts without Hometap's approval, or otherwise make personal decisions about the home such as transferring it to a family member. Ex. A § 6.

39.     Hometap presents itself as working for the joint interest of itself and the homeowner.

40.     For instance, Hometap advertises that its product is: "Built for You. We put homeowners at the heart of everything we do. Our products are designed to help you meet your goals, and our team of real humans is here to support you every step of the way." Hometap Homepage.

41.     Hometap further touts "Our homeowner-first approach," *id*., and states that it "invest[s] alongside homeowners," Hometap FAQs, https://www.hometap.com/faqs (last accessed May 12, 2026) (hereinafter "Hometap FAQs").

42.     In reality, Hometap's goal is to maximize profit for investors.

8

43.     Hometap also misleads homeowners by touting that they will not have to sell their homes to access their home equity, when in fact the contract requires just that. *See, e.g.*, Hometap Homepage ("Access your home equity without having to sell or stress."); Hometap FAQs (asserting that it "provides homeowners with a fast, simple, and straightforward way to access the equity in their home without taking on monthly payments or having to sell.").

44.     Indeed, Hometap advertises specifically to homeowners who cannot afford monthly payments and asserts that their product will help them receive cash without selling. *See* IPE Webinar:   Home   Equity   Investments:   An   Untapped   Asset   Class/Hometap, https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (noting that the product appeals to people who "just can't take on . . . more debt"; later explaining that increased homeowner cost-of-living and inability to take on additional traditional debt "translates into an opportunity for capital . . to earn a really strong relative risk adjusted return") (hereinafter "IPE Webinar").

45.     In reality, homeowners will not be able to refinance with a traditional loan at the end of the contract when the payoff has dramatically increased, because payments will be even more unaffordable. Instead, in direct contrast to Hometap's promises, the homeowner will be forced to sell—at considerable gain to Hometap and its investors.

46.     Hometap further indicates that the loans require "no monthly payments," Hometap Homepage, without making clear that Hometap requires the homeowner to pay all costs associated with the home, including the first mortgage, taxes, insurance, homeowners' association fees, and repair and maintenance costs. Ex. A § 6.

47.     And while Hometap repeatedly characterizes the product as "financing" to homeowners and investors, its contract claims that the payment is "not a loan or any other form of financing transaction," *Compare* Ex. A § 4.1(i) *with* Ex. B at Payoff Affidavit (stating that Hometap

was "grant[ing] financing" to Plaintiffs); Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

48. Prior to entering a Hometap contract, Hometap does not determine whether or not a homeowner can repay the Hometap product based on documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though failure to make these payments triggers the homeowner's repayment obligation.

49. Hometap's only evaluation prior to entering a Hometap contract pertains to a homeowner's ability to repay the Hometap contract through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

50. If a homeowner is unable to pay the required percentage of their home's value in cash to Hometap upon expiration of the ten-year term, then Hometap is entitled to "take joint ownership of the Property . . . and [thereafter] solicit[] a Transfer of the entire Property, including [the homeowner's] interest, to one or more Third-Party Buyers . . . ." Ex. A at § 3.1(b).

51. Hometap does this after years of requiring and relying on homeowners to invest in their own homes and ensure that the value of the home increases, ensuring that Hometap makes a profit while homeowners end up without their home and stripped of their wealth.

52. Hometap is aware of the serious harms that its product can cause, including forcing people to sell their homes or sink even further into debt.

53. Hometap's product further exploits homeowners through a number of unlawful provisions designed to limit the ability of homeowners to vindicate their rights in court, including:

a. The contract includes a mandatory arbitration clause. Ex. A at 23-25 § 8.13. Yet federal law prohibits arbitration clauses in residential mortgages, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e)(1).

b. The contract also seeks to strip Plaintiffs of their right to their remedies, including actual, statutory, punitive, and consequential damages. Ex. A at 21 § 8.1. No matter how much harm the company causes Plaintiffs or how many laws it violates, the contract provides that "IN NO EVENT WILL [Hometap's] AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT." *Id*.

c. The contract also seeks to immunize Hometap by allowing asserting that it is not responsible for the acts of its employees, contractors, agents, or others, except in limited circumstances. Ex. A at 22 § 8.8.

d. The contract's indemnification clause also purports to put Plaintiffs on the hook for Hometap's legal expenses for a wide range of claims, independent of the outcome of the litigation. Ex. A at 21 § 8.1.

54. These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights—including seeking to protect themselves from Hometap's predatory and unlawful attempts to take their homes and strip them of their home equity.

**C.    Hometap's Product Is a Mortgage Loan.**

55. Hometap falsely claims that it is entirely exempt from any federal and state lending laws and licensure requirements because (it claims) its product is not a mortgage loan.

56. Rather than providing appropriate disclosures to homeowners, including the true cost of the loan and the fact that Hometap has structure the transaction to ensure that it will be paid back at a profit, Hometap disguises the finance charge in its contract as a percentage return on investment in the home's equity in scenarios where the home both appreciates or depreciates.

57. But no matter how Hometap labels its product, it is still a mortgage loan, because Hometap provides homeowners with an advance of money, receives security through a mortgage

11

on their home, and defers repayment until the end of the contract, to occur within 10 years. In other words, homeowners have the obligation to repay Hometap, by the very terms of the product. Those features create a mortgage loan.

58.     Hometap ensures that, in practice, it will obtain repayment of its initial advance payment (plus a substantial finance charge) because all of the conditions for the conclusion of the contract require Plaintiffs to pay Hometap.

59.     In this case, Hometap paid Plaintiffs roughly 13% of the value of their home, and Hometap will receive up to 21.523% of the home's value (capped at 20% annual compound interest). *See* Ex. A at Schedule A.

60.     Thus, even without any home appreciation, Hometap is guaranteed a profit.

61.     Upon information and belief, Hometap will not issue one of its products unless it anticipates significant appreciation of the home. As a result, not only does the percentage of the home's value that Hometap will be paid increase, but the real dollar figures (the denominator by which the payout is calculated) also increases.

62.     In reality, Hometap anticipates that its products will reach the 20% APR cap almost all of the time. As a result, the product functions exactly like a traditional loan: the homeowner takes out a debt and then repays it, with 20% interest.

63.     While Hometap shares in the home's appreciation, if the home loses value, the company does not actually share in a homeowner's losses. The large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Hometap requires at the outset.

64.     Hometap's contract contains a number of features to further ensure that nothing will decrease the value of the home or jeopardize its future payment:

a.   Hometap requires homeowners to pay for all the taxes, insurance, and repairs on the home. Ex. A §§ 6.1(j), 6.2(e). Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap cure payments," which themselves accrue interest and have to be paid back. Ex. A § 7.2(b).

b.   Hometap limits the homeowner's ability to rent out the home or leave the property. *See* Ex. A § 6.1(b); *see also* IPE Webinar at 30:02 (explaining that investors will see profit because the homeowner will pay for upkeep of the property and ensure that its value increases, unlike a renter).

c.   Hometap caps the amount of any additional home secured debt that the homeowner can take on. Ex. A § 6.1(i).

d.   Hometap also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Hometap determines that the sale price is too low, Hometap can "in its sole discretion" calculate the value of the "Hometap Share" based on appraisal instead of the sale price. Ex. A § 2.1(b). Hometap can also effectively delay the sale by requiring sworn documentation from both the owner and buyer.

e.   The contract's 10-year maturity date ensures that it will not take a loss: Hometap CEO Jeffrey Glass has explained that there "only three time periods in American history where over a 10-year period the average home in America has had any level of realized decline" and that even then, the amount of decline has been minimal. IPE Webinar at 23:02.

f.   Hometap's (but not the homeowner's) option to extend the contract up to an additional 10 years also allows it to ensure that it will be paid back, with a profit. *See* Ex. A § 1.5.

65.     Hometap's statements to investors confirm it will be paid back at a profit. For instance:

a.   Hometap states that it has a "Proven track record" including "8+ years delivering strong, risk-adjusted returns," and "in both rising and declining home value environments." Hometap Investment Homepage, https://invest.hometap.com/ (last accessed May 18, 2026); *see also id.* (touting that "investors reap the benefits of U.S. home price appreciation without the complexities that historically come with large-scale residential real estate investing," and further explaining that a "combination of data science, technology, thorough underwriting creates high quality assets"—that is, a high

13

rate of return); IPE Webinar at 1:16 (explaining that Hometap has a "very big focus on technology and data science . . . for ensuring that we're creating a really strong portfolio for capital").

b. Hometap explains that it "structure[s] these [products] in a way that we're able to create meaningful downside protection for capital" and that it recognizes that "we have to deliver appropriate risk-adjusted returns for investors who care about downside protection and Sharpe ratios." IPE Webinar at 12:40.

c. Hometap further explains that despite the ten-year contractual period, Hometap knows that it will "always see a percentage of the portfolio turn each year and that provides the cash flow back to investors" because of refinances and sales. IPE Webinar at 37:18.

66. In addition, while the Hometap product *does* have the characteristics of a mortgage loan, its product does *not* have the characteristics of an option, including:

a. Unlike with a typical option contract, the contract terms demonstrate that Hometap does not intend to own the real property on exercise of its so-called "option." Instead, the transaction is structured to so that that Hometap is paid back financially, primarily either through forced or voluntary sale.

b. As described above, the product shifts all risk and costs onto consumers and is designed to ensure that Hometap will always benefit from exercising the option, unlike a true option contract.

c. The homeowner has a contractual right to "repurchase" Hometap's purported "option" to acquire a percentage interest in the home, which is not a feature of a typical option contract and reflects Hometap's true intention that consumers pay back Hometap at a profit. Ex. A § 2.4.

d. A standard option creates a contractual right only, not a property right. Here, Hometap's mortgage on the consumer's home and various contractual terms creating obligations on the homeowner throughout the life of the contract gives it not just a "contractual right" to purchase home equity in the future, but an immediate interest in the property in the present.

e. A typical option to purchase real estate involves both consideration for the option agreement, and consideration representing the purchase price if the option is exercised. Here, Hometap has structured its product so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Hometap pays the "purchase price" for the consumer's home equity up front, and the "exercise payment" at the end of the ten-year term is, at most, a nominal 1% of the cash amount loaned to the consumer. Ex. A § 3.1(e).

14

f. Hometap's statements to consumers about how to "settle" the contract demonstrate that it only contemplates being paid back and does not contemplate any scenario in which it will not exercise the option.

67. Hometap's documents also confirm that the product is a mortgage loan:

a. Hometap has obtained and recorded a mortgage on Plaintiffs' home to secure its loan. Ex. A at Mortgage and Security Agreement.

b. Hometap's documents refer to the product as a "loan." Ex. B at Borrower(s) Closing Statement (listing the "Loan Amount" as $103,575.00); Ex. B at Limited Power of Attorney.

c. Several of Hometap's documents for the transaction refer to Hometap as a "lender" and Plaintiffs as "borrowers." *See* Ex. B at Borrower(s) Closing Statement (listing Hometap Equity Partners, LLC as the "Lender" and Keicha Greenidge and Ryan P. Billey as "Borrower(s)," and setting forth the "Balance Due TO Borrower" of $98,193.35).

d. Hometap also refers to the product as "financing." *See* Ex. B at Payoff Affidavit (stating that Hometap was "grant[ing] financing" to Plaintiffs); Hometap Homepage (referencing "a fresh take on financing"); Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

68. The product contains also various costs that are identical to those incurred with a loan.

69. In sum, Hometap has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus a profit—at a benefit to investors and a huge loss to homeowners.

70. As Hometap's own documents and statements recognize, its product is a mortgage loan.

**D. Hometap's Predatory Business Practices Contribute to its Rapid Expansion**

71. Hometap is a rapidly growing company, and it now boasts that it has over 14,000 customers across the U.S. Hometap, Home Equity Investments: The Tipping Point for Alternative

15

Financing at 16 (back cover) (2025), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

72.    Getting homeowners to sign these mortgage loans is just the first step in Hometap's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to investors.

73.    In late 2025, Hometap entered its fifth substantial securitization, backed by $300 million in Hometap contracts, "reinforcing both its position as a leader in the asset class and its ability to deliver consistent access to capital for investors." Hometap Closes $300M Securitization of Hometap-originated Home Equity Investments, Citybiz (Sept. 8, 2025), https://www.citybiz.co/article/741421/hometap-closes-300m-securitization-of-hometap-originated-home-equity-investments/.

74.    As of that date, Hometap's contracts equate to over $2 billion and impact more than 20,000 homeowners. *Id.*

**E.    Federal and State Laws Protect Homeowners like Plaintiffs from Hometap's Loan.**

75.    Congress and the New Jersey legislature have both passed laws to protect homeowners like Plaintiffs from complex and confusing financial products that can cause people to lose their homes.

76.    While the federal Truth in Lending Act, 15 U.S.C. §1602 *et seq*. ("TILA"), protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

77.    For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. *Id*. § 1639c(a)(1).

78.    Companies originating mortgages must also be licensed under applicable federal and state laws. *Id.* § 1639b(b)(1)(A).

79.    Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* § 1639c(e)(1).

80.    New Jersey requires disclosures and protections for mortgages generally, *see generally* N.J.S.A. § 17:11C-75, as well as other protections for consumer contracts, *see*, *e.g.*, N.J.S.A. § 56:12-1 *et seq*.

81.    New Jersey also requires that only licensed mortgage lenders can offer these products. *See* N.J.S.A. § 17:11C-51 *et seq*.

**F.    Plaintiffs' Experience Is Typical**

82.    In 2018, Plaintiffs Keicha Greenidge and Ryan Billey purchased a home for themselves and their two children at 6 Cherise Court, Jackson Township, New Jersey.

83.    This was the first time Plaintiffs had ever owned their own home, and they valued the financial security that homeownership would provide for their family.

84.    A few years later, Ms. Greenidge learned of Hometap's product from her neighbor.

85.    When Ms. Greenidge contacted Hometap to inquire about its product, Hometap assigned her an agent who assisted through the entire process.

86.    Hometap's agent directed Ms. Greenidge to its website to review additional information and apply for the product, and he walked her through the application process.

17

87.     Hometap advised Ms. Greenidge that Plaintiffs were not required to have good credit, and that it would provide the funds simply based on the equity in her home.

88.     Hometap's agent told Plaintiffs that this was a great new product, that it was beneficial because they did not have to make a monthly payment on top of their existing mortgage, that they had ten years to pay it back, and when the ten years were up, they could simply refinance—either with a different lender or come back to Hometap to get more money again.

89.     Hometap's agent showed Ms. Greenidge a chart that demonstrated that her house was going to increase in equity over the ten years.

90.     While Plaintiffs had been expecting to receive around $20,000, Hometap suggested that they take out over $100,000 from their home equity.

91.     Although Ms. Greenidge requested a complete copy of the closing documents prior to closing, Hometap only provided Plaintiffs with a sample that contained none of the financial specifics of the Plaintiffs' product. Hometap advised Plaintiffs that they provided this sample contract with blanks to all of the homeowners they worked with.

92.     Once Hometap said Plaintiffs were approved, it sent them documents to sign. These included a 33-page Hometap contract entitled "Option Purchase Agreement," a 14-page mortgage contract, and dozens of other documents. Exs. A, B.

93.     Plaintiffs never met in person with anyone from Hometap. When they signed the contract on February 14, 2023, only an agent from the title company—not Hometap—was present.

94.     Hometap required Plaintiffs to grant it a mortgage on their home, which secured their obligations under the contract on penalty of foreclosure (the "Mortgage"). Ex. A § 1.2(a)(iii), Ex. A at Mortgage and Security Instrument.

95.     Plaintiffs did not have any opportunity to negotiate the terms of the contract.

18

96.     Under Hometap's contract, the company claimed to provide her a "loan amount" of $103,575. A copy of the Borrower Closing Statement is attached here as Exhibit B.

97.     This loan amount was equivalent to 12.91% of the appraised value of the home. *See* Ex. A at Schedule A: Investment Term Sheet.

98.     Plaintiffs only received $98,193.35 of the loan amount due to the following deductions:

    a.  An "origination charge" paid to Hometap of $3,107.25;

    b.  An appraisal fee paid to Hometap of $299;

    c.  Title fees to ClearEdge Title, Inc. of $895;

    d.  Mortgage recording fees of $210; and

    e.  $870.40 to a creditor that Hometap required Plaintiffs to pay with the proceeds.

99.     These fees exceed the amount of the actual cost for the services provided.

100.    For instance, the actual recording fee for Plaintiffs' mortgage was $160, as evidenced by the recorded copy of Plaintiffs' mortgage, while Plaintiffs were charged $210.

101.    While some documents classify the product as a loan, *see* Ex. B, the contract characterizes the advance payment not as a loan but as an "investment," *see* Ex. A.

102.    At the end of the contract, Plaintiffs would be forced to pay Hometap 17.936% of their home's value at that time if the property value went down, or 21.523% of their home's value if the home's value increased. Ex. A at Schedule A.

103.    The contract purports to subject this amount to a 20% annual percentage return (APR) cap. *Id.*

104.    Pursuant to the contract's terms, the contract ends at the first of the following events:

19

a.  Plaintiffs sell their home in a sale on terms permitted by Hometap;

b.  Plaintiffs default on property taxes, insurance, or homeowner's association dues on the property, or otherwise default on the contract terms;

c.  The property is destroyed or condemned;

d.  Plaintiffs otherwise pay off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

e.  Plaintiffs pass away; or

f.  Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

105.    As of June 30, 2025, just over two years into the contract, Hometap estimated that it would receive $159,155 if Plaintiffs attempted to settle the contract that day. This amount was limited by the Hometap Cap of 20%.

106.    By April 20, 2026, this amount had grown, and Hometap estimated that Plaintiffs would have to pay it $181,336.

107.    Additionally, Plaintiffs are required to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home. Ex. A § 2.4(g), 2.6(d).

108.    This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

109.    Plaintiffs are also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract.

110.    Plaintiffs cannot repay that amount of money without either selling their home or sinking deeper into debt that they cannot afford.

111.    The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Plaintiffs must either buy out Hometap for hundreds of thousands of dollars that they don't have, or the company will force the sale of their home. Ex. A §§ 2.7, 3.1.

112.    Plaintiffs did not understand that Hometap could force them to sell their home in 10 years. If they had understood the consequences, they never would have signed the contract.

113.    Being forced out of their home would be a personal and financial disaster for Plaintiffs, who would be unlikely to be able to pay sales costs and fees and then qualify to purchase a new home after Hometap drained a huge portion of the equity from their home.

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed classes defined as follows:

> **TILA Nationwide Class:** All persons who have entered into an Option Purchase Agreement with Hometap within the time period commencing three (3) years prior to the filing of this action and extending upon through the date of class certification.

> **New Jersey Class:** All persons who have entered into an Option Purchase Agreement with Hometap secured by a property located in New Jersey, with any applicable statute of limitations.

115.    Plaintiffs reserves the right to amend the definitions of the classes above based on discovery or legal developments.

116.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Upon information and belief based upon publicly disclosed and available materials, Hometap has entered into hundreds if not thousands of Option Purchase Agreements in the State of New Jersey and Nationwide.

117.    **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class

and predominate over the questions affecting only individual members. The common legal and factual questions include, among others:

    a.   Whether Hometap's Option Purchase Agreements are mortgage loans;

    b.   Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

    c.   Whether Hometap's Option Purchase Agreements violate federal and state consumer protection laws such as TILA, RMLA, CFA and TCCWNA;

    d.   Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to rescission of their agreements, statutory damages, actual damages, and punitive damages;

    e.   Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

    f.   Whether Hometap acted willfully, intentionally and/or recklessly in violating federal and state consumer lending laws.

118.    **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiffs' claims are typical of the claims of each class member. Plaintiffs entered into substantially similar form contracts with Hometap as each class member, and they have the same claims for statutory, actual and punitive damages that they seek for absent class members.

119.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the Class. Their interests are aligned with, and are not antagonistic to, the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously. *See McIntyre v. RealPage, Inc*., 2023 WL 2643201, at *3 n.5 (E.D. Pa. Mar. 23, 2023) (noting Francis Mailman Soumilas' "particular skill and efficiency" in prosecuting consumer class actions, as well as "counsel's overwhelming experience in consumer litigation and class actions"); *Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding firm "competent, experienced and well-qualified to prosecute class actions" and noting that class counsel "have done an excellent job in representing the class

22

in the instant litigation."); *Martinez v. Avantus, LLC,* 343 F.R.D. 254 2023 WL 112807, *9 (D. Conn. Jan. 5, 2023) (firm "has substantial experience in class action litigation ….[and] demonstrated proficiency at all stages of suit"); *Ramirez v. Trans Union, LLC*, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022) ("Courts have consistently recognized Francis Mailman Soumilas 'for... the high caliber of its work for the classes it represents.'"); *Der Hacopian v. SentryLink*, C.A. 18-3001 (D. Md., Nov. 23, 2020) (firm "many, many times in the past has been found to be not just qualified or competent, but extremely well-qualified and competent to represent consumer classes in many, many other jurisdictions, not only this particular jurisdiction"); *Flores v. Express Services, Inc.*, C.A. No.14-3298, 2017 WL 1177098, at *3 (E.D. Pa. March 30, 2017) (firm "has extensive experience in consumer class action litigation); *White v. Equifax Info. Solutions*, No. 05-01070, 2014 WL 1716154, at *13, 19, 22 (C.D. Cal. May 1, 2014), *aff'd sub nom. Radcliffe v. Equifax Info. Sol'ns., Inc.*, 818 F.3d 537, 548 (9th Cir. 2016) (appointing firm and its team as interim class counsel over objections from a competing national law firm (Boies Schiller) because firm's team's "credentials and experience [we]re significantly stronger in class action..."); *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 307 (N.D. Cal. 2015) (FMS "have represented consumer classes in many cases in many districts . . . [and] have shown their proficiency in this case[.]"); *Kelly v. Business Information Group*, C.A. 15-6668, 2019 WL 414915 (E.D. Pa. 2019) (firm "qualified and experienced attorneys" . . . Francis & Mailman, P.C., of Philadelphia . . . who have substantial experience in class action . . . and who are qualified to conduct the litigation."). Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

120.    **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and  a class action  is  superior  to  other  available  methods  for  fair  and  efficient

23

adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

**CAUSES OF ACTION**

**<ins>COUNT 1</ins>**
**Truth-in Lending Act, 15 U.S.C. §1602 *et seq*.**
**(Class Claim – TILA Nationwide Class)**

121.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

122.    The contracts at issue in this action from Hometap are an extension of consumer credit that is subject to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. and Regulation Z, 12 C.F.R. Part 1026 (collectively, TILA).

123.    The contracts at issue are "residential mortgage loans" as defined by 15 U.S.C. § 1602(dd)(5).

124.    The contracts are for the extension of credit and require the payment of a finance charge, as those terms are defined in 15 U.S.C. §§ 1602(f) and 1605 and 12 C.F.R. § 1026.4;

24

specifically, the difference between the Investment Amount and the Hometap Share includes a finance charge.

125. The credit was offered to a consumer for personal, family, or household purposes.

126. The contracts are secured by Plaintiffs' dwellings.

127. Hometap is named as the payee on the face of the contract and regularly makes this type of contract pursuant to the requirements of TILA, rendering it a creditor subject to TILA.

128. Hometap violated TILA including but not limited to by:

   a. entering into the contracts with Plaintiffs while being unlicensed to originate mortgage loans in New Jersey, 15 U.S.C. §1639b(b)(1)(A);

   b. failing to make a reasonable and good faith determination that Plaintiffs had the ability to repay the loans, 15 U.S.C. § 1639c(a);

   c. failing to provide Plaintiffs with any of the disclosures required by TILA for residential mortgage loans, including those required by 15 U.S.C. §§ 1638(a), 1639(a); 12 C.F.R. §§ 1026.19, .23, .31, .37, and .38;

   d. including a mandatory arbitration clause in the contract, 15 U.S.C. § 1639c(e); and

   e. in the alternative, failing to comply with TILA's reverse mortgage protections, including failing to provide the required disclosures, despite that the loan (alternatively) is a reverse mortgage as defined by statute, 15 U.S.C. §§ 1602(cc), 1648, 12 C.F.R. § 1026.33.

129. Plaintiffs hereby rescind and request that the Court enforce the rescission of their transaction with Hometap, pursuant to 15 U.S.C. § 1635.

130. Plaintiffs suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

131. As a result of the violations of TILA, pursuant to 15 U.S.C. §§ 1635(i) and 1640, Plaintiffs, on behalf of themselves and the Nationwide TILA Class, seek: a declaration that

Plaintiffs and the Nationwide TILA Class have the right to rescind their loans, pursuant to 28 U.S.C. § 2201; rescission of the transactions, including a declaration that Plaintiffs and the Class are not liable for any finance charges or other charges imposed by Defendant; termination of any security interest in Plaintiffs' property created under the transaction; return of any money or property given by the Plaintiffs to anyone, including the Defendants, in connection with this transaction; actual damages; an amount equal to the sum of all finance charges and fees paid; an award of reasonable attorney's fees and costs; and all other appropriate relief to the class as permitted by statute or law.

## COUNT 2
### New Jersey Residential Mortgage Lending Act., N.J.S.A. § 17:11C-51 to -89
### (Class Claim – New Jersey Class)

132. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

133. Hometap makes "residential mortgage loans" as defined by the New Jersey Residential Mortgage Lending Act ("RMLA"). N.J.S.A. § 17:11C-53.

134. Hometap is a "residential mortgage lender" and/or "residential mortgage loan originator" as defined by the RMLA. *Id.*

135. Plaintiffs' loan is a "secondary mortgage loan" as defined by the RMLA. *Id.*

136. Hometap was not authorized or licensed to make a loan, impose a mortgage, or charge fees, finance charges, or interest to the Plaintiffs.

137. Hometap violated the RMLA by conduct including but not limited to:

   a. Making residential mortgage loans without qualifying for, obtaining, or maintaining a license to make mortgage loans in New Jersey, N.J.S.A. § 17:11C-54 to -70, -83;

b. Generating mortgage loan applications, advertisements, and solicitations that fail to provide a unique identifier assigned through the Nationwide Mortgage Licensing System and Registry, N.J.S.A. § 17:11C-72;

c. Failing to provide the required property insurance notice required by the RMLA, N.J.S.A. § 17:11C-73(d);

d. Assessing fees purportedly for third-party services that were not bona fide or necessary to actually reimburse third parties, in violation of N.J.S.A. § 17:11C-74;

e. Making or causing to be made false, misleading, or deceptive statements or representations, including those set forth throughout this complaint and specifically in paragraph 159 below, N.J.S.A. § 17:11C-75(d);

f. Engaging in unfair or deceptive practices; or employing a scheme, device or artifice to defraud or mislead, including actions to misrepresent, circumvent, or conceal the nature of the transaction, including by those set forth throughout this complaint and specifically in paragraph 159 below, N.J.S.A. § 17:11C-75(e);

g. Failing to make disclosures required under federal and state law in connection with the transaction, N.J.S.A. § 17:11C-75(h);

a. Requiring Plaintiffs to pay fees despite it not being properly licensed, N.J.S.A. § 17:11C-75(i);

b. Charging or exacting a fee not permitted by the applicable statute, including but not limited to the Hometap Share, N.J.S.A. § 17:11C-75(*l*);

c. Failing to provide the required terms and disclosures for secondary mortgage loans, *see* N.J.S.A. § 17:11C-78;

d. Including prohibited terms for secondary mortgage loans, including purporting to relieve Hometap from available liability, claims, or legal remedies; to provide Hometap with a power of attorney to sell the home, that is, effectively, to confess judgment; and purporting to allow Hometap to accelerate and call due the transaction if it deems itself insecure, N.J.S.A. § 17:11C-79; and

e. Contracting for items of value that are not otherwise authorized by law, including but not limited to the Hometap Share and "discount points" as defined in excess of the amount permitted by statute, N.J.S.A. § 17:11C-80.

138. Hometap knowingly and willfully violated the RMLA.

27

139.    Plaintiffs suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

140.    Plaintiffs, on behalf of themselves and the New Jersey Class, seek an order of this court requiring Hometap to return and/or forfeit all fees, costs, and charges in excess of the "Net Investment Amount;" and requiring Hometap to forfeit to the borrower three times the amount of all such fees, costs, and charges collected. N.J.S.A. § 17:11C-81.

141.    Hometap's violations of the RMLA constitute violations of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq*. and the New Jersey Consumer Contract Warranty and Notice Act, N.J.S.A. § 56:12-15, and Plaintiffs seek all available relief under these statutes for Hometap's violations of the RMLA.

## COUNT 3
### New Jersey Consumer Contracts, N.J.S.A. §§ 56:12-1 *et seq.*
### (Class Claim – New Jersey Class)

142.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

143.    The contracts at issue are "consumer contracts" as defined in N.J.S.A. § 56:12-1.

144.    The contracts are not written in a simple, clear, understandable and easily readable way, and thus violate New Jersey law. N.J.S.A. § 56:12-1, -10.

145.    The contracts cause borrowers substantial confusion about the rights, obligations, or remedies of the contract.

146.    The contracts are designed to create an unfair result as described herein.

147.    Namely, the contracts are likely to cause financial detriment to consumers.

148.    Plaintiffs suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

149.    Plaintiffs seek actual damages, punitive damages, reasonable attorney's fees and costs, that the court reform or limit the application of the contracts to avoid the unfair result, and that the court enjoin Hometap from its unlawful conduct. N.J.S.A. § 56:12-3, -4, -4.1, -12.

150.    Hometap's violations of these provisions constitute violations of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.* and the New Jersey Consumer Contract Warranty and Notice Act, N.J.S.A. § 56:12-15, and Plaintiffs also seek all available relief under these statutes for Hometap's violations.

## COUNT 4
### New Jersey Statues on Points & Interest, N.J.S.A. § 46:10B-1 *et seq.*
### (Class Claim – New Jersey Class)

151.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

152.    Defendants charged money or other consideration for the making of a mortgage loan other than interest, that was not a reasonable expense or charge, in violation of § 46:10B-10.

153.    Defendants improperly failed to include discount points in their disclosure of their interest rate cap in violation of § 46:10B-11.1.

154.    Plaintiffs suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

29

155. Plaintiffs, on behalf of themselves and the New Jersey Class, seek return of the points and all interest plus a penalty of $1,000 and costs, and all other appropriate relief. § 46:10B-11.

156. Hometap's violations of the provisions set forth herein constitute violations of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq*. and the New Jersey Consumer Contract Warranty and Notice Act, N.J.S.A. § 56:12-15, and Plaintiffs seek all available relief under these statutes for Hometap's violations.

## COUNT 5
### New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq*.
### (Class Claim – New Jersey Class)

157. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

158. The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq*., ("CFA") prohibits unfair, unconscionable, abusive, and deceptive conduct, and provides remedies for violations of other statutes. N.J.S.A. § 56:8-2.

159. Hometap engaged in unfair, unconscionable, abusive, and/or deceptive practices, including but not limited to, as described with more particularity above: failing to adequately or properly disclose the true cost of the transaction; assessing improper and excessive fees, finance charges, and costs; marketing the loan as being able to be paid off in multiple forms, when Hometap knows that the loan will most likely have to be paid through sale of the home; falsely claiming that the product is not a loan, when it is a loan; falsely claiming that the homeowner has no monthly obligations when the contract imposes monthly obligations on the homeowner; claiming that the company prioritizes the "homeowner-first" when in fact it prioritizes investment gains; representing or implying by its conduct that it was authorized to engage in their transaction;

30

falsely claiming that it provides freedom to the homeowner while obscuring the fact that it restricts the homeowner's freedom to engage with their home as they wish; failing to underwrite the loan for ability to repay it without loss of the home; purporting to restrict the homeowner's rights; drafting the contract in an intentionally confusing manner that makes it nearly impossible to understand; and failing to comply with applicable statutes and regulations.

160. Hometap's violations of statutes as otherwise set forth herein also, separately constitute a violation of the CFA, including but not limited to:

    a. Violations of RMLA;

    b. Violations of TILA;

    c. Violations of New Jersey's statutes related to prepayments, interest, and points, N.J.S.A. §§ 46:10B-10 to -11.1;

    d. Violations of New Jersey's statutes related to consumer contracts, N.J.S.A. §§ 56:12-1 *et seq.*;

    e. Violations of the Senior Citizen Homeowner's Income Security Act, N.J.S.A. §§ 46:10B-16 to -21; and

    f. Violations of the New Jersey Homeownership Security Act of 2002, §46:10B-22 *et seq.*, including but not limited to attempting to avoid application of the act by mislabeling its product an "option" and "not a loan." N.J.S.A. § 46:10B-27(d)(2).

161. These violations caused Plaintiffs an ascertainable loss of money or property, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

162. Plaintiffs seek damages, treble damages, costs, attorney fees, voiding or reformation of the contract, and such other relief as is equitable and just.

## COUNT 6
**New Jersey Truth in Consumer Contract Warranty and Notice Act, N.J.S.A. § 56:12-15**
**(Class Claim – New Jersey Class)**

163. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

164. The defendants violated the New Jersey Truth in Consumer Contract Warranty and Notice Act, by offering and entering into consumer contracts that violate state and federal law, including TILA, HOSA, RMLA, consumer contract requirements, and interest and points limitations, including as described above. N.J.S.A. § 56:12-15.

165. In addition to the violations described above, Defendants violated the Senior Citizen Homeowner's Income Security Act, N.J.S.A. §§ 46:10B-16 to -21, because Hometap's product is a "reverse direct mortgage" as defined by N.J.R.S. § 46:10B-17, and, *inter alia*, Hometap made reverse mortgages to Plaintiffs and members of the Class who are under the age of sixty. N.J.R.S. § 46:10B-18.

166. Plaintiffs are aggrieved consumers under N.J.S.A. § 56:12-17, in that they acted or forbore from acting or suffered damages due to the improper terms provided in the contract or notice provided by Defendants.

167. Plaintiffs suffered an ascertainable loss of money or property due to the improper terms provided in the contract or notice provided by defendants, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

168. Plaintiffs seeks damages, civil penalties, costs, attorney fees, injunctive relief, termination or voiding of the contract, and such other relief as is equitable and just.

## COUNT V
### Declaratory Judgment, 28 U.S.C. § 2201
### (Class Claim – New Jersey Class)

169.    Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

170.    Plaintiffs seek declaratory relief for the purposes of determining questions of actual controversy between the Class members and Defendants.

171.    Defendants have acted in a uniform manner by a) inducing Plaintiffs and members of the class to enter into Option Purchase Agreements that violate federal and state laws as set forth above, and b) attempting to enforce and collect on those loan obligations, including through imposition of a mortgage and security instrument that encumbers title to the property, creates a secured debt, and places Plaintiffs and class members at risk of foreclosure or forced sale.

172.    As set forth more particularly above, Plaintiffs and the class were deprived of the disclosures and substantive limitations set forth in state and federal law for consumer protection generally, consumer lending, and mortgage lending specifically.

173.    As a result, Plaintiffs and the class are subjected to contracts that violate the law and are subject to ongoing harm absent a declaration regarding their rights and remedies.

174.    Plaintiffs seeks declarations to determine their rights and the rights of the Class, in particular, that the Court find that Defendants and Plaintiffs and the Class did not enter into any legal contract, either express or implied-in-fact, for Plaintiffs and the Class to pay the amounts imposed by the Defendants and declare all such contracts void and declare all attempts to enforce the contracts be contrary to law.

175.    Accordingly, Plaintiff and members of the Class respectfully ask the Court to issue a declaratory judgment that (a) Defendants' Option Purchase Agreements and as schedules thereto,

including the mortgage and security instrument, violate the law and are void and unenforceable; (b) that any attempts to enforce the Option Purchase Agreements, including the mortgage, violate the law; and (c) such other necessary and proper relief that may be appropriate following the determination of the declarations made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the Defendants as follows:

A.  An Order certifying the Classes above;

B.  An Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contracts;

C.  An Order awarding monetary damages, including but not limited to any statutory, actual, punitive, and treble damages, in an amount to be determined by the Court or jury;

D.  An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

E.  An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

F.  Such further relief as their Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demands trial by jury as to all issues in the above matter.

By: */s/ James A. Francis*
James A. Francis (NJ Bar #012601996)
**FRANCIS MAILMAN SOUMILAS, P.C.**

34

James A. Francis (#012601996)
John Soumilas (#020371999)
Lauren KW Brennan (#074202013)
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel: (215) 735-8600
Fax: (215) 940-8000
Email: jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Robert P. Cocco*
ROBERT P. COCCO, P.C.
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
bob.cocco@phillyconsumerlaw.com
*Attorneys for Plaintiffs and the Class*


*Pro hac vice forthcoming*

35

# EXHIBIT A

Investment No.: NJ620393

## THIS IS NOT A LOAN.

## THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.

## OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Investment Partners III SPV, LLC, a Delaware limited liability company with its principal offices at 800 Boylston Street, 16th Floor, Boston, MA 02199 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS**, Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS**, the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS**, Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Mortgage and Security Agreement, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS**, as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentage, Hometap Share, and Investment Fee;

**WHEREAS**, as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS**, the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS**, the Investment Term Sheet is attached and made a part of this Agreement as Schedule A; and

WHEREAS, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1    Option and Hometap Percentage.   You agree to sell to Hometap an exclusive and irrevocable option (the **"Option"**) to acquire an undivided percentage interest (the **"Hometap Percentage"**) of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the **"Property"**), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto.

Section 1.2    Agreement Execution and Delivery.   In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a)    Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an **"Investment Document"**, and together the **"Investment Documents"**):

        (i)    this Agreement;

        (ii)    the Investment Term Sheet;

        (iii)    a notarized Mortgage and Security Agreement, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the **"Security Instrument"**);

        (iv)    a Notice of Right to Cancel, substantially in the form as set forth in Exhibit C, which is attached and made a part of this Agreement; and

        (v)    a signed and completed Insurance Request and Authorization Form granting authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property.

(b)    Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the **"Signing Instructions"**); and

(c)    Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3    Right to Cancel.

(a)    You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b)    If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c)    If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the "**Effective Date**").

(d)    For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4    Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a)    Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable on or following the Effective Date.

(b)    Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instrument, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Signing Instructions with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instrument and any related documents.

Section 1.5    Option Period. The term of the Option (the "**Option Period**") shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the "**Expiration Date**"); *provided, however*, that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the "**Extension Period**", and the Option Period and any Extension Period collectively being the "**Effective Period**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period. Notwithstanding any other term of this Agreement, the Effective Period shall terminate no later than 21 years after the death of the last surviving Owner. If the Owner is a trust, the Effective Period shall terminate no later than 21 years after the death of the last surviving trust beneficiary who has an immediate right to occupancy and whose right to occupancy extends until his/her death.

**SECTION 2**
**OPTION CONDITIONS**

Section 2.1    Determination of Ending Home Value. The **"Ending Home Value"** shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2    Calculation of the Hometap Share.  The **"Hometap Share"** represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount (**"Hometap Cap"**), as further described in the Investment Term Sheet.

Section 2.3    Appraisal Process.

(a)    Physical Appraisal.  For purposes of this Agreement, a **"Physical Appraisal"** shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i)    the appraiser will be selected by us or approved in advance by us;

(ii)    the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a **"Person"**) with an interest in the Property, such as a potential third-party buyer;

(iii)    the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv)    the Owner shall be responsible for payment of Appraisal costs.

(b)    Second Physical Appraisal.  In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the **"Appraisal Process"**.

(c)    Alternative Appraisal.  Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an **"Alternative Appraisal"**) in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d)　Appraisal. For purposes of this Agreement, the singular or plural term **"Appraisal"** shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e)　Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f)　Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g)　Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4　Owner Repurchase.

(a)　Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an **"Owner Repurchase"**) from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b)　Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a **"Repurchase Notice"**). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the **"Repurchase Settlement"**).

(c)　Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being **"Confirmation of Title"**).

(d)　Transfer. In the event of a Transfer (as defined below in Section 2.5(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e)　Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f)　Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g)     Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security Instrument and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instrument. Owner will be responsible for all Transfer Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.5     Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a **"Hometap Option Exercise"**), as provided for below in Section 3.1, only upon any of the following events or occurrences during the Effective Period:

(a)     any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a **"Transfer"**), as provided below in Section 2.6; *provided, however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b)     on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c)     upon an Event of Default, as provided below in Section 7;

(d)     upon destruction of the Property as provided below in Section 6.1(d);

(e)     upon condemnation of the Property, as provided below in Section 6.1(h); or

(f)     upon the mutual agreement of Hometap and Owner.

Section 2.6     Event of Transfer.

(a)     Permitted Sale. For purposes of this Agreement, a **"Permitted Sale"** shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i)     the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an **"Arm's Length Transaction"**); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii)     the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a **"P&S"**) prepared and negotiated by legal counsel with experience in such matters; and

(iii)     you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and

rights to which the Property is subject (collectively, **"Liens and Encumbrances"**), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being **"Permitted Encumbrances"**), and (B) loans or other obligations, the payment or performance of which is secured by a lien on the Property (such items being **"Senior Liens"**), including any loans or other obligations owed to any creditor or third-party vendor.

(b)  Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i)  Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a **"Binding Offer Notice"**) of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a **"Third-Party Buyer"**). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii)  All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a **"Transfer Notice"**) no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii)  Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an **"Exercise Notice"**) of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available. Following receipt of such materials, Hometap shall use commercially reasonable efforts to

complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c)     Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d)     Transfer Closing.   Any Transfer shall be completed through a closing process (the "Transfer Closing") that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the "Transfer Closing Notice") to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i)     Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii)     Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Transfer Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii)     Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instrument.

(iv)     Transfer Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes ("Transfer Closing Costs") and all sales commissions ("Sales Commissions"). Transfer Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Transfer Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7     Event of Expiration Date.

(a)     In the event that the Option remains in effect and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an "Expiration Settlement"), each implemented by

delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b)     Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.4 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c)     If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

**SECTION 3**
**EXERCISE OF OPTION; OTHER TERMINATION OF OPTION**

Section 3.1     Exercise of Option. Only upon the occurrence of any of the events identified in Section 2.5 above, Hometap shall have the right to exercise the Option as described in this Section 3.1. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a)     Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise ("**Exercise Closing**"). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instrument upon completion of the Hometap Option Exercise.

(b)     Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Option Exercise by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c)     Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.4 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d)     Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e)     Disbursement of Exercise Closing Payment. In consideration for the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount ("**Exercise Payment**"). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall

be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f)     Recording of Documents.  Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g)     Transfer Following Hometap Option Exercise.

(i)     Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii)     Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii)     Initiation of Transfer by Hometap.  If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv)     Ending Home Value and Payment of the Hometap Share.  In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Transfer Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2     Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a)     upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(b)(1), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b)     we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c)     the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d)     the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(h); or

(e)    we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3    Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a)    the Option and our rights to exercise the Option will immediately terminate;

(b)    the Investment Amount will be retained by you in consideration for the Option;

(c)    subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d)    we will execute, acknowledge, deliver to you, and record and file with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated a release and/or reconveyance of the Security Instrument, and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

**SECTION 4**
**OWNER REPRESENTATIONS AND WARRANTIES**

Section 4.1    Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a)    Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b)    Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c)    Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d)    No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have

not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property; (b) default or notice of default with respect to any loan or other obligation secured by the Property; (c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e)    No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f)    Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g)    Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h)    New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i)    Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j)    Conflict; Enforceability. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Section 5.1    Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a)    Authority.    Hometap is a duly established and organized Delaware limited liability company, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b)    Enforceability.    Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

## SECTION 6
## COVENANTS

Section 6.1    Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a)    Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations.    You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instrument, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an **"Acknowledged Pre-Existing Lien"**), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b)    Owner Occupied; Right of Occupancy.    During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence (**"Owner Occupied"**) other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c)    Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal to the maximum amount permitted under applicable law. All such insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d)    Destruction or Loss of Property.

(i)    Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii)    Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, provided that the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, provided that, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e)    Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f)     <u>Renovation</u>.

(i)     Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of $25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii)    In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g)     <u>Option Fees</u>.  You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation:  (i) fees for processing your requests for subordination; (ii) fees for processing your requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instrument or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in <u>Section 7.2(a)</u>); (v) fees relating to any Event of Default (defined below in <u>Section 7.1</u>), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h)     <u>Condemnation</u>.  If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in <u>Section 6.1(d)(ii)</u>. If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in <u>Section 6.1(d)(ii)</u>. In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i)     <u>Allowed Loans and Transactions</u>.

(i)     <u>Minimum Owner Equity</u>.  Owner may not at any time increase, or permit the increase of, the total balance of loans or other property interests secured by liens on the Property

(including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) in the Property below the dollar amount equal to the "**Minimum Owner Equity**", which is twenty percent (20%) of the current appraised value of the Property (the "**Current Property Value**"). "**Owner Equity**" shall be defined as the amount calculated by subtracting from the Current Property Value: (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans (as defined below), (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property.

        (ii)      Approved Subsequent Loans.

        (1)      In order for Hometap to consider any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

        (2)      If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

        (3)      In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

        (4)      Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

        (5)      In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

        (iii)      Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative

amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) <u>Subsequent Loans used for Owner Repurchase</u>. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to <u>Section 2.4</u>. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) <u>Obligation to Provide Information to and Cooperate with Hometap</u>. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

(k) <u>Waiver of Right to Partition</u>. Owner agrees to waive and relinquish all rights you may now or later have to seek partition of the Property, whether in kind or by sale.

Section 6.2   <u>Hometap Rights and Covenants</u>.

(a) <u>Hometap Interest</u>. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) <u>Waiver of Right to Partition</u>. Hometap waives and relinquishes all rights it may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to <u>Section 7.2</u>, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) <u>Right to Disclose Certain Information</u>. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) <u>Agreement to Subordination</u>. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property;

*provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e)    <u>No Hometap Liability</u>. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

### SECTION 7
### EVENTS OF DEFAULT

Section 7.1    <u>Events of Default</u>. The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a)    you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b)    you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c)    you fail to timely provide us any notice required under this Agreement;

(d)    any representation or warranty set forth above in <u>Section 4.1</u>, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e)    (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f)    Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g)    the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h)      a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i)      you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j)      insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k)      any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l)      any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2      Remedies Following Event of Default.  Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default by delivering to you a written notice (a **"Default Notice"**) and may exercise any of the rights and remedies set forth below in this Section 7.2.

(a)      Hometap Option Exercise.  Upon delivery of a Default Notice, we will have the right in our sole discretion to initiate and complete a Hometap Option Exercise in compliance with Section 3.1. We may record the Default Notice in the county where the Property is located.

(b)      Hometap Cure.  To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an actual or impending Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments (**"Hometap Cure Payments"**). We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, property and other taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c)      Power of Foreclosure and Sale Under State Laws.  We will be entitled to exercise our rights under the Mortgage and Security Agreement in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d)      Failure to Maintain Adequate Insurance.  If you fail to maintain insurance in amounts required by Section 6.1(c), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be deemed exempt, on a dollar-for-dollar basis, from the Hometap Cap. If this occurs, we may complete a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 3.1. The proceeds of any Transfer pursuant to this Section 7.2(d), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(d)(ii).

(e)      Owner Repurchase After Event of Default.  At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.4 above; provided that the Repurchase Settlement must (i) occur (A) within twenty (20) days of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the Repurchase Settlement is not completed within the prescribed periods in this Section 7.2(e) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 3.1.

(f)      Specific Performance, Rescission and Injunctive Relief.  You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages, or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity, or otherwise, we will be entitled to seek specific performance of the covenants, agreements, and rights contained in each of the Investment Documents or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3      Repayment in Bankruptcy.  If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against you for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Effective Period.

Section 7.4      Calculation of Liquidated Damages.  To the extent that enforcement of the Security Instrument and any foreclosure and sale or power of sale granted under the Security Instrument require specification of an amount in default or liquidated bid amount or we elect to exercise the power of sale or otherwise foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of liquidated damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax, and insurance related obligations on the Property, including late fees, reinstatement fees, and other penalties.

Section 7.5      Remedies Concurrent and Not Exclusive.  The remedies set forth in Section 7.2 will be concurrent, cumulative, and not exclusive, to the extent not prohibited by law. Every right, power, and

remedy granted to us in the Investment Documents will be in addition to all those rights, powers, and remedies available to us at law, equity, or otherwise, and each such right, power, and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law, and the decision not to exercise of any such right, power, or remedy will not be deemed a waiver of the right to exercise any right, power, or remedy.

## SECTION 8
## MISCELLANEOUS

Section 8.1     Indemnification by Owner and Maximum Liability.  You agree to defend, indemnify, and hold us harmless from and against any claims, causes of action, proceedings, judgments, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys' fees), reasonable costs, reasonable expenses, settlements, and other obligations of every kind arising out of or relating to:  (a) a breach of any of your representations, warranties, covenants, or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents, or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this Section 8.1, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation.  You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2     Asset Administration.  From time to time during the Effective Period, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3     Covenants to Run with Land.  The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record the Security Instrument reflecting this fact in the public records.

Section 8.4     Relationship.  We are not a partner, joint venturer, trustee, lender, or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5     Ongoing Credit Checks.  By entering into this Agreement, you are providing written instructions, consent, and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Effective Period from one or more consumer reporting agencies, such as TransUnion, Experian, or Equifax.

Section 8.6     Multiple Owners.  If multiple Persons are Owners, then:  (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any notice required to be given by or to an Owner will be deemed adequately given if given

by or to any Owner using the Notice Address, as defined below in <u>Section 8.16</u>; and (e) we may treat any notice received from any one Owner as notice from all Owners.

Section 8.7    <u>Revocable Trusts</u>. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the Notice Address, as defined below in <u>Section 8.16</u>; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8    <u>Delegation of Duties</u>. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9    <u>Successors and Assignees; Owner's Estate</u>. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a)    <u>Assignment by Hometap</u>. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b)    <u>Assignment of Agreement by Owner</u>. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement; (iii) executes a recordable addendum to the Security Instrument in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us ("**Exempted Owner Assignment**"). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c)      Exempted Owner Property Transfer.  If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section 8.9(b) are met (an "**Exempted Owner Property Transfer**").  An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10    Survival.  The following provisions will survive any termination of this Agreement without limitation:  (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Transfer Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11    Injunction.  If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court.  Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12    Governing Law.  The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however,* to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13    DISPUTE RESOLUTION BY BINDING ARBITRATION.  PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a)      Agreement to Arbitrate.  This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement.**"  You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify.  Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf.  You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action.  Your rights will be determined by a neutral arbitrator, not a judge or jury.  The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b)      WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE

INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c)    PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d)    Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e)    Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f)    Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted

solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g)    Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h)    Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator will be strictly confidential for the benefit of all parties.

(i)    Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j)    Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14    Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15    Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be

invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16    Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instrument is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

**HOMETAP**:                                        **OWNER**:

Hometap Investment Partners III SPV, LLC         See signature page.
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department
Email: homeowners@hometap.com

Section 8.17    Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instrument, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18    No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19    Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20    Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21    Consent of Spouse/Domestic Partner. If you should marry or remarry or enter into a civil union or registered domestic partnership during the Effective Period, within thirty (30) days after the

marriage, civil union, or domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must notify Hometap and execute any reasonably necessary documents to acknowledge your spouse or domestic partner's interest in the Property, this Agreement, and the Security Instrument, which may include a Consent of Spouse/Domestic Partner and/or joinder to this Agreement.

Section 8.22    RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE.    OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23    NO ADVICE.  IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING:  (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24    Subordination of Homestead and Waivers.  If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Agreement and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Mortgage and Security Agreement or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Agreement and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Agreement and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Agreement, and all renewals, extensions and modifications of the Mortgage and Security Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS III SPV, LLC**

By: Hometap Equity Partners, LLC,
Its Manager

By: _____

Name: _____

Title: _____

Date: _____

Acknowledgment Certificate

~~Commonwealth of Massachusetts~~ New Jersey

County of ~~Suffolk~~ Ocean

On this ___14___ day of ___Feb___, 20_23_, before me, the undersigned notary public, personally appeared ___Keicha Greenidge Ryan Billey___, proved to me through satisfactory evidence of identification, which was ___DL___, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that they signed it voluntarily for its stated purpose, as an authorized signatory for Hometap Investment Partners III SPV, LLC, a limited liability company.

_____
Notary Public Signature

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

My commission expires ___11/16/25___

**IN WITNESS WHEREOF,** intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: _____

      Keicha Greenidge

Date: _____ 2/14/23 _____

By: _____

      Ryan Prince Albert Billey and also known as Ryan P. Billey

Date: _____ 2/14/23 _____

Notice Address:
6 Cherise Ct, Jackson Township, NJ 08527

Acknowledgment Certificate

State of New Jersey                )
                                   )ss
County of ___Ocean___,)
On __Feb 14__, 20_23_ before me, ___Robert Hall___, Notary Public in and for said county, personally appeared Keicha Greenidge who has satisfactorily identified him/her/themselves as the signer to the above referenced document.

___Robert Hall___

Print Notary Name

(Affix Notary Stamp Here)

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

___BK Hall___

Notary Public Signature

___2/14/23___

Date

My Commission Expires:___11/16/2025___

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

Acknowledgment Certificate

State of New Jersey                    )

                                       )ss

County of ___Ocean___ ,)

On _Feb. 14_, 20_23_ before me, ___Robert Hall___ , Notary Public in and for said

county, personally appeared  Ryan Prince Albert Billey and also known as Ryan P. Billey who has

satisfactorily identified him/her/themselves as the signer to the above referenced document.

___Robert Hall___

Print Notary Name

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

___R.H. Hall___

Notary Public Signature

(Affix Notary Stamp Here)

___2/14/23___

Date

My Commission Expires:___11/16/25___

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

## List of Schedules and Exhibits

Schedule A – Investment Term Sheet

Exhibit A – Property Description
Exhibit B – Mortgage and Security Agreement
Exhibit C – Notice of Right to Cancel

# EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of Jackson, in the County of Ocean, State of New Jersey:

Known and designated as Lot 4.05 Block 82.01 as shown on a certain Map entitled, "Final Plat/Major Subdivision of Autumn Breeze at Jackson, Lot 4.01 Block 82.01 Tax Map" filed in the Ocean County Clerk's Office on April 15, 2002 as Map No. L-3140.

Being further described as follows:

Beginning at a rebar with cap found on the Southwesterly sideline of Cherise Court (50' ROW), said point being the division line between Lots 4.05 and 4.04 on the aforementioned filed Map, and running, thence;

1) Along said sideline of Cherise Court, South 25 degrees 55 minutes 06 seconds East 209.05 feet to a point, thence;

2) Leaving said sideline of Cherise Court, South 64 degrees 04 minutes 54 seconds West 232.78 feet to a point, thence;

3) North 17 degrees 19 minutes 24 seconds West 211.43 feet to a rebar with cap found; thence

4) North 64 degrees 04 minutes 54 seconds East 201.18 feet to the point and place of Beginning.

Containing 45,361 S.F.

This description is drawn in accordance with a Survey performed by Lakeland Surveying, Inc. dated 09/07/2018

Parcel ID / APN: Block: 15801 Lot: 21

## Schedule A:  Hometap Investment Term Sheet

This document and the Option Purchase Agreement define key terms of the Option and Hometap's investment in the Property ("**Investment Terms**"). Capitalized terms are further defined in the Option Purchase Agreement.

Homeowner(s): Keicha Greenidge and  Ryan Prince Albert Billey and also known as Ryan P. Billey
Property Address: 6 Cherise Ct, Jackson Township, NJ 08527
Option ID: NJ620393
Effective Date: 02/21/2023

### Section I: Predetermined Investment Terms
Hometap and Owner agree to the Investment Terms defined below. These terms have the value assigned to them as shown below, and such values shall not change during the Option Period.

| Predetermined Investment Terms | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Amount | *Gross amount that Hometap will pay you to acquire an Option in the Property* | $103,575.00 |
| Net Investment Amount | *Net amount that you will receive after Investment Fees and Costs (see Section II below) have been deducted from the Investment Amount* | $98,193.35 |
| Beginning Home Value | *Property's value at the time of Investment Signing, determined by Appraisal* | $802,053.00 |
| Hometap Percentage (if Ending Home Value ≥ Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is equal to or greater than the Beginning Home Value; used to determine Option's value* | 21.523% |
| Hometap Percentage (if Ending Home Value < Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is less than the Beginning Home Value; used to determine Option's value* | 17.936% |
| Acknowledged Pre-Existing Liens | *Current sum of debt obligations secured by a lien on the Property*<br><br>*network capital, $491,680.49* | $491,680.49 |

### Section II: Investment Fees and Costs
Hometap and Owner agree to the Investment Fees and Costs defined below. The Investment Fees and Costs have the value assigned to them as shown below, which shall be deducted from the Investment Amount to determine the Net Investment Amount. The Net Investment Amount shall be paid to the Owner, as further provided in the Option Purchase Agreement.

| Investment Fees and Costs Deducted from Investment Amount | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Fee | *Investment fee charged by Hometap* | $3,107.25 |
| Third-Party Costs | *Costs incurred for third-party processing and services related to finalizing the Investment and signing the Investment Documents*<br><br>*Appraisal, $299.00*<br><br>*Title Charges, $895.00* | $1,194.00 |
| Government Taxes and Fees | *Taxes and fees assessed by government entities related to finalizing the Investment and signing the Investment Documents*<br><br>*Recording Fee, $210.00* | $210.00 |
| Payoffs | *Amounts paid at time of Signing to lien holders or creditors, on Owner's behalf, to pay down Owner's total amount of liens or debt*<br><br>*Network Capital Funding Corporation, $870.40* | $870.40 |
| Total Investment Fees and Costs | *Total of amounts listed in this table, to be deducted from the Investment Amount to determine the Net Investment Amount* | $5,381.65 |

**Section III: Investment Terms Valued at Time of Option Exercise or Repurchase**

Hometap and Owner agree to the Investment Terms defined below. The value of the Investment Terms in this Section III cannot be determined until the Owner repurchases or Hometap exercises the Option. Hometap and Owner agree that the value of the Investment Terms in this Section III shall be determined or calculated as stated herein and as further provided in the Option Purchase Agreement. Sample calculations of the Investment Terms in this Section III have been provided to Owner in the Investment Disclosures.

| Investment Terms Valued at Time of Option Exercise or Repurchase | |
|---|---|
| **Term** | **Definition** |
| Ending Home Value | *Property's value at the time of Option exercise or repurchase, determined by Appraisal or Permitted Sale* |

| Hometap Cap | *Maximum 20% annualized rate of return on the Investment Amount, prorated for a partial year, as applied to the Hometap Share* |
|---|---|
| Hometap Share | *Value of Hometap's Option, calculated by multiplying the Ending Home Value by the Hometap Percentage; the maximum value of the Hometap Share is the Hometap Cap* |

I acknowledge and agree that the Investment Terms defined in this Schedule A shall apply to the Option, as further described in the Option Purchase Agreement.

_____          2/14/23
Keicha Greenidge                                          Date

_____          2/14/23
Ryan Prince Albert Billey and also known as Ryan P. Billey     Date

# COMPLIANCE AGREEMENT

INVESTMENT NO.: NJ620393

DATE: 02/14/2023

HOMEOWNER(S): Keicha Greenidge
                     Ryan Prince Albert Billey and
                     also known as Ryan P. Billey

INVESTOR:  Hometap Investment Partners III SPV, LLC

PROPERTY ADDRESS: 6 Cherise Ct, Jackson Township, NJ 08527

The undersigned Homeowner(s) agree if requested by Investor, or someone acting on behalf of Investor, to fully cooperate and adjust for clerical errors found in/on any documentation prepared and executed in connection with the consummation of your investment if deemed necessary or desirable in the reasonable discretion of the Investor.

The Homeowner(s) agree(s) to comply with any such requests within thirty (30) days from date of such requests. The provisions of this agreement shall survive the execution of the Investment.

Dated effective this ___14___ day of ___February 2023___

_____
Keicha Greenidge

_____
Ryan Prince Albert Billey and also known as Ryan P. Billey

**EXHIBIT C**

**NOTICE OF RIGHT TO CANCEL**

HOMEOWNER(S): Keicha Greenidge                    DATE: 02/14/2023
                    Ryan Prince Albert Billey and also known
                    as Ryan P. Billey

ADDRESS: 6 Cherise Ct, Jackson Township, NJ 08527

INVESTMENT NO.: NJ620393

<u>YOUR RIGHT TO CANCEL</u>

You are entering into a transaction that will result in a security interest in your home.  You have a right to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

    (1)  The date of this transaction, which is **02/14/2023**; or
    (2)  The date you received your Investment Term Sheet; or
    (3)  The date you received this notice of your right to cancel.

If you cancel the transaction, the security interest is also cancelled.  Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the security interest in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property at your home or at the location of the property.  Money must be returned to the address below.  If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

---

**<u>HOW TO CANCEL</u>**

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Hometap Investment Partners III SPV, LLC
800 Boylston Street, 16th Floor
Boston, MA 02199
Fax: 1-617-663-6878 / email: homeowners@hometap.com

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  You may notify us of your intention to cancel by email at homeowners@hometap.com, but we may require you to confirm in writing.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by email, you must send the notice no later than 11:59 PM ET of **02/17/2023**.  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

| | |
|---|---|
| _____ | _____ |
| Keicha Greenidge | Ryan Prince Albert Billey and also known as Ryan P. Billey |

---

**By signing this notice, I acknowledge that I have RECEIVED this Notice of Right to Cancel:**

| | |
|---|---|
| _____ | _____ |
| Keicha Greenidge | Ryan Prince Albert Billey and also known as Ryan P. Billey |

*Hometap – Notice of Right to Cancel (v. 6.0)*                    *Page 1*

## SIGNATURE / NAME AFFIDAVIT

INVESTMENT NO.: NJ620393

HOMEOWNER(S): Keicha Greenidge and  Ryan Prince Albert Billey and also known as Ryan P. Billey

PROPERTY ADDRESS: 6 Cherise Ct, Jackson Township, NJ 08527

I, Keicha Greenidge (Owner), do certify that this is my true and correct signature.

_____    *Keicha Greenidge*    _____
Owner                                                         Sample Signature

**AKA STATEMENT**

I, Keicha Greenidge (Owner), further certify that I am one and the same person as the names listed below.

_____    _____
Name Variation (Print)                           Sample Signature (Variation / If Applicable)

_____    _____
Name Variation (Print)                           Sample Signature (Variation / If Applicable)

_____    _____
Name Variation (Print)                           Sample Signature (Variation / If Applicable)

 hometap

# INSURANCE REQUEST & AUTHORIZATION FORM

**DATE: 02/14/2023**

| | |
|---|---|
| **Investment Number: NJ620393** | **Homeowner/Insured:**<br><br>Keicha Greenidge<br>Ryan Prince Albert Billey and also known as Ryan P. Billey |
| **Lien Position: 2** | |
| **Investor:**<br><br>Hometap Investment Partners III SPV, LLC | **Property Address:**<br><br>6 Cherise Ct, Jackson Township, NJ 08527 |
| **Investor Contact Information:**<br><br>Hometap Investment Partners III SPV, LLC<br>800 Boylston St, 16th Floor<br>Boston, MA 02199 | **Homeowner Insurance Company:**<br><br>TypTap Insurance Company |

☑ **Update the Mortgagee clause to read:**

Hometap Equity Partners, LLC ISAOA/ATIMA
177 Huntington Ave, Ste 1703
PMB 15177
Boston, MA 02115-3153

☑ **Please provide a copy of the insurance policy including premium and coverage amounts, deductibles, and collateral information.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Homeowner Authorization**

By signing below, I/We hereby authorize and direct TypTap Insurance Company to make the above requested changes to my/our Homeowners Insurance policy and/or to release the requested information to the Investor. Please send the requested information, or evidence of updated mortgagee clause to the Investor at: **Hometap Investment Partners III SPV, LLC, 177 Huntington Ave, Ste 1703, PMB 15177, Boston, MA 02115-3153.**

_____
Homeowner Signature

_____
Homeowner Signature

## SIGNATURE / NAME AFFIDAVIT

INVESTMENT NO.: NJ620393

HOMEOWNER(S): Keicha Greenidge and  Ryan Prince Albert Billey and also known as Ryan P. Billey

PROPERTY ADDRESS: 6 Cherise Ct, Jackson Township, NJ 08527

I,  Ryan Prince Albert Billey and also known as Ryan P. Billey (Owner), do certify that this is my true and correct signature.

_____
Owner

_____
Sample Signature

**AKA STATEMENT**

I,  Ryan Prince Albert Billey and also known as Ryan P. Billey (Owner), further certify that I am one and the same person as the names listed below.

_____
Name Variation (Print)

_____
Sample Signature (Variation / If Applicable)

_____
Name Variation (Print)

_____
Sample Signature (Variation / If Applicable)

_____
Name Variation (Print)

_____
Sample Signature (Variation / If Applicable)

*Hometap – Name Affidavit (v. 6.0)*

*After Recording Return To:*
Hometap Equity Partners, LLC
800 Boylston Street
16th Floor
Boston, MA 02199


*Recording Requested By:*
*Hometap Investment Partners III SPV, LLC*
Investment No.: NJ620393

*Prepared By:*
Adam Jaskievic
Hometap Equity Partners, LLC
800 Boylston Street, 16th Floor
Boston, MA 02199

Block: 15801
Lot: 21

C-NJ859538

_____[Space Above This Line For Recording Data] _____


**Investment Amount: $103,575.00**


## MORTGAGE AND SECURITY AGREEMENT

This MORTGAGE AND SECURITY AGREEMENT, together with any riders (this **"Security Instrument"**), is made as of 02/14/2023 (**"Signing Date"**), by and between Keicha Greenidge and Ryan P. Billey, married (collectively, the **"Owner/Mortgagor"**) and Hometap Investment Partners III SPV, LLC, a Delaware limited liability company, whose address is 800 Boylston St, 16th Floor, Boston, MA 02199, and its successors and assigns (**"Hometap/Mortgagee"**). This Mortgage and Security Agreement was prepared by Adam Jaskievic, with an address of: c/o Hometap, 800 Boylston Street, 16th Floor, Boston, MA 02199.


### RECITALS

A.      This Security Instrument is given in connection with the execution of the Option Purchase Agreement by and between Owner and Hometap (the **"Option Agreement"**) of even date, by which Mortgagor grants and conveys to Mortgagee the option to purchase an undivided percentage interest in that certain real property and improvements thereof located at 6 Cherise Ct, Jackson Township, NJ 08527 and further described on Exhibit A attached hereto (the **"Property"**).

B.      Mortgagee desires to secure the rights granted to it in the Option Agreement and the performance of the Obligations (as defined below).

C.      This Security Instrument is given pursuant to the Option Agreement, and payment fulfillment, and performance of the obligations due under the Option Agreement are secured by this Security Instrument in accordance with the terms set forth herein.

D.    Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Agreement. The Option Agreement and this Security Instrument are collectively referred to as the "**Hometap Homeowner Agreement.**"

## TERMS

1.    <u>Grant</u>. OWNER HEREBY IRREVOCABLY mortgages, grants, transfers, and assigns to Hometap, and its successors and assigns, a security interest, with POWER OF SALE, for the benefit of Hometap, and its successors and assigns, in and to the Property, together with all improvements, replacements, and additions now or hereafter erected on the Property, all easements, appurtenances, and fixtures now or hereafter a part of the Property, and all rents, issues, profits, and proceeds, including insurance and condemnation proceeds, from the Property.

OWNER COVENANTS that Owner is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Owner warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly (a) pay to Mortgagee the Hometap Share at the time and in the manner provided in the Option Agreement, this Security Instrument, and the other Investment Documents, (b) perform the Obligations as set forth in the Option Agreement, this Security Instrument, and the other Investment Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Option Agreement, this Security Instrument, and the other Investment Documents, these presents and the estate hereby granted shall cease, terminate, and be void; *provided, however*, that Mortgagor's obligation to indemnify and hold harmless Mortgagee pursuant to the provisions hereof shall survive any such payment and release.

2.    <u>Secured Obligations</u>. Owner makes the grant, transfer, and assignment set forth in <u>Section 1</u> to secure the following:

      (a)    Owner's performance of each of its obligations in the Option Agreement;

      (b)    Mortgagee's rights under the Option Agreement;

      (c)    Owner's payment obligations in the Option Agreement, including:

            (i)    Payment of the Hometap Share owed to Mortgagee pursuant to the terms of the Option Agreement;

            (ii)    Payment of all Option Fees owed to Mortgagee pursuant to <u>Section 6.1</u> of the Option Agreement;

            (iii)    Payment of all insurance proceeds owed to Mortgagee pursuant to <u>Section 6.1</u> of the Option Agreement;

            (iv)    Payment of all condemnation proceeds owed to Mortgagee pursuant to <u>Section 6.1</u> of the Option Agreement;

            (v)    Payment of the liquidated damages pursuant to <u>Section 7.4</u> of the Option Agreement;

(vi)      Reimbursement of any expenditures made by Mortgagee pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d)      Payment of all costs, fees, and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel) (collectively, "**Legal Fees**") incurred by Mortgagee in the enforcement and collection of the obligations listed above and the protection of Mortgagee's related rights, whether such costs, fees, and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

3.      Uniform Commercial Code Security Agreement and Fixture Filing.      This Security Instrument also is intended to be and will constitute a fixture filing financing statement and security agreement under the New Jersey Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the New Jersey Uniform Commercial Code. Owner grants to Mortgagee a security interest in those items to secure the performance and payment of the Obligations.

(a)      Owner agrees that Mortgagee may file this Security Instrument, or a copy of it, in the real estate records or other appropriate index and/or in the Office of New Jersey Department of the Treasury's Division of Revenue and Enterprise Services, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b)      This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the New Jersey Uniform Commercial Code, and any similar or successor provisions.

(c)      Mortgagee may file such extensions, renewals, amendments, and releases as are appropriate to reflect the status of its security interest.

(d)      Owner will pay all costs, fees, and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees, and expenses of any record searches for financing statements that Mortgagee may require.

(e)      Upon an Event of Default, Mortgagee will have the remedies of a secured party under the New Jersey Uniform Commercial Code and may also take the actions provided in Section 7 below and Section 7 of the Option Agreement.  In exercising any of these remedies and taking any of these actions, Mortgagee may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Mortgagee's remedies under the New Jersey Uniform Commercial Code or the actions available in Section 7 below and Section 7 of the Option Agreement.

4.      Absolute Assignment of Leases and Rents.  Owner absolutely and unconditionally assigns to Mortgagee all of Owner's right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to the ownership, use, or occupancy of the Property (collectively, "**Rents**"); it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a)     Owner gives to and confers upon Mortgagee the right, power, and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b)     Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Mortgagee may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Mortgagee may determine.

(c)     The entering upon and taking possession of the Property, the collection of the Rents, issues, and profits and the application of the Rents, issues, and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d)     Nothing in this Section will permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent, or occupancy of the Property.

5.      Covenants of Owner Regarding the Property. Owner agrees as follows:

(a)     To appear in and defend any action, suit, or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Mortgagee; and to pay all costs, fees, and expenses of Mortgagee (including cost of evidence of title and Legal Fees) incurred: (i) in any state, federal, appellate, or bankruptcy court, in any action, suit, or proceeding in which Mortgagee may appear, and in any action, suit, or proceeding brought by Mortgagee to foreclose this Security Instrument or to collect the Obligations or to protect Mortgagee's rights under this Security Instrument or the Option Agreement; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b)     To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property and all encumbrances, charges, and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees, and expenses of this Security Instrument.

(i)     If Owner fails to make any payment or to do any act as provided in this Security Instrument, Mortgagee may, but will not be obligated to, make the payment or do any such act, in the required manner and to the extent deemed necessary by Mortgagee to protect the security for this Security Instrument, and which any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii)    Such payments made or actions taken by Mortgagee will not require notice to, or demand on, Owner and will not release Owner from any obligation under this Security Instrument.

(iii)   Mortgagee will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding

purporting to affect the Property or the rights or powers of Mortgagee under this Security Instrument, (C) to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in the judgment of Mortgagee appears to be prior or superior to this Security Instrument, and (D) to employ counsel and to pay such counsel necessary expenses and costs, including Legal Fees.

(c)     To pay immediately upon demand all sums expended by Mortgagee related to this Security Instrument and to pay interest on any of such amounts demanded by Mortgagee at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6.     <u>Power of Attorney</u>. Owner irrevocably appoints Mortgagee as Owner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Mortgagee may, in Mortgagee's name or in the name of Owner, prepare, execute, and file or record financing statements, continuation statements, applications for registration, and similar documents to create, perfect, or preserve any of Mortgagee's security interests and rights in or to any of the Property. Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Mortgagee may take any other action that may be required or desired of Owner, including the ability to advertise and solicit the Property for sale, encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; *provided, however*, that Mortgagee as agent and attorney-in-fact will be accountable only for such funds as are actually received by Mortgagee.

7.     <u>Default and Foreclosure</u>. Upon an Event of Default, Mortgagee may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Owner of a written declaration of default. If any Event of Default has occurred and is continuing, Mortgagee may take any or all of the following actions, at the same or at different times:

(a)     <u>Possession</u>. Mortgagee may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the Rents, income, issues, and profits and apply the same to satisfy any Obligation. Mortgagee is granted full power and authority to do any act or thing which Owner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use, and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Mortgagee, then this Security Instrument will, at the option of Mortgagee, become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b)     <u>Appointment of Receiver</u>. Mortgagee may have a receiver of the Rents (including an Asset Administrator), income, issues, and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Owner or any other person who may be legally or equitably liable for the Obligations, and Owner and each such person waive such proof and consent to the appointment of a receiver.

(c)     <u>Fair Rental Payments</u>. If Owner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Mortgagee the amount of rent requested by Mortgagee in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d)     <u>Excess Monies</u>. Mortgagee may apply on account of the unsatisfied Obligations owed to Mortgagee after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Mortgagee that were paid by Owner to Mortgagee

or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Owner.

(e)     Remedies at Law or Equity.  Mortgagee may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f)     Statutory Power of Sale.  To the extent permitted by applicable law:

(i)     Mortgagee will have the power to sell the Property at a nonjudicial foreclosure sale.  In connection with the sale, Mortgagee may declare all performance and Obligations immediately due by delivery to Owner of a written declaration of default.  Mortgagee will give notice of default to Owner prior to acceleration following an Event of Default.  The notice will specify: (A) the default; (B) the action required to cure the Event of Default; (C) a date, not less than 30 days from the date the notice is given to Mortgagor, by which the Event of Default must be cured; and (D) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument and sale of the Property.  The notice will further inform Owner of any right to cure after acceleration and the right to bring a court action to assert the nonexistence of an Event of Default or any other defense of Owner to acceleration and sale, and any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other applicable law.  If the Event of Default is not cured on or before the date specified in the notice, Hometap at its option may require immediate performance in full of all Obligations without further demand and may invoke the power of sale and any other available remedies not prohibited by applicable law.  Hometap will be entitled to collect all costs, fees, and expenses incurred in pursuing the remedies provided in this Security Instrument, including legal fees and costs of title evidence.

(ii)     If Mortgagee invokes the power of sale, Mortgagee will execute a written notice of Mortgagee's election to cause the Property to be sold as may be prescribed by applicable law.  Mortgagee will cause this notice to be recorded in each county in which any part of the Property is located.  Mortgagee will mail copies of any notice required by applicable law to Owner and to the other persons required by applicable law.  Mortgagee will give public notice of sale to the persons and in the manner as may be prescribed by applicable law.

(iii)     After the time required by applicable law, Mortgagee may sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Mortgagee determines.  Mortgagee may postpone the sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

(iv)     Mortgagee will deliver to the purchaser its deed conveying the property sold, but without any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts will be conclusive proof of their truthfulness.  Any person, including Owner or Mortgagee, may purchase at the sale.

(v)     After deducting all costs, fees, and expenses (including Legal Fees), including cost of evidence of title in connection with the sale, Mortgagee will apply the proceeds of the sale to payment of: first, to all sums expended under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by applicable law in effect on the Signing Date of this Security Instrument; second, to other sums then secured by this Security

Instrument and senior to Mortgagee's interest; third, the Hometap Share to Mortgagee; and fourth, the remainder, if any, to the person or persons legally entitled to it.

(vi)     Notice provided to Owner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

(vii)     Exercise of Mortgagee's remedies under this Security Instrument will be in compliance with applicable law.

8.     <u>Late Performance</u>.  By accepting performance of any Obligation after its due date, Mortgagee does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9.     <u>Mortgagee's Powers</u>.  At any time and from time to time, without liability and without notice, upon written request of Owner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations, Mortgagee may:  (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10.     <u>Successors</u>.  This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns.  The terms **"Hometap"** or **"Beneficiary"** will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security Instrument.  Absent Mortgagee's prior written consent, which consent may be withheld in its sole discretion, Owner may not assign or otherwise transfer this Security Instrument.

11.     <u>Interpretation</u>.  In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.  Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

12.     <u>Joint and Several Liability</u>.  If more than one person signs this Security Instrument as Owner, the obligations of each signatory will be joint and several.

13.     <u>Multiple Owners</u>.  If there are multiple Owners of the Property:

(a)     this Security Instrument must be signed by each Owner;

(b)     all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by each Owner;

(c)     each Owner will be jointly and severally liable for all liabilities and Obligations;

(d)     notice required to be given by, or to, each Owner will be deemed adequately given if given by or to any Owner using the contact information set forth in this Security Instrument; and

(e)     Hometap may treat any notice received from any Owner as notice from all Owners.

14.     <u>Incorporation by Reference</u>.  <u>Exhibit A</u> to this Security Instrument is incorporated by this reference.

15.     <u>Extent of Lien</u>.  The lien granted under this Security Instrument will encumber Owner's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

16.     <u>No Merger</u>.  So long as any of the Obligations remain outstanding and undischarged, unless Mortgagee otherwise consents in writing, the fee estate of Owner in the Property or any part of the Property (including the estate of Mortgagee after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Mortgagee or in any other person.

17.     <u>Release</u>.  Following satisfaction of all Obligations secured by this Security Instrument, including any payment of any amounts due and secured by this Security Instrument, Mortgagee will discharge this Security Instrument.  Owner will pay any recordation costs.  Mortgagee may charge Owner a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

18.     <u>Subordination of Homestead and Waivers</u>.  If Owner has acquired before the Signing Date or acquires on or after the Signing Date an estate of homestead in the Property, Owner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions, and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Mortgagee under the Option Agreement and all renewals, extensions, and modifications of the Option Agreement, and is subordinate to the lien evidenced by this Security Instrument and all renewals, extensions, and modifications of this Security Instrument.  Owner waives and relinquishes all rights of curtesy and dower in the Property.

19.     <u>Notice of Option Purchase Agreement</u>.  Mortgagor hereby provides notice that Mortgagor and Mortgagee have entered into the Option Agreement, as more particularly described in <u>Exhibit B</u> attached hereto and incorporated herein by this reference as if set forth in full. The Option Agreement contains certain covenants and promises to or for the benefit of Mortgagee. The Option Agreement is irrevocable by Mortgagor and expires on 02/21/2033. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement is contained in the instrument conveying such interest in the Property to such person or entity.

20.     <u>Notices</u>. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

**Hometap/Mortgagee:**                    **Owner/Mortgagor:**

Hometap Investment Partners III SPV, LLC      Keicha Greenidge
800 Boylston Street, 16th Floor                Ryan Prince Albert Billey and also known as Ryan
Boston, MA 02199                               P. Billey
Attention: Legal Department                    6 Cherise Ct
                                               Jackson Township, NJ 08527

*[Signature Pages Follow]*

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC, AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH HOMETAP, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT, AND THE INVESTMENT DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN MORTGAGOR AND MORTGAGEE AS OF THE EFFECTIVE DATE.

OWNER DECLARES THAT OWNER HAS READ THIS MORTGAGE AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 20 above.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage and Security Agreement under seal as of the Signing Date.

**MORTGAGORS:**

By: _____
    Keicha Greenidge

Date: _____ 2/14/23 _____

By: _____
    Ryan Prince Albert Billey and also known as Ryan P. Billey

Date: _____ 2/14/23 _____

Acknowledgment Certificate

State of New Jersey                    )

                                       )ss

County of _____ Ocean _____,)

On __Feb 14__, 2023 before me, _____Robert Hall_____ , Notary Public in and for said county, personally appeared Keicha Greenidge who has satisfactorily identified him/her/themselves as the signer to the above referenced document.

_____Robert Hall_____

Print Notary Name

```
ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025
```

(Affix Notary Stamp Here)

Notary Public Signature

__7/14/23__

Date

My Commission Expires:____11/16/2025____

---

*Hometap – Mortgage and Security Agreement – New Jersey (v. 6.0)*                    *Page 10*

<u>Acknowledgment Certificate</u>

State of New Jersey                    )

                                       )ss

County of ___Ocean___ ,)

On __2/14__ , 20__23__ before me, ___Robert Hall___ , Notary Public in and for said county, personally appeared   Ryan Prince Albert Billey and also known as Ryan P. Billey who has satisfactorily identified him/her/themselves as the signer to the above referenced document.

___Robert Hall___

Print Notary Name

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

(Affix Notary Stamp Here)

Notary Public Signature

__2/14/23__

Date

My Commission Expires:___11/16/2025___

## EXHIBIT A

### LEGAL DESCRIPTION

Real property described as follows:

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of Jackson, in the County of Ocean, State of New Jersey:

Known and designated as Lot 4.05 Block 82.01 as shown on a certain Map entitled, "Final Plat/Major Subdivision of Autumn Breeze at Jackson, Lot 4.01 Block 82.01 Tax Map" filed in the Ocean County Clerk's Office on April 15, 2002 as Map No. L-3140.

Being further described as follows:

Beginning at a rebar with cap found on the Southwesterly sideline of Cherise Court (50' ROW), said point being the division line between Lots 4.05 and 4.04 on the aforementioned filed Map, and running, thence;

1) Along said sideline of Cherise Court, South 25 degrees 55 minutes 06 seconds East 209.05 feet to a point, thence;

2) Leaving said sideline of Cherise Court, South 64 degrees 04 minutes 54 seconds West 232.78 feet to a point, thence;

3) North 17 degrees 19 minutes 24 seconds West 211.43 feet to a rebar with cap found; thence

4) North 64 degrees 04 minutes 54 seconds East 201.18 feet to the point and place of Beginning.

Containing 45,361 S.F.

This description is drawn in accordance with a Survey performed by Lakeland Surveying, Inc. dated 09/07/2018

Parcel ID / APN: Block: 15801 Lot: 21

# EXHIBIT B

## NOTICE OF OPTION

This Notice of Option ("**Option Notice**") provides notice of the Option Purchase Agreement entered into as of 02/14/2023 ("**Signing Date**"), by and between Keicha Greenidge and Ryan P. Billey, married and Hometap ("**Option Agreement**"), and supplements the Security Instrument of the same date between the parties. Capitalized terms used in this Option Notice shall have the meanings specified herein, or if not defined herein, in the Option Agreement or the Security Instrument.

## RECITALS

A.     Mortgagor hereby declares that as of the Signing Date, Mortgagor and Mortgagee have entered into that certain unrecorded Option Agreement, which is hereby incorporated into this Option Notice as if set forth in full, pursuant to which Mortgagor grants and conveys to Mortgagee the option to purchase an undivided percentage interest of fee simple title ownership in and to the Property. In consideration for granting and conveying the Option to Mortgagee, Mortgagee paid to Mortgagor the Investment Amount. The Option is irrevocable by Mortgagor and expires on 02/21/2033.

B.     In the Option Agreement, Mortgagor has made certain covenants and promises to, or for the benefit of, Mortgagee in connection with the Option and the Property, all as more particularly described in and on the terms and conditions stated in the Option Agreement.

C.     Mortgagor has executed this Option Notice to give notice of the Option Agreement and certain rights and responsibilities of Mortgagor as to the Mortgagee, as well as the covenants and promises set forth in the Option Agreement that run with the land and will be binding upon any party who acquires Mortgagor's interest in the Property, so long as the Option Agreement has not expired or been terminated.

## TERMS

1.     <u>Notice</u>. Every person or entity who now or later owns or acquires any right, title, or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right, and limitation contained in the Option Agreement and this Option Notice, whether or not such person or entity expressly assumes such restrictions, provisions, covenants, rights, and limitations or whether or not any reference to the Option Agreement or this Option Notice is contained in the instrument conveying such interest in the Property to such person or entity.

2.     <u>Covenants</u>. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation:

(a)     Restrictions on Mortgagor's right to transfer the Property without giving proper written notice to Mortgagee and requirements that Mortgagor comply with specific sale procedures set forth in the Option Agreement;

(b)     Requirements that Mortgagor maintain insurance on the Property against certain hazards and risks;

(c)     Restrictions on Mortgagor's ability to increase the amount of debt to third parties secured by liens on the Property as specified in the Option Agreement;

(d)     Restrictions on the Mortgagor's ability to rent the Property;

        (e)    Requirements that Mortgagor keep Property free of liens not approved by Mortgagee; and

        (f)    Requirements that Mortgagor protect and maintain the Property.

# EXHIBIT B



**ClearEdge Title, Inc.**
2605 Enterprise Road E
Suite 270
Clearwater, FL 33759
(877) 536-3390

**ClearEdge Title**

| | |
|---|---|
| File Number: | **C-NJ859538** |
| Loan Number: | **NJ620393** |
| Loan Amount: | **$103,575.00** |
| Close Date: | **2/14/2023** |
| Disbursement Date: | **2/17/2023** |

### BORROWER(S) CLOSING STATEMENT

Type: **Property Report**
Property: **6 CHERISE COURT**
**JACKSON, NJ 08527 (OCEAN)**
**(Block: 15801 Lot: 21)**

Borrower(s): **KEICHA GREENIDGE AND RYAN P. BILLEY**
**6 Cherise Ct**
**Jackson, NJ 08527**

Lender: **Hometap Equity Partners, LLC**
**800 Boylston Street, Suite 2906, Boston, MA 02199**

| Description | P.O.C. | Debit | Credit |
|---|---|---|---|
| **Payoffs** | | | |
| Payoff to Network Capital Funding Corporation | | $870.40 | |
| **New Loans** | | | |
| Loan Amount | | | $103,575.00 |
| Our origination charge $3,107.25 | | $3,107.25 | |
| Appraisal Fee to Hometap Equity Partners, LLC | | $299.00 | |
| **Title Charges** | | | |
| Title - Lender's Title Insurance to ClearEdge Title, Inc. $103,575.00 | | | |
| Title - Settlement or closing fee to ClearEdge Title, Inc. | | $895.00 | |
| **Government Recording and Transfer Charges** | | | |
| Recording Fees: Mortgage $210.00 | | $210.00 | |
| **Totals** | | $5,381.65 | $103,575.00 |

**Balance Due TO Borrower:** $98,193.35

### APPROVED AND ACCEPTED

**BORROWER(S)**

KEICHA GREENIDGE

RYAN P. BILLEY

## ClearEdge Title

2605 Enterprise Rd E, Suite 270, Clearwater, FL 33759

Phone (866) 374-0646

## ******* REFUND CONFIRMATION FORM******

**File Number: C-NJ859538**

**Property Address: 6 Cherise Court**

**Projected Disbursement Date: February 17, 2023**

**Transaction Type:  Home Equity Investment**

**PLEASE SELECT HOW YOU WISH TO RECEIVE THE PROCEEDS FROM YOUR TRANSACTION:**

☐ **CHECK**

Does the check need to be sent to the property address above?  ___ Yes  ___ No

If No, please provide the address where you want the check sent:

_____

☐ **WIRE**

We, the undersigned, have requested that ClearEdge Title deliver the following proceeds or disbursement of funds related to the above property [6 Cherise Court, Jackson, NJ 08527] of settlement by wire to the following financial institution:

| | |
|---|---|
| **Receiving Institution Name** | |
| **Financial Institution Routing Number** | |
| **Financial Institution Checking Account Number** | |

| Name(s) / Payee(s) of Record with Financial Institution | | Are you attaching a voided check | ☐ Yes ☐ No |
|---|---|---|---|

**\*\*\*BANK ACCOUNT NAME MUST MATCH HOW THE TITLE IS HELD\*\*\***

We as the Payee(s) hereby authorize ClearEdge Title to wire the amount listed on the Option Closing Disclosure to the above financial institutions account notwithstanding the differences in the payee names and the names on the receiving account. By acknowledging the below through signature, the payee(s) also hereby hold ClearEdge Title harmless and indemnify them against any and all claims and disputes arising from said delivery of funds to the extent of, but not limited to, actual damages, attorney's fees, penalties and other fees associated with this request.

_____ 2/14/23        _____ 2/14/23
Signature                Date            Signature                Date

**Subscribed and sworn to before me this ___14___ day of ___Feb___, 20_23_.**

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/18/2025
**(seal)**

**Notary Public**



**Clear**Edge Title

Borrower Name(s): Keicha Greenidge and Ryan P. Billey
Property Address: 6 Cherise Court, Jackson, NJ 08527
Loan #: NJ620393

Thank you for handling this signing for ClearEdge Title, Inc and Hometap Equity Partners, LLC

During business hours of 9AM eastern – 8PM eastern Monday through Friday please contact our office at 877-536-3390 with regards to any issues at the closing. Additionally, should an issue arise outside of normal business hours or you are unable to make contact during normal business hours please reach out to the emergency contact number at 727-271-6212. PLEASE LEAVE A VOICEMAIL IF THAT NUMBER IS NOT PICKED UP.

If funds are due at the closing and a check is not available and the customer has not already made arrangements for a wire transfer please also contact us using the above methods.

Thank you.



**Clear**Edge Title

2605 Enterprise Rd E, Suite 270 | Clearwater, FL 33759

877.536.3390 Business |

www.cetitle.com

Formerly known as Meridian National Title



**ClearEdgeTitle**

Attention Signing agent, including this page the total page count for this attachment you are printing is 80 pages.

If you have received or are printing less than that amount please contact our office immediately at:


Toll Free:  877-536-3390
Email:          scheduling@cetitle.com


***************** FULL SCAN BACKS ARE REQUIRED – PLEASE SEND A COPY OF THE SIGNED DOCUMENTS TO SCHEDULING@CETITLE.COM ***************************


If possible please drop documents directly at a FedEx location due to an increase of packages being stolen from FedEx drop boxes



**ClearEdge Title**

# ONE AND THE SAME NAME AFFIDAVIT

BEFORE ME, the undersigned authority, this date personally appeared

Ryan P. Billey

who being by me first duly sworn, deposes and says:

I am known as Ryan Prince Albert Billey

and that they are one and the same person.

_____
Ryan P. Billey

File No: C-NJ859538

STATE OF NJ
COUNTY OF Ocean

The foregoing instrument was acknowledged before me __14__ day of ___Feb___, 2023 by,

Ryan P. Billey

who is personally known to me or who has produced a drivers license(s) as identification and who did not take an oath.

_____
(Notary Signature)

(SEAL)

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

# PLEASE TAKE NOTE OF THE FORM IMMEDIATELY FOLLOWING THIS COVER LETTER

# PLEASE COMPLETE AND EXECUTE THIS FORM IF YOU WISH TO HAVE YOUR PROCEEDS WIRE DIRECTLY INTO A CHECKING OR SAVINGS ACCOUNT



**ClearEdge Title**

## ONE AND THE SAME NAME AFFIDAVIT

BEFORE ME, the undersigned authority, this date personally appeared

who being by me first duly sworn, deposes and says:

I am known as  and also known as

_____Ryan P. Billay_____,

_____,

_____,

and that they are one and the same person.

_____Ry Billey_____

File No: C-NJ859538

STATE OF NJ
COUNTY OF Ocean

The foregoing instrument was acknowledged before me ___14___ day of ___Feb___, 2023 by,

who is personally known to me or who has produced a drivers license(s) as identification and who did not take an oath.

_____
(Notary Signature)

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/19/2025

(SEAL)

# COMPLIANCE AGREEMENT

Re: Order Number: C-NJ859538

In consideration of ClearEdge Title. (hereinafter "title company") closing the transaction under the above order number, the undersigned agree, upon request of the company, to fully cooperate with the company to correct any inaccurate term or provision or mistake in, or omission from any document associated with the closing. He/she/they further agree that, subsequent to closing, he/she/they will execute such documents, or take such action as the company may reasonably deem necessary to properly document the transaction.

The undersigned further agree(s) that in the event an error in charges, costs, or payoff amounts is made, he/she/they will, upon request, immediately remit such sums for which he/she/they had initial responsibility for payment as may be necessary to correct such errors. Nothing herein contained shall be construed to impose liability on the parties for charges incurred as a result of the failure of the company to timely remit payment or take actions which the company has agreed in writing to perform.

The undersigned further authorize the company to correct any clerical errors on his/her/their behalf in order to properly complete the title conveyance and/or provide the lender with insurable documentation.

The undersigned further agree to comply with any such requests outlined above and agree that, in the event he/she/they fail to comply with the request, he/she/they will pay, in addition to any amounts owed above, reasonable costs of the company in enforcing this agreement, including but not limited to, reasonable attorney's fees and costs of litigation.

2/14/23

DATE

Sworn to and subscribed, before me, this 14 day of Feb.

Notary Public

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

# PAYOFF AFFIDAVIT

File No: C-NJ859538

Property: 6 Cherise Court, Jackson, NJ 08527

WE, the undersigned, do hereby hold ClearEdge Title and Stewart Title Guaranty Company harmless for any addition monies due from any shortages in the payoff amounts of any and all liens on the aforementioned property described above and listed in the title commitment on file number C-NJ859538. We also understand that if for any reason the payoff is incorrect, we are fully responsible for making up the difference and will take care of the said shortages within five (5) days from notification by ClearEdge Title whether by telephone or by mail. Should there be a remaining escrow balance we hereby authorize any shortages to be covered thru the escrow balance.

That this affidavit is being made to include Hometap Equity Partners, LLC to grant financing to the homeowner(s) of the above described property, and the said parties rely on the statement(s) made by the affiant(s) herein are aware that ClearEdge Title is insuring the title to the property herein and that affiant(s) warrant the above statements to be accurate. In the event of the necessity to enforce the terms of this affidavit, affiant(s) shall be responsible personally and/or as a corporation for any losses, including but not limited to, attorney's fees and court costs.

## Revolving Line of Credit Instructions

**If this is a revolving credit/equity line of credit account, I/we, the undersigned homeowner (s), hereby authorize you to close this account. We hereby acknowledge that there are no outstanding draws or checks against this line of credit and understand that we will be held responsible for any draws or checks still outstanding as of the date of payoff.**

AFFIANT(S) FURTHER SAYETH NAUGHT.

_____

Keicha Greenidge

_____

Ryan P. Billey

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document

STATE OF NJ

COUNTY OF Ocean

Subscribed and sworn to (or affirmed) before me on 14th day of February, 2023 by, Keicha Greenidge who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____

(Notary Signature)

> ROBERT HALL
> NOTARY PUBLIC OF NEW JERSEY
> Commission # 50143452
> My Commission Expires 11/13/2025

(SEAL)

# Marital Affidavit

File No: C-NJ859538

Date: February 13, 2023

The undersigned being first duly sworn, on oath, deposes and say that (they/he/she) are the owners of the real estate situated in the County of Ocean, State of NJ, commonly known as 6 Cherise Court, Jackson, NJ 08527 and more particularly described in that certain mortgage dated in favor of Hometap Equity Partners, LLC, the lender, under transaction number NJ620393.

Affiant makes the following representations in conjunction with the consummation of the pending mortgage of the real estate referenced above (premises).

On February 13, 2023 before me a Notary Public, personally appeared the undersigned

affiant(s), who being duly sworn according to law and intending to be legally bound, depose(s) and say(s):

1. (Y – N ) _____ That I am married to _____ and have been continuously married since _____
2. (Y – N ) _____ That I am a single person and have never been married
3. (Y – N ) _____ That I am married however currently pending divorce proceedings
4. (Y – N ) _____ That I took title as married and have since been divorced and not remarried
5. (Y – N ) _____ That I took title as married and have since been divorced and remarried, my new spouses name is _____

FURTHER AFFIANTS SAYETH NAUGHT.

_____
Keicha Greenidge

_____
Ryan P. Billey

STATE OF NJ

COUNTY OF Ocean

The foregoing instrument was acknowledged before me February 13, 2023 by: Keicha Greenidge and Ryan P. Billey who is/are personally known to me or who has/have produced a drivers license(s) as identification and who did not take an oath.

_____
(Notary Signature)

(SEAL)

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

**Limited Power of Attorney**

File No: C-NJ859538

Date: February 14, 2023

On this date, the undersigned borrower(s) for and in consideration of the approval, closing and funding of their above referenced mortgage loan, hereby grant **ClearEdge Title, Inc** as settlement agent, Limited Power of Attorney to correct and/or execute or initial all typographical or clerical errors discovered in any or all of the closing documentation required to be executed by the undersigned at settlement. In the event this Limited Power of Attorney is exercised, the undersigned will be notified and receive a copy of the document executed or initialed on their behalf.

THIS LIMITED POWER OF ATTORNEY MAY NOT BE USED TO INCREASE THE INTEREST RATE THE UNDERSIGNED IS PAYING, INCREASE THE TERM OF THE UNDERSIGNED'S LOAN, INCREASE THE UNDERSIGNED'S OUTSTANDING PRINCIPAL BALANCE, OR INCREASE THE UNDERSIGNED'S MONTHLY PRINCIPAL AND INTEREST PAYMENTS. Any of these specified changes must be executed directly by the undersigned.

This Limited Power of Attorney shall automatically terminate 120 days from the closing date of the undersigned's mortgage loan. IN WITNESS WHEREOF, the undersigned have executed this Limited Power of Attorney as of the date and year first above referenced

_____
Keicha Greenidge

_____
Ryan P. Billey

STATE OF NJ

COUNTY OF Ocean

The foregoing instrument was acknowledged before me 14th day of February, 2023 by:

Keicha Greenidge and Ryan P. Billey

who is/are personally known to me or who has/have produced a drivers license(s) as identification and who did not take an oath.

_____

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

(SEAL)

**OWNERS AFFIDAVIT**

File No: C-NJ859538

Date: February 14, 2023

On this day, personally appeared before me, the undersigned authority, authorized to administer oaths and take acknowledgements: Keicha Greenidge & Ryan P. Billey to me well known upon first duly being sworn, deposes and says:

1. They are the legal owner(s) of the property commonly known as:
2. 6 Cherise Court, Jackson, NJ 08527
3. That any and all work, labor, materials and supplies which have been used, applied or furnished upon the said property at any time prior to this date have been paid for and discharged; and that there are no possible liens which may be filed against the said property for work or labor or materials furnished thereon by anyone. No "Notice of Commencement" (if applicable by State) has been executed and/or filed.
4. That there is no person, firm, corporation or governmental authority entitled to any claim or lien against said property.
4. That there are no liens or encumbrances upon the real and/or personal property conveyed with the property herein, unless hereby stated. _____.(None, if blank)
5. That no person, firm or corporation adversely claims the property and they are in exclusive possession thereof.
6. That the undersigned has disclosed if there are any maintenance or homeowner's association fees applicable to the property herein, and that they are responsible for any fees outstanding prior to the date herein. They further warrant all fees to be current at the time of conveyance or upon acquiring financing.
7. That there are no matters pending against the Affiant(s) that could rise to a lien that would attach to the property between the disbursing of the funds and the recording of the interest to be insured, and that the Affiant(s) have not and will not execute any instrument that would adversely affect the title or interest to be insured.
8. That Affiant(s) have not caused, permitted or agreed to any unrecorded easements or right-of-ways for users, and any existing leases or contracts for sale, contracts for deed, or other contractual rights affecting the property except as follows:_____.
9. That Affiant(s) and the property are not subject to any proceedings affecting them or the property under any Federal Bankruptcy Laws.
10. That Affiant(s) are without knowledge of any claims whatsoever of any kind or description against the furniture, fixtures and equipment located in, on or about the improvements thereon, and that personal property that are to be considered as part of the mortgaged property.
11. Affiant(s) further state that they are each familiar with the nature of an oath; and with the penalties as provided by the laws of the State aforesaid for falsely swearing to statements made in an instrument of this nature. Affiant(s) further certify that the have read, or have heard read to them, the full facts of this affidavit, and understand its contents.
12. That this affidavit is being made in order to induce Stewart Title Company, to issue a Policy on the above described property, and the said parties rely on the statements made by the affiants herein and that affiants warrant the above statements to be accurate. In the event of the necessity to enforce the terms of this affidavit, affiants shall be responsible personally and/or as a corporation for any losses, including but not limited to attorneys fees and court costs.

AFFIANTS FURTHER SAYETH NAUGHT.

_____     Social Security #:___124 64 5284_____
Keicha Greenidge     Circle One:

Never Married  Married  Divorced  Widowed

_____     Social Security #:___078 - 70 - 3798___
Ryan P. Billey     Circle One:

Never Married  Married  Divorced  Widowed



**ClearEdge Title**

# ONE AND THE SAME NAME AFFIDAVIT

BEFORE ME, the undersigned authority, this date personally appeared

Ryan P. Billey

who being by me first duly sworn, deposes and says:

I am known as Ryan Prince Albert Billey

and that they are one and the same person.

_____
Ryan P. Billey

File No: C-NJ859538

STATE OF NJ
COUNTY OF Ocean

The foregoing instrument was acknowledged before me ___14___ day of ___Feb_____, 2023 by,

Ryan P. Billey

who is personally known to me or who has produced a drivers license(s) as identification and who did not take an oath.

_____
(Notary Signature)

(SEAL)

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025



**ClearEdge Title**

# ONE AND THE SAME NAME AFFIDAVIT

BEFORE ME, the undersigned authority, this date personally appeared

who being by me first duly sworn, deposes and says:

I am known as  and also known as

_Ryan P. Billey_ ,

_____ ,

_____ ,

and that they are one and the same person.

_Ry Billey_

File No: C-NJ859538

STATE OF NJ
COUNTY OF Ocean

The foregoing instrument was acknowledged before me __14__ day of __Feb__ , 2023 by,

who is personally known to me or who has produced a drivers license(s) as identification and who did not take an oath.

_____
(Notary Signature)

ROBERT HALL
NOTARY PUBLIC OF NEW JERSEY
Commission # 50143452
My Commission Expires 11/16/2025

(SEAL)