# Exhibit B

2013 WL 5524078
Only the Westlaw citation
is currently available.
United States District Court, D. New Jersey.

ACTELION PHARMACEUTICALS
LTD. and Actelion Clinical
Research, Inc., Plaintiffs,
v.
APOTEX INC., et al., Defendants.

Civil No. 12–5743(NLH/AMD).
|
Sept. 6, 2013.

**Attorneys and Law Firms**

Michelle Hart Yeary, Dechert LLP, Princeton, NJ, for Plaintiffs.

A. Richard Feldman, Bazelon Less & Feldman, P.C., Philadelphia, PA, Michael A. Shapiro, Bazelon Less & Feldman, Marlton, NJ, Beth S. Rose, Charles J. Falletta, Sills Cummis & Gross P.C., Newark, NJ, Jason B. Lattimore, Law Office of Jason B. Lattimore, Esq., Morristown, NJ, for Defendants.

*MEMORANDUM ORDER AND OPINION*

ANN MARIE DONIO, United States Magistrate Judge.

**\*1** This matter comes before the Court by way of Plaintiffs' Actelion Pharmaceuticals Ltd. and Actelion Clinical Research, Inc. (hereinafter, "Plaintiffs" or "Actelion") motion to stay discovery pending a resolution of a dispositive motion. (*See* Plaintiffs' Motion to Stay Discovery Pending Ruling on Dispositive Motion (hereinafter, "Pls.' Mot.") [Doc. No. 45].) For the reasons set forth herein, the Court grants Plaintiffs' Motion.

Plaintiff Actelion Pharmaceuticals Ltd. is a "pharmaceutical company" and Plaintiff Actelion Clinical Research, Inc. is an "affiliate" of Actelion Pharmaceuticals Ltd. (*See* Complaint for Declaratory Judgment [Doc. No. 1], 3.) In this action, Plaintiffs seek a determination of whether Plaintiffs "have a legal duty to supply its patented pharmaceutical products" Tracleer and Zavesca "to potential rivals[.]" (*See* Memorandum of Law in Support of Plaintiffs' Motion to Stay Discovery Pending Ruling on Dispositive Motion (hereinafter, "Pls.' Br.") [Doc. No. 45–1], 1.) Defendants Apotex Inc. and Apotex Corp. (hereinafter, "Apotex"), Roxane Laboratories, Inc. (hereinafter, "Roxane"), Actavis Elizabeth LLC (hereinafter, "Actavis"), Johnson Matthey Inc. (hereinafter, "JM"), and Zydus Pharmaceuticals, Inc. and Cadila Healthcare Limited (hereinafter, "Zydus") (collectively, "Defendants") are generic drug manufacturers. [1] Each Defendant has sought to acquire samples of Tracleer, and Defendant Roxane has, in addition to Tracleer, sought samples of Zavesca. (*See* Defendants/ Counterplaintiffs' Memorandum in Opposition to Plaintiffs/Counterdefendants' Motion to Stay Discovery at 2 (hereinafter, "Defs.' Opp'n") [Doc. No. 49], 2.) Defendants allege that such samples are needed "to conduct bioequivalence studies of their generic versions[,]" the results of which must be submitted to the United States Food and Drug Administration in order to obtain necessary approvals to market the generic versions. (*See* Defs.' Opp' n [Doc. No.

49], 2; *see also* Transcript of Proceeding Held on 3/12/2013 (hereinafter, "Transcript") [Doc. No. 71], 18.) There is no dispute that, despite Defendants' various requests, Plaintiffs have "refused" to provide Defendants with samples of these drugs. (*See* Pls.' Br. [Doc. No. 45–1], 1; *see also* Defs.' Opp'n [Doc. No. 49], 2.) Defendants assert that Plaintiffs' conduct in refusing to provide the samples purportedly prevented "approval of [Defendants'] generic products" and "thwart[ed] generic competition for these two products." (Defs.' Opp'n [Doc. No. 49], 2; *see also* Transcript [Doc. No. 71], 17.)

[1]    Plaintiffs' initial complaint named as Defendants only Apotex Inc., Apotex Corp., and Roxane Lab., Inc. By Order dated December 19, 2012, the Court granted Actavis' Motion to Intervene. (*See* Order [Doc. No. 39], Dec. 19, 2012.) By letter dated March 29, 2013, JM joined in Defendants' previouslysubmitted papers, and agreed "to be bound by the resulting decisions subject to any and all appeal rights." (*See* Letter [Doc. No. 66], 1.) By Order dated April 2, 2013, the Court granted JM's Motion to Intervene. (*See* Consent Order [Doc. No. 67], Apr. 2, 2013.) Thereafter, Zydus moved to intervene, joined in Defendants' previously-submitted papers, and agreed to "be bound by the decisions on the [m]otions subject to any and all appeal rights[.]" (*See* Text of Proposed Consent Order [Doc. No. 75–1], 1.) By Order dated July 9, 2013, the Court granted Zydus' motion. (See

Consent Order [Doc. No. 78], 1, July 9, 2013.)

As set forth *supra,* Plaintiffs seek "a declaration that Actelion is under no duty or obligation to provide any quantity" of Tracleer or Zavesca to Defendants. (*See* Complaint for Declaratory Judgment [Doc. No. 1], 14; *see also* Pls.' Br. [Doc. No. 45–1], 3; *see also* Transcript [Doc. No. 71], 30.) Defendants each answered Plaintiffs' complaint, and asserted various affirmative defenses and counterclaims against Plaintiffs.[2] On January 16, 2013, Plaintiffs moved for judgment on the pleadings under FED. R. CIV. P. 12(c) and to dismiss counterclaims under FED. R. CIV. P. 12(b)(6). (*See* Motion for Judgment on the Pleadings (hereinafter, the "dispositive motion") [Doc. No. 44].) At that time, Plaintiffs also filed the present motion to stay discovery. (*See* Pls.' Mot. [Doc. No. 45].) Thereafter, on March 12, 2013, the Court conducted oral argument on the motion to stay discovery, but reserved decision. (*See* Minute Entry [Doc. No. 62], 1.) At this time, the dispositive motion remains pending, with oral argument set for October 17, 2013. (*See* Text Order [ Doc. No. 79].)

[2]    Each Defendant independently alleges that Plaintiffs have violated Section 2 of the Sherman Act, 15 U.S.C. § 2; violated the New Jersey Antitrust Act, N.J. STAT. ANN.. § 56:9–3 and § 56:9–4; New Jersey's common law tortious interference; and seeks mandatory injunctive and declaratory relief. (*See* Apotex's Answer and Countercl. [Doc. No. 24], ¶¶ 60–109; Roxane's Answer and Countercl. [Doc. No. 25], ¶¶ 99–244; Actavis' Answer and Countercl.

[Doc. No. 40], ¶¶ 43–92; JM's Answer and Countercl. [Doc. No. 69], ¶¶ 46–93.)

**\*2** Plaintiffs contend that the circumstances warrant the issuance of a stay pending resolution of the dispositive motion because the motion "seeks a determination of the law based on undisputed facts" "requir[ing] no factual development." (Pls.' Br. [Doc. No. 45–1], 2–3.) Plaintiffs further contend that discovery prior to resolution of the motion would constitute "an unnecessary waste of resources" because a ruling regarding the pending motion to dismiss may obviate the "need for discovery" or "narrow and streamline discovery." (*Id.* at 2–3.)

Defendants jointly contend that Plaintiffs' dispositive motion does not constitute good cause to stay discovery because Plaintiffs have not "demonstrate[d] a 'clear and unmistakable' likelihood of success on its potentially dispositive motion." (Defs.' Opp'n [Doc. No. 49], 6; *see also* Transcript [Doc. No. 71], 13–15.) Defendants further allege that Plaintiffs have "failed to demonstrate that the proposed discovery [would] be unduly burdensome or expensive[,]" in light of Defendants' "very reasonable discovery plan." (*Id.* at 8.) Moreover, Defendants assert that a stay would prejudice Defendants' ability to: " (1) complete bioequivalence studies[;]" "(2) obtain FDA approval[;]" and "(3) bring [Defendants'] generic versions of Tracleer and Zavesca to market." (*Id.* at 9.)

Plaintiffs dispute that the standard for a stay requires a finding that there is a "clear and unmistakable" likelihood of success on the motion, but also assert that Plaintiffs'

dispositive motion "rests on long-standing antitrust and patent law principles[,]" which present no factual issues. (Reply Memorandum of Law in Support of Plaintiffs' Motion to Stay Discovery Pending Ruling on Dispositive Motion at 5 (hereinafter, "Pls.' Reply") [Doc. No. 51], 3–5.) Moreover, Plaintiffs contend that even pursuant to Defendants' proposed discovery plan, "[t]he burden, expense, and distraction to business that discovery ordinarily generates" may be entirely avoided if Plaintiffs' motion is granted. (*Id.* at 6; *see also* Transcript [Doc. No. 71], 10.) Plaintiffs dispute Defendants' assertion of prejudice because "Apotex first demanded samples of Tracleer in January 2011; Roxane demanded Tracleer in January 2012 and Zavesca as early as April 2010; and Actavis demanded samples of Tracleer in September 2011[,]" but no defendant sought relief from a court. (*Id.* at 5 .) Plaintiffs argue that Defendants' assertion that a stay of discovery will further delay production of generic versions of Tracleer and Zavesca purportedly "rings hollow." (*Id.*)

Pursuant to Federal Rule of Civil Procedure 26(c), the Court may stay discovery only on a showing of "good cause" by the party requesting the stay. *Gerald Chamales Corp. v. Oki Data Americas, Inc.,* 247 F.R.D. 453, 454 (D.N.J. Dec.11, 2007) ("A protective order pursuant to FED. R. CIV. P. 26(c) may only be issued if 'good cause' is shown."); FED. R. CIV. P. 26(c)(1) (establishing that the court may issue a protective order with respect to discovery only for "good cause"); *see also Perelman v. Perelman,* No. 10–5622, 2011 WL 3330376, at \*1 (E.D.Pa. Aug.3, 2011) ("The burden is on the party seeking the stay [of

discovery] to show 'good cause.' ") (citations omitted).

 **\*3** "[M]atters of docket control and conduct of discovery are committed to the sound discretion of the district court." *In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 818 (3d Cir.1982); *see also Coyle v. Hornell Brewing Co.,* No. 08–2797, 2009 WL 1652399, at \*3 (D.N.J. June 9, 2009) ("In discovery disputes, the Magistrate Judge exercises broad discretion and is entitled to great deference.") (citations omitted); *Chamales,* 247 F.R.D. at 454 ("Magistrate Judges have broad discretion to manage their docket and to decide discovery issues, including whether to stay discovery pending a decision on a dispositive motion.") (citations omitted). However, "[m]otions to stay discovery are not favored because when discovery is delayed or prolonged it can create case management problems which impede the court's responsibility to expedite discovery and cause unnecessary litigation expenses and problems." *Coyle,* 2009 WL 1652399, at \*3 (internal citations and quotation marks omitted).

In *Landis v. N. Am. Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936), the Supreme Court set forth the standard for a stay of proceedings and found that, the movant "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay ... will work damage to [someone] else." *Id.* at 255. The power to stay proceedings "calls for the exercise of judgment, which must weigh competing interests" and "balance" the hardships with respect to the movant and non-movant. *Id.*

at 254–55; *see Gold v. Johns–Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983) (balancing the potential hardship with respect to both parties). Thereafter, numerous courts further delineated the requisite showing with respect to "hardship or inequity[,]" *see, e.g., Cima Labs, Inc. v. Actavis Group HF,* Nos. 07–893, 06–1970, 06–1999, 2007 WL 1672229, at \*8 (D.N.J. June 7, 2007), and further adapted the approach to reflect the additional considerations that arise where a stay is sought pending resolution of a dispositive motion. *See Mann v. Brenner,* 375 F. App'x 232, 239 (3d Cir.2010) (recognizing that "[i]n certain circumstances it may be appropriate to stay discovery while evaluating a motion to dismiss where" resolution of the motion would render discovery futile).

Consequently, courts generally weigh a number of factors in determining whether to grant a stay including: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party[,]" *Cima Labs,* 2007 WL 1672229, at \*8 (citing *Motson v. Franklin Covey Co.,* No. 03–1067, 2005 WL 3465664, at \*1 (D.N.J. Dec.16, 2005)); (2) whether denial of the stay would create " 'a clear case of hardship or inequity' " for the moving party, *Hertz Corp. v. The Gator Corp.,* 250 F.Supp.2d 421, 424 (D.N.J.2003) (quoting *Gold,* 723 F.2d at 1075–76); (3) "whether a stay would simplify the issues and the trial of the case[,]" *Cima Labs,* 2007 WL 1672229, at \*8 (citing *Motson,* 2005 WL 3465664, at \*1); and (4) "whether discovery is complete and/or a trial date has been set." *Id.* In assessing prejudice, the Court notes that, "the party seeking [a] protective order must show good cause by

demonstrating a particular need for protection. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning" do not suffice. 🚩*Cipollone v. Liggett Grp., Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986). Moreover, if a dispositive motion is pending, courts further consider whether the pending dispositive motion "appear[s] to have substantial grounds or, stated another way, do[es] not appear to be without foundation in law[,]" *Victor v. Huber,* No. 12–282, 2012 WL 2564841, at *2 (M.D.Pa. July 2, 2012) (internal quotations and citations omitted), in assessing "whether a stay would simplify the issues and the trial of the case [.]" *Cima Labs,* 2007 WL 1672229, at *8 (citing *Motson,* 2005 WL 3465664, at *1). However, it is well settled that "the *mere filing* of a dispositive motion does not constitute 'good cause' for the issuance of a discovery stay." 🚩*Gerald Chamales,* 247 F.R.D. at 454 (internal citations omitted).

**\*4** With respect to the first factor, the Court must consider whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party. *See Cima Labs,* 2007 WL 1672229, at *8. In considering this factor, the Court notes that the hearing for Plaintiffs' dispositive motion has now been rescheduled for October 17, 2013. (*See* Text Order [Doc. No. 79], July 10, 2013.) At present, the Court finds that the delay in resolving the Plaintiffs' dispositive motion does not, without more, establish that undue prejudice will result from issuance of a stay. Defendants assert that staying discovery would offend the public's " 'particularly great' interest in 'vigorously enforcing national anti-trust laws through the expeditious resolution of private antitrust litigation' " and would prohibit

Defendants from performing studies necessary for FDA approval. (Defs.' Opp' n [Doc. No. 49], 9; *see also* Transcript [Doc. No. 71], 19.) However, the Court finds that this claim of prejudice is contradicted by Defendants' failure to file claims against Plaintiffs, despite the knowledge that Plaintiffs refused to provide samples of their products. *See, infra.*

With respect to the alleged hardship to Plaintiffs if a stay is denied, Plaintiffs generally contend that, "[t]he burden, expense, and distraction to business that discovery ordinarily generates (and which is commonly recognized) may be entirely avoided." (Pls.' Reply [Doc. No. 51], 6.) Defendants, however, assert that, "Actelion's failure to identify any specific prejudice that it would suffer from proceeding with discovery is fatal to its request for a discovery stay." (Defs.' Sur-reply [Doc. No. 53], 7.) Defendants contend that their proposed phase discovery ameliorates any prejudice. (*See* Defs.' Opp'n [Doc. No. 49], 8.) However, Defendants state that "phase one" would include interrogatories and document requests concerning "core documents[,]" and acknowledge that disputes would exist regarding "what those core documents are." (*See* Transcript [Doc. No. 71], 20.) Plaintiffs generally retort that the proposed discovery would be voluminous, "quite costly[,] and expensive." (*Id.* at 10.) Moreover, Plaintiffs contend that although "phase discovery sounds on its face like it can save expenses, in some instances it can actually be more burdensome because it requires duplicative searching." (*Id.* at 9.)

As Plaintiffs assert, "[d]iscovery, particularly in antitrust cases, can be extremely

Actelion Pharmaceuticals Ltd. v. Apotex Inc., Not Reported in F.Supp.2d (2013)

expensive." (Pls.' Br. [Doc. No. 45–1], 2 (citing ⚑*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558–59, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (recognizing the unusually high cost of discovery in antitrust cases)).) The Court concludes that the potential cost of discovery establishes a specific and substantiated risk of harm.[3] *See* ⚑*Cipollone,* 785 F.2d at 1121 (requiring "specific examples or articulated reasoning" to demonstrate "harm" or "a particular need for protection"). Therefore, the Court concludes that, on balance, the equities favor issuance of a stay.

[3]    In *Twombly,* the Supreme Court acknowledged that "proceeding to antitrust discovery can be expensive." ⚑550 U.S. at 558. Though *Twombly,* as noted by Defendants, involved a putative class action, the Court concludes that the nature of the proposed discovery in this case supports a stay, particularly in light of the number of parties and the parties' various representations regarding the Defendants' proposed discovery plan. (*See, e.g.,* Transcript [Doc. No. 71], 9–10, 19–20.)

**\*5**  With respect to the third factor, the Court must consider "whether a stay would simplify the issues and the trial of the case." *Cima Labs,* 2007 WL 1672229, at \*8 (citing *Motson,* 2005 WL 3465664, at \*1). In that regard, the movants bear the burden of establishing that issuance of a stay would simplify the issues for trial by "narrowing" or "outright eliminati[ng]" the need for discovery. *Weisman v. Mediq, Inc.,* No. 95–1831, 1995 WL 273678, at \*2 (E.D.Pa. May 3, 1995) (generally noting that,

"where a pending motion to dismiss" "may result in a narrowing or outright elimination of discovery [,]" "the balance [of competing interests] generally favors granting a motion to stay."). In this case, consideration of this factor further requires the Court to examine the impact of Plaintiffs' dispositive motion. In assessing such impact, the Court must first determine the appropriate standard under which to evaluate the dispositive motion. Defendants assert that the applicable standard requires the moving party "to demonstrate a 'clear and unmistakable' likelihood of success on its potentially dispositive motion."[4] (Defs.' Opp'n [Doc. No. 49], 5–6.) Plaintiffs assert, however, that the Court need not engage in a substantive review of the dispositive motion in determining whether to issue a stay. (*See* Pls.' Reply [Doc. No. 51], 3–5.) Both parties further contend that *Mann v. Brenner,* 375 F. App'x 232 (3d Cir.2010) endorses their respective articulations of the applicable standard. (*Compare* Transcript [Doc. No. 71], 32, *with* Transcript [Doc. No. 71], 33.)

[4]    Defendants contend that ⚑*Gerald Chamales Corp. v. Oki Data Arms, Inc.,* 247 F.R.D. 453, 454 (D.N.J.2007), and *Ariano Castro, M.D., P.A. v. Sanofi Pasteur Inc.,* No. 11–7178, Order [Doc. No. 102] (D.N.J. July 18, 2012), articulate such a standard.

The Court finds that the appropriate standard considers whether the pending dispositive motion "does not appear to be without foundation in law." *See Victor,* 2012 WL 2564841, at \*2. If the dispositive motion is without foundation or otherwise frivolous, then the Court need not, in considering a

stay request, engage in any inquiry regarding the filing impact of the dispositive motion. However, if there is no such showing, then the filing of a dispositive motion may favor the issuance of a stay where, as here, the Court finds that resolution of the dispositive motion may "narrow[ ]" or "outright eliminat[e]" the need for discovery. *Weisman,* 1995 WL 273678, at *2. A stay is provisional relief designed to maintain the status quo during the pendency of certain proceedings. *See, e.g.,* ⚑*Valansi v. Ashcroft,* 278 F.3d 203, 207 (3d Cir.2002) (noting the court's issuance of a stay pending the court's decision "[t]o preserve the status quo"). Any showing of a "clear and unmistakable" likelihood of success is, quite simply, antithetical to that purpose. Consequently, the Court rejects Defendants' argument that the applicable standard requires the moving party "to demonstrate a 'clear and unmistakable' likelihood of success on its potentially dispositive motion." (Defs.' Opp'n [Doc. No. 49], 5–6; *see also* Transcript [Doc. No. 71], 22.) Nor does the Court find that the Third Circuit case of *Mann v. Brenner,* 375 F. App'x 232 (3d Cir.2010), requires such a showing.[5] Although in *Mann,* the court noted that "none of Mann's claims entitle him to relief[,]" *Mann,* 375 F. App'x at 239, the Third Circuit did not delineate a standard that conditions stays upon an analysis of the merits of the underlying motion. Indeed, requiring this Court to opine on the underlying merits of the Plaintiffs' dispositive motion, in addition to the District Court's consideration, would be unduly duplicative. While clearly the mere filing of a dispositive motion does not, without more, constitute good cause for issuance of a stay, this Court "need not 'form[ ] an opinion as to the merits' of the [pending dispositive] motion." *See Perelman,* 2011 WL 3330376, at *1 (E.D.Pa. Aug.3, 2011) (quoting *Weisman,* 1995 WL 273678, at *2). Therefore, the Court examines whether the pending dispositive motion "does not appear to be without foundation[,]" *Victor,* 2012 WL 2564841, at *2, or otherwise frivolous.

5    With respect to *Castro,* the Court notes that *Castro* relies upon *Gerald Chamales. Castro,* No. 11–7178, Order [Doc. No. 102], 2. The Court further notes that the rulings in *Gerald Chamales* and *Castro* were predicated upon the significant discovery that had already been commenced. ⚑*Gerald Chamales,* 247 F.R.D. at 456; *Castro,* No. 11–7178, Order [Doc. No. 102], n. 2. Here, however, discovery remains in its preliminary stage.

**\*6** Here, there is no contention that Plaintiffs' dispositive motion is without basis, frivolous, or filed solely for a dilatory purpose. Plaintiffs contend that the "dispositive motion rests on long-standing antitrust and patent law principles that respect the fundamental right of a firm like Actelion to deal-and refuse to deal-with whomever it chooses[.]" (Pls.' Reply [Doc. No. 51], 4.) Defendants have not filed an application with the Court seeking sanctions under ⚑Federal Rule of Civil Procedure 11 with respect to Plaintiffs' filing of the dispositive motion. Rather, Defendants dispute the dispositive motion on substantive grounds. (*See* Defs.' Opp'n [Doc. No. 49], 6; *see also* Defs.' Sur-reply [Doc. No. 53], 4.) Thus, it does not appear that Plaintiffs' dispositive motion is without foundation in law or otherwise frivolous. Therefore, the Court concludes that

the filing of the motion may be considered, and examines how the motion's resolution may impact the overall adjudication of this action. In certain circumstances, the nature of the dispositive motion may be such that any resultant resolution may have little impact on the ultimate scope of discovery. Thus, this factor requires an individual determination in light of the specific circumstances of a given case. Here, Plaintiffs contend that, "[i]f the Court grants Actelion's Motion for Judgment on the Pleadings and to Dismiss Counterclaims, then there will be no need for discovery." (Pls.' Br. [Doc. No. 45–1], 3; *see also* Transcript [Doc. No. 71], 29.) Defendants Apotex, Zydus, and JM concede that a resolution of the dispositive motion favorable to Plaintiffs would obviate the need for discovery. (*See* Transcript [Doc. No. 71], 23.) Only two Defendants, Roxane and Actavis, dispute Plaintiffs' assertion. (*See* Transcript [Doc. No. 71], 37, 40.) In light of Plaintiffs' assertion that a favorable resolution of Plaintiffs' dispositive motion would end this litigation, and certain Defendants' agreement with respect to such effect, the Court concludes that "a stay would simplify the issues and trial of the case[,]" *Cima Labs,* 2007 WL 1672229, at *8 (citing *Motson,* 2005 WL 3465664, at *1), and accordingly, that this factor, on balance, favors entry of a stay.

With respect to whether discovery is complete and whether a trial date has been set, the Court notes that the case remains in its initial stages and no trial date has been set. Moreover, Plaintiffs' complaint was filed on September 14, 2012 (*see* Complaint for Declaratory Judgment [Doc. No. 1] ), with the present motion filed shortly thereafter on January 16, 2013. Such temporal proximity supports the issuance of a stay because no party has engaged in significant production or protracted motion practice. Therefore, the Court finds this factor likewise favors entry of a stay.

Consequently, the Court concludes that the factors as set forth herein warrant a stay of discovery. Therefore, for the reasons set forth above,

**\*7** IT IS on this 6th day of September 2013,

**ORDERED** that Plaintiffs' Motion to Stay Discovery [Doc. No. 45] shall be, and is hereby, *GRANTED.*

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5524078

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 10 of 114 PageID: 474

Anfibio v. Optio Solutions LLC, Not Reported in Fed. Supp. (2020)

2020 WL 8483808
Only the Westlaw citation
is currently available.
United States District Court, D. New Jersey.

Rosario ANFIBIO, on behalf of himself
and all others similarly situated, Plaintiff,
v.
OPTIO SOLUTIONS LLC, Defendant.

Case No. 20-cv-11146-CCC-ESK
|
Filed 12/30/2020

**Attorneys and Law Firms**

Michael F. Niznik, Jr., Law Office of Michael
F. Niznik, Philadelphia, PA, for Plaintiff.

Sean Michael O'Brien, Lippes Mathias Wexler
Friedman LLP, Buffalo, NY, for Defendant.

## OPINION AND ORDER

KIEL, U.S.M.J.

 **\*1 THIS MATTER** comes before the Court
on defendant's motion to stay discovery
(Motion to Stay) (ECF No. 13) pending the
resolution of defendant's motion to dismiss and
to compel arbitration (Motion to Dismiss) (ECF
No. 3); and plaintiff having opposed the Motion
to Stay (ECF No. 14); and the Court having
considered the parties' respective submissions
on the Motion to Stay; and the Court finding,

1. The complaint in this matter was filed on
August 23, 2020. (ECF No. 1.) Plaintiff alleges
that defendant violated the Fair Debt Collection
Practices Act (FDCPA), 15 U.S.C. § 1692,
et seq., because defendant's dunning letter
sent to plaintiff allegedly contained false and
misleading statements. (*Id.* pp.8–10.) Plaintiff
also brings a putative class action on behalf of
all other persons similarly situated. (*Id.*)

2. Defendant filed its Motion to Dismiss on
September 21, 2020. (ECF No. 3.) The Motion
to Dismiss argues that plaintiff's claims are
subject to arbitration because the lease for a
motor vehicle (Lease), from which the alleged
debt arose, contains an arbitration provision.
(ECF No. 3-1 p.11.) It further argues that the
class allegations should be stricken because
the applicable arbitration provision mandates
arbitration on an individual basis. (*Id.* p.7.)

3. Plaintiff opposed the Motion to Dismiss.
(ECF No. 7.) He argues that the Motion to
Dismiss should be denied because: (a) there
is no evidence that defendant was "assigned"
the right to arbitrate under the Lease; (b) the
FDCPA claim is "independent" of the debt
itself; and (c) the class action waiver only
applies in the arbitration context. (*Id.* pp.5–14.)

4. This Court has the discretion to stay a
proceeding whenever "the interests of justice"
mandate "such action." *United States v.
Kordel*, 397 U.S. 1, 12 n.27 (1970). The Court's
authority "to control the disposition of the
causes on its docket with economy of time
and effort" implicitly carries with it "the power
to stay proceedings[.]" *Landis v. N. Am.
Co.*, 299 U.S. 248, 254 (1936). In making
such a determination, courts "must weigh
competing interests" and strive to "maintain
an even balance[,]" *id.* at 255, mindful that
the stay of a civil proceeding constitutes "an

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 11 of 114 PageID: 475

Antibio v. Optio Solutions LLC, Not Reported in Fed. Supp. (2020)

'extraordinary remedy.' " *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F.Supp.2d 523, 526 (D.N.J. 1998) (quoting *Weil v. Markowitz*, 829 F.2d 166, 174 n.17 (D.C.Cir. 1987)).

5. Courts weigh a number of factors in deciding whether to grant a stay of discovery, including: (a) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (b) whether denial of the stay would create a "clear case of hardship or inequity"; (c) whether a stay would simplify the issues and the trial of the case; and (d) whether discovery is complete and/or a trial date has been set. *Akishev v. Kapustin*, 23 F.Supp.3d 440, 446 (D.N.J. 2014) (citations omitted).

6. Generally, the filing of a dispositive motion does not constitute good cause under Rule 26(c) to stay discovery. *Gerald Chamales Corp. v. Oki Data America, Inc.*, 247 F.R.D. 453, 454 (D.N.J. 2007). However, in *Klepper v. SLI, Inc.*, 45 Fed.App'x. 136 (3d Cir. 2002), the Third Circuit vacated a district court's order directing the parties to proceed with discovery while the defendant's motion to compel arbitration remained pending. *Id.* at 138. The Third Circuit determined that requiring the "parties to submit to full discovery under the Federal Rules of Civil Procedure may unnecessarily subject them 'to the very complexities, inconvenience and expenses of litigation that they determined to avoid.' " *Id.* (citing *Suarez-Valdez v. Shearson Lehman/American Exp., Inc.*, 858 F.2d 648, 649 (11th Cir. 1988)).

**\*2** 7. Here, defendant claims that all of plaintiff's claims are subject to an arbitration provision in the Lease. Applying the ruling in *Klepper* to this matter, I find that the first and second factors weigh in favor of staying discovery pending the resolution of the Motion to Dismiss (which also seeks to compel arbitration). Defendant believes it should not be required to engage in "time consuming and expensive" discovery in litigation before this Court (ECF No. 13-1 p.7), but rather, should be afforded the benefit of what it claims was bargained for: arbitration. Defendant also believes discovery would be complicated further because plaintiff seeks to assert a class action. While I cannot predict the ultimate disposition of the Motion to Dismiss, I can conclude that requiring defendant at this juncture to engage in discovery in this forum, without knowing whether it has the right to arbitrate plaintiff's claims, would present a clear tactical advantage to plaintiff. Proceeding with discovery before resolution of the Motion to Dismiss would also create a clear case of hardship and inequity for defendant, particularly in view of the additional complexities that defending a putative class action can entail.

8. The third factor weighs in favor of staying discovery. Under the third factor, the Court determines "whether a stay would simplify the issues and the trial of the case[.]" *Cima Labs, Inc. v. Actavis Group HF*, No. 07-00893, 2007 WL 1672229, at \*8 (D.N.J. June 7, 2007) (citing *Motson v. Franklin Covey Co.*, 03-01067, 2005 WL 3465664, at \*1 (D.N.J. Dec. 16, 2005)). If the Motion to Dismiss is granted, this matter would no longer be before this Court and would be resolved through arbitration. Conversely, denying a stay and ordering discovery to proceed would be

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 12 of 114 PageID: 476

inefficient and unproductive were the Court to determine, ultimately, that this matter is subject to arbitration.

9. The fourth factor weighs in favor of staying discovery. Under the fourth factor, the Court examines "whether discovery is complete and/ or a trial date has been set." *Id*. The fact discovery end date is July 30, 2021 (ECF No. 12 ¶ 2), the parties have not engaged in any significant discovery (ECF No. 13-1 p.8), and a trial date has not been scheduled. As such, the relative infancy of this matter, the lack of discovery yet conducted, and the absence of a scheduled trial support the entry of a stay of discovery.

Accordingly,

**IT IS** on this **30th** day of **December 2020 ORDERED** that:

1. The Motion to Stay (**ECF No. 13**) is **GRANTED**. The Clerk of the Court is directed to terminate the Motion to Stay at ECF No. 13.

2. The parties are reminded of the telephone status conference scheduled for **February 16, 2021 at 11:30 a.m.** The dial in number is 1-888-684-8852 and access code is 310-0383#. The parties shall file a joint letter, at least three business days before the conference advising of the status of discovery, any pending motions, and any other issues to be addressed.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 8483808

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 13 of 114 PageID: 477

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 17742738
Only the Westlaw citation
is currently available.
United States District Court,
E.D. Texas, Sherman Division.

John BASKIN, Plaintiff,
v.
EK REAL ESTATE SERVICES,
NY, LLC, et al., Defendants.

CIVIL ACTION NO. 4:21-
CV-00727-SDJ-CAN
|
Signed September 13, 2022
|
Filed September 14, 2022

## Attorneys and Law Firms

Adam David Pogach, Pogach, PLLC, Houston, TX, Cristen David Feldman, Derek Daniel Bauman, Kimberly Dang, Feldman & Feldman, PC, Houston, TX, Robin Marie Ziek, Robin M. Ziek, Attorney at Law, Houston, TX, for Plaintiff.

Christopher Allen Davis, Angela Laughlin Brown, London Ryynanen England, William Nelson Drabble, Angela Laughlin Brown, Gray Reed & McGraw LLP, Dallas, TX, John W. Turner, Haynes & Boone, LLP, Dallas, TX, D. Scott Funk, Looper Reed Mark & McGraw, Houston, TX, Jonathan M. Hyman, Kelley C. Morris, Gray Reed, Houston, TX, for Defendant EK Real Estate Services of NY, LLC.

Christopher Allen Davis, Angela Laughlin Brown, London Ryynanen England, William

Nelson Drabble, Gray Reed & McGraw LLP, Dallas, TX, John W. Turner, Haynes & Boone, LLP, Dallas, TX, D. Scott Funk, Looper Reed Mark & McGraw, Houston, TX, Jonathan M. Hyman, Kelley C. Morris, Gray Reed, Houston, TX, for Defendant EasyKnock, Inc.

Andrew Coulson Wright, Erin Rinehart, Buck Keenan LLP, Houston, TX, Christopher Allen Davis, Gray Reed & McGraw LLP, Dallas, TX, for Defendant LendingOne, LLC.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendants EK Real Estate Services of NY, LLC, an Affiliate of EasyKnock, Inc.; EasyKnock, Inc.; and LendingOne, LLC's Joint Motion to Compel Arbitration [Dkt. 16]. Defendants seek to compel this matter to arbitration pursuant to a clause contained in the "Lease with Tenant Option Agreement" signed by Plaintiff [Dkt. 16 at 1]. After reviewing Defendants' Joint Motion to Compel [Dkt. 16], Plaintiff's Response [Dkt. 22], Defendants' Reply [Dkts. 29; 48], Plaintiff's Sur-Reply [Dkt. 33], Defendants' Supplement to their Joint Motion to Compel Arbitration [Dkt. 58], Plaintiff's Response to Defendants' Supplement [Dkt. 62], and Defendants' Notice of New Authority Related to Defendants' Omnibus Motion to Compel [Dkts. 60, 64], and all other relevant filings, the Court recommends that Defendants' Joint Motion to Compel be **GRANTED IN PART** and **DENIED IN PART**, as set forth herein.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 14 of 114 PageID: 478

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

## BACKGROUND

Plaintiff John Baskin ("Plaintiff") filed his Original Complaint on September 1, 2021, in the Eastern District of Texas, Sherman Division [Dkt. 1]; and his Amended Complaint on October 11, 2021 [Dkt. 5]. Plaintiff's Amended Complaint asserts a suit to quiet title, seeks a declaratory judgment, and further alleges violations of the Truth in Lending Act and Texas Deceptive Trade Practices Act, usury and "additional violations" under the Texas Finance Code, common law and statutory fraud, conspiracy, and aiding and abetting [Dkt. 5 at 14-25], stemming from a real estate transaction with Defendants EK Real Estate Services of NY, LLC, an Affiliate of EasyKnock, Inc. ("EK Real Estate"), EasyKnock, Inc. (together with EK Real Estate, "EasyKnock"), [1] and LendingOne, LLC (collectively, "Defendants").

[1]    EK Real Estate is a single-member New York LLC with one member, EasyKnock, Inc. [Dkt. 16 at 1 n.2].

In 2018, Plaintiff was experiencing financial difficulties and began searching for solutions to his "mounting financial pressures" [Dkt. 22 at 3-4]. Plaintiff alleges in his search he identified EasyKnock, which offers what it describes as a "Sell & Stay" program. Defendants outline that this program "works like any other home sale" [Dkt. 16 at 4]. "First, the homeowner sells the home to EasyKnock" [Dkt. 16 at 4]. "In exchange for the home, EasyKnock provides ... (1) an agreed-upon amount of cash; (2) a payoff, on his or her behalf, of any of the debts on the home; (3) an option

allowing the seller to either (a) repurchase his or her home at a predetermined price, or (b) require EasyKnock to sell the home to a third party based on its market value" [Dkt. 16 at 4]. "[A]fter the sale is completed, EasyKnock leases the house back to the former homeowner —who is now the tenant" [Dkt. 16 at 4]. "The tenant is responsible for paying monthly rent to EasyKnock, the landlord" [Dkt. 16 at 4]. After communications with one or more of Defendants, Plaintiff agreed to proceed with the transaction with Defendants [Dkt. 5 at 8].

At closing, which occurred on September 21, 2018, Plaintiff entered into a "sale-leaseback" agreement involving his homestead —10913 Shadow Brook Lane, Frisco, Texas (the "Property") [Dkt. 22 at 2-4]. Through his suit, Plaintiff asserts he only ever intended and understood the transaction to be a home equity loan [Dkt. 5 at 5]. In completing the transaction, all Parties agree Plaintiff executed numerous documents, including: (1) "Lease with Tenant Option Agreement"; (2) "Residential Real Estate Sales Agreement" (the "Purchase Agreement"); (3) "Sell and Stay —Risk Factors" (the "Risk Disclosures"); (4) "General Warranty Deed with Vendor's Lien" (the "Deed"), transferring ownership of the Property to EasyKnock; and (5) "Tenant Termination Option Price Amendment" [Dkts. 16-1; 16-2; 16-3; 16-4; 16-7]. As part of the transaction, Plaintiff acknowledges he deeded the Property to EasyKnock, and the Contract Sales Price was $390,000 [Dkt. 5 at 11; 16 at 6]. Plaintiff further acknowledges he signed the Lease with Tenant Option Agreement which contained a rental rate of $2,607.00 per month [Dkt. 5 at 11]. Since the sale, Plaintiff has missed rental payments and claims he will have

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 15 of 114 PageID: 479

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

issues making future rent payments [Dkts. 5 at 13; 16 at 9-10]. Underpinning each of Plaintiff's claims is his assertion the "sale-leaseback" transaction constitutes a loan under the Texas law, not a sale, and Plaintiff remains the rightful owner of the Property [*see* Dkt. 5].

### Defendants' Joint Motion to Compel

**\*2** On November 23, 2021, Defendants filed their Joint Motion to Compel [Dkt. 16]. Defendants urge that Plaintiff's claims are subject to a valid, enforceable arbitration agreement. More specifically, Defendants contend that Plaintiff agreed to submit each of the claims now asserted to arbitration, by and through execution of the Lease with Tenant Option Agreement (hereinafter referred to as, the "Agreement") [Dkt. 16 at 8]. The Agreement provides, in relevant part:

> 25. **ARBITRATION**. Except as provided below OR UNLESS TENANT SUBMITS A VALID ARBITRATION/CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED BELOW), any and all claims between Tenant and Landlord will be resolved in binding arbitration rather than in court. Tenant and Landlord agree to submit to individual arbitration the resolution of any and all Claims (as defined below) by or between Tenant and Landlord, except that Tenant and Landlord agree that the following will not be subject to the mandatory arbitration provisions in this Section: (A) Landlord seeking a preliminary injunction, restraining order or other provisional equitable relief in any court whereby Landlord may suffer immediate and irreparable harm for which money damages may be inadequate and impossible

> to calculate (including, but not limited to, a Claim where such Claim will not be subject to the informal dispute resolution procedures described in Section); provided, however, that, subsequent to obtaining such preliminary injunction, restraining order or other provisional equitable relief, the Claim will then be submitted to arbitration in accordance with this Section. Tenant and Landlord agree that this Agreement affects interstate commerce, and that the enforceability of this Section will be governed by, construed, and enforced, both procedurally and substantively, by the Federal Arbitration Act, 9 U.S.C. sections 1–9 ("FAA"). Arbitration is the referral of a dispute to one or more impartial persons for a final and binding determination. There is no judge or jury in arbitration, discovery is more limited than in court, there are no class or representative proceedings, and court review of an arbitration decision is limited. An arbitrator must follow this Agreement and can award on an individual basis the same damages and relief as a court (including, but not limited to, injunctive and declaratory relief, statutory damages, and attorneys' fees). "Claim(s)" means any dispute, claim or controversy by or between Tenant and/or Landlord relating to this Agreement, including, but not limited to, any contract, tort, statutory, or equity claims, but expressly excluding Landlord's claims relating to summary proceedings for eviction or possession of the Property, which may be brought in a court of competent jurisdiction by Landlord. Any arbitration will be administered by the American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration

Rules (the "AAA Rules"), as modified by these Terms. Any arbitration initiated by Tenant or Landlord shall be initiated in New York, New York. The AAA Rules, and other information about the AAA, are available at the AAA's website at www.adr.org. A form for initiating arbitration proceedings is available on the AAA's website (https://www.adr.org, but contact the AAA if you have an issue accessing this link) and arbitration proceedings shall be initiated in the location described in this Section. As required by the AAA Rules, if Tenant initiates the arbitration proceedings, Tenant must send the original copy of the completed form to Landlord. If the Claim is for $10,000 or less, Tenant may choose whether the arbitration will be conducted solely based on documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing under the AAA Rules. In all cases, Tenant and Landlord shall exchange documents and other information that Tenant and Landlord intend to use in the arbitration. The Parties shall select one (1) arbitrator by mutual agreement. Unless Tenant and Landlord mutually agree otherwise, the arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted. If the Parties cannot agree on an arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by AAA. Tenant will have the option of making the first strike.

**\*3** ....

If Tenant does not want to be subject to the arbitration provision set forth in Section 25, Tenant may opt out of the arbitration provision set forth in Section 25, by notifying Landlord, in writing, of Tenant's intent to opt out of the arbitration provision, either by (a) sending, within thirty (30) days of the date of this Agreement, electronic mail to leaseadmin@easyknock.com, stating Tenant's name and intent to opt out of the arbitration provision set forth in Section 25, or (b) by sending a letter by certified U.S. Mail, return receipt requested, or by any nationally recognized delivery service (e.g, UPS, Federal Express, etc.), or by hand delivery to Landlord's address, set forth in Section 23 of this Agreement. In order to be effective, the letter must clearly indicate Tenant's intent to opt-out of the arbitration provision set forth in Section 25, and must be dated and signed. The envelope containing the signed letter must be post-marked within thirty (30) days of the date this Agreement is executed by you. Tenant's writing opting-out of the arbitration provision, whether sent by (a) or (b) above, will be filed with a copy of this Agreement and maintained by Landlord. Should you not opt-out of the arbitration provision set forth in Section 25 within the thirty (30) day period, Tenant and Landlord shall be bound by the terms of the arbitration provision set forth in Section 25. Tenant has the right to consult with counsel of his, her or its choice concerning the arbitration provision set forth in Section 25. Tenant understands that Tenant will not be subject to retaliation if Tenant exercises his, her or its right to assert claims or opt-out of coverage under the arbitration provision set forth in Section 25.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 17 of 114 PageID: 481

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

[Dkt. 16-1 at 10-12].

Plaintiff opposes the request to compel arbitration arguing, primarily, that (1) it violates the Truth in Lending Act's ("TILA") prohibition on arbitration agreements involving mortgages secured by a party's primary dwelling; (2) the Deed is void under Texas law; and (3) arbitration is procedurally and substantively unconscionable [Dkt. 22 at 2-3]. On March 23, 2022, Defendants filed a Motion for Leave to Supplement their Joint Motion to Compel [Dkt. 55], which the Court granted [Dkt. 59]. Therein Defendants, for the first time, argue that the arbitration agreement contains a valid delegation clause by reference to the rules of the American Arbitration Association ("AAA"), thus vesting the arbitrator with authority to decide issues of arbitrability [Dkt. 58 at 1]. On June 8, 2022, Plaintiff filed a response urging that (1) Defendants have waived this argument; and (2) the Court is required to make a merits-based determination of whether the agreement was an equitable mortgage; Plaintiff also raises again his assertion that arbitration and delegation clauses are expressly prohibited by TILA and argues both the arbitration and delegation provision are unconscionable [Dkt. 62].

The Court takes note that this case is one of over twenty-five cases brought throughout the state of Texas by Plaintiff's attorney's challenging the legality of EasyKnock's business model. *See Chlarson v. EK Real Est. Servs. of NY, LLC*, No. 5-21-CV-01046-XR, 2022 WL 2392648, at *4 (W.D. Tex. July 1, 2022).[2] Of particular importance are two cases. In *Chlarson*, the court interpreted a near identical Agreement, as here, and addressed largely the same arguments from the plaintiff and Defendants, including, importantly, the applicability of the delegation clause.[3] The *Chlarson* court granted Defendants' Motion to Compel to Arbitration, save and except as to Defendant LendingOne, finding there was a valid contract between the parties and the delegation clause required the parties to submit threshold issues of arbitrability to the arbitrator. *Id.* at *5-8. As such, the *Chlarson* court concluded it could not reach the merits based argument that the "sale-leaseback" transaction constituted a residential loan incompatible with arbitration per TILA." *Id.* at *4. In *Jackson v. EK Real Estate Services of NY, LLC*, the court denied the motion to compel arbitration finding that the contract was subject to TILA because it was mortgage disguised as a sale-leaseback transaction and the agreement was procedurally and substantively unconscionable. No. H-20-3867, 2021 WL 3831990 (S.D. Tex. Mar. 26, 2021). Notably, the *Jackson* court did not consider the delegation clause because Defendants did not raise it, and the court later vacated its opinion. *Jackson v. EK Real Estate Servs. of NY. LLC*, No. H-20-3867, 2021 WL 1658571 (S.D. Tex. Apr. 27, 2021).[4]

2    The Parties have supplemented their briefing on several occasions to notify the Court of new authority arising out of these other matters [*See, e.g.*, Dkts. 60, 64].

3    On March 30, 2022, District Court Judge Xavier Rodriguez referred Magistrate Judge Richard Farrer the

Motion to Compel under Federal Rule of Civil Procedure 72. *Chlarson*, 2022 WL 2392648, at \*1. Judge Farrar, rather than entering a report and recommendation, entered an order on July 1, 2022, noting a magistrate judge's ability to do so under ⚑28 U.S.C. § 636(b)(1)(A) and citing numerous cases in support. *Id.* at n.1; ⚑28 U.S.C. § 636(b)(1)(A) ("a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action."). Here too, the undersigned could proceed in such a manner; however, out of abundance of caution enters a recommendation.

Moreover, the vacated *Jackson* opinion cannot be relied upon because it is "without precedential value." *Mysaev v. United States Citizenship & Immigr. Servs.*, No. 3:22-cv-0371, 2022 WL 2805398, at \*4 (N.D. Tex. July 18, 2022) (citing *Ridley v. McCall*, 496 F.2d 213 (5th Cir. 1974)) ("The Fifth Circuit has held that vacated opinions are generally without precedential value."); *see also* ⚑*Veasey v. Abbott*, 830 F.3d 216, 301 n.36 (5th Cir. 2016) (citing ⚑*Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012)) ("Vacated opinions have no precedential or persuasive value.").

## LEGAL STANDARD

### *Federal Arbitration Act*

**\*4** Congress enacted the FAA to reverse the longstanding judicial hostility to arbitration agreements, and "to place [arbitration] agreements upon the same footing as other contracts." ⚑*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014) (quoting ⚑*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009)). The FAA states:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

Case 3:26-cv-01431-GC-RLS Document 20-8 Filed 06/26/26 Page 19 of 114 PageID: 483

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

equity for the revocation of any contract.

9 U.S.C. § 2. By enacting the FAA, Congress clearly intended "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible," *Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 814 F.3d 300, 303 (5th Cir. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)), and to effectuate this purpose, it specifically authorizes enforcement of arbitration agreements through court orders staying litigation and requiring that parties engage in the arbitration process. *See* 9 U.S.C. §§ 3-4.

The Court notes that "arbitration [remains] a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)); *Houston Refin., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 408 (5th Cir. 2014) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). Therefore, under the FAA (unless the parties have agreed to submit the arbitrability question itself to arbitration), the Court must perform a two-step inquiry to determine whether to compel a party to arbitrate. First, the Court must determine whether the parties agreed to arbitrate the dispute. *Polyflow, L.L.C. v. Specialty RTP, L.L.C.*, 993 F.3d 295, 302 (5th Cir. 2021) (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). Second, if the Court finds that the parties agreed to arbitrate, the Court typically "must consider whether any federal statute or policy renders the claims nonarbitrable." *Id.* (quoting *Will-Drill Res.*, 352 F.3d at 214).

"When considering the first question, there are two considerations. The first is contract formation—whether the parties entered into an arbitration agreement. The second is contract interpretation—whether the dispute falls within the scope of the arbitration agreement." *Kalenga v. Irving Holdings*, No. 3:19-cv-1969, 2020 WL 7496208, at *4 (N.D. Tex. Dec. 20, 2020) (citing *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016)). Part two of this inquiry "usually is for the Court, unless the arbitration clause contains a valid delegation clause for an arbitrator to determine whether the claim falls within the arbitration agreement." *Baldwin v. Beeche*, No. 4:20-cv-639, 2021 WL 1377149, at *2 (E.D. Tex. Apr. 12, 2021) (citing *Kubala*, 830 F.3d at 201). In addition, the FAA provides that when claims are properly referable to arbitration, the Court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3.

**ANALYSIS**

**\*5** To reiterate, "[w]hen considering a motion to compel arbitration, the Court must address two questions. 'First, whether there is a valid agreement to arbitrate, and second, whether the dispute in question falls within the scope of the arbitration agreement.' " *Jallo v. Resurgent Cap. Servs., LP*, 131 F. Supp. 3d 609, 612 (E.D. Tex. 2015) (quoting *Graves v. BP Am., Inc.*, 568 F.3d 221, 222 (5th Cir. 2009)) (internal citations omitted). However, the analysis changes when the arbitration agreement contains a delegation clause. *Vuoncino v. Forterra, Inc.*, No. 3:21-cv-01046, 2022 WL 868274, at \*4 (N.D. Tex. Feb. 28, 2022) (citing *Kubala*, 830 F.3d at 201), *report and recommendation adopted*, No. 3:21-cv-01046, 2022 WL 865893 (N.D. Tex. Mar. 22, 2022); *WorldVentures Marketing, LLC v. Rogers*, No. 4:18-cv-00522, 2018 WL 7138387, at \*5 (E.D. Tex. Dec. 10, 2018) (citing *Kubala*, 830 F.3d at 201), *report and recommendation adopted*, No. 4:18-cv-522, 2019 WL 447320 (E.D. Tex. Feb. 5, 2019).

> If the party seeking arbitration points to a purported delegation clause, then the court analyzes whether an agreement exists; if it finds an agreement exists, '***the only question*** ... is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated.'

*Vuoncino*, 2022 WL 868274, at \*4 (emphasis added) (quoting *Kubala*, 830 F.3d at 202); *see also Baldwin*, 2021 WL 1377149, at \*5 (citing *Alonzo v. Harden Home Health, LLC*, 1:18-cv-694, 2018 WL 626959, at \*4 (W.D. Tex. Nov. 13, 2018)) ("By delegating the scope issue to arbitration, the court cannot decide whether Plaintiffs' claims fall under the agreement"). Indeed, "if there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Vuoncino*, 2022 WL 868274, at \*4; *WorldVentures Marketing*, 2018 WL 7138387, at \*5 (quoting *Kubala*, 830 F.3d at 203) ("When a contract contains such a clause, a court 'must refer the claim to arbitration absent some exceptional circumstances.' ").

### Is There a Valid Arbitration Agreement?

Courts determine the validity of arbitration agreements under applicable state law. *Kapai v. Unified Bus. Techs., Inc.*, No. 4:19-CV-00749-RWS-CAN, 2020 WL 3066646, at \*3 (E.D. Tex. May 8, 2020) (citing *Cooks v. Soto*, No. 3:15-CV-1929-B, 2015 WL 9583806, at \*1 (N.D. Tex. Dec. 30, 2015)), *report and recommendation adopted*, No. 4:19-CV-00749-RWS-CAN, 2020 WL 3064490 (E.D. Tex. June 9, 2020). Here, the Agreement contains a choice-of-law provision selecting Texas's substantive law to govern [Dkt. 16-1 at 10], and the Parties agree that Texas law applies when determining the Agreement's validity [Dkts. 16 at 11; 22 at 6].

Under Texas law, a valid enforceable contract requires: "(1) an offer; (2) an acceptance in strict compliance with terms of the offer; (3) a meeting of the minds; (4) a communication that each party consented to them terms of the contract; (5) execution and delivery with an intent that it be mutual and binding on the parties; and (6) consideration." *Pickle v. Univ. Cable Holdings, Inc.*, 534 F. Supp. 3d 663, 674 (N.D. Tex. Apr. 16, 2021) (citing *Owens v. Specialized Loan Servicing, LLC*, 694 F.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 21 of 114 PageID: 485

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

App'x 950, 953 (5th Cir. 2017)). Defendants have established evidence of each of the above listed elements, as between Plaintiff and EK Real Estate, and Plaintiff does not meaningfully dispute these facts. In exchange for $390,000 in consideration, EK Real Estate offered to enter into a sale-leaseback transaction that included an agreement to arbitrate [Dkts. 16 at 6; 22 at 2]. Plaintiff accepted this offer, as evidenced by his signature [Dkt. 16-1 at 15]. Moreover, Plaintiff does not dispute that he did not opt-out or even attempt to opt-out of the arbitration provision [Dkt. 22 at 24-25]. A valid agreement to arbitrate exists between Plaintiff and EK Real Estate.

**\*6** Notably, in conducting the inquiry of whether there is a contract between the Parties, the Court must "distinguish between 'validity' or 'enforceability' challenges and 'formation' or 'existence' challenges." *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018) (citing *Rent-A-Center, W., Inc., v. Jackson*, 561 U.S. 63, 70 n.2 (2010)). Though the difference between formation and validity may not always be clear, "the Supreme Court has suggested that the category of arguments that question the very existence of an agreement include 'whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent.' " *Id.* (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)). While Plaintiff argues extensively as to the characterization of the Agreement, these arguments cannot be couched as contract validity challenges. Indeed, whether the Agreement should be characterized as an equitable mortgage, as

Plaintiff argues, is a question of contract interpretation, not formation. *See Johnson v. Cherry*, 726 S.W.2d 4, 6 (Tex. 1987) (emphasis added) ("The true nature of the instrument [i.e., whether it is a deed or a mortgage] is resolved by ascertaining the intent of the parties as disclosed by the contract or attending circumstances or both."); *see also Nelson v. Pasol*, No. 13-15-00379, 2017 WL 3634059, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 24, 2017, no pet.) (mem. op.) (same). [5]

5      Moreover, in order to resolve this issue, the Court would have to look at the merits of the claim, which it is not permitted to do at this stage in litigation. *See, e.g., Henry Schein, Inc., v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("When the parties' contract assigns a matter to arbitration, a court may not resolve the merits of the dispute ... So, too, with arbitrability."); *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) ("Courts must not consider the merits of the underlying action when deciding a motion to compel arbitration."). Plaintiff argues that the Fifth Circuit expressly permits merit-based determinations when determining arbitrability [Dkt. 62 at 10]. However, missing from the cases cited by Plaintiff is the effect of a delegation clause. Indeed, the case law is clear, when an arbitration agreement contains a delegation clause, questions of arbitrability must be left to the arbitrator. *Henry Schein, Inc.*, 139 S.Ct. at 530 ("To be sure, before

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 22 of 114 PageID: 486

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.") (internal citations omitted).

### Who is Entitled to Enforce?

Having found a valid agreement to arbitrate between Plaintiff and EK Real Estate, the Court must further address whether the remaining Defendants are also entitled to enforce the agreement. Neither EasyKnock Inc. nor LendingOne is a signatory to the Agreement. As recognized by the *Chlarson* court, under Texas law, where a non-signatory has a close relationship with one of the signatories and the claims are "intimately founded in and intertwined with the underlying contract obligations," the doctrine of intertwined estoppel permits the non-signatory to enforce the arbitration agreement. *Chlarson*, 2022 WL 2392648, at *5; *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 401 (5th Cir. 2022). Such is the case with respect to EasyKnock Inc.—the only member of EK Real Estate and the recipient of any notice or demand made under the Lease "or any other statute." Plaintiff undeniably "treats EasyKnock Inc. and EK Real Estate as a single entity in his pleadings, raising 'virtually indistinguishable factual allegations' against them." *Chlarson*, 2022 WL 2392648, at *5 (citing *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 611 (5th Cir. 2016) (noting district court properly applied principles of estoppel to compel arbitration where plaintiff treated signatory companies and non-signatory company as a "single unit" in

his pleadings)). Indeed, this Court concurs with the *Chlarson* court that all of Plaintiff's claims against EasyKnock Inc. are intertwined with his execution of the Agreement as well as the Parties' obligations thereunder. Accordingly, there is no basis to distinguish these defendants for present purposes. *See Chlarson*, 2022 WL 2392648, at *5 (finding EK Real Estate and EasyKnock "intertwined" for the purpose of deciding whether EasyKnock can invoke the Loan's arbitration agreement). However, the Court must reach a different conclusion as to LendingOne. Defendants assert LendingOne simply provided a business loan for EK Real Estate's purchase of the Property [Dkt. 16 at 2 n.6]. No close relationship is evinced between EK Real Estate and LendingOne "sufficient to permit LendingOne, as a non-signatory to the Loan, to enforce the arbitration agreement under an estoppel theory, at least based on this record." *Chlarson*, 2022 WL 2392648, at *6 (citing *Hays*, 838 F.3d at 611) ("The 'close relationship' requirement guards against sweeping independent entities and even complete strangers into arbitration agreements, limiting the exception to instances of strategic pleading.") (quotations and brackets omitted). Accordingly, there is no valid agreement to arbitrate as between LendingOne and Plaintiff. *See Chlarson*, 2022 WL 2392648, at *6 (finding LendingOne could not invoke the agreement to arbitrate).

### Is There a Valid Delegation Clause?

**\*7** Defendants, in their supplemental briefing, aver that having found a valid agreement to arbitrate exists, the only other question the Court may address is whether there is a valid delegation clause. [6] Defendants urge a valid

delegation clause exists and that the Parties have delegated issues of arbitrability to the arbitrator through the incorporation of the AAA's rules in the Agreement [Dkt. 58 at 4]. Plaintiff does not argue directly to the contrary; rather, his arguments are focused TILA's preclusion of delegation clauses and the unconscionability of the delegation clause—both Plaintiff's arguments are addressed *infra*.

6    It is undisputed that Defendants at the outset did not rely on the delegation clause in support of their Motion to Compel. Plaintiff offers that because Defendants did not present this argument in their initial briefing, it is waived. This argument is wholly without merit. The Court permitted briefing on this issue on both sides [Dkts. 58; 59; 62]. In addition, Defendants have not proceeded in this matter in a manner inconsistent with an intent to seek arbitration. Therefore, Defendants have not waived this argument as Plaintiff argues. *See, e.g.,* ⚑*Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713-14 (2022) (providing that the waiver inquiry focuses on whether a party seeking to compel arbitration knowingly relinquished its right to arbitrate by acting inconsistently with that right); ⚑*Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 12 (1st Cir. 2003) ("Where we are dealing with a forfeiture by inaction (as opposed to an explicit waiver), the components of waiver of an arbitration clause are undue delay and a modicum of prejudice to the other side."); *Lee*

*v. PSI Services III, Inc.*, No. CV 18-1286 (BAH), 2019 WL 131956, at *1 (D.D.C. Jan. 8, 2019) ("The presumption of forfeiture may be overcome if the defendant's failure to [timely] compel arbitration did not prejudice his opponent or the court").

As set forth *supra*, the Agreement provides, "[a]ny arbitration will be administered by the American Arbitration Association ('AAA') pursuant to its then current Commercial Arbitration rules (the 'AAA Rules'), as modified by these Terms" [Dkt. 16-1 at 11]. The *Chlarson* court, in considering this same language, cited the proposition that "[u]nder Rule 7 of the AAA rules, '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrarily of any claim or counterclaim.' " *See Chlarson*, 2022 WL 2392648, at *6 (citing ⚑*Edwards v. Doordash, Inc.*, 888 F.3d 738, 746 (5th Cir. 2018)). To that end, it is well-settled that when an arbitration agreement incorporates the AAA rules, it constitutes "clear and unmistakable evidence" that the Parties intended to delegate to an arbitrator the power to decide arbitrability. *Id.*; *see also* ⚑*Arnold*, 890 F.3d at 552 (citing ⚑*Petrofac, Inc. v. Dyn-McDermott Petrol. Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012)) (dispensing with plaintiff's argument that Texas law controls the "clear and unmistakable" standard and holding that "generally, stipulating that the AAA rules will govern arbitration of disputes constitutes such clear and unmistakable evidence."); ⚑⚠*Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 549-50 (W.D. Tex. 2017) ("[C]ourts in

the Fifth Circuit have concluded incorporation of the AAA rules demonstrates an intent to delegate arbitrability even in cases involving unsophisticated plaintiffs.") (collecting cases). Accordingly, the Court finds there is a valid delegation clause that requires the Court to leave questions of arbitrability to the arbitrator. *See* ⚑*Arnold*, 890 F.3d at 553 ("Because the April 2016 Terms expressly incorporate the AAA rules, the parties have clearly and unmistakably demonstrated their intent to delegate.").

### Plaintiff's Counterargument - Unconscionability

**\*8** Plaintiff urges the Court to decline to compel arbitration on numerous bases, including that the arbitration agreement and the delegation clause, separate from the Agreement, are procedurally and substantively unconscionable [Dkt. 62 at 19-24]. "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." ⚑*Delfingen US-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 798 (Tex. App.—El Paso 2013, no pet.). Stated differently, a party can claim an arbitration agreement is unconscionable in two ways: one way challenges the arbitration agreement specifically, while the other challenges the contract as a whole. ⚑*Buckeye Check Cashing*, 546 U.S. at 444. The first line of challenges is for this Court. *See id.* But unconscionability allegations to the entire contract are for the arbitrator (assuming the Parties agreed arbitration would decide this issue). *See* ⚑*Prima Paint Corp. v. Flood & Conklin*

*Mfg. Co.*, 388 U.S. 395 (1967); *Dr. Eric J. Hall, Jr., DDS, PA v. Affordable Care, LLC*, No. 4:19-CV-00335, 2019 WL 5550625, at *3 (E.D. Tex. Oct. 28, 2019). In determining whether a contract is unconscionable, the Court evaluates "(1) the 'entire atmosphere' in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the 'non-bargaining ability' of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable." *Affordable Care*, 2019 WL 5550625, at *3.

The entirety of Plaintiff's procedural unconscionability argument is focused on the "atmosphere" of the Agreement as a whole and not any factor specific to the delegation provision. Consider the following passage from Plaintiff's Response:

> The entire atmosphere of Baskin's transaction is procedurally unconscionable. Baskin had no alternatives to obtain funds and no bargaining power whatsoever. Baskin's financial obligations exceeded his income; he had bad credit; and he had no ability to utilize a conventional lender to obtain funds from the equity in his Property, and Defendants knew it. Exhibit 1 at ¶¶3–5, 15, 22–26. Despite having over $260,000.00 in equity in his Property, out of a sales price of $390,000.00, Baskin received only $74,408.03 in exchange for the deed to his Property. *Id.* at ¶16; Dkt. 16-4. Defendants also represented to Baskin that he would have a 50% retained "stake" in his Property; yet Defendants made no express reservation for this reserved stake in the deed or in the *HUD Settlement Statement*.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 25 of 114 PageID: 489

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

For Baskin to repurchase the property in the first year, he would have to come up with $237,000.00. Dkt. 16-1 at 5. In the meantime, he would have to pay $31,284 in rent over the first year. *Id.* at 1. The repurchase price and the rent went up a *minimum* of 2.5% each year. *Id.* at 4. In addition to being an excessing amount of rent,7 no amount of the rent is credited towards the amount Baskin would have to pay towards the payoff of EasyKnock's Secured Funding Amount.

Defendants took none of the required steps to evaluate whether Baskin would be able to qualify for a home equity loan or even keep up with monthly rental payments that far exceeded market value and exceeded his monthly mortgage payments at the time of this transaction. Exhibit 1 at ¶15. Defendants took the entirety of Baskin's homestead as security in advance while having every reason to know that Baskin would never be able to afford to repurchase his property in the face of constantly increasing monthly rent and payoff amounts. For each of these reasons, the arbitration clause in the Lease is against Texas public policy, it is procedurally unconscionable, and it is unenforceable under Texas law.

[Dkt. 22 at 22-23]. Other courts, considering the same or similar arguments, have found that these are really questions of unconscionability of the contract as a whole (rather than the delegation clause), which is a question reserved for, or that must be, presented to the arbitrator. *See, e.g.,* ⚑*Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.,* 564 S.W.3d 105, 130 (Tex. App.—El Paso 2018,

no pet.) ("[Plaintiff's] arguments in resisting arbitration on procedural unconscionability grounds attacked the container contract as a whole, and attacks on the container contract as a whole are matters that must be presented to the arbitrator per the terms of the arbitration clause."). Even still, procedural unconscionability is a high bar, and without having shown unfair surprise or oppression, the Court cannot find the delegation clause is procedurally unconscionable. *See Xome Holdings LLC v. Derbonne,* No. 4:16-CV-00550-ALM, 2017 WL 2402578, at *3 (E.D. Tex. June 2, 2017) (citing *In re Palm Harbor Homes, Inc.,* 195 S.W.2d 672, 679 (Tex. 2006)) ("Texas law requires unfair surprise or oppression for the Court to find procedural unconscionability."). [7]

[7]  In this regard, the Court notes that the Agreement contains an opt-out provision, which further undermines Plaintiff's procedural unconscionability challenge. He had an avenue and was under "no pressure" to enter the agreement to arbitrate [Dkt. 16] ("If Tenant does not want to be subject to the arbitration provision set forth in Section 25, Tenant may opt out of the arbitration provision set forth in Section 25, by notifying Landlord, in writing, of Tenant's intent to opt out of the arbitration provision ...").

**\*9** Plaintiff's argument regarding substantive unconscionability relates to access and availability of arbitration, primarily focusing on the costs imposed on Plaintiff if he is required to arbitrate under the Commercial Arbitration rules, rather than the Consumer

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 26 of 114 PageID: 490

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

Arbitration Rules, and the costs associated with travelling to and seeking representation in New York [Dkts. 22 at 24; 62 at 20]. However, Defendants have offered to arbitrate under the Consumer Arbitration Rules at a location in Texas agreeable to Plaintiff [Dkt. 29 at 2]. This would subsequently cap Plaintiff's costs to $200 [Dkt. 22 at 24]. Courts have found that where the Party takes steps to significantly lower the cost of arbitration, it "moots" the substantive unconscionability argument. *See Chlarson*, 2022 WL2392648, at *8; *see also* ⚑*Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 300 (5th Cir. 2004) (plaintiff's cost-prohibitive argument was mooted by defendant's representation to the district court that it would pay all arbitration costs).[8] While Plaintiff argues there is no severability clause, the Court finds the impact of any unconscionability is mooted when the other parties agree to reduce the costs of arbitration, and therefore, the clause does not need to be severed. With Defendants agreeing to curb costs, Plaintiff cannot show the likelihood of incurring such prohibitive costs, and he has not met his burden as the party arguing unconscionability. *See* ⚑*Taylor Morrison of Tex., Inc., v. Skufca*, No. 01-20-00638-CV, 2021 WL 6138979, at *14 (Tex. App.—Houston [1st Dist.] Dec. 30, 2021, no pet. h.) (citing ⚑*Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 81 (2000)) ("When a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, the party bears the burden of *showing the likelihood of incurring such costs*."). As such, the Court finds that Plaintiff's argument that the arbitration clause and delegation provision are

unconscionable do not dictate a different result, and arbitration is warranted, as set forth *supra*.

[8]    This case is unlike *Jackson*, which again the Court notes lacks precedential value, where the court found EasyKnock's arbitration agreement unconscionable, because unlike here, Defendants continued to insist on arbitration using the commercial rules and did not offer to pay costs. *See* ⚑*Jackson*, 2021 WL 3831990, at *6 ("Requiring Jackson to submit to the more costly arbitration under the commercial rules, despite knowing that those rules would make arbitration essentially unavailable to her, was oppressive. The arbitration clause is procedurally unconscionable.").

### Plaintiff's Counterargument - Federal Statute or Policy (TILA)

Similarly, Plaintiff's argument that the arbitration clause is unenforceable under TILA does not alter this Court's conclusion. Having determined that an arbitration agreement exists between the Parties, and that the Agreement contains a provision reserving issues of arbitrability for the arbitrator, the Court must compel the parties to proceed to arbitration unless a "federal statute or policy renders the claims non arbitrable." *Floyd v. Kelly Servs., Inc.*, No. 3:18-cv-2247, 2019 WL 4452309, at * 2 (N.D. Tex. Aug. 30, 2019), *report and recommendation adopted*, No. 3:18-cv-2247, 2019 WL 4447538 (N.D. Tex. Sept. 16, 2019). Plaintiff avers that TILA precludes enforceability of the arbitration clause. More specifically, Plaintiff avers that because this transaction would be classified

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 27 of 114 PageID: 491

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

as an equitable mortgage under Texas law—a question that this Court cannot reach—TILA is applicable to his claims, which preclude enforcement of the Agreement's arbitration clause. Nevertheless, the Court considers whether Plaintiff's argument would prevail. The relevant provision of TILA at issue here, provides

> No residential mortgage loan and no extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction.
>
> ....
>
> No provision of any residential mortgage loan or of any extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer, and no other agreement between the consumer and the creditor relating to the residential mortgage loan or extension of credit referred to in [§ 1639c(e)(1)], shall be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States, or any other court of competent jurisdiction, pursuant to section 1640 of this title or any other provision of law, for damages or other relief in connection with any alleged violation of this section, any other provision of this subchapter, or any other Federal law.

**\*10** 15 U.S.C. § 1639c(e)(1), (3). A recent Eleventh Circuit opinion proffered by

Defendants provides some clarity on this issue, explaining that when a party's TILA challenge "relates only to the enforceability of the parties' agreement to arbitrate the *merits* of his claim, not the enforceability of the parties' separate agreement to arbitrate the *arbitrability* of his claims," as is the case here, this "is therefore an issue for the arbitrator to decide." *See Attix v. Carrington Mortg. Servs., LLC,* 35 F.4th 1284, 1293–94 (11th Cir. 2022) (emphasis in original) (district court erred in refusing to compel arbitration where the parties' contract contained a valid delegation agreement and plaintiff's Dodd-Frank Act challenge concerned the enforceability of the parties' primary agreement to arbitrate his claims, not whether the parties' delegation agreement was enforceable). And, nothing in the TILA provisions invoked here—either § 1639c(e)(1) or (e)(3)—bars the delegation of questions of arbitrability. As the Supreme Court explains, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc.,* 139 S. Ct. at 529. Accordingly, the Court cannot decline to give effect to the Parties' valid delegation clause and resolve or reach the merits of the dispute in this posture, as Plaintiff desires. *See Chlarson,* 2022 WL 2392648, at \*7 (quoting *Henry Schein, Inc.,* 139 S. Ct. at 529) ("We have held that a court may not 'rule on the potential merits of the underlying" claim that is assigned by contract to an arbitrator, even if it appears to the court to be frivolous.").

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 28 of 114 PageID: 492

Baskin v. EK Real Estate Services, NY, LLC, Not Reported in Fed. Supp. (2022)

### A Stay Is Appropriate

Recall that the Federal Arbitration Act provides for a stay pending arbitration. *See* 9 U.S.C. § 3. Indeed, "a stay is mandatory upon a showing that the opposing party has commenced suit upon any issue referable to arbitration under an agreement in writing for such arbitration." *Alford v. Dean Witter Reynolds*, 975 F.2d 1161, 1164 (5th Cir. 1992) (cleaned up). Although a Court may dismiss—rather than stay—a case, it may only do so when all claims are subject to arbitration. *See id.* The Fifth Circuit has held that a stay pursuant to Section 3 applies "to non-signatories only where: (1) the arbitrated and litigated disputes involve the same operative facts; (2) the claims asserted in the arbitration and litigation are "inherently inseparable"; and (3) the litigation has a "critical impact" on the arbitration." *Rainier DSC 1, L.L.C. v. Rainier Cap. Mgmt., L.P.*, 828 F.3d 356, 360 (5th Cir. 2016). Here, Plaintiff's claims against LendingOne are based on the "same operative facts" and are "inherently inseparable in any practical way from Plaintiff's claims against [EK Real Estate and EasyKnock Inc]." *See Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002). Permitting Plaintiff's claims to proceed against LendingOne while his claims against the other two Defendants proceed to arbitration would "undermine the arbitration proceedings between [Plaintiff, EK Real Estate, and EasyKnock], thereby thwart[ing] the federal policy in favor of arbitration." *See id.* Accordingly, the Court recommends any claims which remain before this Court be stayed.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends Defendants EK Real Estate Services of NY, LLC; EasyKnock, Inc.; and LendingOne, LLC's Joint Motion to Compel Arbitration [Dkts. 16; 58] be **GRANTED IN PART** and **DENIED IN PART** as set forth herein. The Court recommends that all claims asserted by Plaintiff John Baskin against Defendants EK Real Estate Services of NY, LLC, an Affiliate of EasyKnock, Inc., and EasyKnock, Inc. be **COMPELLED** to arbitration and Defendant LendingOne's request to compel arbitration be **DENIED**, and this matter be stayed as to Plaintiff's claims against LendingOne.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

**\*11** Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon

grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See* ⚑*Douglas v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds,*

⚑28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17742738

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 30 of 114 PageID: 494

2023 WL 8866554
Only the Westlaw citation
is currently available.
United States Court of Appeals, Third Circuit.

BLUEPRINT CAPITAL ADVISORS, LLC
v.
State of New Jersey DIVISION OF INVESTMENT; Blackrock, Inc.; Blackrock Alternative Advisors; Cliffwater, LLC; Timothy Walsh, in his individual and professional capacities; Samantha Rosenstock, in her individual and professional capacities; Jason MacDonald, in his individual and professional capacities; Christopher McDonough, in his individual and professional capacities; Corey Amon, in his individual and professional capacities; Dini Ajmani, in her individual and professional capacities; Philip Murphy, in his official capacity as Governor of the State of New Jersey; Owl Rock Capital Corporation; Derrick Green; George Helmy; Matthew Platkin, in their individual and professional capacities Timothy Walsh, Appellant

No. 23-1116
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) November 17, 2023
|
(Filed: December 22, 2023)

On Appeal from the United States District Court for the District of New Jersey (D.C. No. 2:20-cv-07663), District Judge: Honorable Julien X. Neals

**Attorneys and Law Firms**

Michael J. Bowe, Esq., Lauren Tabaksblat, Esq., Brown Rudnick, New York, NY, for Blueprint Capital Advisors, LLC.

Christopher D. Adams, Esq., Greenbaum Rowe Smith & Davis, Red Bank, NJ, Cameryn J. Hinton, Esq., John D. North, Esq., Charles J. Vaccaro, Esq., Greenbaum Rowe Smith & Davis, Iselin, NJ, for New Jersey Department of Treasury Investment Division, Jason MacDonald, Christopher McDonough, Corey Amon, Dini Ajmani.

Scott D. Musoff, Esq., Skadden Arps Slate Meagher & Flom, New York, NY, Justin T. Quinn, Esq., Robinson Miller, Newark, NJ, for Blackrock Inc., Blackrock Alternative Advisors.

John D. North, Esq., Greenbaum Rowe Smith & Davis, Iselin, NJ, for George Helmy, Governor Of New Jersey, Derrick Green, Matthew Platkin.

Kerri E. Chewning, Esq., Archer & Greiner, Philadelphia, PA, for Cliffwater LLC.

Diane P. Sullivan, Esq., Weil Gotshal & Manges, Princeton, NJ, Zachary Tripp, Esq., Weil Gotshal & Manges, Washington, DC, for Timothy Walsh.

Jeffrey S. Chiesa, Esq., Ronald L. Israel, Esq., Chiesa Shahinian & Giantomasi, Roseland, NJ, for Samantha Rosenstock.

Kevin H. Marino, Esq., John D. Tortorella, Esq., Marino Tortorella & Boyle, Chatham, NJ, for Owl Rock Capital Corp.

Blueprint Capital Advisors, LLC v. Division of Investment, Not Reported in Fed. Rptr. (2023)

Case 3:26-cv-01431-GC-RLS Document 20-8 Filed 06/26/26 Page 31 of 114 PageID: 495

Before: CHAGARES, Chief Judge, MATEY and FUENTES, Circuit Judges.

## OPINION [*]

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

FUENTES, Circuit Judge.

**\*1** Blueprint Capital Advisors, LLC ("BCA") sued a former member of its advisory board, Timothy Walsh, for allegedly participating in a discriminatory conspiracy to misappropriate BCA's confidential and proprietary investment model for public pension funds. Walsh argues that BCA's claims against him must be resolved by arbitration due to an arbitration clause in the Transaction Agreement entered into between BCA and Walsh's living trust. We cannot address that issue because the arbitration clause delegates the threshold question of arbitrability to an arbitrator. So we will vacate the District Court's order denying Walsh's motion to compel arbitration and remand for further proceedings.

## I. [1]

[1] Because we write solely for the parties, we recite only the facts necessary to our disposition.

## A.

BCA is an investment advisory firm. BCA and Walsh's trust [2] entered into the Transaction Agreement in June 2017, approximately two years after Walsh joined BCA's advisory board. Under the Transaction Agreement, Walsh's trust made a $75,000 capital contribution to BCA. In exchange, Walsh's trust became a "Member" of BCA with "rights and responsibilities" set forth in the Transaction Agreement. [3]

[2] We will not consider BCA's argument that Walsh is not a party to the Transaction Agreement and therefore cannot invoke the arbitration clause because that argument was raised for the first time on appeal. *See* ⚑*Freeman v. Pittsburgh Glass Works, LLC,* 709 F.3d 240, 249 (3d Cir. 2013) (citing ⚑*Singleton v. Wulff,* 428 U.S. 106, 120 (1976)).

[3] App. 245.

As part of the Transaction Agreement, Walsh's trust "confirm[ed] and agree[d]" that:

> [I]t has not and shall not; and ... its Affiliates have not and [it] shall cause ... its Affiliates not to, directly or indirectly, disclose(d) to any Person or use(d) for [its] own benefit any BCA Party Confidential

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 32 of 114 PageID: 496

Blueprint Capital Advisors, LLC v. Division of Investment, Not Reported in Fed. Rptr. (2023)

Information ... concerning the business, contacts, finances or operations of the BCA Parties or their respective Affiliates. [4]

The Transaction Agreement also includes an arbitration clause, which states:

Any controversy or claim arising out of or relating to this Agreement or the breach thereof, that cannot be settled between the Parties, shall be settled by arbitration in accordance with AAA and pursuant to the AAA Rules; *provided*, that each Party shall retain his or its right to commence an action to obtain specific performance or other equitable relief from any court of competent jurisdiction. [5]

The Transaction Agreement defines "AAA Rules" to mean "the Commercial Arbitration Rules of the American Arbitration Association." [6] The Transaction Agreement also states that it "supersede[s] all other prior agreements and understandings, whether oral, written, or electronic, among the Parties hereto and their respective Affiliates with respect to the subject matter hereof or thereof ...." [7]

[4] App. 250.

[5] App. 257 (emphasis in original).

[6] App. 282.

[7] App. 258.

## B.

BCA's complaint—initially filed in June 2020 but subsequently amended in November 2020—alleges that Walsh used his advisory position to extract BCA's confidential information. It asserts claims of racketeering, fraud, breach of contract, [8] breach of fiduciary duty, and civil conspiracy against Walsh, and seeks declaratory relief, monetary damages, and attorneys' fees and costs from him. [9]

[8] BCA's breach of contract claim does not explicitly refer to the Transaction Agreement. Rather, BCA alleges that "Walsh contracted with BCA to serve as a member of BCA's advisory board," "owed BCA a duty of confidentiality associated with his agreement to serve as a member of the advisory board," and "breached his duties to BCA by, among other things, disclosing proprietary confidential information." App. 234.

[9] The Amended Complaint seeks injunctive relief against other defendants.

**\*2** In February 2021, Walsh moved to dismiss the Amended Complaint or to compel arbitration based on the Transaction

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 33 of 114 PageID: 497

Blueprint Capital Advisors, LLC v. Division of Investment, Not Reported in Fed. Rptr. (2023)

Agreement's arbitration clause. In December 2022, the District Court denied Walsh's motion to dismiss in significant part and denied his motion to compel arbitration in its entirety. On Walsh's motion to compel arbitration, the District Court concluded that the dispute falls outside the scope of the arbitration clause, but did not first consider whether the parties agreed to delegate the issue of arbitrability to an arbitrator. Walsh appeals only the District Court's denial of his motion to compel arbitration.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16.[10] We exercise plenary review over the District Court's order on a motion to compel arbitration, except for underlying findings of fact, which we review for clear error.[11]

10    *See Griswold v. Coventry First LLC,* 762 F.3d 264, 268 (3d Cir. 2014).

11    *See Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008).

## III.

The Supreme Court has consistently held that parties may agree to have an arbitrator, rather than a court, resolve threshold arbitrability questions, "such as whether the parties have agreed to arbitrate or whether their agreement

covers a particular controversy."[12] If the parties have a valid arbitration agreement that delegates the issue of arbitrability to an arbitrator by "clear and unmistakable" evidence, "a court possesses no power to decide the arbitrability issue."[13] "That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."[14]

12    *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530, 529 (2019) (quoting *Rent–A–Center, W., Inc. v. Jackson,* 561 U.S. 63, 68-69 (2010) and citing *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943-44 (1995)).

13    *Id.* (quoting *First Options,* 514 U.S. at 944); *see also Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020).

14    *Henry Schein*, 139 S. Ct. at 529.

There is no dispute that the parties have a valid arbitration agreement,[15] and Walsh argues that the parties' incorporation of the rules of the American Arbitration Association ("AAA") in the arbitration agreement constitutes "clear and unmistakable" evidence of their agreement to delegate arbitrability questions to an arbitrator. We agree.

15    Because there was no challenge to the validity of the arbitration clause before the District Court, we will treat the arbitration clause as a valid and

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 34 of 114 PageID: 498

Blueprint Capital Advisors, LLC v. Division of Investment, Not Reported in Fed. Rptr. (2023)

enforceable agreement. *See Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 326 (3d Cir. 2022) (quoting ⚑*MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020)).

The arbitration clause states that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof ... shall be settled by arbitration in accordance with AAA and pursuant to the AAA Rules,"[16] which the Transaction Agreement defines as the AAA's Commercial Arbitration Rules.[17] And Rule 7(a) of the AAA Rules states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."[18] Because the AAA Rules empower an arbitrator to resolve arbitrability questions, their incorporation into an arbitration agreement may constitute a clear and unmistakable delegation of arbitrability, so long as the parties' agreement does not present ambiguity as to that delegation.[19]

[16]  App. 257.

[17]  App. 282.

[18]  American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a).

[19]  *See* ⚑*Chesapeake Appalachia, LLC v. Scout Petrol., LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (holding that the incorporation of unspecified

AAA rules requiring a "daisy-chain" of cross-references to the AAA's Supplementary Rules did not serve as a clear and unmistakable delegation to an arbitrator to decide class arbitrability); ⚑*HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 322-23 (W.D. Pa. 2020) (holding that the incorporation of the AAA's Commercial Arbitration Rules in a bilateral arbitration agreement constituted a clear and unmistakable delegation of arbitrability).

**\*3**  Here, no ambiguity exists. The arbitration clause broadly applies both to controversies or claims that arise under the Transaction Agreement and those that relate to the Transaction Agreement or its breach,[20] and a dispute over arbitrability surely relates to the Transaction Agreement.[21] Although the arbitration clause excludes claims that seek "specific performance or other equitable relief,"[22] that carve-out does not narrow the delegation where, as here, neither form of relief is sought.[23] Furthermore, the Transaction Agreement clearly and unmistakably specifies that the AAA's Commercial Arbitration Rules apply, making Rule 7(a) readily accessible. We therefore hold that the arbitration clause clearly and unmistakably delegates the threshold arbitrability question, and an arbitrator must determine whether BCA's claims against Walsh are arbitrable.

[20]  We disagree with BCA's argument that the arbitration clause expressly excludes claims that predate the Transaction Agreement. Nowhere does

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 35 of 114 PageID: 499

**Blueprint Capital Advisors, LLC v. Division of Investment, Not Reported in Fed. Rptr. (2023)**

the Transaction Agreement impose such a rigid temporal restriction.

21    *See* 🚩*HealthplanCRM, LLC*, 458 F. Supp. 3d at 324.

22    App. 257.

23    *See* 🚩*Brennan v. Opus Bank*, 796 F.3d 1125, 1130-31 (9th Cir. 2015).

## IV.

For these reasons, we will vacate the District Court's order denying the motion to compel arbitration and remand for further proceedings consistent with this opinion.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 8866554

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2661254
Only the Westlaw citation
is currently available.
United States District Court, D. New Jersey,
Camden Vicinage.

James BURRESS, on behalf of himself
and the putative class, Plaintiff,
v.
FREEDOM MORTGAGE
CORPORATION, Defendant.

Civil No. 20-15242 (NLH/AMD)
|
Signed 05/26/2021

**Attorneys and Law Firms**

Lisa R. Considine, David J. Disabato, Disabato
& Considine LLC, Rutherford, NJ, for Plaintiff.

Joshua N. Howley, Mark E. Duckstein, Sills,
Cummis & Gross, PC, Newark, NJ, for
Defendant.

**ORDER**

ANN MARIE DONIO, UNITED STATES
MAGISTRATE JUDGE

**\*1** This matter comes before the Court by
way of motion [D.I. 26] of Defendant, Freedom
Mortgage Corporation, for a protective order
staying discovery pending resolution of
Defendant's motion for summary judgment.
Plaintiff, James Burress, filed opposition [D.I.
28] to the motion for a stay. The Court has
considered the submissions of the parties and
decides this matter pursuant to Federal Rule of
Civil Procedure 78. For the reasons that follow,
Defendant's motion for a stay is granted in part
and denied in part.

In this action, Plaintiff generally contends that
Defendant engages in a practice "of sending
periodic mortgage statements to borrowers
such as Plaintiff, where the statements include
misleading and patently conflicting recitations
of the 'amount due.' " (Compl. [D.I. 1], ¶ 1.)
Plaintiff alleges, by way of example, that the
statement received by Plaintiff in November
2019 disclosed different amounts due. (*Id.*) As
averred by Plaintiff, because of the inconsistent
amounts identified on the mortgage statement,
Plaintiff sent a "request for information" or
"qualified written request" by certified mail
to Defendant, but Defendant allegedly failed
to respond to the request. (*Id.* at ¶¶ 16, 20.)
Plaintiff brings this action on his own behalf
and as the representative of a class of similarly
situated individuals. (*Id.* at ¶ 21.) Plaintiff
defines the class as "[a]ll persons in the United
States who: (1) obtained a mortgage with
Freedom Mortgage and (2) who were sent a
periodic mortgage statement which disclosed
different sums for the 'amount due.' " (*Id.* at ¶
22.) The original complaint, filed on October
30, 2020, contained a single cause of action for
an alleged violation of the Truth in Lending Act
(hereinafter, "TILA"), 15 U.S.C. § 1601, *et
seq.* (*Id.* at ¶¶ 34-44.)

In lieu of answering the complaint, Defendant
filed a motion to dismiss on statute of
limitations grounds, arguing that Plaintiff had
actual notice of the alleged violation of TILA
well before filing this case and beyond the one-
year statute of limitations for TILA violations.
(Defendant's Brief in Support of Motion to

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 37 of 114 PageID: 501

Burress v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2021)

Dismiss Complaint for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary Judgment Pursuant to Fed. R. Civ. P. 12(d) and 56 [D.I. 6-1], p. 1.) Plaintiff responded by filing an amended complaint which, in addition to the TILA class claim, contains claims on behalf of Plaintiff individually for alleged willful and negligent violations of the Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. § 1681, et seq. (Counts Two and Three), and an alleged violation of the Real Estate Settlement Procedures Act (hereinafter, "RESPA"), 12 U.S.C. § 2601, et seq. (Count Four). (Am. Compl. [D.I. 9], ¶¶ 47-80.) Defendant filed an answer to the amended complaint on February 10, 2021 and thereafter filed a motion for summary judgment on February 19, 2021, seeking dismissal of all claims in the amended complaint. (Defendant's Notice of Motion for Summary Judgment [D.I. 16], p. 1.) However, Defendant has since withdrawn its motion for summary judgment with respect to the RESPA claim contained in Count Four of the amended complaint. (Reply Br. in Further Support of Defendant's Motion for Summary Judgment [D.I. 36], p. 3.) Both dispositive motions are pending before the District Court.

**\*2** Three weeks after filing its summary judgment motion, Defendant filed the present motion to stay discovery.[1] Defendant argues that a stay would save the burden and expense of responding to discovery that may otherwise be unnecessary if the motion for summary judgment is granted. (Letter from Mark E. Duckstein, Esq. (hereinafter, ("Def.'s Ltr. Br.") [D.I. 26-1], Mar. 12, 2021, pp. 6, 8.) Defendant specifically notes that the summary judgment motion seeks dismissal of

the TILA claim, which is asserted on behalf of a putative class of more than 1,000 members and will purportedly entail significant and costly discovery if discovery on that claim should proceed. (Id. at p. 6; Letter from Mark E. Duckstein, Esq. (hereinafter, "Def.'s Reply Br.") [D.I. 32], Mar. 29, 2021, pp. 6-7.) Defendant also argues that Plaintiff will not be prejudiced by a limited stay at this time, noting that Plaintiff's claims will largely be established by documentary evidence rather than witness recollections, "and therefore it is difficult to imagine ... that a brief pause to allow the Court to decide the pending dispositive motion will result in 'undue prejudice' or 'clear tactical disadvantage' " to Plaintiff. (Def.'s Ltr. Br. at pp. 5-6; see also Def.'s Reply Br., pp. 5-6.) Finally, Defendant notes that it filed the motion for a stay only sixty days after Plaintiff filed the amended complaint, that no discovery has been propounded yet,[2] and that the timing of the motion supports entry of a stay. (Def.'s Ltr. Br., p. 8.)

[1]   The motion to dismiss is moot in light of Plaintiff's subsequent filing of an amended complaint and Defendant's answer thereto. As such, Defendant moves for a discovery stay pending resolution of the summary judgment motion.

[2]   Since the filing of the motion to stay discovery, the parties have served written discovery requests and produced documents, and depositions are scheduled for June 1, 2021. (See Letter from Mark E. Duckstein, Esq. [D.I. 34], Apr. 12, 2021; Letter from

David J. DiSabato, Esq. [D.I. 39], May 12, 2021.)

Plaintiff counters that he will suffer a "clear disadvantage" if discovery is stayed because discovery is needed to respond to Defendant's summary judgment motion. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for a Stay of Discovery Pursuant to Fed. R. Civ. P. 26(c) [D.I. 28], pp. 13-19.) Plaintiff identifies specific discovery that he maintains is necessary to address Defendant's motion, including documents and testimony from three witnesses. (*See id.* at pp. 13-19, 26-27.) In addition, Plaintiff argues that Defendant's alleged burden of having to proceed with discovery is insufficient to justify a stay, as Defendant does not demonstrate that participating in discovery would be "unduly" burdensome in this case. (*Id.* at pp. 21-22.) Plaintiff argues in this regard that Defendant has already identified in its initial disclosures those categories of documents which are responsive to the allegations in this case, and production of such documents is a matter of "routine discovery." (*Id.* at pp. 22-23.) Further, Plaintiff contends that the filing of a dispositive motion should not, in itself, warrant a stay, and that a stay in this case would create delay because the parties will be several months behind in the discovery process in the "very likely" event summary judgment is denied. (*Id.* at pp. 25-27.) Finally, while Plaintiff concedes that the early stage of this litigation would typically weigh in favor of a stay, he argues that the procedural posture of this case warrants denial of a stay because discovery is necessary to respond to Defendant's motion for summary judgment. (*Id.* at pp. 27-28.)

Because Defendant withdrew its summary judgment motion with respect to Count Four of the amended complaint subsequent to the briefing on this protective order motion, the Court directed the parties to file supplemental letters addressing the impact of such withdrawal on Defendant's request for a stay of discovery. (Text Order [D.I. 38], May 5, 2021.) Plaintiff argues that because Count Four will remain regardless of the District Court's disposition of the summary judgment motion, Defendant cannot contend that the summary judgment motion may eliminate the need for discovery altogether. (Letter from David J. DiSabato, Esq. [D.I. 39], May 12, 2021, p. 1.) Plaintiff also argues that the motion to stay discovery is "largely moot" because the parties have engaged in some discovery since the filing of the motion to stay. (*Id.*) Further, Plaintiff represents that "the progress of discovery so far has been smooth and has revealed a marked absence of any undue hardship or inequity to Defendant." (*Id.* at p. 2.)[3] Defendant responds that the "overwhelming majority of the burden" in participating in discovery relates to the putative class action TILA claim in Count One, and that the individual claims asserted in Counts Two through Four "*should* involve minimal discovery" but Plaintiff's discovery requests are overly broad. (Letter from Mark E. Duckstein, Esq. [D.I. 40], May 12, 2021, at pp. 1-2) (emphasis in original.) Additionally, Defendant represents that if it succeeds on its summary judgment motion with respect to Counts One through Three, it may choose to settle or take judgment on the remaining RESPA claim in Count Four to avoid the expense of litigation. (*Id.* at p. 2.)

3    However, Plaintiff's counsel recently sought the Court's "intervention in a discovery impasse." (*See* Letter from David J. DiSabato, Esq. [D.I. 42], May 20, 2021, p. 1.)

**\*3**    The Court previously addressed the applicable standard for a stay of discovery pending resolution of a dispositive motion in *Actelion Pharmaceuticals Ltd. v. Apotex, Inc.*, Civil No. 12-5743, 2013 WL 5524078, at \*2-3 (D.N.J. Sept. 6, 2013). As noted in *Actelion*, " '[m]atters of docket control and conduct of discovery are committed to the sound discretion of the district court.' " *Actelion*, 2013 WL 5524078, at \*3 (quoting *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 818 (3d Cir. 1982); citing *Coyle v. Hornell Brewing Co.*, No. 08-2797, 2009 WL 1652399, at \*3 (D.N.J. June 9, 2009) and *Gerald Chamales Corp. v. Oki Data Americas, Inc.*, 247 F.R.D. 453, 454 (D.N.J. 2007)). "Pursuant to Federal Rule of Civil Procedure 26(c), the Court may stay discovery only on a showing of 'good cause' by the party requesting the stay." *Id.* at \*2 (citations omitted). "The power to stay proceedings 'calls for the exercise of judgment, which must weigh competing interests' and 'balance' the hardships with respect to the movant and non-movant." *Id.* at \*3 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936); citing *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983)). To obtain a stay of proceedings, "the movant 'must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay ... will work damage to [someone] else.' " *Id.* (quoting *Landis*, 299 U.S. at 255).

As this court summarized in *Actelion*, the following factors should be considered when determining whether to issue a stay:

> (1) whether a stay would unduly prejudice or present a clear tactical disadvantage of the non-moving party[;] (2) whether denial of the stay would create a clear case of hardship or inequity for the moving party[;] (3) whether a stay would simplify the issues and the trial of the case[;] ... and (4) whether discovery is complete and/or a trial date has been set.

*Actelion*, 2013 WL 5524078, at \*3 (internal citations and quotation marks omitted). The party requesting a stay bears the burden of showing that there is good cause for the Court to issue a stay. *Id.* at \*2 (citing *Chamales*, 247 F.R.D. at 454).

With respect to the first factor, the Court considers whether a stay would unduly prejudice or clearly disadvantage the non-moving party. *See Actelion*, 2013 WL 5524078, at \*4 (citing *Cima Labs, Inc. v. Actavis Group HF*, Civil Nos. 07-893, 06-1970, 06-1999, 2007 WL 1672229, at \*8 (D.N.J. June 7, 2007)). "Delay inherently results from the issuance of a stay, but 'mere' delay does not, without more, necessitate a finding of undue prejudice and clear tactical disadvantage." *Akishev v. Kapustin*, 23 F. Supp. 3d 440,

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 40 of 114 PageID: 504

Burress v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2021)

447 (D.N.J. 2014) (quoting *Levy v. Sterling Holding Co.*, Civil No. 00-994, 2004 WL 2251268, at \*2 (D. Del. Sept. 27, 2004)). Plaintiff's alleged prejudice here focuses on his need for discovery to respond to the pending summary judgment motion. Plaintiff, however, already filed opposition to the summary judgment motion and submitted a Rule 56(d) affidavit[4] identifying additional discovery that he believes is necessary to properly respond to that motion. Plaintiff's asserted prejudice, therefore, may be addressed by the District Court, which may defer or deny Defendant's motion for summary judgment or grant Plaintiff the opportunity to take additional discovery if the District Court determines that additional information is necessary to resolve the motion for summary judgment. *See* FED. R. CIV. P. 56(d)(1), (2). Moreover, Defendant represents that it has now provided Plaintiff with discovery relating to the FCRA and RESPA claims. (Letter from Mark E. Duckstein, Esq. [D.I. 40], p. 2.) Therefore, Plaintiff's alleged prejudice does not demonstrate a basis to allow full, merits-based discovery at this time. Because Plaintiff does not articulate a particular prejudice that would arise from a limited stay of discovery, the Court finds that the first factor under *Actelion* does not weigh against granting the stay requested by Defendant.

[4]    Pursuant to Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

FED. R. CIV. P. 56(d).

**\*4**    With respect to the second factor, "the Court considers whether denying a stay would create 'clear hardship' or 'inequity' for" the moving party. *Akishev,* 23 F. Supp. 3d at 447 (quoting *Actelion*, 2013 WL 5524078, at \*3). Defendant contends that it will incur the unnecessary expense and burden of responding to discovery. Generally, an "incidental burden and cost of proceeding in [ ] litigation falls far short of 'a clear case of hardship or inequity[.]' " *Id.* at 448 (quoting *Landis*, 299 U.S. at 255); *see also* *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning" are insufficient in demonstrating need for protection). However, this case involves a putative class action claim, which broadens the scope of discovery and adds a layer of complexity to the litigation. *See, e.g.*, *Loreaux v. ACB Receivables Mgmt., Inc.*, Civil No. 14-710, 2015 WL 5032052, at \*4 (D.N.J. Aug. 25, 2015) (noting the "substantial costs and burdens associated with whole scale class action discovery"); *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC*, Civil No. 11-00011, 2013 WL 663301, at \*5 (D.N.J. Feb. 21, 2013) (noting that class actions present "potentially enormous costs to Defendant in proceeding as a class action" and "extensive use of judicial resources in the resolution of these claims"). The potential substantial cost of discovery with respect to the class claim establishes a specific and substantiated risk of harm, and the

Court finds that the second factor weighs in favor of Defendant's request for a discovery stay with respect to the TILA class claim. However, Defendant concedes that discovery on the remaining individual claims should be minimal, and the RESPA claim in Count Four will proceed notwithstanding the decision on the dispositive motion. Accordingly, Defendant fails to demonstrate that this factor supports a stay of discovery regarding the individual claims at this time. [5]

[5]    While Defendant argues that Plaintiff's discovery requests concerning the individual claims are overly broad (Letter from Mark E. Duckstein, Esq. [D.I. 40], p. 2), such alleged burden may be addressed by limiting the scope of the discovery requests. Defendant's argument does not address the burden of proceeding with discovery pending disposition of the summary judgment motion.

Turning to the third factor, the Court considers whether resolution of a pending dispositive motion may narrow or eliminate certain issues, which would thereby narrow the scope of discovery. *Actelion*, 2013 WL 5524078, at *5 (citing *Weisman v. Mediq, Inc.*, Civil No. 95-1831, 1995 WL 273678, at *2 (E.D. Pa. May 3, 1995)). The Court notes that " 'the *mere filing* of a dispositive motion does not constitute 'good cause' for the issuance of a discovery stay.' " *Id.* at *3 (quoting ⚑*Chamales*, 247 F.R.D. at 454). The Court must therefore consider, to some extent, the merits of the dispositive motion. *Id.* at *5. This Court previously concluded that the appropriate standard by which to evaluate a

dispositive motion for purposes of a motion to stay is "whether the pending dispositive motion 'does not appear to be without foundation in law.' " *Id.* (quoting *Victor v. Huber*, Civil No. 12-282, 2012 WL 2564841, at *2 (M.D. Pa. July 2, 2012)). [6] Here, no pending Rule 11 motion was filed and thus it does not appear that Defendant's summary judgment motion is without foundation in law or otherwise frivolous. Defendant seeks summary judgment on three out of the four claims in the case, and resolution of the motion may narrow but will not eliminate the need for discovery altogether. Accordingly, the third factor weighs in favor of a stay of some but not all discovery, particularly given that discovery will be necessary as to Count Four of the amended complaint regardless of the disposition of the summary judgment motion.

[6]    The Court notes, as it did in *Actelion*, that in the context of this analysis, "requiring this Court to opine on the underlying merits of the ... dispositive motion, in addition to the District Court's consideration [of the same], would be unduly duplicative" and "this Court, 'need not 'form[ ] an opinion as to the merits' of the [pending dispositive] motion.' " *Actelion*, 2013 WL 5524078, at *5 (quoting *Perelman v. Perelman*, Civil No. 10-5622, 2011 WL 3330376, at *1 (E.D. Pa. Aug. 3, 2011) (quoting *Weisman*, 1995 WL 273678, at *2)).

With respect to the fourth factor, the Court evaluates Defendant's motion for a stay in accordance with the scope of presently completed discovery and the scheduling of a

trial date. *See Actelion*, 2013 WL 5524078, at \*6. Plaintiff filed the original complaint on October 30, 2020 and Defendant moved to dismiss the complaint on December 23, 2020. Upon Plaintiff's filing of an amended complaint on January 13, 2021, Defendant moved for summary judgment on February 19, 2021. Defendant sought to adjourn the initial conference based on the pendency of the summary judgment motion, but the Court denied the request. (*See* Letter from Mark E. Duckstein, Esq. [D.I. 17], Feb. 22, 2021; Text Order [D.I. 20], Feb. 23, 2021.) Defendant then made an oral application for a stay of discovery at the initial conference, and this request was denied without prejudice. (*See* Text Order [D.I. 23], Mar. 9, 2021.) Defendant thereafter filed the instant motion for a stay of discovery on March 12, 2021. Based on this procedural history, Defendant promptly sought to obtain a discovery stay and, as in *Actelion*, the "temporal proximity" between the filing of the complaint and the request for a stay supports the issuance of a stay "because no party has engaged in significant production or protracted motion practice." *Actelion*, 2013 WL 5524078, at \*6. Moreover, no trial date has been set. However, the parties have already exchanged initial disclosures, engaged in some discovery, and scheduled some depositions. (Letter from David J. DiSabato, Esq. [D.I. 39], May 12, 2021, p. 1.) At this time, the Court finds that the fourth *Actelion* factor does not weigh against the issuance of a stay of discovery.

**\*5** A motion to stay "calls for the exercise of judgment" and requires the Court to consider competing interests. ⚑*Landis*, 299 U.S. at 254-255. The Court finds that the infancy of this litigation, the lack of prejudice to Plaintiff, the complexity of discovery regarding the class action claim, Defendant's prompt efforts to seek a discovery stay, and the efficiency that may result from a stay of class discovery support the issuance of a stay concerning the TILA class claim. However, given Defendant's concession that the individual claims should require minimal discovery, and in light of the discovery concerning the RESPA claim that will be necessary regardless of the outcome of the dispositive motion,[7] the Court finds that Defendant has not met its burden of demonstrating that a stay of discovery concerning the individual claims is warranted.

[7]    Defendant contends that it may choose to settle the RESPA claim "as a business matter" should the remaining counts be dismissed on summary judgment. (Letter from Mark E. Duckstein, Esq. [D.I. 40], May 12, 2021, p. 2.) However, Plaintiff's RESPA claim is not the subject of the summary judgment motion, and the Court will not deny Plaintiff the right to obtain discovery on this claim solely because Defendant may decide to settle the claim as a "business matter."

Consequently, for the reasons set forth above and for good cause shown:

IT IS on this **26th** day of **May 2021**,

**ORDERED** that the motion [D.I. 26] of Defendant Freedom Mortgage Corporation for a protective order staying discovery in this action shall be, and is hereby, **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that discovery regarding Plaintiff's class claim in Count One is stayed pending resolution of Defendant's summary judgment motion. Discovery shall proceed with respect to Plaintiff's individual claims in the amended complaint.

## All Citations

Not Reported in Fed. Supp., 2021 WL 2661254

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**2025 WL 2468564 (Mass.Super.) (Trial Order)**
Superior Court of Massachusetts.
Suffolk County

COMMONWEALTH of Massachusetts,

v.

HOMETAP EQUITY PARTNERS, LLC and Hometap Management Holdings, LLC.

No. 2584CV00469-BLS2.
August 21, 2025.

**\*1**  CIVIL ACTION

**Memorandum of Decision and Order on Defendants' Motion to Dismiss**

Debra A. Squires-Lee, Judge.

The Commonwealth of Massachusetts has brought five claims of unfair and deceptive acts and practices under 🚩G. L. c. 93A, § 2 against Hometap Equity Partners, LLC and Hometap Management Holdings, LLC (together Hometap) in connection with Hometap's product, the Home Equity Investment (HEI). The Commonwealth alleges the HEI is an illegal mortgage loan (Count I), violates the criminal usury statute (Count II), has been marketed deceptively (Count III), was unaccompanied by required state and federal loan disclosures (Count IV), and is an unfair, oppressive or otherwise unconscionable product (Count V). The Commonwealth seeks a declaration that all HEI contracts with Massachusetts consumers are unlawful mortgage loans and subject to the criminal usury statute, a permanent injunction barring further violations of G. L. c. 93A, reformation of the HEIs in the Commonwealth, an order requiring Hometap to pay restitution, and an award of civil penalties and costs.

Hometap moves to dismiss the Complaint pursuant to Mass. R. Civ. P. 12(b)(6). Hometap argues that three of the Commonwealth's counts are based on the incorrect premise that the HEI is a loan when, according to Hometap, the HEI is an option contract (Counts I, II, and IV). As to the remaining counts, Hometap argues the Commonwealth has not alleged facts that plausibly suggest the HEI is unfair or unconscionable (Count V) or that the HEIs have been marketed deceptively (Count III).

After hearing and review, and for the reasons stated below the Motion to Dismiss is **DENIED.**

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 45 of 114 PageID: 509

## BACKGROUND

I recite the relevant facts asserted in the Complaint, "taking them as true for purposes of evaluating the motion to dismiss." Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). Although, in general, I do not accept as true conclusory allegations or legal conclusions, see Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008), because the Commonwealth proceeds in the public interest and pursuant to G. L. c. 93A, § 4, I include a brief description of Massachusetts regulations governing various mortgage products as detailed in the Complaint. Further, I consider and address the exhibits attached to the Complaint. See Polay v. McMahon, 468 Mass. 379, 381 n.3 (2014), and cases cited. Lastly, because the Complaint is lengthy and complex, I provide only an overview of the factual allegations regarding the HEI product and Hometap's conduct. Some facts are reserved for discussion below.

### A. Reverse and Subprime Mortgages

In the 1980s and 1990s a new form of home mortgage, reverse mortgages, began to proliferate. A reverse mortgage is typically marketed to homeowners with equity but insufficient assets to cover expenses. The lender provides cash in exchange for an interest in the homeowner's equity. The borrower makes no monthly payments because the lender recoups its investment through a voluntary or involuntary sale of the home. This differs from a traditional mortgage which the borrower pays monthly and the home serves as collateral for the risk of default. In a traditional mortgage, a homeowner's debt decreases with monthly payments at the same time the homeowner's equity increases. In a reverse mortgage, the homeowner's debt increases over the life of the loan which is called negative amortization.

**\*2** Reverse mortgages are almost always non-recourse meaning the lender cannot recover any deficiency from the homeowner if the loan balance exceeds the value of the property. Lenders manage the risk of such non-recourse loans by limiting the size of loans or their duration, or pooling actuarial risk among borrowers.

To protect elderly homeowners, Massachusetts regulations provide that reverse mortgages mature only upon death, default, a sale of the property or when the borrower moves out of the property. In addition, reverse mortgages are limited to owner-occupiers who are over age 60, who receive counseling, and are permitted a seven day rescission period. Reverse mortgages that are federally insured must also comply with federal regulations including limits on the amount of origination fees and closings costs.

In the late 1990s and early 2000s, subprime mortgage lending, another non-traditional form of mortgage, expanded. These mortgage products were marketed nationwide to people with limited access to mainstream loans, often by nonbank entities to avoid oversight. Loans were offered against the value of the home with no regard to or investigation into the borrower's ability to pay the loan. These loans were called "low doc" or "no doc" loans. The mortgages were often sold onto the secondary mortgage market to offload risk. Subprime lenders would also repeatedly refinance loans in short periods of time to generate fees. Subprime loans also often included the following features: negative amortization, interest-only periods, higher rates than disclosed initially, and balloon payments requiring repayment of the principal in a single payment at the end of the loan.

Subprime mortgages led to a mortgage crisis with millions of homeowners unable to pay their mortgages and ultimately losing their homes in a wave of foreclosures. The crisis ultimately led to a nationwide recession.

The Commonwealth enacted regulations to limit subprime loan practices including limiting high cost loans, limiting adjustable-rate subprime loans, allowing borrowers to cure defaults, and permitting borrowers to modify certain loans.

### B. Hometap's HEI

Hometap, founded in 2018, originates, advertises and markets HEIs in Massachusetts. The Commonwealth alleges that HEIs include four key features: an upfront cash payment without underwriting to assess income, jobs or other assets; acquisition of a percentage interest in the homeowner's equity at two times the value of the cash payment; a return that can and does exceed a twenty percent annual interest rate; and a ten-year balloon payment.

*HEI Structure*. Hometap uses a form Option Purchase Agreement (Option Agreement). It provides that the homeowners sell Hometap an "exclusive and irrevocable option to acquire an undivided percentage interest of a fee simple title ownership" in the borrower's property (Option) in exchange for an "Investment Amount" which is a cash payment less fees and costs, some of which Hometap retains. The percentage equity option in the premises that Hometap holds is two times the amount the Investment Amount (Hometap Percentage). [1] When a homeowner signs the Option Agreement, the value of the Hometap Percentage exceeds the Investment Amount. Thus, as described in the Complaint, with an Investment Amount of $100,000, the homeowner would receive approximately $97,000 and Hometap would hold the option to purchase home equity of $200,000.

[1]     The Commonwealth alleges Hometap does not adequately disclose the 2x delta between the Investment Amount and the Hometap Percentage.

**\*3** The homeowner must repay the Investment Amount (settle) within ten years, or earlier if title is transferred or other events of default occur. The value of Hometap's share in the property (Hometap Share) at settlement is calculated by multiplying the Hometap Percentage by the property's value when the option is exercised, determined by an appraisal. According to the Commonwealth, Hometap's profit is driven by equity devaluation and not home value appreciation because the homeowner must pay Hometap twice the Investment Amount before factoring in appreciation. "Thus, it is Hometap's devaluation of homeowner's equity rather than home appreciation that is truly responsible for Hometap's profit," to the detriment of the homeowner.

The Option Agreement caps the annualized rate of return at twenty percent of the Investment Amount by limiting the total value of the Hometap Share to an amount equal to that annualized rate of return (Hometap Cap). According to the Commonwealth, the Hometap Cap "functions as a compounding interest rate" and is applied against the total Investment Amount, including fees that Hometap retained. Thus, HEIs that settle at the Hometap Cap "uniformly exceed a 20% simple interest rate on the amount advanced."

Hometap protects its "contractual and economic interest in the Option" through a Mortgage and Security Agreement recorded when the Option Agreement is executed. The Mortgage provides that, upon an event of default, Hometap may take possession of the property without any foreclosure action and have the right to sell the property at a nonjudicial foreclosure sale.

Homeowners can settle before the ten-year window. In addition, property values can decline. But even in these scenarios, the homeowner's equity is still devalued - at a rate of 33% rather than 50%. Hometap ensures it will be repaid the Investment Amount because the average home "would need a realized decline of 25% before Hometap would lose its first dollar of principal." Thus, "regardless of what happens to property values, homeowners will pay back vastly more than they receive from Hometap" and Hometap's principal would never be at risk. Included within the Complaint is an analysis of the anticipated repayment amounts and effective interest rates based on a $100,000 Investment Amount, using various assumptions in the change in home value showing that, even in the worst real estate market, Hometap would earn a six percent return on its Investment Amount. Thus, Hometap is not investing in equity because its investment is never meaningfully at risk.

*Marketing and Sales*. Until at least the spring of 2024, Hometap claimed on its website that it would "invest alongside homeowners" and would do so "without any … interest over the life of the investment," which would lead homeowners to believe that only home appreciation drives Hometap's returns. To its investors, however, Hometap, markets the HEI as providing downside protection "even during times of declining home values" and that it includes "an adequate cushion" to minimize potential losses. The cushion is, in fact; equity devaluation which insures Hometap against any risk of loss of its investment. Such advertising would lead an average homeowner

to believe that Hometap's investment is equal to its equity option and not twice the value of its investment.

Hometap employs sales representatives who use scripts to explain the HEI to homeowners. At times, these representatives explain to homeowners that Hometap would share in any loss if the property were to depreciate. The representatives also imply they are neutral "guides," not employed to convince the homeowner to take out an HEI when they are, in fact, employed by Hometap to sell HEIs. They also do not explain that the homeowner may be eligible for less costly loans or that the HEI might make it more difficult to refinance in the future. Nor are homeowners provided the actual cost of the HEI - such as by including an Annual Percentage Rate or effective interest in various scenarios - such that homeowners can comparison shop. "The representations in Hometap's Marketing and made by its Investment Managers had, on net, a tendency to obscure the true cost of the Hometap HEI and the reality that the Hometap HEI is dramatically more costly to homeowners than other mainstream mortgage products or that Hometap's marketing materials and sales scripts communicated."

**\*4** *Subsequent HEIs.* Hometap offers homeowners an option to pay off the first HEI with a new larger HEI to obtain additional cash, initially called a "double tap" and later an "investment increase." In those circumstances, Hometap charges the homeowner the same fees charged earlier. Changing the name from "double tap" to "investment increase" falsely implies the new HEI is only an increase and thus, the homeowner will not have to pay all the fees and costs. The Commonwealth described a scenario where a homeowner entered into an HEI for $227,950, and less than a year later entered into a second for an additional $29,000. Hometap charged and the homeowner paid nearly $4,000 in fees plus a 23.9% effective interest rate on the first HEI. Hometap, as a result, owned the right to 50% of the value of the homeowner's $1 million home having paid the homeowner only $257,000 after fees. [2] Further, Hometap did not always disclose it - would charge additional fees.

[2]     The Complaint alleges another homeowner entered into a double tap that resulted in Hometap owning fifty percent of the homeowner's home value even though it paid less than twenty percent of the value.

*Third Party Costs.* Hometap misleads homeowners in connection with alleged third party costs for appraisals. First, because Hometap refers to the costs as "third-party" costs, the homeowners believe the amount is paid to a third party whereas Hometap retains the vast majority of the fee. Second, although Hometap charges $299 for a virtual appraisal, the appraisal it conducts costs less than $100. The same is true with respect to the $599 Hometap charges for a traditional, physical appraisal -Hometap keeps most of the fee. Hometap thus profits, significantly, from both types of appraisals. Further, Hometap requires a formal appraisal when the HEI is paid off, but not when

the HEI is generated. Because physical appraisals result in higher valuations, Hometap receives a higher profit if it does not use the same valuation at the beginning and end of the HEI.

*Renovation Adjustments.* Hometap markets the HEIs as a financing source for renovations and offers a "renovation adjustment" to allay concerns homeowners may have about giving Hometap a percentage of equity prior to a renovation. For renovations of at least $25,000, the renovation adjustment is advertised as an appraiser determined value of the property post renovation compared to an appraisal without the renovation. But Hometap does not disclose that the amount of the adjustment is limited to the lesser of the amount actually spent or the difference. Thus, if a homeowner spent $50,000 on a renovation resulting in $100,000 in increased value the homeowner would be entitled to only the $50,000. The restriction is disclosed only in the lengthy contract which is provided only after the application and underwriting is complete.

*Targeted Homeowners.* "A substantial fraction of Hometap's customers are homeowners facing financial vulnerability such as lack of income, high debts, or high expenses." That is because Hometap markets HEIs' to homeowners who cannot qualify for a traditional loan, retirees, and the unemployed. Hometap also markets to consumers seeking to pay off debt and has persuaded customers to use higher cost HEI's to pay off lower cost unsecured debt. Hometap also markets HEIs' to homeowners who had obtained COVID forbearances without disclosing other, lower cost options.

*Lack of Underwriting.* Hometap does not determine whether a homeowner can repay the HEI using income or assets and makes no assessment of the homeowner's ability to pay taxes, insurance, maintenance expenses, or existing mortgage payments, "even though failure to make these payments" triggers the homeowner's obligation to repay the HEI. The only evaluation Hometap conducts is whether the homeowner can repay the HEI through a sale or refinancing of the property. The lack of assessments result in the homeowner's ability to get money quickly, and without documentation, and may lead them to choose an HEI over loans that cost less and have safeguards.

 **\*5** Hometap can only provide cash quickly if the HEI product is not governed by the regulations put in place with respect to reverse and subprime mortgages. Thus, in marketing the HEI, Hometap neither insures that it provides money only to homeowners with the ability to repay, as with traditional mortgages, nor complies with the strict regulatory limits on reverse mortgages.

*Structural Unfairness. A* significant percentage of Hometap customers will not be able to afford the purchase repayment when due after ten years through income, assets or a refinancing because their income and credit history will not support a loan large enough to pay off an original mortgage plus the HEI. In that event, Hometap can take joint ownership and exercise its right to foreclose or sell the property.

## DISCUSSION

In evaluating a motion brought under Mass. R. Civ. P. 12(b)(6), I "look beyond the conclusory allegations in the complaint," Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded "factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief." Iannacchino, 451 Mass. at 636 (quotations omitted). In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true "such inferences as may be drawn [from those facts] in the plaintiff's favor." Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). Applying this standard, I. conclude that the Commonwealth has alleged sufficient facts to state plausible entitlements to relief on all counts.

## I. Counts I, II, and IV

Counts I, II, and IV all allege violations of G. L. c. 93A based on the illegal provision of unlawful mortgage loans. Count I alleges that HEIs are illegal reverse mortgage and high-cost mortgage home loans that do not comply with Massachusetts law. Count II alleges the HEIs are usurious loans that violate G. L. c. 271, § 49. And Count IV alleges deceptive marketing related to the provision of loans. Hometap argues that Counts I, II, and IV must be dismissed because they are all based on the incorrect premise that the HEI is a loan.

The parties' respective positions center on whether the HEI is an option or a loan. Hometap argues the HEI is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment. [3] Hometap argues that options to compel the conveyance of real property are common and generally permissible. No one disagrees. See Certified Corp. v. GTE Prods. Corp., 392 Mass. 821, 824 (1984) ("An option to purchase property which binds the successors and assigns of each party, and which includes mutual covenants involving the property, creates a contingent equitable interest in the option holder."). With that understanding, Hometap argues the HEIs are options because Hometap pays homeowners for the right to obtain a percentage possessory interest in the homeowner's property in the future upon the occurrence of various contingencies, including the homeowner's failure to repay (settle) the option payment (Investment Amount) within ten years.

---

[3]      Hometap asserts that it has offered HEIs in the Commonwealth for years; the Massachusetts Division of Banks (DOB) publicly recognizes that HEIs are critically distinct from loans and has. indicated that it does not have the legislative authority to regulate such shared equity products; state legislators have recognized the HEI product is not a loan; and

---

that bills are pending before the legislature that would allow the creation of a-regulatory framework for products such as HEIs. Hometap also asserts that prior to offering HEIs in the Commonwealth, Hometap met with both the DOB and the Attorney General's Office (AGO) and neither expressed concern. Thus, the AGO "sat on its hands for years" permitting Hometap to invest significant sums in the Commonwealth prior to determining the product was unfair.

Against that backdrop, Hometap argues that the AGO's pursuit of G. L. 93A claims in this case "short-circuits" and "contravenes" the legislative process and violates Hometap's due process rights. Those issues, however, are not squarely presented before me on the instant motion. And, to the extent I accept Hometap's assertions without converting the motion to one for Summary Judgement, see Mass. R. Civ. P. 12(b), the argument that the AGO is ahead of the DOB or the legislature in taking steps to protect consumers from a product the AGO believes, and alleges is unfair and unconscionable, or has perhaps reached a different conclusion as to the fairness of HEIs after they were offered to Massachusetts consumers is not a basis on which to grant a Motion to Dismiss. Today, I evaluate only whether the Commonwealth has stated claims for relief ultimately subject to judicial review.

**\*6** The Commonwealth responds that the HEIs are merely disguised loans, and that the nomenclature does not control, because Hometap delivers money with the expectation that it will be repaid via settlement or through a forced sale of the property. See ⚑Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 746 (1980) (defining a "loan" as "(d)elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it, with or without interest."), quoting Black's Law Dictionary 844 (5th ed. 1979).

Assuming the facts asserted in the Complaint are true, as I must, the Commonwealth has sufficiently alleged that HEIs are, in substance, loans. The Commonwealth alleges that Hometap provides money to homeowners with a requirement that it be repaid and that the HEI structure ensures there is *no substantial risk* that Hometap will lose its principal. [4] The money is either repaid in ten years, with a substantial increase, which the Commonwealth alleges constitutes interest, or Hometap exercises its option and its right to foreclose or force a sale. The Complaint also alleges that Hometap explicitly markets its products to homeowners in need of cash *in the short term* who will, therefore, be unlikely to be able to settle in ten years. And, neither the homeowner nor Hometap anticipate that Hometap will actually retain a possessory-interest in the property. Put elsewise, Hometap never intended to be a joint equity owner with any homeowner. Those allegations make the HEI - in substance - more akin to a loan than an option to purchase real estate. [5] See In re J.G. Wentworth Originations, LLC, No. 17-2188-C, 2017 WL 3573537, at \*1 (Mass. Super. Aug. 10, 2017) (Gordon, J.) (structured sale of personal injury payments at a 34.2% discount "is in function and economic substance—if not nominally in form—a loan" subject to usury law).

4      Hometap's insistence that the *contract* does not require repayment is simply another way of saying the loan is non-recourse because repayment would be required if the homeowner wished to continue to live in and own the property after ten years. See *infra.*

5      The possibility that Hometap may recover less than its investment amount may be provable. But on a Rule 12(b)(6) motion I must accept as true the Commonwealth's factual allegations that the equity devaluation inherent in the HEI's structure makes that possibility illusory because the property would have to decrease by more than 25% for that eventuality to occur.

That the HEIs are non-recourse does not necessarily mean they are not loans as a matter of law. See In re Stone St. Cap., LLC, No. NOCV2012-01891, 2013 WL 3341052, at *3 (Mass. Super. May 10, 2013) (Salinger, J.) ("A loan of money made on a non-recourse basis - meaning that the borrower is not liable for repaying the lender and that the lender instead must rely on some collateral, other assets, or third-party obligation - is still a loan."), citing Commissioner of Internal Revenue v. Tufts, 461 U.S. 300, 313 (1983) ("a nonrecourse loan should be treated as a true loan" for purposes of applying Internal Revenue Code). See also G. L. c. 167E, § 7(h) (defining "non-recourse reverse mortgage loan" as "a reverse mortgage loan which limits the lender's recovery solely to the value of the property at the time the loan becomes due and payable").

Nor does labelling the transaction and operative agreement as an "option" control. It is the substance of the transaction that governs not the labels. See Singhal v. Unison Agreement Corp., No. 22-60656-CIV, 2023 WL 2734230, at *5 (S.D. Fla. Mar. 31, 2023) ("The law is clear that the substance of the transaction rather than the form is examined to determine whether the transaction should be considered a loan."). Indeed, more than a century ago, the Supreme Judicial Court (SJC) considered whether the transaction at issue - nominally a real estate purchase with an option to repurchase -was a real purchase or a "conveyance received by the defendants as security for a loan made by them to the plaintiff[.]" Southwick v. Bigelow, 237 Mass. 299, 304 (1921). Based on a master's factual findings that the parties "contemplated the payment within a year of the $12,000 advanced by the defendants, and that the deed and agreement were given as security therefor," the SJC held the purported sale was "not one in reality." Id. at 305. Rather, the transaction constituted a loan with a mortgage. Id. Thus, Southwick teaches two things - the substance and not the form controls - and the determination of the true nature of a transaction like the one at issue here is a question of fact. Id. Accord Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 152-153 (1920) (option to purchase real estate does not create an interest in real estate).

**\*7** The Commonwealth also is correct that a typical option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised. See, e.g., Thacher v. Weston, 197 Mass. 143, 146 (1908) (option contract provided that, in consideration of $25, plaintiff held option to purchase real property for

$10,000); FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, No. 1881CV00304-B, 2021 WL 2584131, at *2 (Mass. Super. June 16, 2021) (Salinger, J.), aff'd in part rev'd in part on other grounds, 489 Mass. 702 (2022) (option contract for land on which to build a casino included monthly payments of $100,000 "in exchange for acquiring and maintaining the right, but not any obligation, to buy the property for *$75* million" if option holder was awarded a casino license) Here, the Commonwealth alleges that all the value for the percentage possessory interest in the real property is paid as consideration for the alleged option and not when the option is exercised. As noted, it also alleges that the mortgage does not secure the option, as Hometap argues, but repayment because Hometap "has no intention of becoming a joint owner" of any homeowner's property. Those alleged facts would support a conclusion that the arrangement is not a true option but a loan.

At the end of the day, the Commonwealth's allegations, if true - that Hometap pays money to homeowners who are subject to foreclosure and a forced sale if they fail to repay Hometap approximately two times Hometap's investment - would support the conclusion that the transaction at issue is not an option but a loan. At this stage of the litigation, it is premature to conclude one way or the other, but the Commonwealth has alleged facts which plausibly suggest the HEIs are loans and thus violate G. L. c. 93A because they are illegal mortgage loans (Count I), violate the criminal usury statute (Count II), and violate required state and federal loan disclosures (Count IV).

Hometap's other arguments are not persuasive at this stage of the litigation. First, Hometap relies on In re Yang, No. 23-00075-RLM-11, 2023 WL 7104764, at *1 (Bankr. S.D. Ind. Oct. 23, 2023) for the proposition that a "home equity sharing agreement" in which a company paid cash to acquire an option for a future interest in real property was an option contract. Again, there is no dispute that real estate option contracts can be valid. Indeed, In re Yang involved a more traditional option contract, as discussed above, where the company paid "paid $54,250.00 for the future right to purchase a 70.00% interest in the property for *an additional payment of* $157,325.00." Id. (emphasis added). There, unlike here, most of the consideration for the acquisition of the property interest (three times the option amount) was paid upon exercise of the option.

Hometap argues next that its return on investment is not interest because it is not a charge calculated as a product of principal, interest, and length of loan. But additional compensation to a lender need not be calculated in any particular way to constitute interest. "The word interest in its usual sense is the compensation fixed by the parties or allowed by law for the use of money or as damages for its detention." Begelfer v. Najarian, 381 Mass. 177, 181 (1980), citing Hayes v. Commissioner of Corps. & Taxation, 261 Mass. 134, 136 (1927). See G. L. c. 271, § 49(a) (defining "interest or expenses" for purposes of criminal usury to include "all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan").

Next, Hometap's reliance on Foster v. Equitykey Real Est. Invs. L.P., No. 17-CV-00067-HRL, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017) does not require dismissal. The option at issue there was a payment of "$196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000." Id. at *3. While recognizing that the intent of the parties is "an important factor in determining whether a loan was created," the court held the payment was not a loan but an option because there was "no guarantee that the payment received by Mr. Foster need ever be returned." Id. at *4. The differences are clear. In Foster, return of any portion of the money was entirely contingent on an increase the property appreciating in value. Here, the Commonwealth has alleged that the HEI's structure ensures a return to Hometap regardless of home appreciation because of the functional equity devaluation. For the same reason, Hometap's reliance on the comments to 12 Code. Fed. Regs. Part 1026 does not persuade me that dismissal is appropriate. Those comments note that the Federal Truth in Lending Act (TILA) does not apply to option contracts in which the party advancing money to a homeowner risks the loss of the capital advance. See 12 Code Fed. Regs. § 226, Supplement I, Subpart A, 2(a)(14)(vii) (TILA does not apply to "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced."). Here, as oft noted already, the Commonwealth alleges *as a matter of fact* that Hometap risks no such loss. The truth of that assertion will be tested in this case but is sufficient to avoid dismissal.

**\*8**  Finally, Hometap argues that Count I must be dismissed because the Commonwealth alleges both that the HEI is an unlawful reverse mortgage that fails to comply with G. L. c. 167E, §§ 7, 7A, and a "high cost mortgage loan" as defined by G. L. c. 183C, § 2, and "no product can be both a reverse mortgage and a high cost home mortgage loan." The Commonwealth responds that it has alleged facts which would support the conclusion that HEIs are unlawful reverse mortgages. I agree. The Commonwealth alleges that the HEI is a non-recourse cash payment, secured by a mortgage, and any shared appreciation, principal, or interest are due only upon certain circumstances or at the end of a fixed term and that Hometap did not comply with the regulations governing such loans. (See Com. Mem. at 12-13). The Commonwealth also responds that it has alleged that the HEI is a high cost loan under G. L. c. 183C, § 2. I agree as well. [6] Based on the facts in the Complaint, the Commonwealth has alleged a loan secured by a homeowner's principal dwelling with an annual percentage rate that will exceed nine percent.

[6]    A plaintiff may plead alternative and overlapping theories of liability and any redundancy, if it exists, is more appropriately addressed on a full record via a motion in limine or pursuant to Rule *56.* See Massachusetts Port Auth. v. Turo, Inc., No. 1984CV01773BLS1, 2020 WL 2617169, at *4 (Mass. Super. Apr. 14, 2020) (Green, J.).

For all the above reasons, the Motion to Dismiss Counts I, II, and IV must be **DENIED.**

## II. Count III

Count III alleges deceptive marketing in connection with the HEI. The Commonwealth alleges that Hometap's marketing and sales communications would lead consumer to believe that Hometap's returns stem from the Hometap fee and from home price appreciation when, in actuality, Hometap's return comes from devaluing the homeowner's equity and purchasing it at below market value. In support of its motion, Hometap argues that the Hometap marketing graphic included in the Complaint discloses all the facts from which a reasonable consumer could understand that, at settlement, for a $100,000 payment, Hometap would be entitled to fifteen to twenty percent of the home's value which, in the footnote, is disclosed as home worth $1 million. Further, Hometap argues that the Option Agreement and Investment Term Sheet fully disclose the structure of the HEI and explain in detail how the Hometap Share would be calculated. As a matter of law, then, Hometap argues the marketing could not be deceptive.

This is a closer question. Homeowners are entitled to enter contracts of their choosing - so long as statutorily and regulatorily compliant - and are assumed to have read and understood the contracts and other material provided to them. However, marketing is deceptive if it "directly, *or by implication,* or by failure to adequately disclose additional relevant information, has the capacity *or tendency* or effect of deceiving buyers or prospective buyers in any material respect." 940 Code Mass. Regs. § 3.05(1) (emphasis added). Thus, advertising need not be "totally false in order to be deemed deceptive in the context of G. L. c. 93A.... The criticized advertising may consist of a half-truth, or even may be true as a literal matter, but still create an *over-all misleading impression* through failure to disclose material information." Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 320 (2018), quoting Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394-395 (2004) (emphasis added). Here, the ultimate price of the HEI is certainly material, and the Commonwealth has alleged that Hometap's marketing would mislead an objective homeowner as to the ultimate price he or she would have to pay or face foreclosure or a forced sale. Hometap argues that the Commonwealth's other alleged misleading material - related to third party costs, successive HEIs, and the renovation adjustment - are insufficient either because the disclosures or lack of disclosures were not material or because all were disclosed.

**\*9** After careful review of the Complaint the questions of deception and causation are ones that must be developed in discovery, as the "analysis of what constitutes an unfair or deceptive act or practice requires a case-by-case analysis … and is neither dependent on traditional concepts nor limited by preexisting rights or remedies." Exxon Mobil Corp., 479 Mass. at 316, citing Kattar v. Demoulas, 433 Mass. 1, 14 (2000), and Travis v. McDonald, 397 Mass. 230, 232 (1986). See Nei v. Burley, 388 Mass. 307, 313 (1983) ("This flexible set of guidelines as to what

should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms 'unfair and deceptive' to grow and change with the times.").[7]

[7]   With respect to the allegations concerning Hometap's sales representatives, although puffery and statements of opinion will not support a G. L. 93A claim, see von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497 (2019), the Commonwealth has alleged more than mere puffery, including failures to disclose meaningful information. Reliance and causation must await resolution at a later stage.

For all the above reasons, the Motion to Dismiss Count III must be **DENIED.**

### III. Count V

Count V alleges that the HEI is an unfair, oppressive or otherwise unconscionable product. The claim is based primarily on the structure, as described above, and the allegation that Hometap markets to financially vulnerable consumers who are in debt and cannot qualify for traditional loans, without any investigation regarding whether those homeowners can settle the HEI. The Commonwealth asserts that conduct - whether or not an HEI is a loan - falls within the penumbra of unfairness protected by Chapter 93A.

Hometap argues that the Commonwealth cannot rely on mortgage lending regulations or the usury statute to allege unfairness because the HEIs cannot and should not be measured against regulations that govern loans. According to Hometap, it is not "logical to hold an equity product to the cost limitations of debt products because equity costs more than debt in the market because the equity investor takes on more risk" and "applying the usury limitation to an equity-based product is novel." (Hometap Mem. at 16). I am not persuaded.

Chapter 93A, although more than a half a century old at this point, remains "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 822 (2014), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). Further, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law." H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (quotations and citations omitted). "To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury

to consumers or other businesses' " Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 587 (2024), quoting, 🚩H1 Lincoln, Inc. v. South Washington St.. LLC, 489 Mass. 1, 14 (2022).

It is not *inappropriate* to measure the HEI against statutes and regulations protecting homeowner mortgagees or other consumer borrowers. In 🚩Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 742 (2008), the Court rejected the argument that the defendant did not violate any established concept of unfairness when it originated its loans because "new rules or standards for defining what is unfair" could not be applied retroactively. The Court reiterated that Chapter 93A "creates *new* substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute," and that the concept of unfairness is not frozen in time because "[t]here is no limit to human inventiveness in this field.' " Id., quoting 🚩⚠Kattar v. Demoulas, 433 Mass. 1, 13 (2000). Given G. L. c. 93A's flexibility, "[w]hat is significant is the particular circumstances and context in which the term is applied." 🚩Fremont, 452 Mass. at 743.

**\*10** Here, Hometap concedes that it created a new option for homeowners seeking to access their home's equity. It also concedes that the product is currently unregulated.[8] Therefore, it is not impermissible when considering whether the HEI is unfair or oppressive to consider the guardrails that are in place to protect homeowners who seek to access their equity through traditional or reverse mortgages, as well as the harms those provisions seek to prevent and remedy.

[8] That bills may be "pending" is of no import in connection with a motion to dismiss for failure to state a claim.

The Commonwealth alleges that the HEI is unconscionably expensive because it provides Hometap a right to a home equity share worth more than twice what it paid the homeowner.[9] It alleges HEI features akin to those found to violate G. L. 93A in Fremont namely the failure to consider the homeowner's ability to repay or settle without losing their home, a balloon payment after ten years, and deliberate marketing to individuals with high debt and low credit, which make it highly likely that homeowners were/are doomed to "default" at the ten-year term.[10] Cf. 🚩Fremont 452 Mass. at 743. Characterized as debt or equity, the Commonwealth alleges that Hometap enters into contracts with homeowners knowing that the homeowners will not be able to satisfy their obligation to "settle" up with Hometap and will, therefore, lose their homes. Cf. 🚩Drakopoulos v. U.S. Bank Nat. Ass'n, 465 Mass. *775,* 786 (2013) (Chapter 93A "prohibits the origination of a home mortgage loan that the lender should recognize at the outset [ ] the borrower is not likely to be able to repay"). Those allegations support the claim that the HEI violates Chapter 93A.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 58 of 114 PageID: 522

9    I do not view this argument as an attempt to amend the complaint where the factual allegations regarding the alleged excessive cost of the product are contained within the Complaint.

10    It is immaterial that some of Hometap's customers had better credit ratings or sought funds for purposes other than to pay off high interest, unsecured consumer debt.

Finally, whether the AGO will establish a right to recover penalties, costs or attorney's fees by establishing that Hometap knew or should have known that the HEI violated G. L. c. 93A cannot be decided at this stage.

## ORDER

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint is **DENIED.**

<<signature>>

Debra A. Squires/Lee

Justice of the Superior Court

August 21, 2025

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 59 of 114 PageID: 523

Foster v. Equitykey Real Estate Investments L.P., Not Reported in Fed. Supp. (2017)

2017 WL 1862527
Only the Westlaw citation
is currently available.
United States District Court, N.D. California.

Aaron FOSTER, Plaintiff,
v.
EQUITYKEY REAL ESTATE
INVESTMENTS L.P., Defendant.

Case No. 17-cv-00067-HRL
|
Signed 05/09/2017

**Attorneys and Law Firms**

Pamela Dawn Simmons, William Joseph Purdy, III, Law Office of Simmons & Purdy, Soquel, CA, Daniel Joseph Mulligan, Jenkins, Mulligan & Gabriel , LLP, San Diego, CA, for Plaintiff.

Christopher Lynn Frost, Sarah Fleisig Powers, Eisner Jaffe, APC, Beverly Hills, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Re: Dkt. No. 8

HOWARD R. LLOYD, United States Magistrate Judge

**\*1** Plaintiff Aaron Foster ("Plaintiff"), as an individual and as Trustee of the Michael P. Foster Trust, sues defendant EquityKey Real Estate Investments L.P. ("EquityKey"). The complaint includes seven claims related to an agreement concerning real property between EquityKey and Plaintiff's father, Michael Foster ("Mr. Foster"), from whom Plaintiff inherited his interest in the real property at issue in this action. Dkt. No. 1, Ex. A. EquityKey moves to dismiss all of Plaintiff's claims on the grounds that they are time-barred and fail to state a claim upon which relief may be granted. Dkt. No. 8. For the reasons explained below, the court grants the motion to dismiss.

**BACKGROUND**

Plaintiff alleges the following facts. In 2010, Mr. Foster, then in his early seventies and "still competent," was living alone at his residence at 28 Pennsylvania Avenue, Los Gatos, CA ("the property"). Dkt. No. 1, Ex. A., ¶ 12. Prior to 2010, a fallen tree had damaged Mr. Foster's beloved car, and he sought funds to restore the vehicle. *Id.*

Mr. Foster entered into a contract with EquityKey in June 2010. *Id.*, ¶ 13. The contract states that EquityKey will pay Mr. Foster a $196,000 "option payment" in exchange for Mr. Foster granting EquityKey the right to participate in 100% of the appreciation of his property, if any, for up to fifty years from the date of the agreement. *Id.*, ¶ 14. The contract is secured by a Performance Deed of Trust and confirmed in a Memorandum of Option (the latter dated March 20, 2012). *Id.* Both the contract and the Memorandum of Option state that the arrangement is an option payment and "not a loan." *Id.* Plaintiff asserts that Mr. Foster entered into this contract based on "false and deliberately misleading" representations by EquityKey, which Mr. Foster reasonably

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 60 of 114 PageID: 524

Foster v. EquityKey Real Estate Investments L.P., Not Reported in Fed. Supp. (2017)

believed "given his age and mental status," that the transaction was an option contract rather than, as Plaintiff claims, a "disguised ... high cost mortgage." *Id.*, ¶ 19-21. Given that EquityKey's intentionally deceptive efforts prevented Mr. Foster from understanding the true nature of the transaction, Plaintiff alleges, there was no meeting of the minds and no valid contract was formed. *Id.*, ¶ 21.

Mr. Foster passed away in 2016, and Plaintiff became the executor of his estate and the Trustee of the Michael P. Foster Trust. *Id.*, ¶ 15. Prior to his passing, Mr. Foster had told Plaintiff that he "had made a deal for essentially 'free money' and believed that he could not be forced from the home at any time or for any reason." *Id.*, ¶ 16. Only after his father's death, when Plaintiff was going through his late father's records, did he discover the EquityKey arrangement. *Id.*, ¶ 15. Plaintiff alleges that "[d]ue to Michael Foster's age and the complexity of the contract, as well as EquityKey's deliberate effort to hide the nature of the transaction, ... it was not possible for Michael Foster to understand and/or discover the true nature of the agreement with EquityKey...." *Id.*, ¶ 16. Plaintiff asserts that he himself only realized the "exact nature and terms" of the EquityKey agreement with the assistance of counsel. *Id.* If Plaintiff were to have sold the property at the time of the filing of the complaint, the amount due to EquityKey would have been approximately $705,000.00. *Id.*, ¶ 17.

**\*2** Plaintiff filed his complaint in Santa Clara Superior Court in November 2016. Dkt. No. 1, Ex. A. The complaint asserts that the contract is actually a high-interest loan secured by the property that was issued without the required disclosures or counseling and that EquityKey fraudulently concealed the nature of the agreement. *Id.*, ¶¶ 1-2. The complaint alleges claims for (1) Rescission for Fraud, (2) Declaratory Relief, (3) Elder Financial Abuse (Cal. Welf. & Inst. Code § 15610.30), (4) Cancellation of Instruments (Cal. Civ. Code § 3412), (5) Quiet Title, (6) Violations of the Truth in Lending Act ("TILA") (⚑ 15 U.S.C. § 1601, *et seq.*), and (7) Unfair Business Practices (⚑ Cal. Bus. & Prof. Code § 17200, *et seq.*). Dkt. No. 1, Ex. A.

The contract itself, which Plaintiff attached to the complaint, is titled "Property Appreciation Option Agreement." Dkt. No. 7. It states that EquityKey will pay Mr. Foster an "Option Premium" of $196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000. *Id.* at pg. 1; pg. 2, ¶ 1. The grant of the option does not give EquityKey "any present ownership or possession rights with respect to the Property." *Id.*, ¶ 2. EquityKey's right to exercise its option only comes into play if (1) it is informed of a pending sale of the property "or a transfer, conveyance, assignment or other loss of [ ] ownership," (2) if Mr. Foster breaches the agreement, or (3) if neither of the prior events occurs within the 50-year term of the agreement, EquityKey may call or exercise its option within 90 days of the end of the term. *Id.* At such time, EquityKey may, but need not, exercise its option. If EquityKey decides not to exercise its option, the agreement terminates. *Id.*, ¶ 3. If EquityKey exercises the option at some point during the 50-year option period, Mr. Foster must pay it 100%

of the appreciation of the property, which will be calculated by multiplying the percentage change in the S&P/Case-Shiller Home Price Index (for the Metropolitan Statistical Area in which the Property is located) since the date of the agreement by the initial property value. *Id.*, ¶ 5. An Early Termination Charge— equal to the greater of (1) the Option Premium ($196,000) plus 3% of the initial property value plus 12% annual interest,[1] or (2) the amount of appreciation of the property at the time of the breach—applies if Mr. Foster (or his heirs) sells or otherwise transfers the property within 10 years of the date of the agreement. *Id.*, ¶ 11. The contract further states that Mr. Foster agrees to execute a Performance Deed of Trust and Memorandum of Option. *Id.*, ¶ 14. Finally, the agreement states that Mr. Foster "understand[s], acknowledge[s] and agree[s] that it is binding upon his estate, heirs, successors, and beneficiaries. *Id.*, ¶ 22."

[1] The Early Termination Charge does not include 3% of the Initial Property Value if Mr. Foster dies and his heirs or estate elect to sell the Property within the first 10 years of the Agreement, but this modification does not apply if the Property is owned by a trust. *Id.*, ¶ 12.

As noted in the Plaintiff's complaint, the agreement states that it is "[n]ot a Loan or Security," and is instead "an option in real property." *Id.*, at ¶ 26. The contract also warns that EquityKey's option "may result in you [ (meaning Mr. Foster) ] (including your heirs, estate, beneficiaries and legal representatives) receiving less from your Property in a sale or other Property Transfer than if you did not enter into this Agreement. We recommend you thoroughly discuss this transaction with your heirs and beneficiaries, as well as your legal, tax and financial advisors to make certain you, and those who may be affected by this transaction, understand and are comfortable being bound by this Agreement." *Id.*, ¶ 4. A similar warning, advising Mr. Foster not to sign unless he has read the entire agreement and encouraging him to seek legal counsel and financial advice before signing, is included in capital letters above the signature line. *Id.*, ¶ 31.

**\*3** Defendant EquityKey removed this action to federal court in January 2017, Dkt. No. 1, and filed a motion to dismiss one week later, Dkt. No. 14. In its motion, EquityKey argues that all of Plaintiff's claims, each of which EquityKey asserts is founded on a claim of fraud, are time-barred, and that the complaint fails to state a claim upon which relief may be granted because the contract is not a loan as a matter of law. Dkt. No. 8. Plaintiff responds that the statute of limitations has not run on its claims, that the discovery rule or the doctrine of equitable tolling should apply, and that the true nature of the transaction reveals that it is a loan and not an option contract. Dkt. No. 14.

Both parties have consented to magistrate judge jurisdiction. Dkt. Nos. 10, 11.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Complaints that merely recite the elements of a cause of action are insufficient. *Id.* In considering a motion to dismiss, a court accepts all of the plaintiff's factual allegations as true and construes the pleadings in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). Dismissal may also be based on the absence of a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## DISCUSSION

The court begins its discussion with an analysis of the federal claim.

## I. TILA.

"Congress enacted TILA to promote 'the informed use of credit' by consumers." *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 3d 862, 872 (N.D. Cal. 2010) (quoting 15 U.S.C. § 1601(a)). Thus, the Act seeks to "assure a meaningful disclosure of credit terms" to aid consumers in making informed decisions and protect them from unfair credit practices. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. §

1601(a)). TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f); *see also* 12 C.F.R. § 226.2(14). A "creditor" under TILA is one who regularly extends consumer credit. 15 U.S.C. § 1602(g). 15 U.S.C. Section 1639 requires creditors to make certain disclosures related to extensions or offers of credit.

TILA, however, does not apply to all transactions. In the commentary discussing Regulation Z, the regulations issued by the Federal Reserve Board to carry out Congress's purpose in enacting the statute, *see* 12 C.F.R. § 226.1 *et seq.*, the Board staff explains that certain situations are "not considered credit." 12 C.F.R. § 226, Supplement I, Subpart A, 2(a)(14). These situations include "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. § 226, Supplement I, Subpart A, 2(a)(14)(vii)-(viii).

To determine whether TILA applies to the agreement here, the court must examine its nature (which examination appears to be a matter of first impression, as counsel did not cite—and the court did not find—any decisions evaluating a transaction with these precise features). Is it, as Plaintiff asserts, a high-interest loan or reverse mortgage in disguise? Or is it, as EquityKey argues (and as stated on the face of the transaction documents), an option contract? In analyzing the terms of the agreement, the court must look deeper than its title and assess its substance to determine its true character. *Mahoney v. City and Cnty. of S.F.*, 201 Cal. 248, 258 (1927); *Burnett v. Ala*

*Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993).

**\*4**  An option contract is an agreement in which the optionee, through the provision of consideration, "binds the optionor to perform an underlying agreement upon the optionee's performance of a condition precedent." *Palo Alto Town & Country Vill., Inc. v. BBTC Co.*, 11 Cal. 3d 494, 502 (1974). The optionor is obliged to perform his or her duties under the agreement because he or she has already accepted consideration. *Id.* at 503. The optionee, on the other hand, has no duties "until, and unless, he accepts the irrevocable offer proposed to him by the optionor." *Id.* For example, in an option contract for the purchase of real property, the optionor offers to sell property at a fixed price and pledges to keep that offer open for a set period of time in exchange for consideration. *See Steiner v. Thexton*, 48 Cal. 4th 411, 418 (2010). The optionee, having provided consideration, may then choose to exercise the option during the set period, in which case the optionor must sell the property at the agreed-upon price; or, the optionee can let the time lapse and the option expire. *Id.*

A loan, on the other hand, has been defined as "anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use [otherwise known as interest]." *In re Johnson*, 218 B.R. 449, 456-57 (8th Cir. BAP 1998) (quoting Black's Law Dictionary). Alternatively, the Second Circuit defined a loan as:

[A] contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows. 'In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form.'

*In re Johnson*, 218 B.R. at 455 (quoting *In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914)). This definition was helpfully re-stated in a more recent case defining a loan as "(i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000). Loans do not require a sum certain to be stated in the contract. *McKay v. Ingleson*, 558 F.3d 888, 891 (9th Cir. 2009). Other courts have emphasized the intent of the parties as an important factor in determining whether a loan was created. *In re Johnson*, 218 B.R. at 456 (citing cases).

For the purposes of TILA, the agreement between Plaintiff and EquityKey is not a loan. Mr. Foster and Plaintiff (should he decide not to sell or transfer the property or otherwise breach the agreement) do not currently owe EquityKey any debt. Further, there is no guarantee that the payment received by Mr. Foster need ever be returned. If EquityKey elects not to exercise its option, Plaintiff will

not owe it any money. And as there is no way to know for certain whether calling the option at the end of the 50-year term will be profitable for EquityKey, there is no way to know whether Plaintiff will *ever* be required to pay. [2] Phrased in terms of the definition of a loan from *In re Grand Union Co.*, Mr. Foster did not agree to "repay absolutely" the option premium payment. Finally, contrary to Plaintiff's arguments, the potential return to EquityKey (should EquityKey exercise the option) cannot be characterized as an effective interest rate. The return—based on the increase, if any, in value of the homes in Mr. Foster's Metropolitan Statistical Area—is more akin to a capital gain, like the gain one would realize upon the sale of a stock that has increased in value.

[2]   It appears *likely* that housing values in fifty years will be greater than they were in 2010, and that EquityKey will call the option. But this is not certain.

**\*5**  Rather than being a loan, the agreement is as EquityKey describes it: it is an option contract. EquityKey has paid Mr. Foster valuable consideration ($196,000) to secure an option to participate in the appreciation of Mr. Foster's property. EquityKey is not obliged to exercise its option. In fact, if home prices decrease, it would have little reason to do so. If home values increase, but at a rate that is slower than inflation (or at a slower rate than the rate of return one could receive from a prudent investment of the option premium), then even if EquityKey calls the option, it would ultimately lose money on the deal. On the other hand, if Plaintiff elects to sell the Property, and home values in the area have

increased, EquityKey can call its option and oblige Plaintiff to perform his duties under the terms of the agreement.

Though the ability to call or decline to exercise the option makes an option contract a better characterization of the transaction, the agreement also has many features of an "investment plan" as described by the Federal Reserve Board in the Commentary to Regulation Z. Commentary to 12 C.F.R. § 226.2(a)(14)-1. An investment plan is defined as a transaction "in which the party extending capital to the consumer risks the loss of the capital advanced. This includes, for example, an arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in any gain or loss of property value." 12 C.F.R. § 226, Supplement I, Subpart A, 2(a)(14)(vii)-(viii). Regulation Z excludes such transactions from "credit," which is defined as "the right to defer payment of debt or to incur debt and defer its payment." 12 C.F.R. § 226.2(a)(14). In the present transaction, EquityKey risked the loss of the capital it advanced. Though property values in the Bay Area have increased since 2010 in a manner that at times has seemed inevitable, the real estate market could have stagnated or declined (and indeed, the painful lessons of the recent economic past warn against assuming that housing prices will only increase). While a decrease in home values would not help Plaintiff today (as he would owe an early termination charge if he transferred the property before 2020), if housing prices are down in four years and Plaintiff sells the

property at that time, then EquityKey would lose money on the deal.

Through the provision of consideration, EquityKey has bound Mr. Foster to perform an underlying agreement (to share the appreciation of the property) upon EquityKey's performance of a condition precedent (calling the option). The agreement has all the features of an option contract described above. The court's characterization of the transaction as an option contract and not a disguised loan is fatal to Plaintiff's TILA claim. Since the agreement was not subject to TILA's disclosure requirements, EquityKey did not violate the statute for not making TILA disclosures.

## II. Limitations Issues: TILA, Fraud, Financial Elder Abuse, Unfair Business Practices.

Even if TILA applied to the transaction at issue here, the claim would be barred by the statute of limitations. For similar reasons, Plaintiff's claims for fraud, financial elder abuse, and unfair business practices are also time-barred.

There are two relevant limitations periods for TILA claims: one year for claims seeking damages and three years for claims seeking rescission. 15 U.S.C. §§ 1640(e), 1635(f); *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 3d 862, 873 (N.D. Cal. 2010). The clock starts running on actions for damages upon a violation of TILA, which occurs when the consumer "becomes contractually obligated on a credit transaction." *Davenport*, 725 F. Supp. 3d at 872. As for claims for rescission, the limitations period "shall expire" three years after the transaction is consummated or the

property is sold, whichever occurs first. *Id.* at 873. The three-year rescission period is absolute and cannot be tolled. *Id.; Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). Mr. Foster became contractually obligated on the transaction in June 2010, when he executed the contract and consummated the agreement. Thus, unless Plaintiff can argue that the limitations period should run from another date due to the discovery rule or (for the damages claim) should be tolled, the TILA claim for damages expired in 2011 and the claim for rescission expired in 2013.

**\*6** As for Plaintiff's three state-law claims mentioned above, under California Code of Civil Procedure Section 337, the limitations period for rescission for a contract in writing on the basis of fraud is four years from the date upon which the aggrieved party discovers the facts constituting the fraud or mistake. "A party alleging fraud has a duty to exercise diligence in discovering the fraud, such that the ... limitation begins to run when that party 'has the opportunity to obtain knowledge from sources open to his investigation.' " *Rivera v. BAC Home Loans Servicing, LP*, 756 F. Supp. 2d 1193, 1200 (quoting *Lee v. Escrow Consultants, Inc.*, 210 Cal. App. 3d 915, 921 (1989)). Similarly, the limitations period for actions for damages for financial elder abuse is "four years after the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." *Giordano v. Wachovia Mortg., FSB*, No. 5:10-cv-04661-JF, 2011 WL 1130523, at \*3 (N.D. Cal. Mar. 25, 2011) (quoting Cal. Welf. & Inst. Code § 15657.7). Finally, the limitations period for an unfair

business practices claim is "four years after the cause of action accrued." Cal. Bus. & Prof. Code § 17208. As with the previous claims, the discovery rule may postpone accrual "until a plaintiff discovers or has reason to discover" the unfair competition law claim. ⚑*Glue-Fold, Inc. v. Slauterback Corp.*, 82 Cal. App. 4th 1018, 1029 (2000).

### a. The Discovery Rule.

Plaintiff argues that the discovery rule should apply, and that the clock should not have started running on his TILA, fraud, financial elder abuse, and unfair business practices claims until he discovered the true nature of the transaction in 2016. Under the discovery rule, "the limitations period does not begin to run until the plaintiff discovers (or reasonably should discover) that he has been injured." ⚑*Perez v. Wells Fargo Bank*, No. C-11-02279 JCS, 2011 WL 3809808, at *14 (N.D. Cal. Aug. 29, 2011). Plaintiffs asserting the discovery rule must plead facts adequate to support its application. *Id.*

Plaintiff alleges that Mr. Foster could not discover the true nature of the agreement because of "false and deliberately misleading" representations by EquityKey that the contract was not a loan and because of Mr. Foster's "age and mental status." Plaintiff asserts that he only discovered his claims after his father's death and with the assistance of counsel.

Plaintiff's argument that the discovery rule should apply fails for several reasons. First, the facts relevant to the discovery of the claims at issue here were included on the face of the

contract signed by Mr. Foster. Thus, Mr. Foster had all of the information necessary to discover his claims through the exercise of diligence in 2010, a time at which Plaintiff concedes he was competent. Allegations that Mr. Foster did not understand the terms of the contract he signed or did not consult with legal counsel do not establish that he could not reasonably have learned of his claims had he been diligent. *Nevarez v. Wells Fargo, N.A.*, No. C-12-1660 JCS, 2012 WL 2428233 (N.D. Cal. June 26, 2012); ⚑*Perez v. Wells Fargo Bank*, No. C-11-02279 JCS, 2011 WL 3809808, at *14 (N.D. Cal. Aug. 29, 2011). Second, defendant's allegedly deceptive statements do not excuse Plaintiff's delay, as the transaction documents expressly discussed and disclosed the terms of the agreement. *Hague v. Wells Fargo Bank, N.A.*, No. C11-02366 THE, 2012 WL 1029668, *5 (N.D. Cal. Mar. 26, 2012) (citing ⚑*Parsons v. Tickner*, 31 Cal. App. 4th 1513, 1525 (1995)) ("Where there existed, from the time the loan was made, papers which disclosed the terms of the loan, it would seem that reasonable diligence would have enabled Plaintiff to discover the problem."). Additionally, despite Plaintiffs' allegations of EquityKey's deceptive statements, the agreement itself encourages the exercise of diligence, advising potential signatories to seek the counsel of an attorney or financial advisor before signing.

Mr. Foster's failure to discuss the transaction with Plaintiff also does not excuse his delay. Plaintiff's claims are the same as Mr. Foster's, so the limitations clock does not start fresh upon Mr. Foster's death. And Mr. Foster's statement to Plaintiff that "he had made a deal for essentially 'free money' " demonstrates that Plaintiff was on notice of the transaction

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 67 of 114 PageID: 531

Foster v. EquityKey Real Estate Investments L.P., Not Reported in Fed. Supp. (2017)

(and its potentially suspect nature) during Mr. Foster's life. These allegations do not support the application of the discovery rule here, and, as a result, Plaintiff's claims are time-barred unless the doctrine of equitable tolling applies.

### b. Equitable Tolling.

**\*7** "[E]quitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of [a] TILA action." *King v. Cal.*, 784 F.2d 910, 915 (9th Cir. 1986). Equitable tolling applies where "despite all due diligence, [plaintiff] is unable to obtain vital information bearing on the existence of the claim." *Hensley v. United States*, 531 F.3d 1052, 1057-58 (9th Cir. 2008). "The doctrine is not available to avoid the consequences of one's own negligence and does not apply when a late filing is due to claimant's failure to exercise due diligence in preserving his legal rights." *Id., at 1058* (quoting *Scholar v. Pac. Bell*, 963 F.2d 264, 268 (9th Cir. 1992)). A motion to dismiss on statute of limitations grounds should be granted only when the assertions of the complaint, read liberally, do not permit the plaintiff to prove that the limitations period was tolled. *Alakozai v. Valley Credit Union*, No. C10-02454 HRL, 2010 WL 5017173, at \*4 (N.D. Cal. Dec. 3, 2010).

Plaintiff does not state any plausible allegations suggesting that Plaintiff and Mr. Foster were unable to obtain vital information about their claims despite the exercise of due diligence

beyond (1) the conclusory assertions that EquityKey made deceptive and misleading statements about the transaction and (2) the claim that Mr. Foster did not understand the transaction. As stated above, however, the information Plaintiff needed to discover his claims was available on the face of the transaction documents, regardless of any misleading statements made by EquityKey. And Mr. Foster's lack of understanding of the contract could have been addressed by the exercise of due diligence in consulting counsel earlier, during the limitations period. *See Finuliar v. BAC Home Loans Servicing,* No. C-11-02629 JCS, 2011 WL 4405659, at \*8 (N.D. Cal. Sept. 21, 2011) (declining to apply the equitable tolling doctrine where the plaintiff alleged that she could not understand the express terms of her loan and where she did not discover her claims until she retained counsel). For these reasons, and the reasons stated in the discussion above concerning the discovery rule, Plaintiff's argument that equitable tolling should apply fails.

Since neither the discovery rule nor equitable tolling applies, Plaintiff's TILA, fraud, financial elder abuse, and unfair business practices claims had each expired by 2014, and each is time-barred.

### III. Quiet Title, Cancellation of Instruments, Declaratory Relief.

The California Supreme Court has explained that "no statute of limitations runs against a plaintiff seeking to quiet title while he is in possession of the property." *Muktarian v. Barmby*, 63 Cal. 2d 558, 560-61 (1965). As Plaintiff remains in exclusive and undisputed

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 68 of 114 PageID: 532

Foster v. EquityKey Real Estate Investments L.P., Not Reported in Fed. Supp. (2017)

possession of the property, the limitations period—regardless of which period applies—has not started to run on his claim for quiet title. *See id.* (holding that the three-year statute of limitations for fraud or mistake did not bar an action for quiet title while the plaintiff was still in possession). Defendant's reliance on *Ankoanda v. Walker-Smith*, 44 Cal. App. 4th 610 (1996), to argue that *Muktarian* does not apply here is unavailing. In *Ankoanda*, unlike in *Muktarian*, the plaintiff was a co-tenant and lacked exclusive possession of the property. *44 Cal. App. 4th at 618*. Here, as EquityKey acknowledges in the transaction documents, Plaintiff is in exclusive possession of the property. *See* Dkt. No. 7, Ex. 1, § (A)(1) ("Your grant of the option to [EquityKey] does not give us any present ownership or possession rights with respect to the Property."); *see also* *Salazar v. Thomas*, 236 Cal. App. 4th 467, 469-482 (discussing possession). EquityKey's cloud on Plaintiff's title does not dispute or disturb Plaintiff's possession, and so the statute of limitations has not started running. *See* *Salazar*, 236 Cal. App. 4th at 478 ("mere notice of an adverse claim is not enough to commence the owner's statute of limitations").

 **\*8** As the quiet title claim is not time-barred, the court considers EquityKey's argument that Plaintiff fails to state a claim for quiet title upon which relief may be granted.

To state a claim for quiet title, a plaintiff must allege "that he is the owner of certain described real property, that defendants claim an interest therein adversely to him, that such claim is without right, and that the defendants have no estate, title or interest whatever in said

premises or any part thereof...." *Ephraim v. Metropolitan Trust Co. of Cal.*, 28 Cal. 2d 824, 833 (1946); *see also* *Wolfe v. Lipsy*, 163 Cal. App. 3d 633, 638 (1985), *disapproved of on other grounds by* *Droeger v. Friedman, Sloan & Ross*, 54 Cal. 3d 26 (1991). "[W]here the plaintiff seeks to have his title to property quieted as to an instrument which is attacked on the ground of fraud, then ... the defrauded party must plead the pertinent facts relied upon as grounds for setting aside said instrument." *Borneman v. Salinas Title Guar. Co.*, 66 Cal. App. 2d 500, 503-04 (1944); *see also* *Markowicz v. J.P. Morgan Chase Bank, N.A.*, No. B233602, 2012 WL 3716889, at *3 (Cal. Ct. App. Aug. 29, 2012) (dismissing a quiet title claim brought on the basis of the cancellation of an instrument because the plaintiff did not adequately plead the fraud needed to justify cancelling the instrument); 11A Cal. Jur. 3d Cancellation and Reformation § 4 (Feb. 2017) ("[W]hen, in an action to quiet title, the plaintiff adds to the usual allegations averments showing a deed from the plaintiff to the defendant, the plaintiff must, in order to show that the deed was procured by fraud, plead the facts constituting the fraud.").

Here, EquityKey argues that Plaintiff has failed to plead that the cloud on his title cast by the performance deed of trust was procured by fraud, because the alleged misrepresentations in the transaction documents are not false or misleading. The court confines its analysis to the statements in the transaction documents, as Plaintiff admitted at the hearing on this motion that he was not aware of any misrepresentations beyond those statements.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 69 of 114 PageID: 533

Foster v. Equitykey Real Estate Investments L.P., Not Reported in Fed. Supp. (2017)

The complaint alleges that EquityKey misrepresented the nature of the agreement, calling it an option contract (and affirmatively representing that the transaction is "not a loan") when it was, in reality, a disguised high-interest loan or mortgage. Dkt. No. 1, Ex. A, ¶¶ 1, 14, 19, 20, 21. The court has already concluded that the transaction is excluded from the coverage of TILA. This conclusion does not inevitably mean that the transaction is "not a loan" under state law. *Cf. Jordan v. Paul Fin., LLC,* 745 F. Supp. 2d 1084, 1095 (N.D. Cal. 2011) (noting that TILA's preemptive reach is limited to required disclosures and that the statute does not "otherwise regulate the particulars of a loan agreement."). The court, however, also concludes that the transaction is "not a loan" within the meaning of California law.

The California Supreme Court has distinguished loans from sales. A sale, the Court has explained, "is the transfer of the property in a thing for a price in money." *Milana v. Credit Discount Co.,* 27 Cal. 2d 335, 339-40 (1945); *see also West Pico Furniture Co. of L.A. v. Pac. Fin. Loans,* 2 Cal. 3d 594, 671-72 (1970). A loan, in contrast, is "the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use." *Milana,* 27 Cal. 2d 335, 339-40; *see also* Cal. Civ. Code § 1912. Though a court's determination of whether a transaction is a sale or a loan is usually a question of fact, where, as here, the details of the transaction are not in dispute, this determination is a question of law. *See Kunert v. Mission Fin. Servs. Corp.,* 110 Cal. App. 4th 242, 255-56

(2003); *cf. Ghirardo v. Antonioli,* 8 Cal. 4th 791, 799-801 (1994) (determining that whether a particular transaction was a loan subject to usury law or an exempt transaction of a different character was a question of law).

**\*9** Mr. Foster sold EquityKey an option. An option is not an interest in real property, but rather a contractual right, one that may become an interest in property when it is exercised. *Cyr v. McGovran,* 206 Cal. App. 4th 645, 648 (2012). If exercised, EquityKey's option becomes an interest in the appreciation in value of Mr. Foster's property (as determined by the aggregate increase in value of homes in his area). EquityKey may ultimately choose not to exercise its right; but this does not change the fact that Mr. Foster conveyed to EquityKey a valuable right to claim, if it chooses, an interest in real property in exchange for money (i.e., the option premium). This was the essence of the transaction—the sale of a thing for a price in money. Plaintiff might argue that the "thing" transferred was the right to recover the option premium at a later date, with or without interest. But the features of the transaction—especially the fact that EquityKey might not recover the full option premium—makes this characterization unreasonable.

The transaction is at is described—it is the sale of an option, and not a loan. As a result, Plaintiff—whose only allegations that EquityKey's claim to title is "without right" rely on the (rejected) assertion that the transaction is a loan—has not plead that EquityKey's claim to title is "without right" and has not adequately plead a claim for quiet title upon which relief may be granted. For the same reasons—the absence of allegations as to any basis for

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 70 of 114 PageID: 534

Foster v. Equitykey Real Estate Investments L.P., Not Reported in Fed. Supp. (2017)

the invalidity of the transaction (and thus of any actual controversy regarding it)—the court concludes that the cancellation of instruments and declaratory relief claims must also fail. [3]

[3]    As the court dismisses the cancellation of instruments and declaratory relief claims because it is unclear what underlying wrongful conduct they rely on, the court declines to reach whether these claims are barred by the statute of limitations (as which limitations period applies depends on the substantive nature of these claims).

## CONCLUSION

As Plaintiff's TILA claim fails because the transaction is excluded from that statute's disclosure requirements, amendment would be futile and the court grants the motion to dismiss as to this claim without leave to amend. The fraud, financial elder abuse, and unfair competition law claims are dismissed on the grounds that they are time-barred. A plaintiff who fails to plead facts to support equitable tolling "normally should be permitted to amend his or her complaint" to plead such facts.

*Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 641 (2003). As the facts giving rise to these claims were apparent on the face of the transaction documents and discoverable through the exercise of due diligence, however, the court is persuaded that amendment would be futile and grants the motion to dismiss as to these claims without leave to amend.

Finally, the quiet title, cancellation of instruments, and declaratory relief claims are dismissed on the grounds that Plaintiff failed to allege a basis for invalidating the performance deed of trust. As the court is not persuaded that amendment to cure this defect would be futile, the court dismisses these claims with leave to amend. Plaintiff may file an amended complaint within 21 days of the date of this order. Failure to do so will result in dismissal of the complaint with prejudice. Plaintiff may not add any new claims without first obtaining leave of the court.

## IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1862527

---

**End of Document**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 2057294
Only the Westlaw citation
is currently available.
**<u>NOT FOR PUBLICATION</u>**
United States District Court, D. New Jersey.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY, GEICO
Indemnity Company, GEICO General
Insurance Company, and GEICO
Casualty Company, Plaintiffs,
v.
Shahid MIAN, M.D., Shahid Mian, M.D.,
P.C., Shahid Mian, MD Professional
Corporation, Surgery Center of
Oradell, LLC, Global Surgery Center,
LLC, Parkway Ambulatory Surgery
Center, LLC, Sadia Chaudhry, Ata
Chaudhry a/k/a Danny Chaudhry,
and Sako Tarakhchyan, Defendants.

Civil Action No. 22-233 (GC) (RLS)
|
Signed May 8, 2024

**Attorneys and Law Firms**

Gene Y. Kang, Rivkin Radler LLP,
Hackensack, NJ, Michael Vanunu, Rivkin
Radler LLP, Uniondale, NY, for Plaintiffs.

Steven Jay Harfenist, Harfenist Kraut &
Perlstein, LLP, Lake Success, NY, for
Defendant Gabriel Dassa, D.O.

Igor Niman, Law Offices of Igor Niman,
Brooklyn, NY, for Defendant Kostanian
Consulting Associates, Inc.

Benjamin M. Pinczewski, Law Offices of
Pinczewski & Shpelfogel, Brooklyn, NY,

for Defendants Shahid Mian, Shahid Mian,
M.D., P.C., Shahid Mian, MD Professional
Corporation.

Damian P. Conforti, Andrew Gimigliano,
Brian Matthew Block, Mohamed Nabulsi,
Mandelbaum Barrett PC, Roseland, NJ,
for Defendant Parkway Ambulatory Surgery
Center, LLC.

Brian Matthew Block, Mandelbaum Barrett
PC, Roseland, NJ, for Defendant Sako
Tarakhchyan, D.C.

**<u>MEMORANDUM ORDER</u>**

CASTNER, District Judge

**\*1  THIS MATTER** comes before the
Court upon Defendants Parkway Ambulatory
Surgical Center, LLC and Sako Tarakhchyan's
(the Parkway Defendants) Motion to Compel
Arbitration or, alternatively, Dismiss (ECF No.
217) certain claims in Plaintiffs' (GEICO's)
Second Amended Complaint (SAC) (ECF
No. 210) pursuant to Federal Rule of Civil
Procedure (Rule) 12(b)(6). GEICO opposed,
and the Parkway Defendants replied. (ECF
Nos. 220 & 221.) The parties subsequently
filed supplemental letter briefs in light of
the United States Court of Appeals for
the Third Circuit's precedential decision in
⚑*Government Employees Insurance Co. v.
Mount Prospect Chiropractic Center, P.A.*, Civ.
Nos. 23-1378, 23-2019, & 23-2053, 2024 WL
1611904 (3d Cir. Apr. 15, 2024). (ECF Nos.
232-236.) The Court has carefully considered
the parties' submissions and decides the
Motion without oral argument pursuant to Rule
78(b) and Local Civil Rule 78.1(b). For the

Government Employees Insurance Company v. Mian, Not Reported in Fed. Supp. (2024)

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 72 of 114 PageID: 536

reasons set forth below, and other good cause shown, the Parkway Defendants' Motion is **GRANTED** in part and **DENIED** in part.

# I. BACKGROUND

## A. Factual Background [1]

[1] On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts. *See* 🚩 *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

Defendants are various New York and New Jersey medical facilities and their owners or physician-employees. (*See* ECF No. 210 ¶¶ 5(i)-(vi).) GEICO, an automotive insurer, alleges that Defendants submitted or caused to be submitted thousands of fraudulent "no-fault," "personal injury protection" (PIP) insurance claims for reimbursement of medical expenses. (*Id.* ¶¶ 1(i)-(ii), 5.) According to GEICO, the PIP claims submitted by Defendants were for procedures and examinations that were either medically unnecessary, or otherwise not reimbursable due to Defendants' noncompliance with the healthcare practice and licensing requirements governing such medical facilities. (*See id.* ¶¶ 6(i)-(iv).)

GEICO alleges distinct but interrelated conspiracies between different sets of defendants. (*See id.* ¶¶ 10-11.) First, GEICO accuses Defendant Shahid Mian, M.D., of submitting inflated and fraudulent PIP claims to GEICO through Mian's New Jersey and New York medical professional corporations — Mian NJ PC and Mian NY PC (the Mian Defendants). (*Id.* ¶¶ 71-190.) Second,

GEICO alleges that Former Defendants Ata and Sadia Chaudhry conspired with the Mian Defendants to submit fraudulent PIP claims to GEICO through two ambulatory care facilities — Surgery Center of Oradell, ASC (Oradell ASC) and Global Surgery Center, LLC (Global Surgery). [2] (*Id.* ¶¶ 191-216, 268-269.) Third, GEICO accuses the Chaudhrys of conspiring with Defendant Tarakhchyan to submit fraudulent PIP claims through Parkway ASC, another ambulatory care facility. (*Id.* ¶¶ 217-237.)

[2] Former Defendants A. Chaudhry, S. Chaudhry, Global Surgery, and Oradell ASC reached a settlement with GEICO and were dismissed without prejudice from this action before GEICO filed the SAC. (ECF No. 210 ¶ 23; ECF No. 192.)

## B. Procedural History

**\*2** GEICO filed its Second Amended Complaint on July 10, 2023. GEICO's SAC asserts thirty-eight causes of action. Count 1 seeks a declaratory judgment ruling that Mian NJ PC, Mian NY PC, and Parkway ASC did not comply with certain New Jersey and New York laws governing their facilities and were therefore ineligible to receive PIP payments from GEICO under both New Jersey and New York no-fault insurance laws. (*Id.* ¶¶ 294-300.)

The remaining causes of action are against specific defendants or groups of defendants separated by the state of the applicable PIP policy — New Jersey or New York. For example, GEICO brings two sets of claims against the Parkway Defendants. First, GEICO asserts claims for Racketeer Influenced and

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 73 of 114 PageID: 537

Government Employees Insurance Company v. Mian, Not Reported in Fed. Supp. (2024)

Corrupt Organizations Act (RICO) violations, fraud, unjust enrichment, and New Jersey Insurance Fraud Prevent Act (IFPA) violations based solely on the Parkway Defendants' fraudulent New Jersey PIP insurance billing. Second, GEICO asserts RICO violations, fraud, and unjust enrichment based solely on the Parkway Defendants' fraudulent New York PIP insurance billing. Of the 1,665 allegedly fraudulent PIP claims submitted by the Parkway Defendants, 226 claims pertain to GEICO's New York PIP insurance policies, and 1,439 claims were submitted under GEICO's New Jersey PIP insurance policies. (*See* ECF No. 217-1 at 12; ECF No. 210-7; ECF No. 210-8.)

On July 24, 2023, the Parkway Defendants filed their Third Motion to Compel Arbitration or, alternatively, Dismiss GEICO's claims against the Parkway Defendants. (ECF No. 217-1.) On September 18, 2024, the Court granted the Parkway Defendants' motion to stay discovery pending disposition of the Third Motion to Compel Arbitration. (ECF No. 225 at 8.) The Court found that the parties' relative hardships and prejudices, as well as the early stage of the case, warranted a stay of discovery; and that a stay would assist in simplifying the case because "it is possible that a large swath of discovery and perhaps a trial in this Court may be unnecessary" if "at least some of the issues could be resolved through arbitration." (*Id.* at 8-9.)

On April 15, 2024, the Third Circuit Court of Appeals issued the precedential decision in *Government Employees Insurance Company v. Mount Prospect Chiropractic Center, P.A.*, [3] which "directly addresses several of the dispositive legal questions at issue in the motion pending before this Court." (ECF No. 233 at 1.) As the Third Circuit held, New Jersey IFPA claims are arbitrable, and both the contractual arbitration clause in GEICO's New Jersey Decision Point Review Plan (DPRP) and the arbitration provision in New Jersey's no-fault insurance statute (N.J. Stat. Ann. § 39:6A-5.1(a)) required GEICO to arbitrate their IFPA claims asserted in those district court cases. *Mount Prospect*, 2024 WL 1611904, at *3-*6.

[3]     Civ. Nos. 23-1378, 23-2019, & 23-2053, 2024 WL 1611904 (3d Cir. Apr. 15, 2024).

Following *Mount Prospect*, GEICO advised the Court that GEICO "now consent[s] to the Parkway Defendants' Third Motion to Compel Arbitration or Dismiss to the extent that the motion seeks to compel arbitration" of GEICO's claims against the Parkway Defendants that are predicated on Parkway ASC's New Jersey-based PIP billing. (ECF No. 232 at 1 (footnote omitted).) But GEICO "do[es] not consent to the Parkway Defendants' motion to the extent that it seeks to compel arbitration or otherwise dismiss" GEICO's claims that are predicated on Parkway ASC's New York-based PIP billing. (*Id.* at 1-2.) In response, the Parkway Defendants argue that in light of GEICO's consent to arbitration of the New Jersey claims, the Court must "enter an order ... staying the entire case pending arbitration" pursuant to Section 3 of the Federal Arbitration Act (FAA), 9 U.S.C. § 3. [4] GEICO opposes a stay of any claims because (1) "Plaintiffs have not yet decided whether they will proceed with any such arbitration on the

New Jersey claims" and "may choose not to proceed with any such arbitration"; and (2) "even if Plaintiffs were to proceed with arbitration" of the New Jersey claims, the Court should permit discovery to proceed on GEICO's remaining claims. (ECF No. 234 at 3-4.)

4      Although the Parkway Defendants ask the Court to stay the "entire case," they later clarify that they take "no position regarding whether and how this case should proceed against the Mian Defendants, as GEICO's case against them is entirely unrelated to [the Parkway] Defendants." (ECF No. 233 at 4 n.3) (citing ⚑*Mendez v. Puerto Rican Int'l Cos., Inc.*, 553 F.3d 709 (3d Cir. 2009).)

## II. DISCUSSION

### A. Plaintiff's New Jersey PIP Claims against the Parkway Defendants are Referred to Arbitration

**\*3**  As noted above, GEICO now consents to the Parkway Defendants' Motion to compel arbitration of GEICO's claims against the Parkway Defendants based on New Jersey PIP insurance billing. (ECF No. 232 at 1.) Accordingly, the Parkway Defendants' Motion is **GRANTED** in part. Counts 23, 28, 29, 30, and 31, and Count 1 to the extent that it seeks a declaration that Parkway ASC was not in compliance with all significant laws and regulations governing healthcare practice in New Jersey, are **DISMISSED WITHOUT PREJUDICE** in favor of arbitration.

### B. GEICO's Remaining Claims are Stayed Pending Arbitration

The Parkway Defendants argue that Section 3 of the FAA requires that the Court stay all of GEICO's remaining claims against the Parkway Defendants pending the completion of arbitration. (ECF No. 233 at 2.) "Even setting aside the statutory language," the Parkway Defendants argue, "this is a textbook case where the arbitrable issues dominate and where arbitration of the issues will have some effect ... on the non-arbitrable claims," given that GEICO's claims against the Parkway Defendants rely mostly on fraudulent PIP billing under New Jersey insurance policies, as opposed to New York policies. (*Id.* at 3 (noting that the New Jersey-based causes of action are premised on 1,439 underlying PIP claims, as opposed to only 226 underlying PIP claims based on New York PIP policies).) The Parkway Defendants take no position on how the case should proceed against the Mian Defendants. (*Id.* at 4 n.3.)

GEICO points out that under *Mendez v. Puerto Rican International Companies, Inc.*, the Third Circuit affirmed a district court's decision staying a case pending arbitration as to plaintiffs who had entered into arbitration agreements but declining to stay the case as to plaintiffs who had not entered into arbitration agreements. ⚑553 F.3d 709, 712 (3d Cir. 2009). (ECF No. 234 at 3.) In so ruling, the Third Circuit held that Section 3 of the FAA was "not intended to mandate curtailment of the litigation rights of anyone who has not agreed to arbitrate any of the issues before the court," and affirmed the district court's holding that Section 3 did not

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 75 of 114 PageID: 539

Government Employees Insurance Company v. Mian, Not Reported in Fed. Supp. (2024)

mandate a stay against parties who had not entered into arbitration agreements. ⚑553 F.3d at 711. GEICO argues that because Section 3 does not mandate a stay of the non-arbitrable claims, "the decision whether to stay non-arbitrable issues is discretionary," and the "usual rule ... is that the court will stay only the arbitrable claims and will permit the others to proceed." (ECF No. 234 at 4) (citing ⚑*LoanDepot.com v. CrossCountry Mort., Inc.*, Civ. No. 18-12091, 2019 WL 2613265, at *8 (D.N.J. Jun. 24, 2019).) GEICO argues that this Court "should exercise its discretion to permit discovery to proceed" on GEICO's remaining claims that have not been referred to arbitration. (*Id.*)

Section 3 of the FAA provides that "issues within the scope of an arbitration agreement shall be referred to arbitration, and that trial must be stayed pending arbitration of those issues." ⚑*LoanDepot.com,* 2019 WL 2613265, at *8 (citing 9 U.S.C. § 3).

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration ..., the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceedings is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the application for the stay is not in default in proceeding with such arbitration.

**\*4** [9 U.S.C. § 3.]

As GEICO correctly notes, *Mendez* held that "in order for a party to be the subject of a mandatory stay pending arbitration under Section 3 of the FAA, that party must have committed itself to arbitrate one or more issues in suit." ⚑553 F.3d at 715. Section 3 does not "mandate curtailment of the litigation rights of anyone who has not agreed to arbitrate any of the issues before the court." ⚑*Id.* at 711. But *Mendez* recognized that even where Section 3 does not mandate a stay of proceedings, a district court has its own "inherent discretion," separate from the FAA, to stay litigation among non-arbitrating parties pending the outcome of the arbitration. ⚑*Id.* at 712 (quoting ⚑*Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)).

"In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of arbitration. That decision is one left to the district court ... as a matter of discretion to control its docket." ⚑*Id.* (*Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)); *see also* ⚑*Neal v. Asta Funding, Inc.*, Civ. No. 13-3438, 2014 WL 131770, at *4 (D.N.J. Jan. 6, 2014) ("[A] district court also possesses the inherent discretion to control its docket. As a component of that discretion, the court has the inherent power to stay its own proceedings.") "[A] stay of court proceedings pending arbitration is a remedy that ... 'does not require statutory authority.' " *Id.* (quoting ⚑*Merritt-Chapman & Scott Corp. v. Pa. Turnpike Comm'n*, 387 F.2d 768, 773 (3d Cir. 1967)). "When the parties and issues significantly overlap between a court proceeding and an arbitration, a court may stay the entire court action. That is true even where the overlap is not complete, for example, even

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 76 of 114 PageID: 540

Government Employees Insurance Company v. Mian, Not Reported in Fed. Supp. (2024)

if some of the parties or issues are not subject to arbitration." *Id.* at *3 (citing 🚩*Crawford v. W. Jersey Health Sys. (Vorhees Div.), 847 F. Supp. 1232, 1240 (D.N.J. 1994)*). "[E]ven where Section 3 of the FAA does not apply, a trial court may properly stay a proceeding pending arbitration where 'it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case.' " *Id.* at *5 (quoting 🚩*Leyva v. Certified Grocers of California, Ltd., 593 F.2d 857, 863-64 (9th Cir. 1979)*).

Here, the Court finds that a stay of GEICO's remaining claims against both the Parkway and Mian Defendants, though not mandated under Section 3 of the FAA, is nevertheless appropriate given the overlapping factual and legal issues governing the claims, the balance of the parties' relative hardships and prejudice, and the current stage of the case.

First, the underlying New Jersey PIP claims related to the Parkway Defendants outnumber the underlying New York PIP claims by a factor of six to one. (*See* ECF No. 210-8; ECF No. 210-7.) Where, as here, "the arbitrable claims predominate" the non-arbitrable claims, courts tend to grant a stay of the non-arbitrable claims. *See DiValerio v. Best Care Lab., LLC*, 2022 WL 20679837, at *1 (D.N.J. Mar. 28, 2022). It is also likely that the arbitration of the New Jersey-based claims will substantially affect the New York-based claims. For example, a finding at arbitration that the A. Chaudhry, S. Chaudhry, and Tarakhchyan used Parkway ASC to submit fraudulent billing under GEICO's New Jersey PIP insurance policies would be highly relevant to GEICO's claim that

these Defendants also used Parkway ASC to submit fraudulent billing under GEICO's New York PIP insurance policies. It would therefore be "inadvisable to have these intertwined claims proceed simultaneously in court and in arbitration." *See* 🚩*Neal*, 2014 WL 131770, at *5. The significant factual overlap between GEICO's New Jersey-based and New York-based claims against the Parkway Defendants justifies this Court's exercise of its discretion to stay all remaining claims against the Parkway Defendants pending arbitration of the New Jersey-based claims.

**\*5** Second, the arbitrable IFPA, RICO, fraud, unjust enrichment, and declaratory judgment claims against the Parkway Defendants share many of the same factual and legal issues with GEICO's claims against the Mian Defendants, justifying a stay of the remainder of the action. *See* 🚩*Crawford*, 847 F. Supp. at 1243 (finding that after referring some claims to arbitration, staying the remaining non-arbitrable claims against parties not subject to arbitration was appropriate because of the overlapping factual and legal issues).

Here, underpinning many of GEICO's claims against the Parkway and Mian Defendants is a common nucleus: Former Defendants A. and S. Chaudhry. Mian and the Chaudhrys allegedly used Oradell ASC and Global Surgery as "vehicle[s] to submit fraudulent and unlawful no-fault insurance billing to GEICO ... in New York and New Jersey." (ECF No. 210 ¶¶ 24-25.) Separately, Tarakhchyan and the Chaudhrys allegedly used Parkway ASC "as a vehicle to submit additional fraudulent and unlawful PIP insurance billing to GEICO" in New York and New Jersey.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 77 of 114 PageID: 541

Government Employees Insurance Company v. Mian, Not Reported in Fed. Supp. (2024)

(*Id.* ¶¶ 17, 217.) GEICO accuses both the Mian and Parkway Defendants of co-owning and operating several of their respective facilities together with A. Chaudhry, despite A. Chaudhry's being ineligible to lawfully own, manage, or operate such facilities due to his 2016 criminal convictions. (ECF No. 210 ¶¶ 195-196, 219-220, 242-243.) The resolution of some claims against the Parkway Defendants at arbitration will therefore likely involve overlapping legal and factual issues that bear upon GEICO's claims against the Mian Defendants. For example, a finding at arbitration that A. Chaudhry's ownership and management of Parkway ASC was unlawful, rendering Parkway ASC ineligible to bill GEICO for PIP benefits, would impact GEICO's claim that Mian submitted PIP charges through A. Chaudhry's Oradell ASC facility "seeking payments ... that Oradell ASC was not entitled to receive." (*See id.* ¶ 393.)

To be sure, the factual overlap between these claims is not "complete." The Mian and Parkway Defendants are not alleged to have conspired directly with each other. Mian is also accused of referring insureds from the Mian Defendants' facilities to Oradell ASC and Global Surgery "in exchange for unlawful compensation" from the Chaudhrys; and of unlawfully operating his medical professional corporations across state lines. (*Id.* ¶¶ 182-190, 268-269.) And a portion of GEICO's claims against Mian are based on fraudulent PIP insurance billing that Mian submitted through Mian NY PC and Mian NJ PC, without any involvement of the Chaudhrys or other ambulatory care facilities.

But arbitration of GEICO's claims against the Parkway Defendants "will, at the very least, advance key issues affecting this matter, if not resolve them completely." *DiValerio*, 2022 WL 20679837, at *2; *see also* ⚑*Neal*, 2014 WL 131770, at *5 (noting that a court may properly stay a proceeding pending arbitration where "it is efficient for its own docket and the fairest course for the parties," and that such a stay "does not require that the issues in such proceedings are necessarily controlling of the action before the court") (quoting ⚑*Leyva*, 593 F2d at 863-64). A finding at arbitration that the Chaudhrys conspired with the Parkway Defendants to submit fraudulent PIP billing will, for example, be highly relevant as to whether the Chaudhrys and their facilities entered into nearly identical conspiracies with the Mian. Continuing with discovery and litigation of the remaining claims could impose an undue hardship on the Parkway Defendants by creating duplicative proceedings. Nor is the Court convinced that imposing a stay on GEICO's remaining claims would be unduly prejudicial to GEICO, given that arbitration is likely to assist in narrowing the factual and legal issues in its remaining claims, and GEICO will still be able to pursue any claims that remain unaffected by arbitration. To avoid the risk of duplicative proceedings and as a matter of judicial economy, GEICO's remaining claims will be stayed pending arbitration of its New Jersey-based claims against the Parkway Defendants.

### III. CONCLUSION

**\*6** For the reasons set forth herein, and other good cause shown,

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 78 of 114 PageID: 542

Government Employees Insurance Company v. Mian, Not Reported in Fed. Supp. (2024)

**IT IS**, on this <u>8th</u> day of May 2024 **ORDERED** as follows:

1. The Parkway Defendants' Motion to Compel Arbitration (ECF No. 217) is **GRANTED** in part and **DENIED** in part. Counts 23, 28, 29, 30, and 31, and Count 1 to the extent that it seeks a declaration that Parkway ASC was not in compliance with all significant laws and regulations governing healthcare practice in New Jersey, are **DISMISSED WITHOUT PREJUDICE** in favor of arbitration.

2. GEICO's remaining claims are hereby **STAYED** pending arbitration of Counts 23, 28, 29, 30, and 31, and the portions of Count 1 as specified herein.

3. The remainder of the Parkway Defendants' Motion in the alternative to dismiss Plaintiff's claims is **DENIED** without prejudice to the Parkway Defendants' right to refile the Motion once the Court lifts the stay. The Clerk's Office is directed to **ADMINISTRATIVELY TERMINATE** the Parkway Defendants' Motion to Compel Arbitration and to Dismiss at ECF No. 217.

4. The Clerk's Office is directed to **ADMINISTRATIVELY TERMINATE** this matter, and to **ADMINISTRATIVELY TERMINATE** the Motion for Interpleader Disbursement at ECF No. 212, subject to reopening after arbitration is complete.

5. Counsel shall file, within fourteen days of any decision by the arbitrator, a joint letter detailing the status of this matter and whether the stay should be lifted.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2057294

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 79 of 114 PageID: 543

Mancuso v. MDG USA, Inc., Not Reported in Fed. Rptr. (2024)

2024 WL 1230149
Only the Westlaw citation
is currently available.
United States Court of Appeals, Third Circuit.

Peter MANCUSO
v.
MDG USA, INC., Appellant

No. 23-1963
|
Argued on February 7, 2024
|
(Filed: March 22, 2024)

On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. No. 3-22-cv-01405), District Judge: Honorable Joseph F. Saporito, Jr.

**Attorneys and Law Firms**

Gregory Blase [Argued], Andrew C. Glass, K&L Gates, 1 Congress Street, Suite 2900, Boston, MA 02114, David R. Fine, K&L Gates, 17 N. Second Street, 18th Floor, Harrisburg, PA 17101, Counsel for Appellant.

John T. Shaffer, Jr. [Argued], Starks Law, 1422 West Street Road, Suite 2, Warminster, PA 18974, Counsel for Appellee.

Before: HARDIMAN, SCIRICA, and SMITH, Circuit Judges.

OPINION[*]

[*]  This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

HARDIMAN, Circuit Judge.

**\*1**  MDG USA, Inc. appeals the District Court's order denying its motion to compel arbitration. Because we agree with MDG that Plaintiff Peter Mancuso's claims are subject to an enforceable arbitration clause, we will reverse and remand with instructions to enter an order compelling arbitration.

I

In September 2020, Mancuso bought a laptop from MDG for about $850 to be paid in monthly installments of around $70 as required by a financing agreement. After Mancuso made his monthly payments for over a year, he and MDG disagreed about the remaining account balance. Mancuso instructed his bank to stop payment, and MDG reported him to credit agencies for refusing to pay.

After Mancuso was denied a mortgage because of his delinquent account with MDG, he sued MDG in Pennsylvania state court alleging violations of state and federal fair credit laws. MDG removed the case to federal court and then moved to compel arbitration and dismiss the case because the financing agreement contains an arbitration clause. The arbitration clause covers "any past, present, or future claim, dispute, or controversy ... relating to or arising out of th[e] Agreement," including statutory claims. App. 19. MDG provided a signed copy of the financing agreement with

its motion, as well as a declaration from its General Counsel authenticating the document.

In response, Mancuso acknowledged that he entered into the financing agreement with MDG and that his claims "arise[ ] from" and "are encompassed by" the agreement. Dist. Ct. Dkt. No. 9, at 2, 8. But he nonetheless argued that the agreement was unenforceable because of fraud and unconscionability.

The District Court denied MDG's motion without prejudice and ordered limited discovery on the arbitrability of Mancuso's claims because the Court concluded that "it [wa]s not apparent on the face of the complaint that [Mancuso's] ... claims [we]re subject to arbitration." App. 4.

MDG timely appealed. MDG argues the District Court erred by refusing to enforce the arbitration clause and seeks reversal.

## II [1]

[1] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332, and 9 U.S.C. § 4. We have jurisdiction under 9 U.S.C. § 16. "We exercise plenary review over questions regarding the validity and enforceability of an agreement to arbitrate." *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177 (3d Cir. 2010).

Mancuso does not dispute the authenticity of MDG's copy of the financing agreement, and he acknowledges that his claims arise from it. Because the "undisputedly authentic documents" on which Mancuso's claims are based contain an arbitration provision, we apply the standard from Rule 12(b)(6) of the Federal Rules of Civil Procedure to MDG's motion to compel arbitration. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (cleaned up). Under this standard, "the question to be answered" is whether Mancuso's complaint and the financing agreement "provide a recognized legal basis for rejecting" enforcement of the arbitration clause. *Id.* at 774 (cleaned up). [2] We look to state contract law to determine whether the arbitration clause is enforceable. *See* *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004).

[2] We acknowledge *Guidotti*'s cautionary guidance as to when limited discovery into arbitrability is appropriate. *Id.* at 774 (noting that in some cases, "a more deliberate pace is required" to allow for limited discovery into arbitrability). But this is not one of those cases. Here, arbitrability is clear based on Mancuso's complaint and the contract proffered by MDG. Further, Mancuso himself does not seek discovery. Mancuso Br. 9 ("More discovery is unnecessary to show" the arbitration clause is unenforceable.). *Guidotti* makes clear that where "arbitrability ... is apparent on the face of a complaint (or ... documents relied upon in the complaint)," courts should "resolv[e] a motion to compel arbitration under a motion to dismiss standard *without the inherent delay of discovery*," 716 F.3d at 773–74 (cleaned up) (emphasis

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 81 of 114 PageID: 545

Mancuso v. MDG USA, Inc., Not Reported in Fed. Rptr. (2024)

added). So we focus our analysis on the enforceability of the arbitration provision itself.

**\*2** Mancuso alleges that the terms of the financing agreement are fraudulent and unconscionable under Pennsylvania law. But he does not dispute that he formed a valid contract with MDG, so our review is limited to whether the arbitration clause itself—not the rest of the contract—is enforceable. *See* 🚩*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967). So we cannot address the merits of Mancuso's claims that the financing agreement includes illegal interest rates and cancellation procedures.

As for the arbitration clause, Mancuso asserts it is unenforceable because it was "hidden and minimized." Mancuso Br. 8. But nothing about its appearance is surreptitious: it occupies one-and-a-half out of eight pages of substantive provisions, uses the same font size as surrounding paragraphs, and announces its presence with several lines of uppercase text on a page of mostly lowercase words. *See* 13 Pa. Cons. Stat. § 1201(b)(10) (2008) (headings in capital letters are "conspicuous"). Nor does Mancuso allege he was unaware of the arbitration clause when he signed the financing agreement.

Mancuso next asserts that a paragraph numbering error made the clause confusing. The arbitration clause is in section 35 of the agreement, and it includes internal cross-references that incorrectly identify the arbitration clause as "section 34." *See* App. 19. But this error exists solely within the subparagraphs of the arbitration clause itself,

so the only way for Mancuso to have noticed the error was for him to have read the clause. Because section 34 has nothing to do with arbitration—it is a force majeure clause—no reasonable person would be confused as to the existence or terms of the arbitration clause.

Finally, under Pennsylvania law, "a contract or term is unconscionable ... where there was a lack of meaningful choice in the acceptance of the challenged provision." 🚩*Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007). Mancuso argues that he could not alter the terms of the contract before signing it, so the entire financing agreement, including the arbitration clause, is procedurally unconscionable. But we can consider this argument only as to the arbitration provision, and that was not procedurally unconscionable because it permitted Mancuso to opt out "for all purposes by sending [MDG] an arbitration opt out notice." App. 19. Thus, Mancuso has not raised a colorable legal issue of fraud, unconscionability, or unenforceability of the arbitration clause itself.

\* \* \*

Mancuso's claims are subject to an enforceable arbitration clause in his financing agreement with MDG. We will reverse the District Court's order denying MDG's motion to compel arbitration and remand with instructions for the District Court to enter an order compelling arbitration.

## All Citations

Not Reported in Fed. Rptr., 2024 WL 1230149

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 82 of 114 PageID: 546

**Mancuso v. MDG USA, Inc., Not Reported in Fed. Rptr. (2024)**

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Clerk of the Superior Court
*** Electronically Filed ***
12/19/2025 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2025-024855                                          12/17/2025

                                              CLERK OF THE COURT
HONORABLE JOSEPH KREAMER                              E. Valadez
                                                      Deputy

STEVEN MUSKAL                                 BLAKE A BRACHT

v.

POINT DIGITAL FINANCE INC                     COLLETTE NICOLE PELCIC

                                              JUDGE KREAMER

HEARING

East Court Building – Courtroom 811 – VC -CV

1:59 p.m. This is the time set for a hybrid Oral Argument on Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings, filed September 22, 2025. Plaintiff Steven Muskal, who is not present, is represented in-person by counsel, Blake A. Bracht. Defendant Point Digital Finance, Inc. is represented virtually by counsel, Collette Nicole Pelcic.

A record of the proceedings is made digitally in lieu of a court reporter.

Plaintiff's counsel informs the Court that Plaintiff Steven Muskal may appear virtually for today's oral argument.

The Court notes Defendant's counsel filed a Motion for Remote Appearance at Oral Argument, filed November 14, 2025. The Court granted the Motion and informed Plaintiff's counsel that he too may appear virtually.

2:00 p.m. Plaintiff Steven Muskal connects to the TEAMS meeting.

Docket Code 005                    Form V000A                            Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2025-024855                                                12/17/2025

The Court informs counsel regarding the Court's preferences when hearing oral arguments.

The Court states its initial thoughts on the Motion to be argued today and further states its inclinations of the record.

Oral argument is held on Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings.

Based on the foregoing,

**IT IS ORDERED** denying Defendant Point Digital Finance, Inc.'s Motion to Compel Arbitration and Dismiss the Complaint, or Alternatively, Stay Proceedings. The Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act.

**IT IS FURTHER ORDERED** Defendant may file an Answer within **20 days** of today.

2:47 p.m. Matter concludes.

2023 WL 4492346
Only the Westlaw citation
is currently available.
United States District
Court, W.D. Washington,
at Seattle.

Charles Boyd OLSEN, et al., Plaintiffs,
v.
UNISON AGREEMENT
CORPORATION, Defendant.

Case No. 2:22-cv-01859-RAJ
|
Signed June 27, 2023

**Attorneys and Law Firms**

Beth E. Terrell, Blythe H. Chandler, Elizabeth Anne Adams, Terrell Marshall Law Group PLLC, Seattle, WA, Joseph W. Moore, Umar Ibrahim Gebril, Cascade Law PLLC, Everett, WA, for Plaintiffs.

Brent Lawson Caslin, Jenner & Block, Los Angeles, CA, Jeremy M. Creelan, Pro Hac Vice, Joseph L. Noga, Pro Hac Vice, Jenner & Block LLP, New York, NY, Katherine S. Wan, Michael Rosenberger, Gordon Tilden Thomas & Cordell LLP, Seattle, WA, Kelly M. Morrison, Pro Hac Vice, Jenner & Block, Washington, DC, for Defendant.

**ORDER GRANTING MOTION
TO COMPEL ARBITRATION**

Richard A. Jones, United States District Judge

## I. INTRODUCTION

**\*1** This matter comes before the Court on Defendant's Motion to Compel Arbitration. Dkt. # 8. Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary. For the reasons below, the motion is **GRANTED**.

## II. BACKGROUND

In December 2022, this matter was removed from King County Superior Court. Dkt. # 1. According to the complaint, Plaintiffs entered into a "HomeOwner Agreement" ("Agreement") with Defendant Unison Agreement Corporation ("Unison"). Under the Agreement, Plaintiffs received a monetary payment from Defendant and Defendant received an option to acquire equity in Plaintiffs' homes. Dkt. # 1-1, ¶ 1.1. The Agreement signed by Plaintiff Maggie Colin contains several sections relating to arbitration, including the following clauses:

> 20.1 You and Investor agree that either party may, at its sole election, choose to submit to neutral, binding arbitration pursuant to this Section 20 (the "Arbitration Provision") rather than court action the following controversies (which will be called "Claims"): any past, present, or future claim, dispute or controversy (including matters arising as initial claims, counter-claims, cross-claims, third-party claims, or otherwise) whether in contract, tort (intentional or

Olsen v. Unison Agreement Corporation, Not Reported in Fed. Supp. (2023)

otherwise), constitution, statute, common law, principles of equity, or otherwise, between you and Investor or Investor's employees, directors, agents, successors or assigns, which arises out of or relates to the HomeOwner Agreement, including any dispute regarding an Appraised Value of the Property, Remodeling Adjustment or Deferred Maintenance Adjustment, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract)

...

20.3 The scope of this Arbitration Provision is to be given the broadest possible interpretation that is enforceable. The interpretation and scope of this Arbitration Provision, and the arbitrability of any Claim shall be resolved by neutral, binding arbitration and not by a court action. If any portion of this Arbitration Provision is deemed invalid or unenforceable, the remaining portions of this Arbitration Provision shall nevertheless remain valid and enforceable.

Dkt. # 10 at 34.

Now, Unison moves to stay proceedings and compel arbitration of Colin's claims. Dkt. # 8. The motion is ripe for review.

### III. DISCUSSION

Because the Federal Arbitration Act ("FAA") requires courts to "direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed, the FAA limits court involvement to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal quotation marks omitted). These "gateway questions of arbitrability" are presumptively "within the province of judicial review." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

**\*2** That said, parties may agree to delegate such gateway issues to an arbitrator for the arbitrator to decide. *Id.* The parties must delegate "clearly and unmistakably." *Id.* "Clear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include ... a course of conduct demonstrating assent ... or ... an express agreement to do so." *Id.* at 988 (alteration omitted) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 79 (2010) (Stevens, J., dissenting)); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[G]ateway issues can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* provide otherwise.' " (emphasis in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The Court finds that the clause here "clearly and unmistakably" delegates threshold issues to an arbitrator: "The interpretation and scope of this Arbitration Provision, and the arbitrability of any Claim shall be resolved by neutral, binding arbitration and not by a court action." *Id.* § 20.3.

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 87 of 114 PageID: 551

Olsen v. Unison Agreement Corporation, Not Reported in Fed. Supp. (2023)

In opposing the motion, Plaintiff makes two primary arguments. First, Plaintiff says that the delegation clause is prohibited by federal law—specifically, that the Dodd-Frank Act "prohibits requirements to arbitrate 'any controversy' .. in mortgages and consumer credit agreements secured by the consumer's home." Dkt. # 26 at 12 (citing 15 U.S.C. § 1639c(e)(1)). Second, Plaintiff argues the arbitration provision is procedurally unconscionable. *Id.* at 15.

Both arguments fail. Plaintiff's Dodd-Frank argument is one that attacks the underlying merits—*i.e.*, whether the parties' dispute falls within the scope of § 1639c(e)(1)'s protections against arbitration. While the Court agrees that there is a live threshold dispute, nothing within the Dodd-Frank Act prohibits who is empowered to decide arbitrability in the first instance. Indeed, several circuits have found such arguments unpersuasive upon a clear and unmistakable delegation clause. *See, e.g.,* *Caremark, LLC v. Chickasaw Nation,* 43 F.4th 1021, 1034 (9th Cir. 2022) (rejecting theory that the Recovery Act displaces the arbitration provisions in the parties' agreement because that argument did not impugn the validity of the delegation clause); *Attix v. Carrington Mort. Serv., LLC,* 35 F.4th 1284, 1307 (11th Cir. 2022) (argument that Dodd-Frank Act gave plaintiff the right to prosecute claims in federal court disputed the enforceability of the parties' primary arbitration agreement, not the delegation clause specifically).

Because the agreement unmistakably delegates arbitrability questions to the arbitrator," the only question left is whether the delegation provision itself is unconscionable. *Brennan,* 796 F.3d at 1132 (emphasis omitted). Under Washington law, the complainant must show that the party offering a contract of adhesion "refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her with a reasonable opportunity to consider its terms, and/or that the terms of the agreement were set forth in such a way that an average person could not understand them." *Zuver v. Airtouch Commc'ns, Inc.,* 153 Wn.2d 293, 306-07 (2004). Plaintiffs do not set forth any facts sufficient meet this burden.

In sum, gateway issues of arbitrability—such as whether a valid arbitration agreement exists, or whether the agreement covers the instant dispute—are for the arbitrator, not the Court, to decide.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Unison's Motion to Compel Arbitration. Dkt. # 8. Unison, as the proponent of arbitration, must submit a brief report on the status of the arbitration beginning on August 15th and on the fifteenth day of every second month thereafter. The parties shall immediately notify the Court of the conclusion of arbitration.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4492346

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 88 of 114 PageID: 552

Olsen v. Unison Agreement Corporation, Not Reported in Fed. Supp. (2023)

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 89 of 114 PageID: 553

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

2025 WL 2254522
Only the Westlaw citation
is currently available.
United States Court of Appeals, Ninth Circuit.

Charles Boyd OLSON; Janine Olson, Plaintiffs-Appellants,
v.
UNISON AGREEMENT CORPORATION, Defendant-Appellee,

No. 23-2835
|
Argued and Submitted October 23, 2024 San Francisco, California
|
FILED AUGUST 7, 2025

Appeal from the United States District Court for the Western District of Washington, Richard A. Jones, District Judge, Presiding, D.C. No. 2:22-cv-01859-RAJ

**Attorneys and Law Firms**

Thomas Scott-Railton, Matthew W.H. Wessler, Gupta Wessler, LLP, Washington, DC, Beth Ellen Terrell, Blythe H. Chandler, Elizabeth A. Adams, Terrell Marshall Law Group, PLLC, Seattle, WA, Joseph W. Moore, Cascade Law, PLLC, Everett, WA, for Plaintiffs-Appellants.

Brent Caslin, Kelly Morrison, Jenner & Block, LLP, Los Angeles, CA, Jeremy Creelan, Joseph L. Noga, Jenner & Block, LLP, New York, NY, Michael Rosenberger, Gordon Tilden Thomas & Cordell, LLP, Seattle, WA, for Defendant-Appellee.

Julia Eisentrout Assistant Attorney General, AGWA - Office of the Washington Attorney General, Olympia, WA, for Amicus Curiae Washington Department of Financial Institutions.

Brendan Donckers, Breskin Johnson & Townsend PLLC, Seattle, WA, for Amicus Curiae Northwest Consumer Law Center.

Before: S.R. THOMAS, WARDLAW, and COLLINS, Circuit Judges.

MEMORANDUM [*]

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

**\*1** In this putative class action, Plaintiffs Charles Boyd Olson and Janine Olson appeal the district court's dismissal, for failure to state a claim, of their complaint alleging violations of Washington's Consumer Protection Act ("WCPA"). We have jurisdiction under 28 U.S.C. § 1291, and reviewing the dismissal *de novo, see Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir. 2001), we reverse.

**I**

The Olsons have resided in their home in Kent, Washington, since their marriage in 1990. In early 2019, at a time when they were experiencing financial difficulties, the Olsons received a flyer in the mail from Unison that offered a way to obtain needed cash. The flyer stated, in relevant part (footnotes and emphasis omitted):

Great news! You're pre-approved to access the equity locked in your home.

With Unison, you can receive $79,850 and use that money for any purpose you choose —with no monthly payments and no interest. Yes, you read that correctly. It's almost too good to be true.

This offer is possible because Unison invests in your home—with you. We pay you a percent of your home's current value. You make no payments to us until you sell. If the value of your home increases from its current value, when you sell, Unison will share in a portion of the increase and make a profit. If the value decreases, we incur a loss. It's that simple.

It's quick and easy. Unison can provide the funds you need without the burden of additional debt. Contact us today!

In three side boxes, the flyer also stated: (1) "NO INTEREST CHARGES Unlike a home equity loan or home equity lines of credit, you'll pay no interest with Unison."; (2) "NO MONTHLY PAYMENTS Use the money now, for up to 30 years, and pay nothing until you decide to sell."; and (3) "NO ADDED DEBT By partnering with Unison you do not take on any additional debt."

After inquiring about the offer, the Olsons signed a "HomeOwner Agreement" with Unison, as well as other related documents, on March 26, 2019. Under the terms of the agreement, Unison provided an advance of funds in the amount of $64,750 in exchange for "an option to purchase," in the future, an

undivided "70.00% ownership" of the Olsons' home (which was then valued at $370,000) for another payment of $194,250.[1] The Olsons were also required to pay $2,525 in fees to complete the transaction and obtain the funds. Unison's rights under the contract, and the Olsons' obligations, are secured by a deed of trust recorded on the property.

[1] That payment would be reduced, however, if the Olsons had "Unpaid Owner Obligations," which might occur if Unison was required, by default of the Olsons, to expend money to maintain the condition of the home or to procure appropriate insurance. Such expenditures were referred to, in the relevant agreement papers, as "Protective Advances." The complaint contains no allegations that Unison ever incurred any Protective Advances with respect to the Olsons' home.

Unison's option can be exercised upon the following triggering events: (1) the expiration date of the contract in 30 years, (2) the sale of the property, (3) the death of the last surviving owner, or (4) "following a material and uncured event of Owner default." If the triggering event is expiration of the contract or death of the owners, then upon exercise of the option and recording of Union's 70% interest as a co-owner, the property is to be promptly sold in order to pay Unison the value of its 70% interest in the property and any other amounts due to it. If the triggering event is an uncured default, then Unison can either conduct a nonjudicial foreclosure sale or, with the Olsons' agreement, elect to conduct an "orderly market sale." The agreement thus contemplates that, upon

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    2

exercise of the option, the property in all events would be promptly sold and Unison would be paid what was owed to it. In the event of a sale, all expenses and closing costs would be paid entirely from any sales proceeds owed to the Olsons and not those owed to Unison.

**\*2**  Because exercising the option would give Unison a percentage interest in the property and not a fixed sum, the actual amount due to Unison after an exercise of the option and a sale could vary. A table provided to the Olsons showed some of the possible scenarios. For example, if the appraised value at the time the option was exercised was $518,000, a 70% equity interest would equal $362,600, and by purchasing that equity interest for $194,250, Unison would earn $168,350 in net proceeds, which would amount to a $103,600 gain on its initial payment of $64,750. But if the home was still worth only $370,000, a 70% equity interest would be $259,000, and Unison's payment of $194,250 would net $64,750, which would mean a $0 return on its then-recouped initial payment. But because the decision to exercise the option would rationally depend on the *marginal* value of exercising it, Unison would be expected to do so unless and until the value of its 70% share dropped below the marginal option exercise price of $194,250. That could occur only if the value of the house dropped by more than 25%, *i.e.*, to less than $277,500; at that point, a 70% interest would be worth $277,500 x 70%, which equals $194,250.

The agreement stated that Unison's product "is not designed for use as short-term financing," and it therefore provided that if the Olsons decided to sell the house within three years and the house value has declined, the Olsons would have to pay Unison back its initial $64,750 payment and any unpaid owner obligations. After the third anniversary of the HomeOwner Agreement, the Olsons can terminate the contract, without a sale, only by paying a "Special Termination Price" that would be the *greater* of (1) the sum of Unison's initial $64,750 payment and any additional owner obligations that had accrued; or (2) the amount that Unison would obtain if the house were to be sold at that time. Thus, unless and until a triggering event occurred, the Olsons could get out of the agreement only by paying back the full $64,750 plus Unison's share of any increase in the home's value. In other words, so long as the Olsons wished to stay in their home, they could only cancel the agreement by paying Unison back the full $64,750 they had received (plus, possibly, more).

In 2021, the Olsons thought about selling their home, but they realized that, in light of the HomeOwner Agreement and their pre-existing conventional mortgage, "they would receive almost nothing from the sale" of the property. In December 2022, the Olsons brought a class action complaint in state court against Unison, alleging that "Unison's HomeOwner Agreement product meets nearly all of the criteria for a reverse mortgage loan and functions as a reverse mortgage," and is therefore "subject to Washington law regulating such loans." The complaint asserted that, by failing to comply with such laws, and by engaging in unfair and fraudulent practices, Unison had violated the WCPA. The district court granted Unison's motion to dismiss, holding that Unison's HomeOwner Agreement was not a "loan" and that all of the

Olsons' WCPA claims failed. Plaintiffs timely appealed.

## II

We separately address the three causes of action asserted by the Olsons under the WCPA.

## A

In their first WCPA cause of action, the Olsons allege a predicate violation of the Washington Consumer Loan Act ("WCLA"), which, under Revised Code of Washington § 31.04.208, is a "per se unfair trade practice" that is actionable under the WCPA if the practice caused injury to the plaintiffs in their business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533, 535–39 (Wash. 1986). Specifically, the Olsons allege that their transaction with Unison involves a "reverse mortgage loan" under RCW §§ 31.04.501–31.04.540, which is a portion of the WCLA that is known as "the Washington state reverse mortgage act" ("WRMA"), *id.* § 31.04.500. The Olsons allege that the HomeOwner Agreement violates the WRMA because (1) Unison lacks the necessary state approval to provide such loans, *id.* § 31.04.525; (2) the loan requires the Olsons to maintain insurance as specified by Unison, *id.* § 31.04.515(7), (8)(b); and (3) the loan was issued without following the WRMA's counseling requirement, *id.* § 31.04.515(9)–(10). The Olsons further allege that, even if the transaction did not involve a "reverse mortgage loan" within the meaning of the WRMA, it still constituted a "loan" within the meaning of the WCLA, and that loan violated the WCLA because Unison lacks the requisite license to issue it. *See id.* § 31.04.035(1).

**\*3** In addressing these contentions, we begin with the WRMA's definition of the crucial term "reverse mortgage loan." The WRMA provides:

> (5) "Reverse mortgage loan" means a nonrecourse consumer credit obligation in which:
>
> > (a) A mortgage, deed of trust, or equivalent consensual security interest securing one or more advances is created in the borrower's dwelling;
> >
> > (b) Any principal, interest, or shared appreciation or equity is due and payable, other than in the case of default, only after:
> >
> > > (i) The consumer dies;
> > >
> > > (ii) The dwelling is transferred; or
> > >
> > > (iii) The consumer ceases to occupy the dwelling as a dwelling; and
> >
> > (c) The broker or lender is licensed under Washington state law or exempt from licensing under federal law.

RCW § 31.04.505 (indentation added). Unison contends that its arrangement with the Olsons does not involve a "consumer *credit* obligation" and therefore falls outside the statutory definition. That is true, according to Unison, because "the homeowner does not borrow any money and is not obligated to pay any money or interest back." In particular, Unison argues

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 93 of 114 PageID: 557

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

that there is no guarantee that the initial $64,750 payment received by Plaintiffs need ever be returned.

The WCLA does not define the term "credit." "[I]n the absence of a statutory definition, [Washington courts] give the term its plain and ordinary meaning ascertained from a standard dictionary." ⚑*American Cont'l Ins. Co. v. Steen*, 91 P.3d 864, 867 (Wash. 2004). As relevant here, the term "credit" broadly refers to "[a]n arrangement for deferred payment of a loan or purchase." *Credit*, AMERICAN HERITAGE DICTIONARY 428 (5th ed. 2018); *see also Credit*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 532 (1981 ed.) ("an amount or limit to the extent of which a person may receive goods or money for payment in the future"). Accordingly, in order for a given arrangement to count as a "credit obligation," it must involve, at a minimum, an initial advance of funds or goods coupled with an obligation to make future payment to the person providing that advance. *Cf.* ⚑RCW § 31.04.015(14) (broadly defining a "loan," for purposes of the WCLA, as "a sum of money lent at interest or for a fee or other charge"). That understanding of "credit obligation" coheres with the remainder of § 31.04.505(5), which proceeds to address (1) the type of "advances" that are covered (*i.e.*, ones secured by a security interest in the consumer's home); and (2) the types of future payments that are covered (*i.e.*, "[a]ny principal, interest, or shared appreciation or equity [that] is due and payable" after certain future events). *See* RCW § 31.04.505(5)(a), (b).

Here, Unison supplied an advance of funds—it gave the Olsons, up front, $64,750 (less certain

fees). Unison contends, however, that, because its agreement with the Olsons only grants it an option, the additional essential ingredient of an *obligation* to make future payments back to Unison is missing. Whatever force this argument might have in other contexts, we conclude that it is unavailing here.

In construing the range of "consumer credit obligation[s]" covered by the statute, we cannot ignore what the statute itself says about the type of arrangements it covers. One example of a "credit obligation" the statute expressly covers is a secured obligation to pay over "shared appreciation or equity," RCW § 31.04.505(5)(b), and the statute further specifies that this obligation must be "nonrecourse," *id.* § 31.04.505(5), *i.e.*, that the obligation can only be enforced to the extent of the security interest granted in the deed of trust, *Milkovich v. United States*, 28 F.4th 1, 4 (9th Cir. 2022). But where the home secured by the deed of trust falls significantly in value, a nonrecourse obligation to pay over "shared appreciation" will not result in any payment to the beneficiary of the deed of trust. The statute thus expressly contemplates that a "consumer credit obligation" may exist even though the actual future obligation to pay back sums may be entirely contingent upon future events, including sufficient "shared appreciation or equity."

 **\*4** Here, the future contingency is *Unison's election* to exercise its option, rather than merely an appreciation or decrease in the value of the home. We agree that, as a general matter, a consumer's grant of a purchase option in exchange for cash would not ordinarily be thought of as creating a "credit obligation," because it does not involve an advance of

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 94 of 114 PageID: 558

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

money in exchange for an expectation of future payments by the consumer back to the option holder. But given the details of the particular structure of *this* overall arrangement, which includes a formal option as one component but effectively creates the substance of a shared-appreciation reverse mortgage, we conclude that Unison's agreement with the Olsons sufficiently gave rise to a "credit obligation" to fall within the statute.

As we have explained, Unison's agreement with the Olsons is structured such that, unless the home falls in value by a substantial amount, the option will have marginal value and would be expected to be exercised when Unison is eligible to do so. At that point, the agreement contemplates that the house will promptly be sold, so that Unison will receive the cash payment then due (rather than retain the house as a co-owner). Unison will thereby recoup some or all of its initial payment to the Olsons—and potentially much more—depending upon how much the value of the home at the time of sale exceeds 75% or so of its original value. Moreover, in the absence of a sale, the only way that the Olsons can remove the deed of trust on their home is by paying back the full amount of the initial payment ($64,750), plus any additional share of equity that may be due to Unison if the house has appreciated in value. The entire structure of the arrangement is designed to put Unison in the same position, and to have the same right to payment, as an unadorned nonrecourse obligation to pay Unison 70% of the home's equity, less $194,250. The fact that Unison must elect to receive that payment, by exercising the option, does not detract from the fact that, even prior to the exercise

of the option, the Olsons have a very real set of contingent obligations to make future payments to Unison. Economically speaking, the only operative contingency is whether the value of the home's equity will decline, and, as we have noted, the statute clearly covers obligations to pay over future equity that are contingently recoverable only if the property does not depreciate in value.

Unison also argues that, even if its arrangement with the Olsons entails a "consumer credit obligation," it does not meet the statute's additional requirement that "one or more advances" be secured by a "mortgage, deed of trust, or equivalent consensual security interest" in the consumer's home. RCW § 31.04.505(5)(a). That is wrong. Unison relies on the fact that the deed of trust recites that the Olsons are not obligated to pay back the "Unison Investment Payment" (referring to the initial $64,750 payment) and that the deed of trust consequently does not secure any such obligation. But the same clause of the deed of trust goes on to say that "[t]he foregoing shall <u>not</u>, however, in any way limit any payment calculated and agreed by [the Olsons] to be paid" under the agreement, including both the earlier-described 70%-of-equity payment and the "Special Termination" payment. The deed thus *does* secure all of the payments that Unison expects in the future in order to recoup the value of its $64,750 advance, including a potential payment (the "Special Termination Price") that specifically cannot be less than the $64,750 initial payment. *See supra* at 5. The Olsons' deed of trust thus does secure the "advance[ ]" within the meaning of the statute. [2]

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 95 of 114 PageID: 559

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

2    Unison has not contended that the further elements in § 31.04.505(5)(b) and (c) are not met here.

**\*5** Unison contends that, because the wording of the definition of "reverse mortgage loan" in § 31.04.505(5) closely matches the definition of "reverse mortgage transaction" in Regulation Z (issued by the Consumer Financial Protection Bureau ("CFPB") under the Federal Truth in Lending Act ("TILA")), *see* 12 C.F.R. § 1026.33(a), the Washington statute should be construed to follow the CFPB's "official interpretation" of that regulation, which states that it does not apply to "option contracts." *See* 12 C.F.R. Part 1026, Supp. I, cmt. for § 1026.2(a)(14), cmt. 1.vii (stating that an "option contract[ ]" is not "considered credit for purposes of the regulation"). As noted earlier, we agree that option contracts generally do not constitute credit obligations, but that does not mean that the mere embedding of a formal option in a highly complex overall arrangement automatically exempts that arrangement from being classified as a "credit obligation." Moreover, the Washington law does not include any provision stating that § 31.04.505 should be interpreted consistently with the TILA, much less with the interpretations of that statute given by the CFPB. In enacting the WCLA, the Washington Legislature expressly cross-referenced, as applicable to that statute, several different definitions in the TILA, *see, e.g.,* RCW §§ 31.04.015(24),[3] 31.04.025(4)(g), but it did not do so here. *See* *State v. Delgado*, 63 P.3d 792, 795 (Wash. 2003) (stating that the exclusion, in one statute, of language that was included in a related statute should generally be presumed to be intentional).

3    This section defines "residential mortgage loan" to mean "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other consensual security interest on a dwelling, *as defined in the truth in lending act*, or residential real estate upon which is constructed or intended to be constructed a dwelling." RCW § 31.04.015(24) (emphasis added). Contrary to what Unison contends in its brief, the referent of the phrase "as defined in the truth and lending act" is clearly "dwelling." *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS §§ 18, 20 (2012) (describing the related canons applying a modifier only to the nearest reasonable referent or the last antecedent).

For these reasons, we conclude that Unison's arrangement constitutes a "reverse mortgage loan" within the meaning of § 31.04.505(5). And for substantially the same reasons, it is also a "residential mortgage loan" under § 31.04.015(24) and a "loan" under § 31.04.015(14). We therefore reverse the dismissal of the Olsons' first cause of action.[4]

4    We agree with Unison that, because the result in this case turns on "Appellants['] conten[tion] that the particular characteristics of Unison's contracts render them 'reverse

Case 3:26-cv-01431-GC-RLS Document 20-8 Filed 06/26/26 Page 96 of 114 PageID: 560

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

mortgage loans' under Washington law," certification of this issue to the Washington Supreme Court is unwarranted.

**B**

In their second cause of action, the Olsons alternatively allege that, even if their transaction with Unison did *not* involve a "reverse mortgage loan" within the meaning of the WCLA, it still involved an "unfair" practice in violation of the WCPA because Unison "purposely attempt[ed] to avoid reverse mortgage lending laws." Because we have concluded that the Olsons' arrangement *did* involve a "reverse mortgage loan" and that the Olsons have therefore stated a claim for a per se "unfair" trade practice under the WCPA, this alternative theory for stating an unfair practice is moot. That is, we do not understand the Olsons to be contending that, even if their agreement with Unison involves a reverse mortgage loan, they may maintain an additional, essentially duplicative WCPA "unfair" practices claim rooted in the same reverse mortgage lending laws. On that basis, we affirm the dismissal of this claim, but without prejudice.

**C**

In their third cause of action, the Olsons allege that certain statements made by Unison in connection with its marketing of the agreement were "deceptive" in violation of the WCPA. Unlike the Olsons' second cause of action, this one is based on different underlying conduct

and a distinct theory of liability. Specifically, the Olsons allege that it was deceptive for Unison to market this arrangement as involving no "debt," "no monthly payments and no interest," and no "loan."

"[A] claim under the Washington CPA may be predicated upon ... an act or practice that has the capacity to deceive substantial portions of the public." *Klem v. Washington Mut. Bank,* 295 P.3d 1179, 1187 (Wash. 2013). "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." *Panag v. Farmers Ins. Co. of Wash.,* 204 P.3d 885, 894 (Wash. 2009). "Deception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." *Id.* at 895 (quoting *Southwest Sunsites, Inc. v. F.T.C.,* 785 F.2d 1431, 1435 (9th Cir. 1986)). In view of our earlier discussion, the Olsons have adequately alleged that the assertions that the transaction did not involve a "loan" or "debt" have the capacity to deceive. Moreover, because the WRMA expressly includes an "interest" payment "that is contingent on the value of the property upon execution of the loan or at maturity, or on changes in value between closing and maturity," within its concept of "interest" in the context of a reverse mortgage, RCW § 31.04.515(2), we conclude that the Olsons have adequately alleged that the statement that "no interest" was involved is deceptive. By contrast, the Olsons' complaint pleaded no facts to support the assertion that it is deceptive to say that the arrangement involved "no monthly payments." Finally, although the Olsons attempt to raise additional alleged deceptive statements in their appellate briefing, these allegations were not in

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 97 of 114 PageID: 561

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

the complaint, and we decline to consider them for the first time on appeal.

* * *

**\*6**  For the foregoing reasons, we reverse the district court's dismissal of this action, and we

remand for further proceedings consistent with this memorandum.

**REVERSED AND REMANDED.**

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 2254522

**End of Document**                                © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17853214
Only the Westlaw citation
is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Randal Scot SITZMAN and Anne
B. Sardovsky Sitzman, Plaintiffs,
v.
EK REAL ESTATE SERVICES
OF NY LLC, et al., Defendants.

Civil Action No. 3:21-CV-2666-E
|
Signed December 21, 2022

**Attorneys and Law Firms**

Jeff D. Carruth, Weycer Kaplan Pulaski & Zuber PC, Arlington, TX, Adam David Pogach, Pogach PLLC, Houston, TX, Cristen David Feldman, Derek Daniel Bauman, Kimberly Dang, Feldman & Feldman PC, Houston, TX, Robin Marie Ziek, Robin M. Ziek - Attorney at Law, Houston, TX, for Plaintiffs.

Chris A. Davis, Angela Laughlin Brown, London Ryynanen England, M. Jill Bindler, William Nelson Drabble, Gray Reed & McGraw LLP, Dallas, TX, Darrell Scott Funk, Jonathan M. Hyman, Kelley Clark Morris, Gray Reed & McGraw LLP, Houston, TX, John W. Turner, Haynes & Boone, LLP, Dallas, TX, for Defendants EK Real Estate Services of NY LLC, EasyKnock Inc.

Andrew C. Wright, Erin Rinehart, Helen McLaughlin, Buck Keenan LLP, Houston, TX, Anthony Raul Cuesta, Decker Jones PC, Fort Worth, TX, for Defendant LendingOne LLC.

## MEMORANDUM OPINION AND ORDER

Ada Brown, UNITED STATES DISTRICT JUDGE

**\*1** On September 29, 2022, this Court issued an Order, (Doc. 57), that—among other things—**GRANTED** Defendants' Joint Motion to Compel Arbitration, (Doc. 21), with reasoning to follow. This Memorandum Opinion and Order **VACATES** and **SUPERSEDES** only the portion of the September 29, 2022 Order, (Doc. 57), granting the Joint Motion to Compel Arbitration.

After reviewing the Joint Motion to Compel Arbitration ("the Motion"), the relevant portions of the record, and the relevant law, the Court recognizes that the Motion should be, and therefore is, **GRANTED IN PART** with respect to Defendant EK Real Estate Services of New York, LLC, and Defendant EasyKnock, Inc. The Motion, however, is **DENIED IN PART** with respect to Defendant LendingOne, LLC. Nonetheless, the Court hereby **STAYS** all of Plaintiffs' claims against all defendants, pending the resolution of arbitration.

## I. BACKGROUND

This case arises from a sale-leaseback transaction involving Plaintiffs Randal Scot Sitzman and Anne B. Sadovsky-Sitzman's ("Plaintiffs") homestead property located on Helsem Bend Circle in Dallas, Texas ("the Property"). In 1985, Plaintiff Anne

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 99 of 114 PageID: 563

Sitzman v. EK Real Estate Services of NY LLC, Not Reported in Fed. Supp. (2022)

B. Sadovsky-Sitzman ("Mrs. Sadovsky-Sitzman") purchased the Property and, shortly thereafter, constructed a home on the Property, in which she has lived ever since. Plaintiff Randal Scot Sitzman ("Mr. Sitzman") moved into the Property with Mrs. Sadovsky-Sitzman in 1986, and the couple married in 1992. Mrs. Sadovsky-Sitzman retained sole ownership of the Property until 2010, when she conveyed an interest in it to her husband—at which time the couple took joint community ownership of the Property. Until the closing of the sale-leaseback transaction at issue here, the Property was Plaintiffs' residential homestead.

In 2018, Plaintiffs fell behind on their mortgage payments. In the early months of 2019, Plaintiffs attempted to obtain a home equity loan but were twice denied. In November 2019, Plaintiffs were notified by their mortgage lender that their mortgage loan was being placed into foreclosure. Around this time, a friend suggested that Plaintiffs contact Defendant EasyKnock, Inc. ("EasyKnock"); Mr. Sitzman has testified, via sworn declaration, that Plaintiffs believed EasyKnock to be an alternative home equity lender for homeowners with poor credit. (Doc 30, Appx. 1: Decl. of Randal Sitzman, pg. 8, ¶ 11). However, EasyKnock's Chief Operating Officer has testified, via sworn declaration, that EasyKnock is a private Delaware corporation that—through its wholly-owned subsidiary EK Real Estate Services of New York, LLC ("EK Real Estate")[1]—engages in sale-leaseback transactions in which it purchases homes and leases the homes back to the former owners. (Doc. 22-6, Decl. of Barry Feierstein, pgs. 2-3, ¶ 12).

[1] EK Real Estate is a single-member limited liability company registered in New York, and EasyKnock is its sole member.

Plaintiffs reached out to EK Real Estate and entered into the transaction at issue. On October 7, 2019, Plaintiffs executed a document entitled Residential Real Estate Sales Agreement ("Sales Agreement"). (*see* Doc. 22-2, Sales Agreement). In the Sales Agreement—which identified Plaintiffs as the "Seller" and EK Real Estate at the "Buyer"—Plaintiffs "agree[d] to sell and convey" and EK Real Estate "agree[d] to purchase" the Property in exchange for approximately $620,000 in consideration. (Doc. 22-2, Sales Agreement, pg. 5, ¶¶ 1-2). Furthermore, Plaintiffs agreed to "enter into a Lease with Tenant Option Agreement," which would allow Plaintiffs to continue occupying the property as a tenant while retaining the possibility of re-establishing ownership upon payment of an agreed upon purchase fee. (*see* Doc. 22-2, Sales Agreement, pg. 14, ¶ 18 & Ex. A (draft Lease Agreement)).

**\*2** On November 14, 2019, Plaintiffs deeded the Property to EK Real Estate, which in turn secured the Property with a $374,000 mortgage payable to Defendant LendingOne, LLC ("LendingOne"). (*see* Doc 22-5, General Warranty Deed With Third Party Vendor's Lien). In all, Plaintiffs sold the Property for $621,356.49. (*see* Doc. 22-3, HUD Settlement Statement). Excluding fees, EasyKnock and EK Real Estate provided Plaintiffs $596,656.49. Specifically, Plaintiffs received:

    i. $75,750.74 in cash;

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 100 of 114
PageID: 564

ii. $229,206.37 to pay off their mortgage;

iii. $9,237.18 to pay off property taxes

iv. $1,716.90 to pay late fees and assessments to the homeowner's association;

v. $4,467.00 in December rent;

vi. $2,531.30 in prorated November rent;

vii. $9,747.00 in rent holdback to be applied to future rent; and

viii the option to repurchase the property, valued at $264,000.00

(*see* Doc. 22-3, HUD Settlement Statement). Once signed, EK Real Estate properly recorded the deed in the county records.

On November 16, 2019, two days after deeding the property to EK Real Estate, Plaintiffs entered into a Lease Agreement with EK Real Estate pursuant to the terms of the Sales Agreement. Under the terms of the Lease Agreement, EK Real Estate, as the "landlord," agreed to lease the Property to Plaintiffs, as "tenants," for an initial twelve-month term, renewable annually for unlimited one-year terms. (Doc. 22-1, Lease Agreement, pgs. 4-5, ¶ 5). The Lease Agreement also included an option for Plaintiffs—prior to the Lease's expiration—to (1) repurchase the Property for $373,800 (plus any applicable fees); or (2) direct EK Real Estate to sell the Property to a third party, in which case Plaintiffs would receive the resulting net profits.[2] (Doc. 22-1, Lease Agreement, pgs. 5-6, ¶ 6). In exchange, Plaintiffs agreed to pay $4,467 in rent to EK Real Estate for the initial twelve-month term,[3]

to be increased each year after the initial term by the greater of (1) 2.5% or (2) an amount reflecting the increase in the cost of living as reflected by the Consumer Price Index for all Urban Consumers. (Doc. 22-1, Lease Agreement, pg. 1, ¶ 1(a), & pg. 5, ¶ 5(d)). The Lease Agreement also contained the following arbitration clause:

**21. ARBITRATION.**

**a) Arbitration Requirement**: Except as provided below OR UNLESS TENANT SUBMITS A VALID ARBITRATION/ CLASS ACTION WAIVER OPT-OUT NOTICE (AS DESCRIBED BELOW), any and all claims (each, a "Claim") between Tenant and Landlord will be resolved in binding arbitration rather than in court. Tenant and Landlord agree to submit to individual arbitration the resolution of any and all claims) by or between Tenant and Landlord .... Tenant and Landlord agree that this Agreement affects interstate commerce, and that the enforceability of this section will be governed by, construed, and enforced, both procedurally and substantively, by the Federal Arbitration Act, 9 U.S.C. sections 1–9. Any arbitration will be administered by the American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration Rules (the "AAA Rules"), as modified by the terms set forth in this section 21.

**b) Arbitration Procedure:** Any arbitration initiated by Tenant or Landlord shall be initiated in New York, New York....

(Doc. 22-1, Lease Agreement, pg. 37, ¶ 21(a), (b)) (emphasis in original). Further,

Sitzman v. EK Real Estate Services of NY LLC, Not Reported in Fed. Supp. (2022)

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 101 of 114
PageID: 565

the arbitration clause contained an "Opt-Out" provision allowing Plaintiffs to opt-out of arbitration entirely:

> **d) Opt-out**: Arbitration is not a mandatory condition of your contractual relationship with Landlord. If Tenant does not want to be subject to the arbitration provision set forth in this section 21, Tenant may opt out of the arbitration provisions by notifying Landlord, in writing, of Tenant's intent to opt out of the arbitration provision .... Should you not opt-out of the arbitration provision set forth in section 21 within the thirty (30) day period, Tenant and Landlord shall be bound by the terms of the arbitration provision set forth in this section 21. Tenant has the right to consult with counsel of his, her or its choice concerning the arbitration provision set forth in this section 21. Tenant understands that Tenant will not be subject to retaliation if Tenant exercises his, her or its right to assert claims or opt-out of coverage under the arbitration provision set forth in this section 21.

**\*3** (Doc. 22-2, Lease Agreement, pg. 38, ¶ 21(d)). Plaintiffs did not notify EK Real Estate of their intent to opt-out of the arbitration clause.

[2] Net profits would be calculated as: the third-party purchase price LESS the Option Exercise Price ($373,800) Less transaction fees LESS any unpaid rent or other expenses due to EK Real Estate under the Lease. (Doc. 22-1, Lease Agreement, pg. 6, ¶ 6(b)).

[3] In actuality, Plaintiffs would pay $4,000 per month, as the $9,747 in rent holdback, mentioned above, was used to credit $467 towards monthly rent payments, and any unused portion would be applied to subsequent renewal terms or returned to Plaintiffs in the even they exercised the option to repurchase the Property. (Doc. 22-1, Lease Agreement, pg. 1, ¶ 1(a)).

In March of 2021, Plaintiffs fell behind on their rent payments. In October of 2021, EasyKnock informed Plaintiffs that their lease had expired and that they were considered "holdover" tenants in the Property. On October 27, 2021, Plaintiffs sued EK Real Estate, EasyKnock, and LendingOne (collectively, "Defendants") in federal court, claiming that Defendants fraudulently induced them into the sale-leaseback transaction by falsely representing it as a home-equity loan, failed to provide certain mandatory disclosures, and charged a usurious amount of interest. (*see* Doc. 1). Plaintiffs bring claims against Defendants for: (1) suit to quiet title under the Texas Property Code; (2) declaratory relief that—among other things—

Defendants have no rights, title, or ownership in the Property and that the General Warranty Deed is void as a matter of law; (3) violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602(g) and Regulation Z § 226.2(a)(17); (4) violations of the Texas Deceptive Trade Practices Act ("DTPA"); (5) usury in violation of Texas Finance Code § 305.001(a); (6) various violations of Texas Finance Code §§ 341.011–354.007; (7) common-law fraud and statutory fraud under Texas Business and Commerce Code § 27.01; (8) conspiracy "to commit acts of fraud and other statutory and common-law torts;" and (9) aiding and abetting one another in the commission of the foregoing torts.

Defendants moved to compel arbitration of Plaintiffs' claims pursuant to paragraph 21 of the Lease Agreement included above (*see* Doc. 21). Despite the Lease Agreement's requirement that arbitration take place in New York pursuant to the AAA's Commercial Arbitration Rules, Defendants have agreed to arbitrate the case in the Dallas-Fort Worth area at location amenable to Plaintiffs under to the AAA Consumer Rules. (Doc. 22-6, Decl. of Barry Feierstein, pg. 8, ¶ 29). Plaintiffs oppose arbitration on the grounds that: (1) the arbitration clause in unenforceable under the TILA; (2) the entire transaction was procedurally unconscionable; (3) the arbitration clause is substantively unconscionable; and (4) the arbitration clause violates Texas public policy requiring litigation involving real property in Texas to occur in the venue in which the property is located.

## II. LEGAL STANDARD

The Federal Arbitration Act provides that a written agreement to arbitrate disputes arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The statute does not permit a trial court to exercise any discretion, "but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

**\*4** When considering a motion to compel arbitration, courts engage in a two-step inquiry. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). First, courts determine whether "whether the parties agreed to arbitrate the dispute." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (per curiam) (citations omitted). "This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (citations omitted). If the answer to both questions in step one is "yes," then courts determine " 'whether constraints external to the parties' agreement foreclosed the arbitration of those claims.' " *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

However, when an agreement to arbitrate "contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). "Delegation clauses are enforceable and transfer [a] court's power to decide arbitrability questions to the arbitrator." *Id.* The presence of a delegation clause obligates a court to "refer a claim to the arbitration to allow the arbitrator to decide gateway arbitrability issues." *Id.* (citing *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). Accordingly, if an arbitration agreement contains a delegation clause, "[a] court's analysis is limited." *Id.* In such a context, a court first determines "whether the parties entered into *any agreement to arbitrate at all*[;]" if so, the only remaining question is whether the delegation clause is valid. *Id.* at 201-02 (emphasis in original).

In determining whether parties entered into an agreement to arbitrate, courts must "distinguish between 'validity' or 'enforceability' challenges and 'formation' or 'existence' challenges." *Maravilla v. Gruma Corp.*, 783 F. App'x 392, 395 (5th Cir. 2019) (internal quotations omitted) (quoting *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018). "[W]here the 'very existence of a contract' containing the relevant arbitration agreement is called into question, the federal courts have authority and responsibility to decide the matter." *Banc One*, 367 F.3d at 429 (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th

Cir. 2003)). However, because arbitration agreements are severable from underlying contracts, if a court determines that there is a properly formed agreement to arbitrate, "any remaining arguments that target the validity [or enforceability] of the contract to are questions for the arbitrator." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018) (citing *Rent-A-Center*, 561 U.S. 63, 70 (2006)). The same logic applies to challenges attacking the validity or enforceability—as opposed to formation or existence—of arbitration agreements that contain delegation clauses. *Id.* Because delegation clauses are severable from arbitration agreements, a court must leave challenges the enforceability of a properly formed agreement to arbitrate to the arbitrator unless the validity of delegation clause has been specifically challenged. *Id.* (citing *Rent-A-Center*, 591 U.S. at 72).

In sum, the Court will first look to see if the parties formed an agreement to arbitrate and then determine whether that agreement contains a delegation clause. *Id.* If the arbitration agreement contains a delegation clause, and the validity of the delegation clause itself has not been specifically challenged by Plaintiffs, the clause is valid, and arbitration will be compelled. *Id.* Thus, the Court will consider arguments as to whether an arbitration agreement was properly formed, and, if there is a valid delegation clause, challenges to the arbitration agreement as a whole will be heard by the arbitrator. *Id.*

## III. ANALYSIS

**\*5** For the reasons discussed below, the Court concludes that Defendants' Joint Motion to Compel Arbitration (1) is granted with respect to EK Real Estate and EasyKnock but (2) is denied with respect to LendingOne. The Court has determined that Plaintiffs' claims against all defendants must be stayed pending the completion of arbitration between Plaintiffs, EK Real Estate, and EasyKnock.

### A. Defendants' Motion to Compel Arbitration is Granted with Respect to EK Real Estate and Easy Knock but Denied with Respect to LendingOne.

First, the Court considers whether there is an agreement to arbitrate between Plaintiffs and Defendants. Second, the Court considers whether the Lease Agreement's arbitration clause delegates the question of arbitrability to the arbitrator. Finally, the Court considers the effect of such delegation on Plaintiffs' arguments against the enforceability of the arbitration clause.

*1. There is a valid agreement to arbitrate between Plaintiffs and EK Real Estate, which EasyKnock may enforce but LendingOne may not.*

The Court concludes that an agreement to arbitrate exists between Plaintiffs and EK Real Estate, as both are parties to the Lease Agreement, which contains a binding arbitration clause. EasyKnock and LendingOne, however, are not parties to the Lease Agreement. Nonetheless, EasyKnock —as EK Real Estate's parent company—is entitled to enforce the arbitration clause against

Plaintiffs under the doctrine of intertwined estoppel. This doctrine is not available to LendingOne, and, as such, LendingOne is not entitled to enforce the arbitration clause against Plaintiffs.

Whether or not the parties formed an agreement to arbitrate is governed by state contract law. *Kubala*, 830 F.3d at 201. Here, the Lease Agreement contains a choice-of-law provision selecting Texas's substantive law to govern. (Doc 22-1, Lease Agreement, pg. 15, ¶ 20). [4] Under Texas law, a binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *In re Capco Energy, Inc.*, 669 F.3d 274, 279–80 (5th Cir. 2012) (citation omitted). "Evidence of mutual assent in written contracts generally consists of signatures of both of the parties and delivery with intent to bind." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam).

[4] The Lease's choice-of-law provision states that the "Agreement shall be governed, construed[,] and interpreted by, through and under the laws of the state in with the Property is located[.]" (Doc. 22-1, pg. 15, ¶ 20).

EK Real Estate has established all of the elements of contract formation through evidence. In exchange for $622,365 in consideration, EK Real Estate offered to enter into a sale-leaseback transaction, which included an agreement to arbitrate. Plaintiffs accepted the offer, as evidenced by their

signatures on both the Sales Agreement and the Lease Agreement. Plaintiffs did not opt-out of the arbitration clause contained within the Lease Agreement despite having the opportunity to do so. Thus, the Court must conclude that Plaintiffs entered into a properly formed agreement to arbitrate with EK Real Estate when both parties signed and executed the underlying Lease Agreement on November 16, 2019.

While it is apparent from the record that EK Real Estate is a party to a properly formed agreement to arbitrate, the same cannot be said for the remaining defendants. Neither EasyKnock nor LendingOne were signatories to the Sales Agreement or the Lease Agreement. While EasyKnock is not party to the agreement, it is nonetheless entitled to compel Plaintiffs to arbitrate their claims against it under the doctrine of intertwined estoppel. This doctrine, however, is not available to LendingOne.

**\*6** Under Texas law, the doctrine of intertwined estoppel permits a non-signatory to enforce an arbitration agreement where the non-signatory "(1) has a *close relationship* with one of the signatories, and (2) the claims [against the non-signatory] are intimately founded in and intertwined with the underlying contract obligations." *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 404 (5th Cir. 2022) (emphasis added) (citing *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016) (quoting *Cotton Com. USA, Inc. v. Clear Creek Indep. Sch. Dist.*, 387 S.W.3d 99, 105 (Tex. Ct. App.—Houston [1st] 2012, no pet.)) (additional citations omitted). "[A] *close relationship* is a term of art generally

requiring formal corporate affiliation." *Id.* at 404-05 (emphasis in original) (citing *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 640 (Tex. 2018)). Additionally, "when plaintiffs treat multiple defendants as a single unit in their pleadings, raising virtually indistinguishable factual allegations against them, then that cuts in favor of a close relationship." *Id.* at 405 (internal quotations omitted) (quoting *Hays*, 838 F.3d at 611).

First, a close relationship exists between EK Real Estate and EasyKnock under Texas law. It is undisputed that a formal corporate relationship exists between the two—EasyKnock is the sole member of the single-member limited liability company that is EK Real Estate. What's more, EasyKnock is the only recipient of notices or demands for lessor made under the Lease Agreement. (*see* Doc. 22-1, Lease Agreement, pg. 15, ¶ 19) (specifying that notices shall be given "[t]o the Landlord: EK Real Estate Services of NY, LLC c/o Benjamin Black, EasyKnock, Inc."). Finally, Plaintiffs treat EasyKnock and EK Real Estate as a single unit in the Original Complaint, raising virtually indistinguishable claims of fact against them. (*see* Doc. 1). Plaintiff's claims against EasyKnock are founded in and intertwined with the contractual agreements with EK Real Estate—the Lease Agreement; Sales Agreement; and the parties' respective obligations contained therein. Accordingly, under the doctrine of intertwined estoppel, EasyKnock is entitled to enforce the agreement to arbitrate contained within the Lease Agreement.

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 106 of 114
PageID: 570

Sitzman v. EK Real Estate Services of NY LLC, Not Reported in Fed. Supp. (2022)

The same cannot be said for LendingOne. Like EasyKnock, LendingOne is not a signatory to the Lease Agreement. Unlike EasyKnock, however, the record does not show a close relationship between LendingOne and EK Real Estate. According to Defendants, LendingOne provided the business loan that financed EK Real Estate's purchase of the Property. (Doc. 22, pg. 2, n.6). This is insufficient to establish a close relationship. *See Chlarson v. EK Real Est. Servs. of NY, LLC*, No. 5-21-CV-01046-XR, 2022 WL 2392648, at *6 (W.D. Tex. July 1, 2022) (holding—in a substantially similar suit against EK Real Estate, EasyKnock, and LendingOne—that no close formal relationship exists between EK Real Estate and LendingOne). As such, the doctrine of intertwined estoppel does not apply to LendingOne's request for compelled arbitration.

Further, LendingOne has not argued that it is a third-party beneficiary to the contract. While LendingOne received a deed of trust with respect to the Property from EK Real Estate in exchange for financing the purchase, that is insufficient to establish LendingOne as third-party beneficiary. Texas law presumes that non-contracting parties are not third-party beneficiaries. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 420 (Tex. 2011). To overcome this presumption, it must be shown that "the parties to the contract intended to secure a benefit to [the] third party and entered into the contract directly for the third party's benefit." *Jody James Farms*, 547 S.W.3d at 634. Because the Lease Agreement makes no mention of LendingOne whatsoever, and the parties have not otherwise demonstrated that the Sales Agreement or

Lease Agreement were intended to benefit LendingOne, LendingOne may not enforce the Lease Agreement's arbitration clause as a third-party beneficiary. As such, the Court must conclude that LendingOne is not entitled to enforce Plaintiff and EK Real Estate's agreement to arbitrate.

### 2. There is a valid delegation clause.

**\*7** The Court concludes that the agreement to arbitrate at issue here contains a valid delegation clause. "Under the FAA, parties are free to delegate questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself." *Arnold*, 890 F.3d at 551 (citing *Rent-A-Center*, 561 U.S. at 68-70). "However, courts may not assume that parties have agreed to arbitrate threshold questions absent clear and unmistakable evidence of their intent to do so." *Id.* at 551-52 (citing *First Options*, 514 U.S. 944-45). Parties may "provide such clear and unmistakable evidence of their intent to delegate these issues is by expressly incorporating rules empowering the arbitrator to decide substantive arbitrability." *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 537 (5th Cir. 2019) (alterations omitted) (citation and internal quotations omitted). Here, the parties have done so by expressly incorporating the American Arbitration Association's Commercial Arbitration Rules.

The Lease Agreement's arbitration clause states that "Tenant and Landlord agree that ... [a]ny arbitration will be administered by the

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 107 of 114 PageID: 571

Sitzman v. EK Real Estate Services of NY LLC, Not Reported in Fed. Supp. (2022)

American Arbitration Association ("AAA") pursuant to its then current Commercial Arbitration Rules (the "AAA Rules")[.]" (Doc. 22-1, Lease Agreement, pg. 37, ¶ 21(a)). Rule 7(a) of the AAA's Commercial Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on his or her jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AMERICAN ARBITRATION ASSOCIATION, Commercial Arbitration Rules and Mediation Procedures, R-7(a), p. 14 (last modified Sep. 2022), https://www.adr.org/sites/default/files/Commercial_Rules-Web.pdf. The Fifth Circuit has repeatedly held that, because Rule 7(a) provides that the arbitrator will determine questions of arbitrability, express incorporations of the AAA's Commercial Rules constitute clear and unmistakable evidence of intent to delegate gateway arbitration questions. *See, e.g.*, *Halliburton Energy Servs*, 921 F.3d at 537; *Edwards*, 888 F.3d at 746; *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Thus, the present agreement to arbitrate clearly and unmistakably delegates questions of arbitrability to the arbitrator.

In reaching this conclusion, the Court recognizes that the Defendants did not raise the matter of the delegation clause in their Joint Motion to Compel Arbitration. This, however, does not prevent the Court from relying on the existence of the clause in its ruling. "When an issue or a claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

### 3. Plaintiff's arguments against enforcing the agreement to arbitrate must be heard by the arbitrator.

Because the present agreement to arbitrate contains a valid delegation clause, Plaintiffs' arguments against the enforcing the arbitration clause must be referred to the arbitrator. Plaintiffs argue that arbitration should not be compelled because (1) the arbitration clause is unenforceable under TILA; (2) the entire transaction itself is procedurally unconscionable; (3) the arbitration clause is substantively unconscionable; and (4) the arbitration clause violates Texas public policy. These arguments do not attack the existence of a contract between the parties, the existence of an agreement to arbitrate between the parties, or the validity of the delegation clause. Instead, they attack the *enforceability* of the either the transaction, as a whole, or the arbitration clause, in particular, due to certain external legal constraints. Thus, they raise issues for the arbitrator, not the Court, to decide. *See* *Edwards*, 888 F.3d at 744.

**\*8** First, Plaintiffs argue arbitration clause is unenforceable because § 1639c(e) of the Truth in Lending Act prohibits arbitration of claims or controversies arising out of residential mortgage loan transactions or extensions of credit secured against a principle dwelling of a consumer. (*see* Doc. 29, pg. 10). Plaintiffs assert that sale-leaseback transactions like the one in question here are equitable mortgage

loans on a consumer's primary dwelling under Texas state law, bringing them under the auspices of the TILA. Plaintiffs essentially ask the Court to reach the merits of their underlying claims. However, the Supreme Court has explained that "a court may not rule on the potential merits of [an] underlying claim that is assigned by contract to an arbitrator[.]" ⚑*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). Thus, whether the TILA prohibits arbitration of this dispute is a gateway question of arbitrability that the parties have agreed to delegate to the arbitrator. ⚑*Rent-A-Center*, 561 U.S. at 68-69.

Plaintiffs' unconscionability arguments are similarly delegated to the arbitrator under the agreement's delegation clause. First, Plaintiffs' procedural unconscionability argument attacks the entire Lease Agreement, rather than the validity of the delegation clause or even the agreement to arbitrate. (*see* Doc. 29, pg. 25) ("The entire atmosphere of EasyKnock's transaction is procedurally unconscionable."). Under Texas law, unconscionability challenges of this type are a matter of enforceability, not contract formation. *See* TEX. BUS. & COMM. CODE § 2.302(a) (permitting a court refuse to enforce a contract based on unconscionability); *Maravilla*, 783 F. App'x at 396 (plaintiff's procedural unconscionability argument did not "relate to whether an agreement to arbitrate was formed [but instead] call[ed] into question the validity of the contract as a whole") (citing ⚑*Edwards*, 888 F.3d at 746); ⚑*Ridge Natural Res., L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105 129 (Tex.App.—El Paso 2018, no pet.) (unconscionability arguments "represent affirmative defenses against the enforceability of a presumptively formed contract") (citing

⚑*In re FirstMeritBank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001) (orig. proceeding)). Because the Court has determined that an agreement to arbitrate exists, the Court may not consider general challenges to the validity or enforceability of the transaction as a whole. ⚑*Edwards*, 888 F.3d at 744. Thus, the issue of procedural unconscionability is squarely one for the arbitrator to decide. *See* ⚑*Rent-A-Center*, 561 U.S. at 72.; ⚑*Buckeye Check Cashing, Inc.*, 546 U.S. at 449.

Similarly, Plaintiffs' substantive unconscionability argument must be decided by the arbitrator and not the Court. Plaintiffs argue that the arbitration clause itself is substantively unconscionable because it requires that arbitration take place in New York and would impose potentially onerous fees on Plaintiffs under the AAA's Commercial Arbitration Rules. (Doc. 29, pgs. 26-27). Like the plaintiff in *Rent-A-Center*, Plaintiffs' "substantive unconscionability argument[ ] assail[s] arbitration procedures called for by the contract," like the location of arbitration and the allocation of arbitration fees, "under *both* the agreement to arbitrate [disputes arising from the contract] *and* the delegation provision." ⚑*Rent-A-Center*, 561 U.S. at 74 (emphasis in original). Had Plaintiffs challenged "the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable," the Court would be bound to consider the challenge. *Id.* (emphasis in original). However, Plaintiffs did not do that; instead, they assert that the arbitration clause as a whole—rather than the delegation clause in particular—is unconscionable. Thus,

Case 3:26-cv-01431-GC-RLS   Document 20-8   Filed 06/26/26   Page 109 of 114 PageID: 573

the arbitrator must assess their substantive unconscionability challenges.

Moreover, Plaintiff's substantive unconscionability argument is mooted by EasyKnock's on-the-record representation that any potential arbitration would take place at a location in or near Dallas, Texas under the AAA Consumer Rules, which would cap Plaintiffs' arbitration costs at $200. (Doc. 22-6, Decl. of Barry Feierstein, pg. 8, ¶ 29); *see* *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 300 (5th Cir. 2004) (plaintiff's prohibitive-cost argument was mooted by defendant's representation to the district court that it would pay all arbitration costs). Finally, Plaintiffs' argument that Texas public policy mandates venue of any dispute involving property in Texas to occur only in the county where the property is located is also mooted by EasyKnock's representation that arbitration—if ordered—would occur in or near Dallas, Texas.

### B. All Claims Asserted by Plaintiffs are Stayed.

**\*9** The Federal Arbitration Act permits staying a case pending arbitration. *See* 9 U.S.C. § 3. "[A] stay is mandatory upon a showing that the opposing party has commenced suit upon any issue referable to arbitration under an agreement in writing for such arbitration[.]" *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). Thus, a stay of all claims against EasyKnock, and EK Real Estate is warranted because, as discussed above, both may enforce the Lease Agreement's arbitration clause.

Further, while LendingOne may not enforce the arbitration agreement, a stay of Plaintiffs' claims against it is nonetheless also warranted. The Fifth Circuit has identified three factors that weigh on whether claims against a non-signatory to an agreement to arbitrate may be stayed when compelling arbitration over claims against parties to such an agreement: "(1) the arbitrated and litigated disputes must involve the same operative facts; (2) the claims asserted in the arbitration must be 'inherently inseparable;' and (3) the litigation must have a 'critical impact' on the arbitration." *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004). "The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Id.*

Plaintiffs assert the following claims against LendingOne: (1) suit to quiet LendingOne's title in the Property; (2) suit for declaratory judgment that LendingOne has no rights, title, or ownership interest in the Property and that its Deed of Trust is void; (3) usury under the Texas Finance Code; (4) additional violations of the Texas Finance Code; (5) conspiracy; and (6) aiding and abetting EasyKnock and EK Real Estate's actions. Each of these claims are based on the same operative facts and are inherently inseparable from the claims asserted against EK Real Estate and EasyKnock, which are subject to arbitration for the reasons discussed above. Further, litigating Plaintiffs' claims against LendingOne could potentially influence the arbitration of Plaintiffs' claims against EK

Real Estate and EasyKnock. Specifically, such litigation would require the Court to determine whether the transaction in question was, as Plaintiffs allege, a mortgage disguised as a sale-leaseback transaction. Permitting Plaintiffs' claims against LendingOne to proceed in this Court when Plaintiffs' claims against the other two defendants proceed to arbitration would "undermine the arbitration proceedings between [Plaintiff, EK Real Estate, and EasyKnock], thereby thwart[ing] the federal policy in favor of federal arbitration." ⚑⚠*Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002). Accordingly, the Court will exercise its discretion to stay all claims asserted by Plaintiffs against all three defendants.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Joint Motion to Compel Arbitration is **GRANTED IN PART** with respect to Defendant EK Real Estate Services of New York, LLC, and Defendant EasyKnock, Inc.

The Motion, however, is **DENIED IN PART** with respect to Defendant LendingOne, LLC. Nonetheless, the Court hereby **STAYS** all of Plaintiffs' claims against all defendants, pending the resolution of arbitration.

The Clerk of Court is hereby **DIRECTED** to administratively close this case, pending completion of arbitration. *See Mire v. Full Spectrum Lending, Inc.*, 389 F.3d 163, 167 (5th Cir. 2004) (explaining that district courts frequently make use of administrative closure to remove inactive cases from their pending dockets). The case may be re-opened in the future, without payment of filing fees, upon written motion from any party after conclusion of the arbitration proceedings, subject the limited judicial review set forth in the Federal Arbitration Act.

**\*10** **SO ORDERED:** December 21, 2022.

## All Citations

Not Reported in Fed. Supp., 2022 WL 17853214

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4201961
Only the Westlaw citation
is currently available.
United States District
Court, W.D. Washington,
at Seattle.

Mary VENEZIANI, Plaintiff,
v.
UNISON AGREEMENT
CORPORATION, Defendant.

Case No. 2:22-cv-01789-RAJ
|
Signed June 27, 2023

**Attorneys and Law Firms**

Beth E. Terrell, Blythe H. Chandler, Elizabeth Anne Adams, Terrell Marshall Law Group PLLC, Seattle, WA, Joseph W. Moore, Umar Ibrahim Gebril, Cascade Law PLLC, Everett, WA, for Plaintiff.

Jeremy M. Creelan, Pro Hac Vice, Joseph L. Noga, Pro Hac Vice, Jenner & Block LLP, New York, NY, Katherine S. Wan, Michael Rosenberger, Gordon Tilden Thomas & Cordell LLP, Seattle, WA, Andrew Ramiro Escobar, Seyfarth Shaw LLP, Seattle, WA, Kelly M. Morrison, Pro Hac Vice, Jenner & Block, Washington, DC, Brent Lawson Caslin, Jenner & Block, Los Angeles, CA, for Defendant.

**ORDER GRANTING MOTION
TO COMPEL ARBITRATION**

Richard A. Jones, United States District Judge

## I. INTRODUCTION

**\*1** This matter comes before the Court on Defendant's Motion to Compel Arbitration. Dkt. # 16. Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary. For the reasons below, the motion is **GRANTED**.

## II. BACKGROUND

In December 2022, this matter was removed from King County Superior Court. Dkt. # 1. According to the complaint, Plaintiff entered into a "HomeOwner Agreement" ("Agreement") with Defendant Unison Agreement Corporation ("Unison"). Under the Agreement, Plaintiff received a monetary payment from Defendant and Defendant received an option to acquire equity in Plaintiff's homes. Dkt. # 1-1, ¶ 1. The Agreement signed by Plaintiff contains several sections relating to arbitration, including the following clauses:

20.1 You and Investor agree that either party may, at its sole election, choose to submit to neutral, binding arbitration pursuant to this Section 20 (the "Arbitration Provision") rather than court action the following controversies (which will be called "Claims"): any past, present, or future claim, dispute or controversy (including matters arising as initial claims, counter-claims, cross-

Case 3:26-cv-01431-GC-RLS    Document 20-8    Filed 06/26/26    Page 112 of 114
PageID: 576

Veneziani v. Unison Agreement Corporation, Not Reported in Fed. Supp. (2023)

claims, third-party claims, or otherwise) whether in contract, tort (intentional or otherwise), constitution, statute, common law, principles of equity, or otherwise, between you and Investor or Investor's employees, directors, agents, successors or assigns, which arises out of or relates to the HomeOwner Agreement, including any dispute regarding an Appraised Value of the Property, Remodeling Adjustment or Deferred Maintenance Adjustment, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract)

...

20.3 The scope of this Arbitration Provision is to be given the broadest possible interpretation that is enforceable. The interpretation and scope of this Arbitration Provision, and the arbitrability of any Claim shall be resolved by neutral, binding arbitration and not by a court action. If any portion of this Arbitration Provision is deemed invalid or unenforceable, the remaining portions of this Arbitration Provision shall nevertheless remain valid and enforceable.

Dkt. # 18 at 33.

Now, Unison moves to stay proceedings and compel arbitration of Plaintiff's claims. Dkt. # 8. The motion is ripe for review.

## III. DISCUSSION

Because the Federal Arbitration Act ("FAA") requires courts to "direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed, the FAA limits court involvement to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal quotation marks omitted). These "gateway questions of arbitrability" are presumptively "within the province of judicial review." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

**\*2** That said, parties may agree to delegate such gateway issues to an arbitrator for the arbitrator to decide. *Id.* The parties must delegate "clearly and unmistakably." *Id.* "Clear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include ... a course of conduct demonstrating assent ... or ... an express agreement to do so." *Id.* at 988 (alteration omitted) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 79 (2010) (Stevens, J., dissenting)); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[G]ateway issues can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* provide otherwise.' ") (emphasis in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The Court finds that the clause here "clearly and unmistakably" delegates threshold issues to an arbitrator: "The interpretation and scope of this Arbitration Provision, and the arbitrability of any Claim shall be resolved by neutral, binding arbitration and not by a court action." *Id.* § 20.3.

In opposing the motion, Plaintiff makes two primary arguments. First, Plaintiff says that the delegation clause is prohibited by federal law—specifically, that the Dodd-Frank Act "prohibits requirements to arbitrate 'any controversy' ... in mortgages and consumer credit agreements secured by the consumer's home." Dkt. # 26 at 12 (citing 15 U.S.C. § 1639c(e)(1)). Second, Plaintiff argues the arbitration provision is procedurally unconscionable. *Id.* at 15.

Both arguments fail. Plaintiff's Dodd-Frank argument is one that attacks the underlying merits—*i.e.*, whether the parties' dispute falls within the scope of § 1639c(e)(1)'s protections against arbitration. While the Court agrees that there is a live threshold dispute, nothing within the Dodd-Frank Act prohibits who is empowered to decide arbitrability in the first instance. Indeed, several circuits have found such arguments unpersuasive upon a clear and unmistakable delegation clause. *See, e.g.*, *Caremark, LLC v. Chickasaw Nation, 43 F.4th 1021, 1034 (9th Cir. 2022)* (rejecting theory that the Recovery Act displaces the arbitration provisions in the parties' agreement because that argument did not impugn the validity of the delegation clause); *Attix v. Carrington Mort. Serv., LLC, 35 F.4th 1284 (11th Cir. 2022)* (argument that Dodd-Frank Act gave plaintiff the right to prosecute claims in federal court disputed the enforceability of the parties' primary arbitration agreement, not the delegation clause specifically).

Because the agreement unmistakably delegates arbitrability questions to the arbitrator," the only question left is whether the delegation provision itself is unconscionable. *Brennan, 796 F.3d at 1132* (emphasis omitted). Under Washington law, the complainant must show that the party offering a contract of adhesion "refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her with a reasonable opportunity to consider its terms, and/or that the terms of the agreement were set forth in such a way that an average person could not understand them." *Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d 293, 306-07 (2004)*. Plaintiffs do not set forth any facts sufficient meet this burden.

In sum, gateway issues of arbitrability—such as whether a valid arbitration agreement exists, or whether the agreement covers the instant dispute—are for the arbitrator, not the Court, to decide.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Unison's Motion to Stay Proceedings and Compel Arbitration. Dkt. # 16. Rather than dismissing this action, the Court **STAYS** this action pending arbitration. Unison, as the proponent of arbitration, must submit a brief report on the status of the arbitration beginning on August 15th and on the fifteenth day of every second month thereafter. The parties shall immediately notify the Court of the conclusion of arbitration or any other matters impacting this stay.

**\*3** Because the Court grants Unison's Motion to Stay Proceedings and Compel Arbitration,

the Court **DENIES** Defendant's Motion to Stay Discovery as moot. Dkt. # 24. The Court also **DENIES** Plaintiff's Motion for Remand and Defendant's Motion to Dismiss without prejudice to refile upon the conclusion of arbitration. Dkt. ## 19, 21.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4201961

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.