**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KEICHA GREENIDGE AND RYAN P. BILLEY, H/W *on behalf of themselves and all others similarly situated,*<br>Plaintiffs,<br>v.<br>HOMETAP EQUITY PARTNERS, LLC<br>and<br>HOMETAP INVESTMENT PARTNERS III SPV,<br>Defendants. | **Case 3:26-cv-01431**<br><br>**Motion Day: August 17, 2026** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**

James A. Francis
Lauren KW Brennan
FRANCIS MAILMAN SOUMILAS, P.C.
1600 Market Street, Suite 2510
Philadelphia, PA 19103
T: (215) 735-8600
F: (215) 940-8000
jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Robert P. Cocco
ROBERT P. COCCO, P.C.
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
bob.cocco@phillyconsumerlaw.com

Jennifer Wagner*
Shennan Kavanagh*
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
skavanagh@nclc.org
jwagner@nclc.org

**Pro hac vice application pending*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. RELEVANT FACTUAL BACKGROUND ..... 3

A. Ms. Greenidge and Mr. Billey borrowed money from Hometap. ..... 3

B. Hometap advances money in exchange for a future payment obligation secured by a mortgage. ..... 5

C. Hometap is guaranteed repayment, independent of the housing market. ..... 7

D. Hometap touts its guaranteed returns to its investors. ..... 9

III. LEGAL STANDARD ..... 10

IV. ARGUMENT ..... 11

A. This Court Must Adjudicate Plaintiffs' Challenges to the Delegation Clause ..... 11

B. The Truth in Lending Act prohibits any terms mandating arbitration in "residential mortgage loans" like the one at issue here. ..... 17

1. Hometap's product is a residential mortgage loan as defined by TILA ..... 17

2. Hometap's arguments have no merit. ..... 26

a. TILA's definition of "credit" does not require that the product be a "loan" or accrue interest; but even if it did, this product is & does. ..... 26

b. TILA's definition of "credit" does not require guaranteed repayment of a sum certain; but Hometap's product does, in fact, guarantee repayment much as any other credit. ..... 27

c. TILA does not exempt contracts like Hometap's from "credit" or "residential mortgage loan." ................33

d. State regulatory action does not help Hometap. .............38

e. Courts have consistently rejected Hometap's arguments. ....................................................................38

V. CONCLUSION ...........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adler v. Gruma Corp.*,
135 F.4th 55 (3d Cir. 2025) ....................12

*Arabian Motors Grp., W.L.L. v. Ford Motor Co.*,
775 F. App'x 216 (6th Cir. 2019) ....................17

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ....................28

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*,
864 A.2d 387 (2005) ....................36

*Burgess v. United States*,
553 U.S. 124 (2008) ....................27

*Burnett v. Ala Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993) ....................18, 19, 29, 34

*Certain Underwriters at Lloyds, London v. 3131 Veterans Blvd LLC*,
136 F.4th 404 (2d Cir. 2025) ....................17

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) ....................3, 11, 12, 16

*Cole v. U.S. Cap.*,
389 F.3d 719 (7th Cir. 2004) ....................19

*Com. v. Hometap Equity Partners, LLC*,
No. 2584CV00469-BLS2, 2025 WL 2468564 (Mass. Super. Aug. 21, 2025) ....................2

*Comm'r v. Tufts*,
461 U.S. 300 (1983) ....................29

*Downey v. Penn. Dep't of Corr.*,
968 F.3d 299 (3d Cir. 2020) ....................18

*Feeman v. Bridge It, Inc.*,
2026 WL 880508 (S.D.N.Y. Mar. 31, 2026)....................................................26

*Foster v. Equitykey Real Estate Invs. L.P.*,
No. 17-cv-76, 2017 WL 1862527 (N.D. Cal. 2017)....................................11, 40

*Fowler v. Equitable Tr. Co.*,
141 U.S. 384 (1891)..........................................................................................19

*Franklin Mills Assocs., L.P. v. Nationwide Life Ins. Co.*,
836 F. Supp. 2d 238 (E.D. Pa. 2011)................................................................33

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*,
716 F.3d 764 (3d Cir. 2013) ........................................................................10, 41

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019), ECF 20-1 ..........................................................................16

*Johnson v. Novastar Mortg., Inc.*,
698 F. Supp. 2d 463 (D.N.J. 2010)....................................................................35

*Lafferty v. St. Riel*,
495 F.3d 72 (3d Cir. 2007) ...............................................................................14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................35

*MacDonald v. CashCall, Inc.*,
883 F.3d 220 (3d Cir. 2018) ..........................................................................12,16

*Merck & Co. v. United States*,
652 F.3d 475 (3d Cir. 2011) ..........................................10, 32, 33, 34, 39

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022)..........................................................................................11

*Moss v. Cleo AI Inc.*,
799 F. Supp. 3d 1152 (W.D. Wash. 2025) ........................................................25

*Muskal v. Point Dig. Fin. Inc.*,
No. CV 2025-024855 (Ariz. Super. Dec. 17, 2025)................................2, 24, 40

*Navajo Nation v. U.S. Dep't of the Interior*,
907 F.3d 1228 (9th Cir. 2018) ....................25

*Olson v. Unison Agreement Corp.*,
No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025)................30, 32, 38, 40

*Revell v. Grant Money, LLC*,
808 F. Supp. 3d 1036 (N.D. Cal. 2025)....................25

*Roberts v. Unlock Partnership Sols. AOI, Inc.*,
No. 24-cv-1374 (D.N.J. Dec. 4, 2025) ....................2, 24, 25, 32

*Rossman v. Fleet Bank (R.I.) Nat. Ass'n*,
280 F.3d 384 (3d. Cir. 2002) ....................15, 18, 19, 33, 39

*Scott v. Lloyd*,
34 U.S. 418 (1835)....................19

*Smith v. Berryhill*,
587 U.S. 471 (2019)....................19

*State By & Through Adams v. New Jersey Zinc Co.*,
193 A.2d 244 (1963)....................36

*In re Stone*,
671 B.R. 752 (Bankr. D. Colo. 2025)....................2, 26, 31, 38, 40

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012)....................20

*U.S. v. Smukler*,
991 F.3d 472 (3d. Cir. 2021) ....................15

*United States v. Gonzales*,
520 U.S. 1 (1997)....................15

*Vallies v. Sky Bank*,
2007 WL 2492730 (W.D. Penn. 2007)....................18, 19, 34

*Vickery v. Empower Fin., Inc.*,
2025 WL 2841686 (N.D. Cal. Oct. 7, 2025) ....................26

*Yurth v. Experian Info. Sols., Inc.*,
622 F. Supp. 3d 89 (E.D. Pa. 2022) .....17

Statutes

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 90–321, title I, § 129 .....13

Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16 .....14

Truth In Lending Act, 15 U.S.C. § 15 U.S.C. §§ 1601–1667f .....*passim*

# I. INTRODUCTION

Owning a home is a cornerstone of the proverbial American dream. Purchasing a home is often a result of years of savings and hard work and is a source of significant pride and financial stability. For many, their home serves as a safe haven, a way to maintain stability for their families, and a financial anchor. For that reason, state and federal laws create strong protections for homeowners who use their homes as collateral for debt. These laws were further strengthened after the 2008 financial crisis, which exposed the dangers of complex, one-sided mortgage products. Such safeguards are critical to protect both homeowners and the stability of our economy. They also limit some of the most lucrative predatory practices.

As a result, companies like Hometap[1] seek out ways to evade these rules. Hometap has designed a complex residential mortgage loan that poses significantly greater risks than traditional mortgages. But Hometap claims that its product is exempt from laws protecting homeowners—including the law passed after the 2008 crisis to ensure that homeowners can challenge illegal mortgages in court by prohibiting mandatory arbitration. 15 U.S.C. § 1639c(e)(1) ("No residential mortgage loan . . . may include terms which require arbitration.").

Courts—including the District of New Jersey—have seen through this ruse.

[1] Plaintiffs refer to Defendants collectively as Hometap herein.

These courts have found that the Truth in Lending Act's (TILA's) clear bar on mandatory binding arbitration for residential mortgage loans prohibits arbitration in this context. *See* Hrg. Tr., *Roberts v. Unlock Partnership Sols. AOI, Inc.*, No. 24-cv-1374 (D.N.J. Dec. 4, 2025) (attached as Ex. A) (hereinafter *Roberts* Hrg. Tr.); *Muskal v. Point Dig. Fin. Inc.*, No. CV 2025-024855 (Ariz. Super. Dec. 17, 2025) (attached as Ex. C). And the *only* court to examine Hometap's specific contract upheld the Massachusetts Attorney General's claims that Hometap's product is a residential mortgage loan covered by consumer protection laws, and denied Hometap's motion to dismiss. *Com. v. Hometap Equity Partners, LLC*, No. 2584CV00469-BLS2, 2025 WL 2468564 (Mass. Super. Aug. 21, 2025) (hereinafter, *Hometap*). Other courts, enforcement officials, and regulators have likewise found that products like Hometap's are residential mortgage loans covered by laws like TILA. *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025); *In re Stone,* 671 B.R. 752 (Bankr. D. Colo. 2025); Assurance of Discontinuance, *In the Matter of the Investigation of Unlock Partnership Solutions* (June 22, 2026), available at https://coag.gov/app/uploads/2026/06/26.06.22-Unlock-AOD-fully-executed.pdf (hereinafter, Colo. AOD); Br. of Wash. State Dept. of Fin. Institutions as Amicus Curiae in Support of Neither Party & Reversal of the Dist. Ct., ECF 22.1, *Olson v. Unison Agreement Corp.*, No. 23-2835 (9th Cir. Aug. 7, 2025) (hereinafter, Wash. DFI Br.) (attached as Ex. D).

Hometap attempts to sidestep this clear authority by relying on the provision it wrote into its contracts that purports to delegate questions of whether the arbitration clause is enforceable to the arbitrator to decide. But this is contrary to law. The delegation clause itself is just a specific type of arbitration requirement: It is an agreement to arbitrate questions about whether the arbitration clause is enforceable. It is therefore just as invalid under TILA's prohibition on mandatory arbitration as any other arbitration requirement in a residential mortgage loan. And, under Supreme Court precedent, because Ms. Greenidge and Mr. Billey challenge the delegation clause itself, this Court must decide this threshold issue. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) ("the federal court *must* consider the challenge before ordering compliance with that arbitration agreement.") (emphasis original).

Like any other homeowner challenging an unlawful mortgage loan, the Greenidge-Billey family has a right to have their claims heard in court. They thus respectfully request that the Court deny Hometap's motion to compel arbitration.

## II. RELEVANT FACTUAL BACKGROUND

### A. Ms. Greenidge and Mr. Billey borrowed money from Hometap.

Keicha Greenidge and Ryan Billey (together, Plaintiffs), a married couple, are New Jersey homeowners who value the financial security that comes with homeownership. First Am. Compl. ¶¶ 82-83, ECF 12 (hereinafter, FAC). Ms.

Greenidge learned of Hometap from a neighbor and reached out to inquire about the product. *Id.* at ¶¶ 84-85. Hometap assigned an agent to Ms. Greenidge, who showed her a chart demonstrating that Hometap expected her house to substantially increase in value over ten years, and pressed her and Mr. Billey to take out over $100,000, rather than the $20,000 they had expected. *Id.* at ¶¶ 85-90.

After Hometap notified Plaintiffs that their application was approved, it required them to sign several non-negotiable form contracts drafted by Hometap, including an "Option Purchase Agreement" and a Mortgage securing their obligations on penalty of foreclosure. *Id.* ¶¶ 92, 94, 95; ECF 12-1; ECF 12-2. Hometap uses a non-negotiable form contract. FAC ¶ 95. In total, the transaction amounted to 69 pages across different documents, filled with complicated terms and multiple cross-references, dozens of proprietary terms without a glossary, no index, and with the actual term sheet hidden in a schedule in the middle. *Id.* ¶¶ 15-17; ECF 12-1, 12-2.

The Option Purchase Agreement alone is 33 pages long, with signatures appearing on pages 28 and 29. *Id.* ¶ 16; ECF 20-3. There are no places for initials or signatures on any other page in the Option Purchase Agreement. *Id*. The arbitration provision Hometap seeks to enforce spans pages 23-26. *Id*. Plaintiffs simultaneously signed a 9-page Mortgage and Security Instrument. ECF 20-4. The Mortgage and Security Instrument gives Hometap the power to "sell the property at a nonjudicial

foreclosure sale." *Id.* § 7(f).

Because of the complex nature of the transaction, and Hometap's misleading statements, Plaintiffs did not understand that Hometap could force them to sell their home in ten years if they failed to repay significantly more than they received. If they had, they never would have entered the contract. *Id.* ¶¶ 112-13.

**B. Hometap advances money in exchange for a future payment obligation secured by a mortgage.**

Hometap advances money to homeowners in exchange for a future payment obligation, secured by a mortgage. Here's how it worked:

*First*, Hometap paid Plaintiffs a "loan amount" of $103,575, which was equivalent to 12.91% of the appraised value of the home. FAC at ¶¶ 96-97; ECF 12-2 at 2; ECF 20-3 at 36-38. Plaintiffs did not actually receive the full amount of the "Investment Amount," however, as Hometap charged them thousands of dollars in fees, including a $3,107.25 "origination charge" and other false and inflated fees. FAC ¶¶ 98-100.

*Second*, Hometap's contract requires Plaintiffs to repay Hometap 21.523% of the home's value in 10 years or less (or 17.936% if the home decreased in value). ECF 20-3 at § 1.5. The contract requires repayment upon the first of several events including:

(1) if Plaintiffs sell their home, the sale must be approved by Hometap, the closing costs must be paid by Plaintiffs, and Plaintiffs must pay Hometap

21.523% of the sale price[2];

(2) if Plaintiffs want to repay the loan without selling their home, they must pay 21.523% of its value as agreed by Hometap;

(3) if Plaintiffs die, repayment is triggered through the same mechanism; or

(4) if the 10-year term expires, Hometap forces the sale of home, Plaintiffs pay all associated costs, and Hometap receives repayment of 21.523% of the sale price.

FAC at ¶¶ 104; ECF 20-3 at §§ 1.5, 2.4, 2.6(d) 2.7. Upon any of these events, Hometap receives payment of its "Hometap Share." ECF 20-3 at §§ 1.5, 2.4, 2.6(d) 2.7. The "Hometap Share" is defined as either 17.936% or 21.523% of the value of the Plaintiffs' home (along with any additional "Hometap Cure Payments"). *Id.* § 7.2(b). The Hometap Share is capped at repayment of the initial advance *plus* a 20% annualized rate of return (that is, compound interest).[3] Hometap calls this the "Hometap Cap." *Id.* § 2.2.

*Third*, Hometap's contract and repayment are secured by a mortgage on Plaintiffs' home. ECF 20-4. The mortgage states that it secures Plaintiffs' "payment

---

[2] For simplicity, this paragraph refers to the percentage Hometap receives if the home value increases, consistent with Hometap's projections, and does not refer to the "Hometap Cap" of 20% APR, but the effect of the provisions are the same.

[3] Hometap deceptively calculates this cap without including fees, resulting in an actual APR cap that exceeds 20%. This is demonstrated by the April 2026 statement that Hometap provided Plaintiffs, in which Hometap does not apply the cap, even though the correctly calculated APR exceeds 20%. FAC ¶ 98-103, 106. *See also* 15 U.S.C. §§ 1605 (defining finance charge), 1606 (explaining how to calculate APR).

fulfillment, and performance of the obligation due under" the Hometap agreement. *Id.* § C. It goes on to note that it secures "payment obligations" including "payment of the Hometap Share *owed*" to Hometap. *Id.* § 2 (emphasis added). Thus, if Plaintiffs fail to pay Hometap or default in any other way, Hometap can non-judicially foreclose on their home to obtain the payment. *Id.* § 7(f).

**C. Hometap is guaranteed repayment, independent of the housing market.**

Hometap presents itself as partnering with homeowners—as reflected in its name, Hometap Equity Partners—and purports to share in the risk that the home might lose in value. Yet Hometap's contract expressly states that Hometap is "not a partner" with the homeowner, ECF 20-3 at § 8.4, likely to avoid any of the important duties of an actual partner, such as acting in the others' best interest, 59A Am. Jur. 2d Partnership § 270. And as this case shows, Hometap has carefully structured the transaction to ensure that its future payment will be far larger than its advance to the homeowner, even if the home loses value. *See* FAC at ¶¶ 33-34, 51, 56, 59-60, 64-65, 69.

The primary way Hometap does so is by requiring Plaintiffs to pay Hometap a far greater percentage of the value of their home (21.523% or 17.936%) than it advanced (12.91%). FAC at ¶¶ 92, 102. Given this disparity, for Hometap's payout to drop below its advance, Plaintiffs' Jackson Township home would have to drop in value by over 30%—substantially more than the decline in New Jersey housing

prices during the market crash of 2008.[4] This is consistent with Hometap's own projections. *See* FAC at ¶¶ 61-63, 64(e), 65(a)-(b). So Hometap will be repaid in full unless there is a crash that is more catastrophic than the worst crash in modern history—a crash in which other mortgage lenders would also see devastating losses, as they did in 2008. And Hometap reserves the right to unilaterally extend the contract, allowing it to avoid losses should such an unprecedented crash occur. *Id.* ¶ 64(f); ECF 20-3 § 1.5.

Hometap also charges thousands in fees, which further increase the company's profit. FAC at ¶ 98. And Hometap requires the homeowner to carry the costs of ensuring Hometap's future payment. In entering the contract, Hometap didn't assume the responsibilities of co-ownership. Instead, Plaintiffs are required to cover all such costs, including taxes, repairs, and an insurance policy. ECF 20-3 at §§ 6.1(j), 6.2(e). Otherwise, Hometap can foreclose or demand "Hometap Cure Payments," which accrue interest and must be paid back. *Id.* § 7.2(b).

Hometap further ensures repayment by limiting Plaintiffs' ability to rent out the home or reside elsewhere; capping the amount of other debt that Plaintiffs can

---

[4] Prices dropped from a peak index of 576.51 in Q1 of 2007 to a low of 448.91 in Q2 of 2012, a drop of 22.13%. U.S. Federal Housing Finance Agency, All-Transactions House Price Index for New Jersey [NJSTHPI], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/NJSTHPI, July 14, 2026. This was the steepest decline in over fifty years of federal data. *Id.*

take on; giving itself significant power over any sale of the property; requiring Plaintiffs to cover the significant costs of any sale or home valuation required to settle the contract; imposing a ten-year contract period designed to ensure no decline in value; and retaining the unilateral right to extend the contract term if it will not be paid back at a profit. FAC at 64(a)-(f), 107-09; ECF 20-3 at §§ 1.5, 2.1(b), 2.4(g), 2.6(d), 6.1(b), 6.1(i).

Even the documents memorializing the agreement repeatedly characterize the transaction between Hometap and Plaintiffs as a loan, listing the amount provided to Plaintiffs as the "Loan Amount," identifying Hometap as a "lender" and Plaintiffs as "borrowers," and stating that Hometap is "grant[ing] financing" to Plaintiffs. *See* FAC ¶ 67; ECF12-2 at 2, 12.

**D. Hometap touts its guaranteed returns to its investors.**

Locking homeowners into its mortgages is only the first step in Hometap's business model. After that, like other mortgage lenders, Hometap bundles and securitizes these mortgages and sells them to Wall Street investors. FAC ¶ 72. And while Hometap argues in court that it risks not being paid back if the housing market drops, it presents a different face to its investors. It boasts that it has consistently provided "strong, risk-adjusted return," "in both rising and declining home value environments." *Id.* ¶ 65(a); https://invest.hometap.com/ (last visited July 15, 2026); *see also* FAC ¶¶ 65(b), (c). Reflecting this, Hometap's security offerings have been

exceedingly lucrative, selling for hundreds of millions of dollars. FAC ¶ 73.

## III. LEGAL STANDARD

When a motion to compel arbitration can be decided based on "the face of a complaint, and documents relied upon in the complaint," it is evaluated under Rule 12(b)(6) standard, "accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff." *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). However, "if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing." *Id*. The court then evaluates the motion "under a summary judgment standard." *Id*. Here, the parties agree that this dispute should be decided under the Rule 12(b)(6) standard.[5] *See* ECF 20-1 at 9.[6]

Further, the Supreme Court has made clear that any "federal policy" about

[5] Hometap's assertion that the Court should not look outside the four corners of the contracts is wrong. ECF 20-1 at 29. Instead, as Hometap notes, the Rule 12(b)(6) standard applies, and the Court must consider the allegations in the FAC as true for the purposes of this motion. *Id.* at 9; *Guidotti*, 716 F.3d at 776. And allegations related to the true nature of the contract are highly relevant. *See, e.g.*, *Merck & Co. v. United States*, 652 F.3d 475, 483 (3d Cir. 2011); *Hometap*, 2025 WL 2468564, at *7. To the extent the Court believes it could benefit from further factual development, or that the summary judgment standard should apply, Plaintiffs request that they be permitted to engage in limited discovery regarding facts germane to arbitrability. *See* ECF 11.

[6] Plaintiffs refer to the page numbering on the bottom of Hometap's brief throughout.

arbitration "is about treating arbitration contracts like all others, not about fostering arbitration" and "a court may not devise novel rules to favor arbitration over litigation." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

## IV. ARGUMENT

Hometap argues that Plaintiffs are barred from seeking relief in this Court because: (1) its contract supposedly contains a delegation clause that claims to require arbitration of the question of whether the broader arbitration provision is enforceable (often referred to as "arbitrability"); and (2) the arbitration provision itself does not violate TILA. Both arguments fail: TILA prohibits Hometap from including a requirement to arbitrate *any* matter—including enforceability of the broader arbitration provision itself—in a residential mortgage contract like Hometap's.

### A. This Court Must Adjudicate Plaintiffs' Challenges to the Delegation Clause.

Hometap argues that this Court may not hear the Plaintiffs' challenge to the arbitration provision because the contract supposedly contains a delegation clause that requires arbitration of questions about the validity and enforcement of the broader arbitration provision. This is wrong. Plaintiffs expressly challenge the delegation clause's validity under federal law. Under Supreme Court precedent, this Court must resolve that challenge. *Coinbase*, 602 U.S. at 151.

As the Supreme Court recently explained, this follows from "the fundamental

principle that arbitration is a matter of contract." *Id.* at 147. To "refer[] a dispute to an arbitrator," there must be some valid and enforceable arbitration agreement. *Id.* at 149. And a delegation clause "is simply an additional, antecedent agreement" to arbitrate arbitrability that is subject to the same principles as "any other." *Id*. at 148; *see also Adler v. Gruma Corp.*, 135 F.4th 55, 66 (3d Cir. 2025) ("[a] delegation clause is merely a specialized type of arbitration agreement, which a court must evaluate in the same manner as it would any other arbitration agreement." (cleaned up)). Accordingly, for a delegation clause—as much as any other agreement to arbitrate—"[i]f a party challenges the validity of the precise agreement to arbitrate at issue, the federal court *must* consider the challenge before ordering compliance with that arbitration agreement." *Id*. at 151. "To hold otherwise would be to impermissibly elevate a delegation provision over other forms of contract." *Id*. at 152.

To "challenge the delegation provision specifically," a plaintiff is merely required to "reference the provision in its opposition to a motion to compel arbitration." *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018) (cleaned up). And "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *Id.* at 226–27; *see also Coinbase*, 602 U.S. at 144, 151 ("[W]here a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge."). That requirement is

easily satisfied here, as Plaintiffs expressly challenge that the delegation clause is invalid under TILA.

TILA prohibits the inclusion of a delegation clause in the Plaintiffs' contract. Under TILA, "[n]o residential mortgage loan . . . may include terms which require arbitration . . . as the method for resolving *any* controversy or settling *any* claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1) (emphases added).

A "controversy" means broadly "[a] disagreement or a dispute," or "[a] justiciable dispute." Controversy, Black's Law Dictionary (9th ed. 2009); *see also* Controversy, American Heritage Dictionary (5th ed. 2018) (A "controversy" means broadly a "dispute."); Controversy, Cornell L. Sch., Legal Information Institute, https://perma.cc/KAT5-QEBP ("actual dispute"). Hometap cites the 1968 Black's definition, ECF 20-1 at 12, perhaps because TILA was originally enacted that year. But section 1639c(e)(1) was not added to TILA until 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 90–321, title I, § 129. Thus, the 21st century definitions of "controversy" are the proper tools for interpreting the statute. Moreover, the dictionary cited by Hometap does not even support its position. Rather, that dictionary *also* defines "controversy" as, variously, "a litigated question," or "a justiciable dispute." Controversy, Black's Law Dictionary (4th ed. 1968). Hometap conveniently omits these definitions.

Congress's goal of completely prohibiting mandatory arbitration in mortgage

agreements, including delegation clauses, is further evidenced by its choice to track the language of the Federal Arbitration Act (FAA) when it enacted the TILA bar. Specifically, the FAA applies to agreements to arbitrate "a controversy arising out of [a] . . . transaction" involving commerce. 9 U.S.C. § 2. So, for the FAA to apply at all—which is the basis for Hometap's motion—a dispute over arbitrability *must* be a "controversy." The FAA goes on to state that arbitration clauses should not be enforced when "grounds as exist at law" prohibit such enforcement. *Id.* In enacting just such grounds in TILA, Congress tracked the exact language of the FAA, barring "terms which require arbitration . . . as the method for resolving any controversy . . . arising out of [a] transaction" involving a "residential mortgage loan." 15 U.S.C. § 1639c(e)(1). These statutes, which both address the same subject matter, must be read *in pari materia*; that is, "similar statutes are to be construed similarly." *See, e.g.*, *Lafferty v. St. Riel*, 495 F.3d 72, 81-82 & n.12 (3d Cir. 2007) (noting that although the two statutes examined "address different situations, the doctrine of *in pari materia* nevertheless applies because both provisions" dealt with the same topic, there, venue). So either a dispute about the enforceability of Hometap's arbitration clause is *not* a "controversy," in which case the FAA does not apply, or it *is* a "controversy," in which case TILA prohibits any term requiring the dispute to be arbitrated, including Hometap's delegation clause. Either way, Hometap's motion must be denied.

Furthermore, Hometap ignores the key term "any" in "any controversy." 15 U.S.C. § 1639c(e)(1). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). And disputes of "whatever kind" would include disputes over the enforceability of the broader arbitration provision. The phrase "arising out of" is similarly broad, encompassing "originating from, "growing out of," "flowing from," or "done in connection with." *U.S. v. Smukler*, 991 F.3d 472, 490 (3d. Cir. 2021) (citing and quoting cases, *inter alia*, *Fed. Ins. Co. v. Tri-State Ins. Co*., 157 F.3d 800, 804 (10th Cir. 1998)).

Thus, in TILA's own words, a delegation clause is a "term[]" that "require[s] arbitration" to resolve a "controversy" about whether the parties must arbitrate disputes about the residential mortgage transaction. 15 U.S.C. § 1639c(e)(1). Accordingly, section 1639c(e)(1) prohibits requiring arbitration to resolve disputes of any kind that are incident to or connected with a residential mortgage transaction—including disputes regarding enforcement of the arbitration agreement itself. And if there were any ambiguity about whether section 1639c(e)(1) covers a delegation clause, TILA must be "liberally construed in favor of the consumer." *Rossman v. Fleet Bank (R.I.) Nat. Ass'n*, 280 F.3d 384, 390 (3d. Cir. 2002).

Because TILA prohibits delegation clauses in residential mortgage loans, a challenge that a delegation clause is unenforceable because it is contained within a

residential mortgage loan "specifically challenge[s] the delegation clause." *MacDonald*, 883 F.3d at 227. Accordingly, this Court must "assess[] the delegation clause's enforceability." *Id.*; *see also Coinbase*, 602 U.S. at 151 (when a party challenges the validity of the delegate clause "the federal court *must* consider the challenge before ordering compliance" with the delegation clause) (internal quotation marks omitted).

While Hometap cites a handful of unpublished, out-of-circuit cases in its motion that it claims show otherwise, ECF 20-1 at 13, these cases all predate *Coinbase*, in which the Supreme Court clarified that where a delegation clause is challenged as invalid, the court *must* decide that dispute in the first instance.[7] 602 U.S. at 150-51. Hometap also relies on *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 67-68 (2019), ECF 20-1 at 12, but this case also does not help its position: in *Henry Schein,* like the Court's more recent instruction in *Coinbase*, the Supreme Court confirmed that a court must "determine whether a valid arbitration

---

[7] In addition, none of these cases analyze the statutory language of section 1639c(e)(1), which clearly bars delegation clauses as explained herein. These cases do cite *Attix v. Carrington Mortgage Services, LLC*, which expressly did *not* consider section 1639c(e)(1), the TILA provision at issue here, because it was not "at issue." 35 F.4th 1284, 1292 n.4 (11th Cir. 2022). The court instead considered different statutory language that, among other things, did not expressly track the language of the FAA in prohibiting mandatory arbitration of any kind.

agreement exists"—including a delegation clause, if challenged—before it refers a dispute to arbitration. 586 U.S. at 69.[8]

Because Plaintiffs contend that the delegation clause is invalid under TILA, this Court must resolve that challenge.

### B. The Truth in Lending Act prohibits any terms mandating arbitration in "residential mortgage loans" like the one at issue here.

Under TILA, "[n]o residential mortgage loan . . . may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). And "[n]o provision of any residential mortgage loan . . . shall be applied or interpreted so as to bar a consumer from bringing an action in . . . court [based on] any alleged violation of . . . Federal law." *Id.* § 1639c(e)(3). Hometap's product is a residential mortgage loan under TILA's plain text. As a result, both Hometap's delegation provision and its arbitration provision are invalid and cannot be enforced.

1. Hometap's product is a residential mortgage loan as defined by TILA.

TILA defines a "residential mortgage loan" broadly as "any consumer credit transaction . . . secured by a mortgage [or] deed of trust . . . on a dwelling." 15 U.S.C. § 1602(dd)(5). Hometap does not dispute that the transaction is a consumer

[8] When a federal statute prohibits arbitration courts routinely do just this. *See, e.g.*, *Certain Underwriters at Lloyds, London v. 3131 Veterans Blvd LLC*, 136 F.4th 404, 409 (2d Cir. 2025) (same); *Arabian Motors Grp., W.L.L. v. Ford Motor Co.*, 775 F. App'x 216, 219 (6th Cir. 2019) (same); *Yurth v. Experian Info. Sols., Inc.*, 622 F. Supp. 3d 89, 99 n.6 (E.D. Pa. 2022) (same).

transaction, nor that it is secured by a mortgage, but disputes that its product qualifies as "credit." Hometap's position is contradicted by the plain text of the statute.

"Every exercise of statutory interpretation begins with the plain language," and "[w]here the statutory language is plain and unambiguous, further inquiry is not required." *Downey v. Penn. Dep't of Corr.*, 968 F.3d 299, 306 (3d Cir. 2020). And if there were any ambiguity or differences in the breadth of these definitions, TILA's definitions of credit and debt must be construed "liberally in favor of the consumer." *Rossman*, 280 F.3d at 394; *see also Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993).

In interpreting whether TILA applies to a transaction, courts must interpret TILA to ensure that companies may not "circumvent" their statutory "obligations" through "strategic" product structures. *Rossman*, 280 F.3d at 392, 399; *see also Burnett*, 3 F.3d at 1262 (courts look "past the form of the transactions to their economic substance in deciding whether [TILA] applie[s]."). And TILA also does not "elevate superficial form over meaningful substance." *Vallies v. Sky Bank*, 2007 WL 2492730, at *4 (W.D. Penn. 2007) (citing *Rossman*, 280 F.3d at 390); *see also, e.g.*, *Cole v. U.S. Cap.*, 389 F.3d 719, 726–27 (7th Cir. 2004) (compiling cases). Instead, courts must look to the "economic substance" of the transaction. *Burnett*, 3 F.3d at 1262 (citing *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 157–58 (1981)). This principle long predates TILA, as centuries of Supreme Court precedent

insist that courts must look to substance, not labels, to determine whether lending laws apply: "There is no more familiar rule in the law than that the [lending] laws cannot be evaded by mere pretenses, shifts, or evasions." *Fowler v. Equitable Tr. Co.*, 141 U.S. 384, 403 (1891); *Scott v. Lloyd*, 34 U.S. 418, 446–47 (1835).

TILA's definition of "residential mortgage loan" easily encompasses Hometap's product. To start, TILA's use of the word "any" in its definition of residential mortgage loan—"any consumer credit transaction," 15 U.S.C. § 1602(dd)(5)—indicates that "consumer credit transaction" should be read "expansively," *Smith v. Berryhill*, 587 U.S. 471, 479 (2019). TILA also defines the term "credit" broadly as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The term "debt" is not defined, so courts "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *see also* ECF 20-1 at 16. Hometap does not dispute that the ordinary meaning of a "debt" is "something owed." *Id.* at 17; *see also* Debt, *Webster's New Collegiate Dictionary* (9th ed. 1983); Debt, *American Heritage Dictionary* (1st ed. 1969) ("something owed, as money, goods, or services"); Debt, *Oxford English Dictionary* (1980) ("something owed by one person to another"). Hometap also agrees that a "'credit transaction' contemplates an agreement by which the right of deferred payment is promised in exchange for some form of consideration." ECF 20-1 at 17.

Thus, "the right granted by a creditor to a debtor to defer payment of debt," 15 U.S.C. § 1602(f), means the right to defer payment of "something owed." So Hometap's product is a "consumer credit transaction" if it grants the homeowner the right to defer payment of "something owed." This transaction falls squarely within this definition. In exchange for an advance from Hometap, Plaintiffs "owe" Hometap "something."

Specifically: Hometap provided Plaintiffs an advance of just over 12% of their home's value. FAC ¶¶ 18(a), 20, 97; ECF 20-3 at 36. In exchange, they assumed an obligation to later pay Hometap the "Hometap Share" of over 21% of the value of their home. *See* FAC ¶¶ 18(b), 21, 30, 102; ECF 20-3 at 36. This amount was immediately secured by a mortgage on the property. ECF 20-4. The home-secured debt has a term of 10 years, although it can come due sooner under certain conditions such as, for example, sale of the home. *See* FAC ¶¶ 32, 104, 111.

While Hometap calls the contract an "option," all of the conditions for the conclusion of the contract require the homeowner to repay Hometap—including by allowing Hometap to unilaterally force the sale of the home to collect its payment. *See id.* ¶¶ 58, 50, 111; ECF 20-3 § 3.1(b). And the mortgage expressly secures the Plaintiffs' "*payment obligations* in the Hometap Homeowner Agreement," including "payment of the Hometap Share *owed* to Hometap." ECF 20-4 § 2(c) (emphasis added). If the Plaintiffs don't pay what they owe Hometap, it can foreclose on their

home. *See id.* § 7; ECF 20-4 § 7.2(c), 7.4. In short, the "Hometap Share" is, functionally, an obligation to repay Hometap's advance (plus a profit, that is, interest or a finance charge)—that is, credit. FAC ¶¶ 34-35, 57, 69-70.

And while guaranteed repayment is not a requirement to be "credit" under TILA, Hometap does take several steps to ensure that the debt will be repaid. It will only enter a contract if its market analysis and evaluation of the home demonstrates that it will be repaid (usually through the forced sale of the home). *Id.* ¶¶ 49, 61, 62. And the contract ensures repayment at a profit including:

- obligating the homeowner to pay Hometap a significantly larger percentage of the home's value than the value of the initial loan amount, so that if it was repaid on day one, Hometap would reap a significant profit, *id.* ¶¶ 59-60, 63; ECF 20-3 at 36-38;

- requiring that the homeowner maintain the property to Hometap's specifications, FAC ¶ 51;

- requiring homeowners pay for all taxes, insurance, and other costs, or be declared in default and risk foreclosure or additional fees, FAC ¶¶ 64(a), 94, 109; ECF 20-3 §§ 1.2(a)(iii), 6.1(j), 6.2(e), 7.2(b); ECF 20-4;

- limiting the ability of the homeowner to rent out or vacate the property, which Hometap's CEO has stated will protect the value of the property and ensure Hometap's profit, since homeowners living in the property are incentivized to improve and maintain it, while renters are not, FAC ¶ 64(b) (citing remarks of Hometap CEO); ECF 20-3 § 6.1(b);

- limiting the amount of home secured debt the homeowner can take on, FAC ¶ 64(c); ECF 20-3 § 6.1(i);

- controlling any sale or valuation of the home at the conclusion of the contract, FAC ¶ 64(d); ECF 20-3 § 2.1(b);

- requiring Plaintiffs to pay all fees associated with the sale of the home or other costs associated with the end of the contract, FAC ¶¶ 107-08; ECF 20-3 §§ 2.4(g), 2.6(d));
- imposing a 10-year maturity date on the contract, since home values do not decline over that period, FAC ¶ 64(e) (citing Hometap's CEO's remarks);
- allowing itself to unilaterally extend the term if it determines that it has not yet realized a profit, *id.* ¶ 64(f); ECF 20-3 § 1.5;
- entitling Hometap to unilaterally sell the property at the expiration of the ten-year term, without the homeowner's involvement, FAC ¶ 50.

This is consistent with Hometap's stated goal of maximizing profits for investors. *See* FAC ¶¶ 42, 65(a)-(c). It is also consistent with Hometap's own repeated characterization of the product—in documents provided to Plaintiffs and in statements to investors—as "financing," a "loan," and a "mortgage." *See id.* ¶¶ 47, 67(b)-(d), 70, 96; ECF 20-4; ECF 12-2 at 2, 10, 12.

Like a typical residential mortgage loan, the contract is secured by mortgage; requires payment of typical mortgage loan fees and costs, such as an origination charge, appraisal fee, title fees, and recording fees; has similar (though more restrictive) conditions of default that lead to the possibility of foreclosure, and is bundled and sold in securitized trusts. *See* FAC ¶¶ 64(a), 67(a), 68, 72-73, 94, 98; ECF 20-4. Indeed, during the sales process, Hometap told Plaintiffs that they would have to pay Hometap back within ten years. FAC ¶ 88. And as of April 20, 2026, Hometap told Plaintiffs that they would owe it $181,336 if they settled the contract

that day—nearly double the amount that they received three years earlier. *Id.* ¶ 106.

Again, this makes sense. Making homeowners pay Hometap is its whole business model. It would come as a surprise to Hometap's investors, who have purchased hundreds of millions of dollars of securitized Hometap mortgages, if Hometap did not require homeowners to pay the company.

In light of this, it is unsurprising that the only court to consider the issue to date has have found that Hometap's contract can, in fact, be properly described as the extension of credit. In Massachusetts, the Attorney General recently filed suit against Hometap for making residential mortgage loans without complying with applicable laws. Hometap moved to dismiss the case, but the court rejected the very argument Hometap makes here: that its product "is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment." *See Hometap*, 2025 WL 2468564, at *5. The court instead found that Hometap's agreements are "in substance, loans." *Id.* at *6. While Hometap attempts to distinguish this decision because it was rendered on a motion to dismiss, ECF 20-1 at 21, Hometap agrees that a Rule 12(b)(6) standard applies here as well, *id.* at 9.

Other courts have found that TILA's definition of "credit" applies to products offered by Hometap's competitors and held their arbitration clauses to be unenforceable as a result. *See Muskal*, No. CV 2025-024855 ("The Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply

when the Court applies the language of the Act") (Ex. C hereto)[9]; *Roberts* Hrg. Tr. (Ex. A hereto). In *Roberts v. Unlock*, Judge O'Hearn heard argument on a similar company's motion to compel arbitration under TILA and New Jersey law. In response to the company's argument that the contract was not a debt because the contract allows it to choose not to exercise its option, Judge O'Hearn remarked that the homeowner had a liability to the company, *Roberts* Hrg. Tr. at 55, that the product is "really not an option," and that that language was used simply to evade application of TILA, *id.* at 60-61. *See also id.* at 9, 14, 16, 31-33, 51, 53 Shortly after the hearing, the company attempted to withdraw its motion in an attempt to avoid issuance of an order denying its motion. Hrg. Tr. at 5-7, *Roberts v. Unlock Partnership Sols. AOI, Inc.*, No. 24-cv-1374 (D.N.J. Dec. 12, 2025) (attached as Ex. B). After Judge O'Hearn declined to allow the company to withdraw its motion without further briefing, the matter settled.

The Ninth Circuit decision in *Olson* provides yet more support. There, the court held that product offered by another one of Hometap's competitors also met the ordinary language definition of "credit" and accordingly was a residential

[9] Hometap asks this Court to ignore the *Muskal* court's decision. ECF 20-1 at 22. But the *Muskal* court's decision was rendered after thorough briefing and argument, and the appeal has not yet been briefed. Hometap provides no reason that the decision "is not likely to survive the pending appeal" no matter how much Hometap might wish for that result, and indeed, none exists.

mortgage loan under a state law analogous to TILA.[10] 2025 WL 2254522 at *3; *compare* RCW § 31.04.505(5)(b) *with* 15 U.S.C. § 1602(cc)(2). Other courts have also reached this conclusion. *See In re Stone*, 671 B.R. at 756-57 (rejecting company's assertions that a similar product was an option, and finding that plaintiff adequately pleaded that similar transaction was a residential mortgage loan subject to statutory provisions). Likewise, Colorado's Attorney General recently reached a settlement with a competitor of Hometap's, based on its finding that the company's product a residential mortgage loan, not an option as the company claimed. Colo. AOD. Washington State's regulators have reached the same conclusion. Wash. DFI

---

[10] Hometap's description of the product and decision in *Olson* are misleading at best. ECF 20-1 at 21. The contract in that case does *not* have any minimum repayment obligation. *Olson*, 2025 WL 2254522, at *1-*2 (describing product). Rather, the quoted language describes the terms by which the homeowners could buy their way out of the contract early, just like Hometap's "Owner Repurchase" provisions. *Id.* at *2 (describing "Special Termination Price"); ECF 20-3 § 2.4.

And, while TILA was not directly at issue, the court did reject Hometap's arguments regarding TILA that track its arguments here. *Olson*, 2025 WL 2254522, at *5. Hometap also inaccurately asserts that *Olson* was vacated, ECF 20-1 at 21 n.3, but this is not the case. Rather, the parties reached a private settlement after the decision was rendered and the appeal was dismissed. *See Navajo Nation v. U.S. Dep't of the Interior*, 907 F.3d 1228, 1229 (9th Cir. 2018) (distinguishing between granting a request to "dismiss" an appeal after a decision and a "request to vacate the … opinion"); *Roberts* Hrg. Tr. at 69. Indeed, multiple courts have subsequently relied on *Olson* in analyzing whether a financial transaction is a disguised credit obligation under TILA. *See Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1159 (W.D. Wash. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1049 (N.D. Cal. 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *5 (N.D. Cal. Oct. 7, 2025); *Feeman v. Bridge It, Inc.*, 2026 WL 880508, at *8 (S.D.N.Y. Mar. 31, 2026).

Br.

2. Hometap's arguments have no merit.

In arguing that its product is not actually "credit"—despite all the authority set forth above—Hometap attempts to place limits on TILA's definitions that exist nowhere in its text or related authority.

a. *TILA's definition of "credit" does not require that the product be a "loan" or accrue interest; but even if it did, this product is & does.*

First, Hometap asks this Court to rely on a 1968 dictionary definition of "loan." ECF 20-1 at 17. But the term "loan" is contained nowhere in TILA's definitions and thus has no bearing here. Rather, TILA contains a specific definition of the term "residential mortgage loan": "any consumer credit transaction . . . secured by a mortgage [or] deed of trust . . . on a dwelling." 15 U.S.C. § 1602(dd)(5). And the statute further defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). "Statutory definitions control the meaning of statutory words" and "exclude[] any [other] meaning." *Burgess v. United States*, 553 U.S. 124, 129-30 (2008). TILA's definition does not contain the word "loan"; instead, the operative term is "debt." And even if the term was relevant, courts have expressly held that Hometap's product and those like it *do* meet the actual definition of a loan. *See, e.g.*, *Hometap*, 2025 WL 2468564, at *6.

Based on its chosen definition of "loan," Hometap also argues that its product

is not a "residential mortgage loan" because it does not require repayment with interest. ECF 20-1 at 17-18. But TILA also does not make "interest" a requirement for something to be "credit." 15 U.S.C. § 1602(f). Nor, for that matter, does the dictionary definition Hometap relies upon. ECF 20-1 at 17. And, in any event, the difference between what Hometap advances and the payment it ultimately receives *is* a finance charge under TILA. *See* 15 U.S.C. § 1605; *see also* ECF 12 ¶¶ 58-64 (explaining how Hometap structures the contract to generate interest on its initial advance). Hometap itself recognizes as much: it includes an interest rate cap in its own agreements. ECF 20-3 § 2.2 ("Hometap Cap" is "equal to an annualized rate of return of twenty percent (20%) on the Investment Amount.").

b. *TILA's definition of "credit" does not require guaranteed repayment of a sum certain; but Hometap's product does, in fact, guarantee repayment much as any other credit.*

Hometap goes on to contend that because no particular amount is "guaranteed" to be repaid, TILA does not apply.[11] ECF 20-1 at 18-20. But guaranteed repayment is also not a requirement of "credit" under TILA. 15 U.S.C. § 1602(f). To the contrary, TILA covers many types of credit that share this feature

[11] Hometap claims that its product does not create debt because it has labelled the product an "option" contract. ECF 20-1 at 18. But, as discussed below, TILA's definitions do not exclude products with option mechanisms from the definition of credit, and courts recognize that products labeled as options can constitute credit; and regardless, even if a court could import an option exception to TILA's definition of residential mortgage loans when Congress did not create one, this is not a true option. *See* FAC ¶¶ 57-69; *infra* Part IV.B.2.c.

with Hometap's product.

For example, TILA expressly covers "nonrecourse" credit, 15 U.S.C. § 1602(cc), which "requires the [creditor] to look only to the Debtor's collateral for payment," *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 438 n.3 (1999); Debt, *Black's Law Dictionary* ("nonrecourse" obligation is "[d]ebt for which the borrower is *not personally liable*, so that a creditor can collect *only* on the collateral securing the debt" (emphases added)). The amount the creditor can recover will thus vary with the value of the security. When that collateral is a home, if "the home secured by the deed of trust falls significantly in value," the "nonrecourse obligation" can fall in value or even "not result in any payment." *Olson*, 2025 WL 2254522, at *3. As the *Hometap* court explained, with a non-recourse mortgage loan "the lender cannot recover any deficiency from the homeowner if the loan balance exceeds the value of the property. Lenders manage the risk of such non-recourse loans by limiting the size of loans or their duration, or pooling actuarial risk among borrowers." *Hometap*, 2025 WL 2468564, at *2. And nonrecourse loans are clearly loans. *See id.* at *6 & n.4 (citing authority); *see also Comm'r v. Tufts*, 461 U.S. 300, 313 (1983) ("a nonrecourse loan should be treated as a true loan"); *Olson,* 2025 WL 2254522, at *3-*4.

TILA also covers pawn shops as a form of "credit." There, the owner gives the borrower a discounted percentage of the value of a good in exchange for taking

the good as security. *Burnett*, 3 F.3d at 1262. Then, either the borrower can buy back the good for a higher price, or the lender keeps the security. *Id.* Here, Hometap gave Plaintiffs a discounted 12% of the value of their home up front. Then when payment comes due, Plaintiffs must either pay Hometap 21% of the value of the home or Hometap will collect that amount from the sale of the home. *See* FAC ¶ 59. That's much more obviously a debt than a pawn shop.

And TILA expressly includes reverse mortgage loans as a form of residential mortgage loan, which illustrates the same principle. A "reverse mortgage" is a nonrecourse credit obligation where: (1) a homeowner is given "one or more advances"; (2) the company receives security through "[a] mortgage . . . against the consumer's principal dwelling"; and (3) "any principal, interest, and shared appreciation or equity is due and payable" upon default or "only after (A) the transfer of the dwelling; (B) the consumer ceases to occupy the dwelling as a principal dwelling; or (C) the death of the consumer." 15 U.S.C. § 1602(cc). Here, (1) Hometap gave Plaintiffs an advance, (2) Hometap received security through a mortgage on their home; and (3) an amount of money tied to the shared appreciation or equity of Plaintiffs' home is due and payable on default, upon transfer of the home, if Plaintiffs move, or if Plaintiffs die. FAC at ¶¶ 67, 94, 96-98, 102, 104, 111; ECF 20-3 §§ 1.5, 7.2; ECF 20-4. Indeed, the only court to consider Hometap's contract easily found that it met the definition of a reverse mortgage. *Hometap*, 2025

WL 2468564, at *8; *see also Olson*, 2025 WL 2254522, at *3, 5 (same, as to similar product); *In re Stone,* 671 B.R. at 756-57 (same, as to similar product).[12]

And even if guaranteed repayment were required for "credit" (which it is not), Hometap's factual assertions are inaccurate. Hometap asserts that "[t]here are multiple scenarios, in fact, in which Hometap walks away with nothing." ECF 20-1 at 19. Hometap sets out only two such "scenarios" in its brief: (1) that it declines to exercise its option and (2) that the home value decreases so much that Hometap would recoup less than the initial payment to Plaintiffs. The first scenario is pure fiction—no for-profit business simply declines to be repaid, and if it does, that has no bearing on whether the advance was credit to begin with. And the second is both unlikely and does not leave Hometap with "nothing"—rather this is just the risk of a nonrecourse loan, reverse mortgage, or really any credit that ultimately goes unpaid. *See Hometap*, 2025 WL 2468564, at *6 n.4. Hometap is a company designed to make a profit and, as a result, has structured the contract so that it will recoup a profit unless the house *drastically* declines in value, and it is essentially impossible for it to fail to recover any money at all.[13] *See supra* Part II.C; FAC ¶¶ 59-60, 63;

---

[12] The transaction does not have to be a reverse mortgage to be subject to TILA's ban on mandatory arbitration: All residential mortgage loans (including but not limited to reverse mortgages) are subject to that bar, 15 U.S.C. § 1639c(e)(1).

[13] Hometap provides an example where the repayment amount would be less than the original debt. As described above, this is a possibility for all nonrecourse loans. Moreover, the scenario Hometap presents is unprecedented. For Plaintiffs' home

ECF 20-3 at 36-38; *see also Hometap*, 2025 WL 2468564, at *6.

The only true scenario for Hometap to "walk away with nothing" would be if Hometap declined to exercise its so-called "option"—that is, choose not to receive payment. But because the contract is designed to ensure that the "Hometap Share"—the amount of money the homeowner owes Hometap—will always be worth something, it would be commercially unreasonable and a breach of Hometap's duty to its investors to waive repayment. Indeed, Hometap itself admits that its "business model is . . . based on . . . the likelihood that" it will be repaid "more than what it pays," at the outset, ECF 20-1 at 20, and it promises as much to its investors, FAC ¶¶ 65(a)-(c) (quoting investor statements). And in any event, any creditor may choose not to collect a debt; that choice does not undermine the nature of the transaction. *See Olson*, 2025 WL 2254522, at *4; *Roberts* Hrg. Tr. at 31-33. Indeed, the Mortgage itself states that it secures Plaintiffs' "payment obligation" for the amounts that they "owe" Hometap. ECF 20-4 § 2(c). In other words, as Judge O'Hearn found, the option is illusory. *See Roberts* Hrg. Tr. at 9, 16, 51, 53, 55.

The Third Circuit has rejected Hometap's very argument in the tax context: "[A] formal legal obligation" to repay "is not an absolute prerequisite for a

---

value to decrease to $577,470 or less the market would have to crash by over 30%, which it has not done in the over 50 years that the federal government has been tracking this data. *See supra* Part II.C.

determination that a transaction is a loan." *Merck & Co. v. United States*, 652 F.3d 475, 483 (3d Cir. 2011). While courts in that context often reference "an unconditional obligation to repay," as a feature of a loan, the test is not whether there are "*literally* no conditions on repayment." *Id.* Otherwise "[i]t would be simplicity itself" to "draft a contract in which repayment would not occur in the event of some occurrence so unlikely" that there is no genuine risk. *Id.* Instead, courts ask if the product "ensure[s] repayment of funds as a practical matter." *Id.*[14]

The facts in *Merck* illustrate why. In *Merck*, one company advanced another money in exchange for a complex option mechanism that pegged payment to certain interest rates that would vary with the market. *Id.* at 477–79. The defendants claimed this was not a loan because, "had the relevant interest rates dropped low enough," the advance would not have been fully repaid. *Id.* at 482–83. The Third Circuit saw through it: The transaction was structured such that the money would be repaid unless the relevant interest rates dropped below a level to which "they had not dropped since 1962." *Id.* at 483. As a result, "even with the collapse of interest rates at the end of the 2000s, [the money] would have been repaid." *Id.* There was thus no

[14] If anything, TILA's definition of credit is broader than in *Merck*. *Merck* ruled for the government, and in the tax context any "ambiguities are construed most strongly and strictly against the Government." *Franklin Mills Assocs., L.P. v. Nationwide Life Ins. Co.*, 836 F. Supp. 2d 238, 247–48 (E.D. Pa. 2011). In contrast, TILA is construed "liberally in favor of the consumer." *Rossman*, 280 F.3d at 394.

"serious uncertainty as to the return," making the product a loan. *Id.* at 484.

So too here. Hometap makes money unless the house drops in value by over 30%. *See supra* Part II.C. That's far more than average home prices ever fell in New Jersey, even during the worst stretch of the 2008 crash. Notably, Hometap never actually disputes that it has effectively guaranteed it will recover its advance as a practical matter—much less cites any evidence to that effect, despite access to all its internal data on its products.

In any event, all that "debt" requires is that there be *some* "obligation or liability to pay." Debt, *American Heritage Dictionary*. No matter how much the housing market might theoretically drop, Plaintiffs' house will be worth *something*, and Hometap's contract requires her to pay it at least 17.936% of that amount. FAC ¶ 102. Hometap's rule would improperly place "form over meaningful substance." *Vallies*, 2007 WL 2492730, at *4; *see also Burnett*, 3 F.3d at 1262. Hometap's preferred rule would make it "simplicity itself" to disguise a loan by adding any contingency on payment, no matter how "unlikely." *Merck*, 652 F.3d at 483.

*c. TILA does not exempt contracts like Hometap's from "credit" or "residential mortgage loan."*

Unable to dispute that its product meets the definition of a residential mortgage loan under TILA, Hometap labels it an "option." But that doesn't matter: TILA has no exception in its statutory definitions of "residential mortgage loan" or "credit" that includes an option mechanism. And that accords with a long history of

recognizing that credit is still credit, regardless of its structure. So Hometap turns to agency staff commentary interpreting a regulation.

As an initial matter, the plain text of the commentary on which Hometap relies makes clear that it does not govern TILA's statutory definition of credit. The commentary accompanies a regulation and only applies to the definition of "credit" "for purposes of [that] *regulation*." 12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1) (emphasis added). It therefore does not even purport to control the statutory definition of credit. Nor could it, as staff commentary cannot trump statutory text. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

And even if this commentary could graft an unwritten exception onto the statute, neither of the exceptions to the regulation that Hometap invokes—"option contracts" and "investment plans"—apply here. A fundamental principal underlying TILA is that the substance of the product matters, not its form. *See*, 280 F.3d at 392, 399; *see also Johnson v. Novastar Mortg., Inc.*, 698 F. Supp. 2d 463, 469–71 (D.N.J. 2010) (finding that "equitable mortgage" qualifies as credit under TILA).

Hometap's product is not an option contract. An option contract is "a contract conveying a right to buy or sell designated securities, commodities, or property interest at a specified price during a stipulated period." Option, *Merriam-Webster*, https://perma.cc/74JP-RSWH; Option, *American Heritage Dictionary* ("The right . . . to buy or sell an asset within a specified time at a set price."); *see also Brunswick*

*Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (2005) ("In a real estate transaction, an option contract is a unilateral agreement requiring a party to convey property at a specified price, provided the option holder exercises the option 'in strict accordance' with the terms and time requirements of the contract."). "An option contract is a promise which . . . limits the promisor's power to revoke an offer"; in other words, the promisor cannot buy back or otherwise escape from the option, during its term. Restatement (Second) of Contracts § 25. "An option does not create an interest in the land," such that the entity purchasing the option does not have any rights related to the property during the option period; it only has the right to either exercise the option or not. *State By & Through Adams v. New Jersey Zinc Co.*, 193 A.2d 244, 252 (1963). An "option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised." *Hometap*, 2025 WL 2468564, at *7.

Hometap's contract lacks all the hallmarks of an option. Under the contract terms, Hometap has no intention of actually owning the property—instead it seeks a monetary repayment through sale of the home. FAC ¶ 66(a); *see Hometap*, 2025 WL 2468564, at *7. The contract also does not allow the homeowner unrestricted ownership of the home during the option period like a true option but instead immediately imposes requirements on the homeowner to maintain, reside in, and not

further encumber the home, among other obligations, so that Hometap will always benefit from exercising the option. FAC ¶ 66(b), (d). The homeowner can "repurchase" the purported option, which is not a feature of a typical option and reflects Hometap's true intention of repayment. *Id.* ¶ 66(c); ECF 20-3 § 2.4. A typical option involves consideration for the option agreement and then consideration representing the purchase price if the option is exercised; here, Hometap only pays a nominal sum of 1% at the time of the option exercise, changing the incentive and cost structure for both parties into a credit arrangement rather than an option arrangement. FAC ¶ 66(e); ECF 20-3 § 2.4; *see Hometap*, 2025 WL 2468564, at *7. And Hometap's representations to homeowners and investors demonstrate that it does not contemplate any scenario in which it will not exercise the option. FAC ¶ 66(f).

But Hometap's contract *does* contain the features of a debt. *See id.* at ¶¶ 57-65, 67-70. Hometap's contract does not convey any future right to buy Plaintiffs' property at a specified price: it conveys the right to receive future payment. That is a debt, not an option. For this reason, courts have repeatedly rejected the argument that Hometap's product, and others like it, are not credit because they purport to use an option mechanism. *See Hometap*, 2025 WL 2468564, at *7; *Olson*, 2025 WL 2254522, at *5 (rejecting the company's argument that the agency commentary to the TILA regulation exempting "option contracts" was instructive, explaining "this

does not mean that the mere embedding of a formal option in a highly complex overall arrangement automatically exempts that arrangement from being classified as a 'credit obligation.'"); *In re Stone*, 671 B.R. at 755-57.

Nor is Hometap's product an investment plan where Hometap "risk[ed] the loss of the capital advanced." 12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii). Generally, an investment is "[a]n expenditure to *acquire* property or assets to produce revenue." Investment, *Black's Law Dictionary* (12th ed. 2024) (emphasis added); *see also* Investment, *American Heritage Dictionary* ("Property or another possession *acquired* for future financial return or benefit." (emphasis added)). Acquiring property means taking on burdens of ownership and risks of loss, as illustrated by the commentary's example: "[A]n arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in *any* gain or loss of property value." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) (emphasis added). In contrast, Hometap does not genuinely risk losing its advance, does not acquire the property, does not take co-ownership, and does not share in the burdens of ownership. *See* FAC ¶¶ 57-70; ECF 20-3 § 6.1 (requiring Plaintiffs to cover all costs of homeownership).

Hometap ignores this portion of the agency commentary, focusing instead on the risk that it will lose its advance. ECF 20-1 at 24. But as previously shown,

Hometap does not genuinely risk losing its advance and does not share in "any" loss. And the mere fact that Hometap could lose money in an unprecedented crash makes it no different from any other nonrecourse loan secured by a home, and holding otherwise would allow companies to "circumvent" TILA. *Rossman*, 280 F.3d at 392, 399; *see also Merck*, 652 F.3d at 483 (rejecting argument that a product is not a loan if there is any possibility of non-payment, no matter how "unlikely").

d. *State regulatory action does not help Hometap.*

Finally, Hometap claims that state attempts to increase regulation of its predatory product demonstrate that TILA does not apply. Again, Hometap's argument misses the mark. First, none of these laws apply here, and none relate to TILA's ban on arbitration or its definitions. And the statutes simply seek to clarify that lending laws apply to these products, given the efforts of Hometap and others to evade them. More instructive are the actions of the Massachusetts and Colorado Attorneys General and the Washington State Department of Financial Institutions, which have each determined that these products (including Hometap's specifically) fall within their state lending laws, qualify as residential mortgage loans, and that Hometap and its competitors are violating those essential consumer protections. *See Hometap*, 2025 WL 2468564; Colo. AOD; Wash. DFI Br.

e. *Courts have consistently rejected Hometap's arguments.*

As Hometap recognizes, courts across the country have considered and

rejected the very same arguments it advances here. In response these courts have held that allegations like those set forth in this case are sufficient to show that Hometap's product and products like it are credit. *See Hometap*, 2025 WL 2468564; *Olson*, 2025 WL 2254522; *In re Stone*, 671 B.R. at 755-57; *Muskal*, No. CV 2025-024855 (Ex. C).

In response to this weight of authority, Hometap cites *Foster v. Equitykey Real Estate Invs. L.P.*, No. 17-cv-76, 2017 WL 1862527 (N.D. Cal. 2017). But the Ninth Circuit has since rejected the exact reasoning that underlies *Foster*, demonstrating that *Foster* would not have survived appeal. *Olson*, 2025 WL 2254522. And, in any event, as the *Hometap* court found, "[t]he differences are clear" between Equitykey's and Hometap's products. 2025 WL 2468564, at *7. "In *Foster*, return of any portion of the money was entirely contingent on . . . the property appreciating in value." *Id.* In contrast, under Hometap's Agreement, even if—in a surprise, and exceedingly unlikely turn of events— Plaintiffs' home value drops significantly, Hometap will still receive a substantial payout of nearly 18% of the home's value.

***

In sum, Hometap's product is a "residential mortgage loan" under TILA. And "[n]o residential mortgage loan . . . may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). That's true "based on the face of [the] complaint[] and documents relied upon in the complaint." *Guidotti*, 716 F.3d at 776. If this Court

believes more factual development is required, however, Hometap's motion should be denied and discovery granted. *See id.* at 780; *Hometap*, 2025 WL 2468564, at *7 (allowing case about similar product to "proceed through discovery" into whether it was a loan).

## V. CONCLUSION

This Court is required to consider Plaintiffs' specific challenge to the delegation clause, that the clause is prohibited by TILA. And, because Plaintiffs have plausibly alleged that the product is a "residential mortgage loan" as defined by TILA, TILA prohibits enforcement of both the delegation clause and the arbitration provision as a whole. As a result, Plaintiffs respectfully request that this Court deny Defendants' Motion.[15]

Dated: July 20, 2026

Respectfully submitted,
KEICHA GREENIDGE AND RYAN P. BILLEY, *by their attorneys*,

*/s/James A. Francis*
James A. Francis (NJ Bar #012601996)
**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis (#012601996)
Lauren KW Brennan (#074202013)
1600 Market Street, Suite 2510
Philadelphia, PA 19103

[15] While Plaintiffs do not object to staying discovery while this Court is deciding this motion, Plaintiffs note that Hometap fails to meet the standard for a stay of all discovery, given that there would be no prejudice to Hometap in light of the availability of discovery in arbitration, but Plaintiffs are prejudiced by a delay in accessing their home equity while saddled with Hometap's improper mortgage lien.

Tel: (215) 735-8600
Fax: (215) 940-8000
Email:jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Robert P. Cocco
ROBERT P. COCCO, P.C.
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
bob.cocco@phillyconsumerlaw.com

Jennifer Wagner*
Shennan Kavanagh*
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
skavanagh@nclc.org
jwagner@nclc.org

**Pro hac vice application pending*
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he caused the foregoing memorandum of law, as well as the various declarations and exhibits cited therein, to be filed using the Court's CM/ECF system, which will send notice and a copy thereof to all counsel of record.

Dated: July 20, 2026

*/s/James A. Francis*
James A. Francis