**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

KEICHA GREENIDGE and RYAN P. BILLEY, H/W *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

HOMETAP EQUITY PARTNERS, LLC and HOMETAP INVESTMENT PARTNERS III SPV,

Defendants.

Case No. 3:26-cv-01431 (GC)(RLS)

**Motion Date: August 17, 2026**

# DEFENDANTS' REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

Philip A. Goldstein
McGuireWoods LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020-1104
Phone: (212) 548-2167
Email: pagoldstein@mcguirewoods.com

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners III SPV, LLC*

# TABLE OF CONTENTS


Page

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................. 2

I. The Delegation Provisions Require an Arbitrator to Decide Whether TILA Applies .................................................................................. 2

II. Even If the Court Reaches Arbitrability, TILA Does Not Bar Arbitration .............................................................................................. 5

A. TILA Does Not Apply to Any Agreement that Could Require a Payment of Any Kind ........................................................................ 6

B. The Agreement Does Not Require or Guarantee Repayment ................................................................................. 11

C. Plaintiffs Provide No Other Basis for Applying TILA ................................................................................ 13

CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Attix v. Carrington Mortgage Services, LLC*,
35 F.4th 1284 (11th Cir. 2022) ....................5

*Burnett v. Ala Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993) ....................12

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)....................2, 4

*Com. v. Hometap Equity Partners, LLC*,
No. 2584CV00469, 2025 WL 2468564 (Mass. Super. Ct. Aug. 21, 2025) ....................13, 14

*Comm'r v. Tufts*,
461 U.S. 300 (1983)....................8

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992)....................10

*Foster v. Equitykey Real Est. Invs. L.P.*,
No. 17-cv-67, 2017 WL 1862527 (N.D. Cal. 2017)....................15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019).................... 2-5

*In re Stone*,
671 B.R. 752 (Bankr. D. Colo. 2025)....................13, 14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................15

*Merck & Co. v. United States*,
652 F.3d 475 (3d Cir. 2011) ....................12

*Olson v. Unison Agreement Corp.*,
No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025)....................14

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) ........................................ 4

**Statutes**

9 U.S.C. § 2 ........................................ 3

9 U.S.C. § 4 ........................................ 5

15 U.S.C. § 1602(cc)(2) ........................................ 8

15 U.S.C. § 1602(dd)(2)(E)(iii) ........................................ 10

15 U.S.C. § 1602(dd)(5) ........................................ 1, 10

15 U.S.C. § 1602(j) ........................................ 6, 8

15 U.S.C. § 1638(a)(2)(A) ........................................ 7

15 U.S.C. § 1638(a)(3) ........................................ 7

15 U.S.C. § 1639c(e)(1) ........................................ 2-5

15 U.S.C. § 1639c(e)(3) ........................................ 5

**Other Authorities**

12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(vii) ........................................ 14

12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) ........................................ 11, 14

12 C.F.R. § 1026.2(a)(10) ........................................ 6, 7

12 C.F.R. § 1026.2(a)(20) ........................................ 8

12 C.F.R. § 1026.18(b) ........................................ 7

12 C.F.R. § 1026.18(d) ........................................ 7

12 C.F.R. § 1026.18(f) ........................................ 8

Loan, BLACK'S LAW DICTIONARY (4th ed. 1968) ........................................ 9

Opening Br. of Appellant Point Digital Finance, Inc., *Point Digital Fin., Inc. v. Muskal*, No. 1-CA-CV-26-0131 (Ariz. Ct. App. July 1, 2026) ....................12

# INTRODUCTION

Plaintiffs agreed to arbitrate both the merits of their claims and threshold issues of arbitrability. Their opposition to Hometap's motion to compel only underscores why this case belongs to an arbitrator, not this Court.

Plaintiffs advance a circular theory as to why this Court should not enforce the binding delegation provisions. Plaintiffs contend that because they allege the Agreement is a residential mortgage loan under the Truth in Lending Act, this Court must decide whether they are right before honoring the delegation provisions. But this approach would render delegation clauses meaningless whenever a plaintiff invokes TILA. Neither the Federal Arbitration Act nor TILA justifies this result.

Even if the Court were to look past the delegation provisions, Plaintiffs' TILA objection to arbitration fails. The Agreement is not a "consumer credit transaction" that qualifies as a "residential mortgage loan" because it does not create the debt-repayment relationship inherent to a credit transaction. 15 U.S.C. § 1602(dd)(5). Plaintiffs cannot avoid that problem by arguing that, in some circumstances, the Agreement requires them to pay *something*. Plaintiffs' theory would cover any contract that *could* involve *some* amount of payment. That theory would turn any investment into a credit transaction. It would also broaden TILA's meaning beyond what its text can bear. This Court should reject Plaintiffs' theory, enforce the Agreement's terms, and compel arbitration.

## ARGUMENT

### I. The Delegation Provisions Require an Arbitrator to Decide Whether TILA Applies.

Plaintiffs argue that TILA's bar on "terms which require arbitration . . . as the method for resolving any controversy or settling any claims arising out of the transaction," 15 U.S.C. § 1639c(e)(1), covers delegation provisions. *See* Opp. 21, ECF No. 29. And they assert that because they challenge the delegation provisions' enforceability, this Court must decide whether TILA's bar applies and the dispute is arbitrable. *See id.* That argument is untenably circular, and courts have uniformly rejected it.

Plaintiffs reason that an arbitrator cannot decide *whether* TILA applies because they assert that TILA *does* apply and invalidates the delegation provisions. By that logic, this Court must answer the arbitrability question to determine who gets to decide that question. But those are two distinct arbitration questions—(1) whether a dispute is arbitrable, and (2) who decides that arbitrability question. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 148-49 (2024). Neither TILA nor precedent permits Plaintiffs' attempt to collapse them into one.

Courts may not "short-circuit the process and decide the arbitrability question themselves" based on how they perceive the strength of the claim for arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). They must instead enforce valid delegation provisions according to their terms before reaching

arbitrability questions. *See id.* at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."). The delegation provisions here are valid, because they were validly formed as a matter of contract and TILA's text does not undermine them. *See* Defs.' Mem. 16 & n.2, 18-19, ECF No. 20-1.

Plaintiffs try to circumvent this conclusion by arguing that TILA's reference to "controversy" encompasses challenges to delegation provisions, because the FAA's reference to that term does. Opp. 21. But the two statutes use the term differently. TILA bars arbitration of "any controversy" that "ar[ose] out of the transaction." 15 U.S.C. § 1639c(e)(1). Here, those controversies are Plaintiffs' merits claims that Hometap violated TILA and state law. The FAA more broadly enforces agreements "to settle by arbitration a controversy thereafter arising out of such contract or transaction, *or the refusal to perform the whole or any part thereof*." 9 U.S.C. § 2 (emphasis added). A threshold arbitrability dispute is not a "controversy" arising from a transaction (under TILA). It is a "controversy" arising out of Plaintiffs' "refusal to perform" the Agreement's arbitration provisions (under the FAA). Plaintiffs' insistence that "controversy" functions identically across these statutes ignores this distinction. *See* Opp. 22.

Moreover, whatever the scope of "controversy" in general, TILA's arbitration prohibition applies only to "residential mortgage loan" transactions. 15 U.S.C.

§ 1639c(e)(1). Whether the Agreement is such a transaction is the very question the delegation provisions assign to the arbitrator. TILA's arbitration bar cannot be triggered by the untested assertion that it applies.

Plaintiffs' contrary view would produce the absurd result of invalidating delegation provisions in any contract a party merely alleges is a residential mortgage loan subject to TILA. Delegation clauses exist precisely to route such contested threshold arbitrability questions to arbitrators. And the Supreme Court has squarely rejected the idea that the perceived merits of an arbitrability challenge should dictate whether that challenge goes to the arbitrator. *See Henry Schein*, 586 U.S. at 68. So, too, have multiple lower courts addressing similar TILA arguments. *See* Defs.' Mem. 19 (collecting cases).

Plaintiffs dismiss these decisions because they predate *Coinbase*'s instruction that courts must determine whether a delegation provision is valid if a party specifically challenges it. Opp. 24. But *Coinbase* simply reiterated that instruction from *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010). *See Coinbase*, 602 U.S. at 151 (quoting *Rent-A-Ctr.*, 561 U.S. at 71). And following that instruction does not require (or even allow) this Court to determine whether the Agreement is a "residential mortgage loan" such that the underlying merits dispute is arbitrable. It simply requires this Court to analyze whether TILA undermines the validity of the delegation provisions. It does not, as courts have uniformly held.

Plaintiffs fault these courts for relying on the Eleventh Circuit's interpretation of a separate TILA provision, 15 U.S.C. § 1639c(e)(3). Opp. 24 n.7. That provision states that "[n]o provision of any residential mortgage loan . . . shall be applied or interpreted so as to bar a consumer from bringing an action in . . . court" based on "any alleged violation of . . . Federal law." 15 U.S.C. § 1639c(e)(3). In *Attix v. Carrington Mortgage Services, LLC*, the Eleventh Circuit correctly concluded that § 1639c(e)(3) bars "arbitration agreements in contracts that fall into a particular bucket," but does not "bar an arbitrator from deciding whether a given contract falls into that bucket to begin with." 35 F.4th 1284, 1308 (11th Cir. 2022). Plaintiffs observe that the court did not specifically pass on § 1639c(e)(1). Opp. 24 n.7. But as Plaintiffs' own argument demonstrates, § 1639c(e)(1) and (3) work in tandem. *See id.* at 25. The same reasoning applies to both.

The delegation provisions are thus valid, and TILA does not preclude this Court from enforcing them. *See* 9 U.S.C. § 4. Rather, the FAA requires it. *See Henry Schein*, 586 U.S. at 68.

## II. Even If the Court Reaches Arbitrability, TILA Does Not Bar Arbitration.

The arbitration agreement should be enforced even if this Court decides arbitrability, because the Agreement is not a "residential mortgage loan" under TILA. 15 U.S.C. § 1639c(e)(1). Plaintiffs' contrary theory about what constitutes

a "credit transaction" and thus a "residential mortgage loan" has shifted from their Amended Complaint and pre-motion letter but remains unavailing.

Hometap's opening brief explained that the Agreement is not a credit transaction—and is instead an option contract and an investment plan—because, contrary to Plaintiffs' allegations, the Agreement does not require or otherwise guarantee repayment of the Investment Amount that Hometap paid to Plaintiffs. *See* Defs.' Mem. 22-28. In response, Plaintiffs have largely abandoned that theory and now posit that a "credit transaction" is any agreement requiring payment of *any* sum to a counterparty after that counterparty makes any initial payment. *See* Opp. 28, 39, 41. In their view, Plaintiffs "owe" Hometap "something"—so they have received credit. *Id*. at 28. Just like Plaintiffs' original stance, this new tack is wrong. The Agreement is not a "residential mortgage loan" under TILA.

### A. TILA Does Not Apply to Any Agreement that Could Require a Payment of Any Kind.

Plaintiffs are incorrect that TILA classifies any agreement involving a requirement to pay "something" as a credit transaction. *See id.* Only transactions that require *repayment* of a loaned amount qualify. That result flows necessarily from TILA and its implementing Regulation Z, which contemplate no other kind of credit transaction.

TILA and Regulation Z divide consumer credit into two categories: closed-end and open-end. *See* 15 U.S.C. § 1602(j); 12 C.F.R. § 1026.2(a)(10), (20). Both

types of credit involve a consumer who has received something of value (*i.e.*, a lump sum, a good, or a service) and must pay back the value of what was received. Because the Agreement never requires such repayment, it fits neither category of credit transaction.

Plaintiffs initiated this case on the theory that the Agreement extends closed-end credit, like a typical residential mortgage loan. *See, e.g.*, Am. Compl. at 3-4, ECF No. 12 (alleging that Hometap's "loan product . . . provides homeowners with an advance of money for a secured mortgage interest in their home and then requires repayment at substantial additional cost"); ECF No. 16 at 2 (insisting that Hometap does "require repayment"). Closed-end credit is consumer credit other than open-end credit. 12 C.F.R. § 1026.2(a)(10). The disclosures TILA requires for closed-end credit transactions presuppose that the consumer received a sum—the "amount financed"—she must repay, with a cost of credit—the "finance charge"—added. *See* 15 U.S.C. § 1638(a)(2)(A), (a)(3); 12 C.F.R. § 1026.18(b), (d).

As Plaintiffs now appear to acknowledge, the Agreement does not fit the closed-end credit framework. *See* Opp. 39, 41 (arguing that the option will be "worth something," even if not the Investment Amount). Indeed, as Plaintiffs recognize, *see id.* at 28, the Hometap Share is not calculated by reference to the Investment Amount. It is the product of the property's future value and the Hometap

Percentage—a formula in which the Investment Amount does not appear. As a result, there is no "amount financed" to repay and no "finance charge" added to it.

Still, Plaintiffs assert that the 20% annualized Hometap Cap proves the Agreement charges "interest" or a "finance charge." *Id.* at 14, 35. It does not. The Hometap Cap merely limits Hometap's share of appreciation in the extraordinary case that property values increase rapidly. *See* Defs.' Mem. 11. It operates as a ceiling on the value of Hometap's ownership interest—thereby protecting Plaintiffs—not as an interest rate accruing on principal. Indeed, there is no principal on which interest *could* accrue.[1]

Nor does Plaintiffs' assertion of owing "something" qualify the Agreement as open-end credit under TILA. Open-end credit, the only other type TILA governs, has the following attributes: (1) "[t]he creditor reasonably contemplates repeated transactions"; (2) "[t]he creditor may impose a finance charge . . . on an outstanding unpaid balance"; and (3) the amount of credit available is generally replenished as amounts are "repaid." 12 C.F.R. § 1026.2(a)(20); *see* 15 U.S.C. § 1602(j). Common

---

[1] The Agreement's lack of a repayment obligation distinguishes it from recognized forms of closed-end credit. In a variable-rate mortgage, the borrower must repay the principal advanced plus interest at a variable rate. *See* 12 C.F.R. § 1026.18(f). In a shared-appreciation reverse mortgage, the borrower must repay the principal plus a share of appreciation. *See* 15 U.S.C. § 1602(cc)(2). Even a nonrecourse mortgage involves an obligation to repay an advance; the nonrecourse feature limits only the remedy, not the existence of the debt. *See Comm'r v. Tufts*, 461 U.S. 300, 310-12 (1983); Opp. 36. In each case, unlike in the Agreement, the payment obligation is tethered to repayment of the advance.

examples of open-end credit include credit cards and home equity lines of credit. The Agreement has none of those characteristics. Most importantly, there is no revolving credit that replenishes as the consumer repays it. Indeed, even open-end credit, like closed-end credit, is fundamentally about repaying advances—the "unpaid balance" presupposes that the consumer drew credit and must pay it back.

Because the Agreement cannot be classified under either category of credit TILA recognizes, it is not a "credit transaction" at all. The Agreement is missing the core feature of a credit transaction—a repayment obligation. Its incompatibility with TILA's framework reflects the fundamental reality that the Agreement does not create a debt-repayment relationship, is not a credit transaction, and is not a residential mortgage loan.

Common sense and the plain meaning of the term "loan" further support this view. Plaintiffs do not dispute that a "loan" involves a repayment obligation. *See* Defs.' Mem. 23 (citing Loan, BLACK'S LAW DICTIONARY (4th ed. 1968)). But to advance their new theory that a "credit transaction" need not have a repayment obligation, Plaintiffs contend that the meaning of "loan" "has no bearing here" because it is "contained nowhere in TILA's definitions."[2] Opp. 34. That is wrong.

[2] Even though Plaintiffs argue that the term "loan" is irrelevant, they emphasize that "the documents memorializing the agreement repeatedly characterize the transaction between Hometap and Plaintiffs as a loan." Opp. 17 (citing ECF No. 12-2 at 2, 12). These dueling arguments do not cohere. In any event, the cited documents reflect a title company's application of standard terms to this unique arrangement. The

TILA makes clear that a "residential mortgage loan" is a species of "loan." In the same subsection that defines "residential mortgage loan," 15 U.S.C. § 1602(dd)(5), TILA repeatedly uses the shorthand "loan" and even refers to the buyer's "reasonable ability to *repay* the loan," *id.* § 1602(dd)(2)(E)(iii) (emphasis added). Given this context, Plaintiffs' claim that a "residential mortgage loan" need not involve an obligation to repay a loaned amount is implausible. There is no need to resort to canons of liberal construction (Opp. 23, 26, 40 n.14) when the text, especially when read in context, is clear. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Finally, the Agreement does not even fit Plaintiffs' revised definition of "credit transaction" because it does not contain any absolute payment obligation. Any payment obligation that arises under the Agreement is not because the Agreement required paying that amount, but because Hometap exercised its option (or Plaintiffs repurchased it for the same value). Plaintiffs owe nothing if the option expires without exercise or repurchase.

Contrary to Plaintiffs' view, an agreement does not extend "credit" merely because one party may receive proceeds after paying a counterparty. Otherwise, any investment would be a loan. That result is contrary to both the CFPB's commentary

---

understanding of a third party to a contract cannot override the parties' understanding, which is reflected in the contract's plain terms. Here, the Agreement repeatedly states that it is "not a loan." *See* Defs.' Mem. 12, 29.

and common sense. *See* 12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) (stating that "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced" are not "credit").

**B. The Agreement Does Not Require or Guarantee Repayment.**

The Agreement is not a "credit transaction," properly understood, because it does not require or otherwise guarantee repayment of the Investment Amount. *See* Defs.' Mem. 22-28. Plaintiffs' opposition offers only a scattered defense of their original theory that the Agreement functionally operates like an ordinary residential mortgage loan by requiring repayment of the amount advanced. *See, e.g.*, Opp. 28-29. To the extent this theory remains live, it fails.

Plaintiffs argue that the Agreement effectively "guarantees" recovery of the Investment Amount, because an "unprecedented crash" would have to occur for Hometap not to recover that amount. *Id.* at 15-16, 38 n.13, 41, 46. The argument evokes a market-wide crash, but individual properties can and do experience depreciation based on localized factors—like deterioration, environmental contamination, zoning changes, and the like.

The risk that any one property's value may decline (irrespective of broader market trends) is real, and it is why Hometap's business model involves bundling many transactions, so that gains on some offset losses on others. Hometap may extend the option period for another ten years, *see* ECF No. 20-3 § 1.5, but that will

not help it avoid any long-lasting depreciation that has occurred or avoid the risk that additional loss will occur, as Plaintiffs contend, Opp. 16-17, 30. Hometap attempts to limit this risk by researching the market, evaluating the home, and requiring adherence to certain standards. *See id.* at 29. That makes Hometap a prudent investor; it does not convert Hometap from an investor to a lender.

Indeed, one of Plaintiffs' own authorities well illustrates the point. Plaintiffs invoke *Muskal v. Point Digital Finance Inc.*, No. CV 2025-024855 (Ariz. Super. Ct. Dec. 17, 2025), currently on appeal. *See* Opp. 23-24. Although the reasoning of that non-binding decision has little value here, the facts of that case (as developed after the decision) powerfully refute Plaintiffs' theory. The property involved there did substantially depreciate (from $2.8 million to $2 million), such that the value of the company's option fell short of its initial investment (by over $15,000). *See* Opening Br. of Appellant Point Digital Finance, Inc. at 8-9, *Point Digital Fin., Inc. v. Muskal*, No. 1-CA-CV-26-0131 (Ariz. Ct. App. July 1, 2026) (attached to the Second Goldstein Declaration as Ex. A). Agreements of this sort thus possess the "uncertainty" that Plaintiffs baselessly argue is missing. *Merck & Co. v. United States*, 652 F.3d 475, 484 (3d Cir. 2011); *see* Opp. 40-41.[3]

[3] Plaintiffs also compare the Agreement to the pawn-shop arrangement in *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993). *See* Opp. 31. The transactions have nothing in common. *Burnett* relied on the "strong incentive" debtors would have to "repurchase" pawned items, because they could reacquire pawned items for much less than their market value. 3 F.3d at 1262. The Agreement

### C. Plaintiffs Provide No Other Basis for Applying TILA.

Plaintiffs' remaining contentions fare no better. First, Plaintiffs emphasize that the Agreement is "secured by a mortgage" and that the mortgage references Plaintiffs' "payment obligations" and the "Hometap Share owed to Hometap." Opp. 14, 28-30, 39; ECF No. 20-4 § 2(c). But using a mortgage to secure performance of a contract does not transform the underlying transaction into a loan. The mortgage secures Plaintiffs' obligation to honor the option—not to repay borrowed money. That the mortgage instrument uses terms like "payment obligations" reflects the reality that Hometap becomes entitled to payment of the Hometap Share upon exercise of the option; it does not establish a debt.

Second, Plaintiffs attempt to rely on non-binding, inapt cases. Under Plaintiffs' own revised theory, cases that analyze whether the arrangements at issue are "loans" are irrelevant to TILA. Opp. 34; *see, e.g.*, *Com. v. Hometap Equity Partners, LLC,* No. 2584CV00469, 2025 WL 2468564, at *7 (Mass. Super. Ct. Aug. 21, 2025); *In re Stone*, 671 B.R. 752, 757 (Bankr. D. Colo. 2025). And several of these cases apply state law rather than TILA. *See* Defs.' Mem. 26-28. The only new authorities Plaintiffs add are a hearing transcript reflecting one judge's preliminary

---

offers no financial incentive to repurchase the option; assuming an equivalent property value, Plaintiffs are in the same position whether they repurchase it or Hometap exercises it.

impressions during oral argument, not a reasoned decision on the merits, *see* ECF No. 29-1, and another state-law case, *see In re Stone*, 671 B.R. at 757.

Plaintiffs also describe some of the case law incorrectly. The state court in *Commonwealth v. Hometap Equity Partners, LLC* did not reject Hometap's argument that its agreement is not a loan. *Contra* Opp. 10, 31. Rather, the court explicitly stated it was "premature" given the procedural posture "to conclude one way or the other" whether "the HEIs are loans." *Hometap*, 2025 WL 2468564, at *7. As for *Olson v. Unison Agreement Corp.*, Hometap correctly described the minimum repayment obligation applicable when the homeowners wanted "to terminate the agreement." Defs.' Mem. 27 (citing No. 23-2835, 2025 WL 2254522, at *2 (9th Cir. Aug. 7, 2025)). That obligation does not exist here. Plaintiffs here need not pay back the investment amount, to repurchase the option or otherwise, so the Agreement's terms are not "just like" those at issue in *Olson*. *Contra* Opp. 33 n.10. And the judgment in *Olson* was indeed vacated. *See* Order, *Olson*, No. 23-2835 (9th Cir. Oct. 17, 2025) (attached to the Second Goldstein Declaration as Ex. B); *contra* Opp. 33 n.10.

Third, Plaintiffs attempt to discredit the force of the CFPB commentary providing that option contracts and investment plans are not "credit." 12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(vii), (viii). That commentary warrants "due respect" regarding the interpretation of the statute that the CFPB administers,

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024), and is certainly more relevant to the meaning of a federal statute than any state regulator's position about whether state law (not TILA) applies—especially where those regulators distinguish TILA from state law on the very ground that TILA does not cover option contracts and investment plans. *See* ECF No. 29-4 at 25 ("[W]hile the Foster [sic] court noted that TILA does not apply to option contracts or investment plans, by contrast, the Department by rule regulates shared appreciation mortgages.").

Finally, Plaintiffs also assert that the Agreement is not a true option contract. Opp. 42-43. They are wrong. A contract's status as an option contract does not vary based on how the optionee intends to use or sell the property. An option's defining characteristic is that the optionee has discretion over whether to accept an offer that the optionor must hold open, unless the agreement terminates, which can occur here by the homeowner's repurchase of the option. *See* Defs.' Mem. 28-29. The fact that the Agreement is an option contract, not a loan, is just another reason that TILA does not govern it. *See Foster v. Equitykey Real Est. Invs. L.P.*, No. 17-cv-67, 2017 WL 1862527, at *3-5 (N.D. Cal. 2017).

## CONCLUSION

For these reasons, this Court should (1) compel Plaintiffs to arbitrate their claims on an individual basis, (2) stay this action pending the outcome of that arbitration, and (3) award such other relief as the court deems just and proper.

Dated: August 3, 2026
New York, NY

Respectfully submitted,

*/s/ Philip A. Goldstein*

Philip A. Goldstein
McGuireWoods LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020-1104
Phone: (212) 548-2167
Email: pagoldstein@mcguirewoods.com

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners III SPV, LLC*