# Exhibit A

**ARIZONA COURT OF APPEALS**

**DIVISION ONE**

| | |
|---|---|
| POINT DIGITAL FINANCE, INC.,<br>Appellant,<br>v.<br>STEVEN MUSKAL,<br>Appellee. | No. 1-CA-CV-26-0131<br><br>Maricopa County Superior Court<br>No. CV2025-024855 |

**OPENING BRIEF OF APPELLANT POINT DIGITAL FINANCE, INC.**

Kathryn M. Barber
(*Pro Hac Vice admission pending*)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 755-1227
kbarber@mcguirewoods.com

C. Nicole Pelcic
State Bar No. 29503
KLINEDINST PC
2701 East Camelback Road
Suite 150
Phoenix, AZ 85016
(602) 813-0000
npelcic@klinedinstlaw.com

Erin L. Brown
(*Pro Hac Vice admission pending*)
MCGUIREWOODS LLP
50 North Laura Street
Suite 3300
Jacksonville, FL 32202
(904) 798-2622
ebrown@mcguirewoods.com

Jonathan Y. Ellis
(*Pro Hac Vice admission pending*)
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Attorneys for Appellant Point Digital Finance, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION .......... 1
STATEMENT OF THE CASE .......... 3
I. Factual Background .......... 3
A. Point contracts for the option to purchase an ownership interest in the homeowners' property .......... 3
B. The parties agree to arbitrate any and all disputes related to the contract .......... 7
C. The property sells at a substantially depreciated value and Point takes a loss on its investment .......... 8
II. Procedural History .......... 9
A. The Muskal estate sues Point .......... 9
B. The trial court denies Point's motion to compel arbitration .......... 11
STATEMENT OF THE ISSUE .......... 12
STANDARD OF REVIEW .......... 12
SUMMARY OF ARGUMENT .......... 12
ARGUMENT .......... 13
I. The arbitration agreement meets the prerequisites for enforcement under the Federal Arbitration Act .......... 13
II. TILA does not apply .......... 15
A. TILA's bar applies only to contracts that extend "credit" by imposing a "debt" .......... 15
B. The contract does not extend credit because it does not require repayment of a debt .......... 18
C. The contract is an option contract and an investment plan .......... 20
D. The trial court's contrary conclusion is wrong .......... 24
CONCLUSION .......... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Prop. & Cas. Ins. Co. v. Watts Water Techs., Inc.*,
244 Ariz. 253 (App. 2018)....12

*American Express v. Koerner*,
452 U.S. 233 (1981)....17

*Commonwealth v. Hometap Equity Partners, LLC*,
No. 2584CV00469, 2025 WL 2468564 (Mass. Super. Ct. Aug. 21, 2025)....22

*Curtis v. Propel Prop. Tax Funding, LLC*,
915 F.3d 234 (4th Cir. 2019)....18

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....13

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011)....16

*Foster v. EquityKey Real Estate Investments, L.P.*,
No. 17-cv-67, 2017 WL 1862527 (N.D. Cal. May 9, 2017)....19, 26

*Gilliam v. Levine*,
955 F.3d 1117 (9th Cir. 2020)....20-21

*Gray v. GC Servs., LP*,
256 Ariz. 480 (App. 2023)....14

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000)....14, 15

*Hasan v. Chase Bank USA, N.A.*,
880 F.3d 1217 (10th Cir. 2018)....15

*Honeycutt v. United States*,
581 U.S. 443 (2017)....26

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004)....................26

*McKay v. Ingleson*,
558 F.3d 888 (9th Cir. 2009)....................25, 26

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)....................14

*Persinger v. Sw. Credit Sys., L.P.*,
20 F.4th 1184 (7th Cir. 2021)....................16

*Riethman v. Berry*,
287 F.3d 274 (3d Cir. 2002)....................16

*S. Cal. Edison Co. v. Peabody W. Coal Co.*,
194 Ariz. 47 (1999) (en banc)....................13

*In re Sabino R.*,
198 Ariz. 424 (App. 2000)....................8

*Steiner v. Thexton*,
226 P.3d 359 (Cal. 2010)....................21, 22

*United Behav. Health v. Maricopa Integrated Health Sys.*,
240 Ariz. 118 (2016)....................14

*Wolfington v. Reconstructive Orthopaedic Assocs. II PC*,
935 F.3d 187 (3d Cir. 2019)....................17

**Statutes**

A.R.S. § 12-2101.01(A)(1)....................12

9 U.S.C. § 2....................12, 13

9 U.S.C. § 3....................14

15 U.S.C. § 1602(dd)(5)....................15

15 U.S.C. § 1602(f)....................9, 15

15 U.S.C. § 1639c(e)(1)....................9, 12, 15

Act of Apr. 13, 2026, 2026 Me. Laws ch. 653 ....................23

Act of Aug. 9, 2024, No. 103-1015, 2024 Ill. Laws ....................23

Act of May 8, 2023, ch. 568, 2023 Md. Laws ....................23

Public Act No. 21-138, 2021 Conn. Acts (Reg. Sess.) ....................23

Public Act No. 25-115, 2025 Conn. Acts (Reg. Sess.) ....................23

**Other Authorities**

12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(vii) ....................20

12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii) ....................23

Debt, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1982) ....................16

Debt, BLACK'S LAW DICTIONARY (4th ed. 1968) ....................16

Debt, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) ....................16

Loan, BLACK'S LAW DICTIONARY (4th ed. 1968) ....................17

Option, BLACK'S LAW DICTIONARY (12th ed. 2024) ....................21

Owe, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) ....................16

Restatement (Second) of Contracts § 25 & cmt. a ....................21

## INTRODUCTION

This appeal concerns a transaction between two Arizona homeowners and Point Digital Finance, Inc., through which Point provided the homeowners an upfront cash payment in exchange for the right—an option—to later acquire an ownership interest in the homeowners' property. From the homeowners' perspective, the transaction allowed them to immediately access their home's equity without selling their home or taking out a loan. It afforded them that opportunity without any obligation to ever repay the cash payment—much less repay it with interest—only the requirement to keep open the option for Point to later buy (with an *additional* sum) an ownership interest in their property.

From Point's perspective, the transaction conversely did not provide any guaranteed repayment—much less with interest—but it permitted the company to share with the homeowners in any appreciation or depreciation of the property's value. Any sum Point received after the option's repurchase or exercise would be tied entirely to the property's future value, not to the initial cash payment that Point gave the homeowners. That investment might benefit Point long term compared to a loan or it might not. Here, it did not—not only did Point not enjoy any return on its investment, it took *a loss*. Either way, Point made a bet on the future value of the property, not an extension of credit to the homeowners themselves.

Through the course of this transaction, there is no indication that the homeowners had any regrets about the deal they struck with Point. Steven Muskal, administrator of the homeowners' estate, appears to have a different view. On behalf of the estate, Muskal has sued Point, alleging that the transaction was actually a loan in disguise. He argues that, because Point treated and described its contract with the homeowners as what it was—an option contract—Point violated both federal and Arizona fraud and lending laws. Point vigorously disputes the merits of those claims. But the issue on appeal is where they should be resolved.

The answer is not the Arizona court system. When the homeowners entered into the contract with Point, they agreed that "any and all controversies, claims, or disputes with Point … arising out of, relating to, or resulting from th[e] agreement or the property, shall be subject to binding arbitration." App. 109, § 7.20.1 (emphasis omitted). There is no question that this case fits within those terms. Yet Muskal asserts that agreement is unenforceable under a provision of the federal Truth in Lending Act (TILA) that applies exclusively to "residential mortgage loans." While expressing significant doubt, the trial court agreed and denied Point's motion to compel arbitration. That order was wrong.

Under TILA (and common sense), a "residential mortgage loan" is a credit transaction that creates a debt in the mortgagor. Because the option contract at the center of this dispute did not require the homeowners to repay any sum of money

given to them, much less repay that sum with interest, it did not impose a "debt" on the homeowners. In turn, because it did not impose a "debt," it did not reflect a "consumer credit transaction" that could qualify as a "residential mortgage loan" under TILA. The trial court's contrary conclusion is irreconcilable with the contract's plain terms, the ordinary meaning of "debt," and the arrangement's financial reality. This Court should reverse and remand with instructions to enforce the parties' arbitration agreement.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Point contracts for the option to purchase an ownership interest in the homeowners' property.

Home equity can be a significant financial asset, but one to which homeowners have limited access. Typically, a homeowner can only tap into their home's equity by selling their home or taking on debt through a mortgage or home equity line of credit.

Point offers another possibility. It provides home equity investment products that allow homeowners to access equity in their homes without selling or borrowing against the property. Point's home equity investment products are option contracts, in which Point pays the homeowners for the right to eventually purchase a percentage ownership interest in the property. The homeowner receives (and retains) the upfront payment from Point and maintains the ability to repurchase the

option. Point need not exercise its option, but if it does, it receives the value of its ownership interest at that time, based on the home's value.

In 2024, Point executed such an option contract with James Muskal and Cheryl Collins-Muskal, who owned property located at 6023 East Turquoise Avenue in Paradise Valley, Arizona. App. 88. The home's appraised value at the time was $2.8 million. App. 59.

The contract provided that Point would purchase an option to later acquire a percentage ownership interest in the property. App. 88. To buy that option, Point paid the homeowners $210,000. *Id.* In exchange, the homeowners gave Point "an exclusive and irrevocable option … to purchase an undivided percentage interest of fee simple title ownership"—specifically, a 34.5% interest—in the property. *Id.*

The contract gave Point the right to exercise its option after 30 years or upon other triggering events, such as the property's transfer. App. 89, § 1.1; App. 90, § 1.4.2. Exercising the option would require paying the homeowners an additional $495,180. App. 88, § 1.1. To purchase and then exercise the option, Point would therefore pay the homeowners a total of $705,180. That total amount would reflect the sum of (1) the initial investment payment and (2) the exercise payment. *Id.*

Upon paying this sum, Point would obtain a 34.5% ownership interest in the property. *Id.* And it would receive "Point Proceeds" based on that ownership interest. App. 89, § 1.4. In the typical case, as here, the Point Proceeds would equal

(1) the property's value (either the effective sale price or the appraised value), multiplied by (2) the 34.5% ownership interest, minus (3) the $495,180 exercise payment.[1] App. 122-23.

If the property's value had increased when Point exercised its option, Point would share in that appreciation. That is because the value of its 34.5% ownership interest would also have increased (so, too, would the value of the homeowners' remaining 65.5% ownership interest). So if the ownership interest's value exceeded $705,180—the total amount Point would pay to purchase and exercise the option—Point would obtain a return on its investment, one linked to the home's value.

But if the value of Point's 34.5% interest decreased to under $705,180, Point would take a loss. As the complaint acknowledges, that scenario would occur if the property's value dropped to below $2.044 million. App. 8, ¶ 26(a). Again, Point's return on its investment, if any, would depend on the property's value—not on the $210,000 sum it initially paid the homeowners for the option.

---

[1] Three other factors can influence Point Proceeds, but none is relevant here. First, the contract's "Homeowner Protection Cap" limits the potential proceeds by setting a 19% cap. App. 88, § 1.1; App. 89, § 1.4. In the rare case that the value of the property appreciated at an extraordinary rate, Point's share of the proceeds would be limited. Second, the Point Proceeds formula also includes, if applicable, certain service fees and preservation payments. App. 122. No service fees or preservation payments are at issue here. App. 9, ¶ 27 n.1. Third, in event of a default, the baseline property value would be the contract's "Appreciation Starting Value" of $2.044 million. App. 88, 122-23.

It was neither inevitable nor required that Point exercise the option. The homeowners could repurchase the option at any time during the 30-year contract term. Doing so would require paying the "Point Proceeds" based on the property's value at the time of the repurchase, calculated the same way as if Point had exercised the option. App. 90, § 1.4.1. It would *not* require repaying the initial $210,000 amount or repaying it with interest. Instead, it would require some separate payment based on the home's current value.

Point could also choose not to exercise the option. Point could, for example, decide to use the additional $495,180 it would have to spend to exercise the option in some other way. If the property's value had depreciated or Point could get a better return on investment by using that money elsewhere, it could rationally choose to forgo its option. In that scenario, Point would receive no Point Proceeds or any other amount. And the homeowners would again retain the initial $210,000 Point paid them to purchase the option. App. 96, § 3.2 ("[T]he Investment Amount paid to you by us shall be retained by you in consideration of the granting of the Option.").

Indeed, under no circumstances did the homeowners have to pay back that $210,000 or pay any interest on that amount. The homeowners' only obligation was to hold open the continuing offer to allow Point to share in any increased value of the property. Meanwhile, the homeowners were free to invest or use that $210,000 as they saw fit. The homeowners thus received the immediate benefit of the

$210,000 payment in exchange for the chance that Point might eventually exercise the option, most likely years or decades down the line. And if Point did ultimately exercise its option, the homeowners (still with the $210,000 in hand) would receive the additional exercise payment of $495,180 and retain the remaining 65.5% ownership interest that Point did not acquire.

Point assigned its rights under the contract to Point Titling Trust, the statutory trust that Point manages. App. 88, 125. Point Titling Trust recorded a deed of trust against the homeowners' property to protect its purchased right to the option. App. 90, § 1.5; App. 125. The deed of trust reiterates the contract's provision that the homeowners "shall not be obligated to repay any part of the Investment Amount." App. 128.

### B. The parties agree to arbitrate any and all disputes related to the contract.

The homeowners and Point agreed to arbitrate "any and all" claims arising out of the contract. App. 109, § 7.20.1 (emphasis omitted). The contract's arbitration agreement states:

> OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH POINT (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF POINT IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES (THE "**RULES**") OF, AND PURSUANT TO THE STATE LAW OF, THE

STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2.

*Id.*

The contract, including this arbitration agreement, is "binding on the Owner's Estate." App. 106, § 7.7. "[T]he executor, personal representative and other persons charged with the administration and distribution of the Property following the death of the Owner" are therefore bound to arbitrate any claims or disputes relating to the contract. App. 118.

### C. The property sells at a substantially depreciated value and Point takes a loss on its investment.

Following the contract's execution, the homeowners died, and Plaintiff Steven Muskal was appointed administrator of James Muskal's estate. App. 4, ¶ 1.

In September 2025, the estate sold the property for $2 million. App. 197.[2] The $2 million sale price reflects a roughly 28.6% decrease from the $2.8 million starting appraised value.

At that sale price, the value of Point's 34.5% ownership interest (once the estate repurchased the option in the sale) was $690,000. That amount is thousands of dollars less than the total option consideration of $705,180. Point's return under the Point Proceeds formula—the $690,000 value of the ownership interest minus the

[2] This Court may take judicial notice of the official affidavit reflecting this sale, which is publicly filed in the Maricopa County Recorder's Office. *See In re Sabino R.*, 198 Ariz. 424, 425, ¶ 4 (App. 2000).

$495,180 exercise payment—was thus $194,820. That is $15,180 *less* than Point's initial $210,000 investment payment.

## II. Procedural History

### A. The Muskal estate sues Point.

On July 15, 2025, Muskal, as the estate's administrator, sued Point in the Arizona Superior Court. App. 14. Muskal claimed that, by executing the contract, Point violated state and federal fraud and lending laws. App. 10-13.

In Muskal's view, Point's initial $210,000 investment payment was a loan, making the contract subject to TILA. App. 9.

TILA provides that "[n]o residential mortgage loan … may include terms which require arbitration … as the method for resolving any controversy or settling any claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1). To be a "residential mortgage loan," a transaction must extend "credit": "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 1602(f). Thus, to extend "credit," the contract must impose a "debt."

The thrust of Muskal's allegations was that Point faced little if any risk of losing money on the transaction. That is, in Muskal's view, it was unlikely that Point's ownership interest would ever be worth less than what it would pay to

purchase and exercise the option and substantially more likely that it would exceed $210,000.

Muskal alleged that "for Point to lose money on the transaction, the value of the Property would have to plummet 27% from its true starting fair market value" of $2.8 million. App. 6, ¶ 15. Muskal claimed that "the only time in history when housing prices declined to that exten[t] year over year was during the Great Recession housing crisis." App. 6, ¶ 16. The complaint also emphasized that "the Property's fair market value in 2054"—when the 30-year option period ends—"would need to be less than … $2,044,000 before Point fails to cover its initial investment of $210,000 and less than $1,435,304.35 for Point to receive nothing at all." App. 8, ¶ 26(a). In Muskal's telling, then, it was "extremely improbable" that "the future amount due to Point [would] be less than the initial investment amount." App. 12, ¶ 52(g). And that improbability, Muskal asserted, made the contract one for a loan of the initial $210,000 payment.

Relying on that premise, Muskal claimed that the contract was unconscionable and subject to rescission and violated both TILA and the Arizona Consumer Fraud Act. App. 10-13, ¶¶ 37-59.

### B. The trial court denies Point's motion to compel arbitration.

Point moved to enforce the parties' arbitration agreement and compel arbitration of Muskal's claims under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* App. 68.

Muskal refused to arbitrate. App. 142. He did not dispute that the arbitration agreement existed or that it bound him. Nor did Muskal dispute that his claims fell within the arbitration agreement's scope. His sole argument against arbitration was that the contract was a "residential mortgage loan" under TILA, and thus not subject to arbitration. *Id.*

After a hearing on Point's motion to compel arbitration, the Superior Court grappled with what it termed a "difficult question." App. 183. The trial court hesitantly concluded that the contract created a "functional debt" and "therefore fits in the TILA definition of a consumer credit transaction, which makes the agreement subject to TILA." *Id.* The court recognized that "the court of appeals and the Arizona Supreme Court might disagree" with its conclusion. App. 184.

The court then entered an unsigned minute order denying the motion to compel arbitration. App. 188-89. The minute order stated: "The Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply when the Court applies the language of the Act." App. 189.

Point's appeal followed. Because the Superior Court did not initially enter a signed order, this Court stayed the appeal to allow it to do so. Upon Point's motion, the Superior Court entered a signed order denying Point's motion to compel arbitration. App. 195-96. This Court has jurisdiction under A.R.S. § 12-2101.01(A)(1).

## STATEMENT OF THE ISSUE

Whether the trial court wrongly denied Point's motion to compel arbitration based on the incorrect view that the contract qualified as a "residential mortgage loan" under TILA.

## STANDARD OF REVIEW

This Court reviews the denial of a motion to compel arbitration de novo. *See Allstate Prop. & Cas. Ins. Co. v. Watts Water Techs., Inc.*, 244 Ariz. 253, 256, ¶ 9 (App. 2018).

## SUMMARY OF ARGUMENT

TILA's arbitration bar is narrow and only applies to "residential mortgage loan[s]." 15 U.S.C. § 1639c(e)(1). Outside that prohibition, the FAA applies in full force. *See* 9 U.S.C. § 2.

The FAA requires arbitration here, and the trial court wrongly decided otherwise. Point's contract with the homeowners is not a loan subject to TILA. That

contract did not extend "credit" because it did not create a "debt"—meaning an obligation to repay a particular sum advanced, often with interest.

Point did not issue the homeowners the initial payment with the obligation that they repay that sum, much less repay it with interest. To the contrary, the homeowners never had to repay that set sum or any amount linked to that initial payment. The contract therefore did not create a debt or extend credit. Instead, the contract falls within two categories that do not extend "credit" under TILA: it is both an option contract and an investment plan.

## ARGUMENT

### I. The arbitration agreement meets the prerequisites for enforcement under the Federal Arbitration Act.

The FAA requires state and federal courts to "enforce arbitration agreements according to their terms." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018); *see S. Cal. Edison Co. v. Peabody W. Coal Co.*, 194 Ariz. 47, 51, ¶ 13 (1999) (en banc) ("The FAA preempts state law and governs all written arbitration agreements involving interstate commerce, making such agreements enforceable in both federal and state courts."). The statute broadly provides that an arbitration agreement in "a contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If, despite an arbitration agreement, a party pursues

litigation in court, the FAA requires courts to compel the dispute to arbitration and stay the litigation pending the arbitration's resolution. *See id.* § 3.

The FAA advances a "liberal federal policy favoring arbitration agreements," and establishes "as a matter of federal law" that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The party opposing arbitration "bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). That includes having to show that "Congress intended to preclude arbitration." *Id.* at 92.

To determine "whether a dispute is subject to arbitration governed by the FAA, a court is limited to deciding whether an arbitration agreement exists and whether it encompasses the dispute." *United Behav. Health v. Maricopa Integrated Health Sys.*, 240 Ariz. 118, 126, ¶ 28 (2016). Muskal has raised no dispute over the valid formation of the contract or the arbitration agreement under state law. *See Gray v. GC Servs., LP*, 256 Ariz. 480, 484, ¶ 9 (App. 2023). Muskal's claims all fall within the scope of the arbitration agreement, which broadly encompasses "any and all controversies, claims, or disputes … arising out of, relating to, or resulting from" the contract. App. 109, § 7.20.1 (emphasis omitted); *see Gray*, 256 Ariz. at 484, ¶ 9. Each of Muskal's claims directly challenges the contract.

As a result, Muskal must show that Congress, through TILA, intended to preclude arbitration of his claims. *See Green Tree*, 531 U.S. at 91.

## II. TILA does not apply.

The Superior Court wrongly held that Muskal had carried his burden in avoiding arbitration by invoking TILA. This Court should reverse.

### A. TILA's bar applies only to contracts that extend "credit" by imposing a "debt."

TILA's text does not encompass contracts like Point's. TILA narrowly prohibits arbitrating disputes over "residential mortgage loan" transactions, and the contract here is not such a transaction. 15 U.S.C. § 1639c(e)(1).

TILA defines a "residential mortgage loan" to include a "consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling." *Id.* § 1602(dd)(5). To be a "consumer *credit* transaction," an agreement must extend "credit."

TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 1602(f). Thus, whether a transaction extends "credit" hinges on whether it creates a "debt." *See Hasan v. Chase Bank USA, N.A.*, 880 F.3d 1217, 1219 (10th Cir. 2018) ("[W]hen a creditor extends 'credit' to someone, the person receiving the 'credit' now has a debt

to the creditor," because "[t]he credit granted and the debt owed are two sides of the same transaction.").

TILA does not define "debt," so the term's "ordinary meaning" controls. *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). That ordinary meaning is clear: it requires a legal or contractual obligation to repay a specific sum of money. All relevant sources support this view.

Dictionaries define "debt" the same way. "Debt" is defined as money "owed" or "due." Debt, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1982); Debt, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976); Debt, BLACK'S LAW DICTIONARY (4th ed. 1968) ("[a] sum of money due by certain and express agreement"). And money loaned is "owed" if there is an obligation to repay it. Owe, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra*. Thus, a person incurs a debt when she takes on a binding commitment to repay a defined amount of money.

Case law further confirms this meaning. Courts have explained that "the plain meaning of 'credit transaction' contemplates an agreement by which the right of deferred payment is promised in exchange for some form of consideration." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1195 n.5 (7th Cir. 2021); *see Riethman v. Berry*, 287 F.3d 274, 277 (3d Cir. 2002) ("The hallmark of 'credit' under the [Equal Credit Opportunity Act] is the right of one party to make deferred

payment.”). And a loan permits a debtor to defer payment, but that payment is always eventually due to be repaid (and often with interest). *See* Loan, BLACK’S LAW DICTIONARY, *supra* (“[A]dvance of money with an absolute promise to repay”; “contract whereby one delivers money to another who agrees to return equivalent sum”; “payment of money by one to another to be repaid some future day.”). In short, a legal or contractual repayment obligation must exist.

Cases applying TILA further reflect this ordinary meaning of “debt.” In *American Express v. Koerner*, for example, the Supreme Court explained that credit-card companies extend “credit” to card users within TILA’s definition of “credit,” because “when the card is used, the creditor has allowed the cardholder ‘to defer payment of debt.’” 452 U.S. 233, 241 (1981). Of course, the card user must eventually repay the charged amount, plus any applicable interest, to the credit card company. Without that repayment obligation, the payment transaction would not be “credit.”

Likewise, a medical facility extended “credit” under TILA when it allowed a patient “to pay off the remaining deductible stemming from his surgery at the rate of $100 per month.” *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 200 (3d Cir. 2019). And a tax payment agreement stating that one party would pay another’s taxes “in exchange for installment repayments, interest, and fees” was also credit, as the agreement “deferred payment” of the tax obligation with

an obligation to eventually repay. *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 243 (4th Cir. 2019) (brackets omitted). These examples confirm that extending "credit" requires creating a "debt" in the form of a specific sum that the debtor must repay.

### B. The contract does not extend credit because it does not require repayment of a debt.

The homeowners' contract with Point did not create a debt and thus did not extend "credit." TILA therefore does not apply.

The homeowners had no obligation to repay the $210,000 option purchase price and indeed never did. Point paid the homeowners that amount to purchase an option to later purchase an ownership interest in the home. The homeowners' only obligation upon receiving that payment was to hold open the continuing offer to sell Point that ownership interest. If Point did exercise the option, the homeowners' only additional obligation would be to allow Point to share in the property's value. At no time was there any obligation to repay the $210,000.

Confirming this point, the monetary amount of Point's share upon the option's exercise had no link to the $210,000 payment. The Point Proceeds formula makes this clear. Under that formula, the amount Point receives is contingent on the property's value, not on the amount it initially paid the homeowners. App. 122. Thus, any eventual distribution of the home's value would not reflect a repaid debt—it would reflect only Point's and the homeowners' agreed division of ownership

interests in the property. Point would walk away with its 34.5% interest in the home. Meanwhile, the homeowners would retain the $210,000 payment, the additional exercise payment of $495,180, and the remaining 65.5% of the home's value. They had no obligation to repay the $210,000—or any other amount.

This lack of a repayment obligation is dispositive. The only court to have addressed a similar option contract under TILA correctly recognized this fact. In *Foster v. EquityKey Real Estate Investments, L.P.*, EquityKey made "a $196,000 'option payment'" for an option "to participate in 100% of the appreciation of [the] property, if any, for up to fifty years from the date of the agreement." No. 17-cv-67, 2017 WL 1862527, at *1 (N.D. Cal. May 9, 2017). The court held that this agreement was not one for "credit" under TILA. *See id.* at *4. Central to the court's reasoning was that the contract did not "guarantee that the payment received by [the homeowner] need ever be returned." *Id.* Instead, like the contract here, "[i]f EquityKey elect[ed] not to exercise its option," the homeowner would "not owe it any money." *Id.* There was also "no way to know for certain whether calling the option at the end of the 50-year term w[ould] be profitable for EquityKey." *Id.* At bottom, the agreement was not a loan under TILA because the homeowner "did not agree to 'repay absolutely' the option premium payment." *Id.*

The same conclusion should result here. The contract did not impose an obligation on the homeowners to repay the $210,000 sum they received.

Indeed, as this litigation progressed, the lack of a repayment obligation or guaranteed return on investment has played out in real time. Muskal sold the property for $2 million. At that price, the return to Point under the Point Proceeds formula was thousands of dollars *less* than the initial $210,000 payment. The 34.5% ownership interest was worth $690,000. Because Point had to make the $495,180 exercise payment to obtain that ownership interest, the Point Proceeds from the transaction amounted to only $194,820—well under $210,000. These facts vividly show that the homeowners never had any contractual obligation to repay Point the $210,000 it paid them. Point's return depended only on the property's value, which substantially depreciated in this case. The contract thus did not create a "debt" and did not extend "credit" under TILA.

**C. The contract is an option contract and an investment plan.**

Rather than qualify as a loan under TILA, the contract aligns with arrangements not subject to TILA's arbitration bar: option contracts and investment plans. As the Consumer Financial Protection Bureau's official staff commentary recognizes, both option contracts and investment plans are excluded from the definition of "credit." 12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(vii), (viii). Those exceptions are consistent with TILA's plain meaning, as neither arrangement extends "credit" or creates "debt." The commentary is thus persuasive authority worthy of this Court's deference. *See Gilliam v. Levine*, 955 F.3d 1117,

1121 (9th Cir. 2020) ("Courts defer to the CFPB's Official Staff Commentary to Regulation Z.").

To start, the contract has the "classic features of an option"; specifically, an option to purchase real estate. *Steiner v. Thexton*, 226 P.3d 359, 364 (Cal. 2010) (brackets omitted). An option to purchase real estate is "[a] contract by which a property owner agrees with another that the latter may buy the property at a fixed price within a specified time," and it includes "the right or privilege to buy property at the election of the purchaser." Option, BLACK'S LAW DICTIONARY (12th ed. 2024). An option contract's core feature is the optionee's (here, Point's) complete discretion to decline to exercise the option and accept the offer held open by the optionor (here, the homeowners). *See Steiner*, 226 P.3d at 364; *see also* Restatement (Second) of Contracts § 25 & cmt. a.

Option contracts are not loans governed by TILA, because they do not impose any repayment obligation. The optionor has no obligation to repay any sum; she must simply hold a continuing offer to sell open.

That scenario describes the contract here: the homeowners offered to sell Point a percentage ownership interest in their property "upon specified terms" and "agree[d], in view of the payment received, that [they would] hold the offer open" for the "fixed time" of 30 years, absent their own repurchase. *Steiner*, 226 P.3d at 364. Point "had the power to accept the offer" by paying the additional $495,180

exercise payment, but "was not obligated to do anything." *Id.* And the homeowner never had to repay any amount received. The contract is thus an option agreement that falls outside TILA's arbitration bar.

The contract's plain terms underscore this conclusion. The first provision describes the core of the transaction: "You agree to sell us an exclusive and irrevocable option (the 'Option') to purchase an undivided percentage interest of fee simple title ownership (the 'HEI Percentage') in and to the Property in exchange for our agreement to pay you the Investment Amount." App. 88, § 1.1 (emphasis omitted). The contract repeatedly confirms—four times—that Point has "the right, *but not the obligation*, to exercise the Option." App. 90, § 2.1; App. 92, § 2.2; App. 94, § 2.3; App. 103, § 6.2.1 (emphasis added). And the contract states that it "is intended to be and shall be treated for all purposes … as an option to purchase real property and not as a purchase, or joint venture." App. 105, § 7.4.

The contract also has the "typical" feature of an "option to purchase real estate": "payment of consideration for the option itself and then payment of the agreed-upon purchase price if the option is exercised." *Commonwealth v. Hometap Equity Partners, LLC*, No. 2584CV00469, 2025 WL 2468564, at *7 (Mass. Super. Ct. Aug. 21, 2025). The contract required two payments: first, a fixed payment for the option; second, a fixed payment to exercise that option. App. 88, § 1.1. This division reflects the contract's status as an option agreement, rather than a loan.

Multiple state legislatures have recognized that such option contracts do not traditionally qualify as "residential mortgage loans" by amending their lending laws to expressly regulate "shared appreciation agreements." Illinois law now defines a "shared appreciation agreement" to mean "a writing evidencing a transaction or any option, future, or any other derivative between a person and a consumer where the consumer receives money or any other item of value in exchange for an interest or future interest in a dwelling or residential real estate." Act of Aug. 9, 2024, No. 103-1015, 2024 Ill. Laws. It newly includes such agreements within the state-law definition of "residential mortgage loan." *Id.* Maryland, Connecticut, and Maine have enacted similar laws. *See* Act of May 8, 2023, ch. 568, 2023 Md. Laws; Public Act No. 25-115, 2025 Conn. Acts (Reg. Sess.); Public Act No. 21-138, 2021 Conn. Acts (Reg. Sess.); Act of Apr. 13, 2026, 2026 Me. Laws ch. 653. These state-law amendments reflect that TILA's "residential mortgage loan" provision does not, by its plain terms, include option contracts like Point's.

The contract also qualifies as an investment plan outside TILA's scope. Because the contract tied Point's potential proceeds (if any) to the property's future value, Point's initial payment functioned as an investment in the property, where Point "risk[ed] the loss of the capital advanced." 12 C.F.R. Pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii). If the home appreciated, Point would share in that

appreciation. If the home depreciated, Point could lose some or all of its investment (just as it did here).

The CFPB recognizes that such an investment plan, like an option contract, is not an extension of "credit" under TILA. *Id.* Rightly so, because there is no repayment obligation and thus no "debt." Instead, Point risks receiving nothing, or receiving far less than it paid the homeowners. At the same time, the homeowners retain the investment payment, as well as any additional exercise payment and their share in the home's value. That risk turned to reality in this very case. *See supra* at 20.

In sum, because the contract does not impose any repayment obligation, but simply allows Point to purchase an option and make an investment in the property, it does not qualify as a "loan" subject to TILA. And TILA's arbitration bar thus does not apply. The contract's arbitration provisions are fully enforceable.

**D. The trial court's contrary conclusion is wrong.**

In deciding otherwise, the trial court misread the contract and misapplied TILA.

The trial court held that the contract "fits in the TILA definition of a consumer credit transaction" because it creates "a *functional* debt." App. 183 (emphasis added). The court did not explain what it meant by "functional debt." Nor does that term appear in TILA. TILA refers only to "credit," which in turn requires imposing

a "debt." And a "debt," as detailed above, requires an obligation to repay a specific sum. The trial court never grappled with this definition or explained how the contract fit it (it does not).

As best Point can discern, the trial court simply accepted Muskal's argument that "[a]s a functional matter, [Point's] initial payment will always be paid back to Defendant, with significant additional charges." App. 146. But that assertion is wrong as a matter of both law and reality.

Again, TILA does not apply to "functional" debt—it applies to actual legal or contractual obligations to repay set amounts. No such obligation exists under the contract.

Nor does the contract "function" to "always … pa[y] back" that initial payment or any sum tethered to it. *Id.* Any proceeds Point might receive (if any) are contingent on the property's value and the parties' decision to repurchase or exercise the option. They do not depend on, or involve in any way, repayment of the $210,000 investment payment.

Indeed, unlike a loan, any benefit to Point is in no way "based on the amount of benefit received" by the homeowners. *McKay v. Ingleson*, 558 F.3d 888, 891 (9th Cir. 2009). The homeowners did not "sign an agreement with [Point] to repay the

money" they received—they agreed to allow Point the value of its ownership interest, minus the payment needed to exercise the option. *Id.*

Thus, the contract is not a loan. The initial payment is consideration for the option. It does not impose a debt—"functional" or otherwise—that must be or ever will be repaid. In this very case that amount was not repaid to Point, given the property's depreciation. *See supra* at 20.

In concluding otherwise, the trial court departed from TILA's plain text, asserting "TILA is a remedial statute and the Court interprets it liberally." App. 183. But such a rule of liberal construction is never a "license to read" additional words "into the statute." *Honeycutt v. United States*, 581 U.S. 443, 454 n.2 (2017).

TILA's role as a remedial statute cannot overcome its plain text. *See Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 237 (2004) (reversing a federal court of appeals decision that relied on the rule that "TILA must be liberally interpreted in favor of consumers"). That text requires a repayment obligation, and none exists here. By reading TILA to cover agreements like the one here and in *Foster*, where a party pays for an option to acquire an ownership interest in property, the trial court did more than undertake a "liberal" construction. It stretched TILA's text beyond what its plain meaning can bear. Its ruling should be reversed.

## CONCLUSION

For these reasons, this Court should reverse and remand with instructions that the case be sent to arbitration and be stayed pending the resolution of arbitration.

Dated: July 1, 2026

Respectfully submitted,

*/s/ C. Nicole Pelcic*
C. Nicole Pelcic
State Bar No. 29503
KLINEDINST PC
2701 East Camelback Road
Suite 150
Phoenix, AZ 85016
(602) 813-0000
npelcic@klinedinstlaw.com

Jonathan Y. Ellis
(*Pro Hac Vice admission pending*)
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

Kathryn M. Barber
(*Pro Hac Vice admission pending*)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 755-1227
kbarber@mcguirewoods.com

Erin L. Brown
(*Pro Hac Vice admission pending*)
MCGUIREWOODS LLP

50 North Laura Street
Suite 3300
Jacksonville, FL 32202
(904) 798-2622
ebrown@mcguirewoods.com