# Exhibit C

**2025 WL 2468564 (Mass.Super.) (Trial Order)**
Superior Court of Massachusetts.
Suffolk County

COMMONWEALTH of Massachusetts,
v.
HOMETAP EQUITY PARTNERS, LLC and Hometap Management Holdings, LLC.

No. 2584CV00469-BLS2.
August 21, 2025.

***1** CIVIL ACTION

**Memorandum of Decision and Order on Defendants' Motion to Dismiss**

Debra A. Squires-Lee, Judge.

The Commonwealth of Massachusetts has brought five claims of unfair and deceptive acts and practices under G. L. c. 93A, § 2 against Hometap Equity Partners, LLC and Hometap Management Holdings, LLC (together Hometap) in connection with Hometap's product, the Home Equity Investment (HEI). The Commonwealth alleges the HEI is an illegal mortgage loan (Count I), violates the criminal usury statute (Count II), has been marketed deceptively (Count III), was unaccompanied by required state and federal loan disclosures (Count IV), and is an unfair, oppressive or otherwise unconscionable product (Count V). The Commonwealth seeks a declaration that all HEI contracts with Massachusetts consumers are unlawful mortgage loans and subject to the criminal usury statute, a permanent injunction barring further violations of G. L. c. 93A, reformation of the HEIs in the Commonwealth, an order requiring Hometap to pay restitution, and an award of civil penalties and costs.

Hometap moves to dismiss the Complaint pursuant to Mass. R. Civ. P. 12(b)(6). Hometap argues that three of the Commonwealth's counts are based on the incorrect premise that the HEI is a loan when, according to Hometap, the HEI is an option contract (Counts I, II, and IV). As to the remaining counts, Hometap argues the Commonwealth has not alleged facts that plausibly suggest the HEI is unfair or unconscionable (Count V) or that the HEIs have been marketed deceptively (Count III).

After hearing and review, and for the reasons stated below the Motion to Dismiss is **DENIED.**

## BACKGROUND

I recite the relevant facts asserted in the Complaint, "taking them as true for purposes of evaluating the motion to dismiss." Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). Although, in general, I do not accept as true conclusory allegations or legal conclusions, see Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008), because the Commonwealth proceeds in the public interest and pursuant to G. L. c. 93A, § 4, I include a brief description of Massachusetts regulations governing various mortgage products as detailed in the Complaint. Further, I consider and address the exhibits attached to the Complaint. See Polay v. McMahon, 468 Mass. 379, 381 n.3 (2014), and cases cited. Lastly, because the Complaint is lengthy and complex, I provide only an overview of the factual allegations regarding the HEI product and Hometap's conduct. Some facts are reserved for discussion below.

### A. Reverse and Subprime Mortgages

In the 1980s and 1990s a new form of home mortgage, reverse mortgages, began to proliferate. A reverse mortgage is typically marketed to homeowners with equity but insufficient assets to cover expenses. The lender provides cash in exchange for an interest in the homeowner's equity. The borrower makes no monthly payments because the lender recoups its investment through a voluntary or involuntary sale of the home. This differs from a traditional mortgage which the borrower pays monthly and the home serves as collateral for the risk of default. In a traditional mortgage, a homeowner's debt decreases with monthly payments at the same time the homeowner's equity increases. In a reverse mortgage, the homeowner's debt increases over the life of the loan which is called negative amortization.

***2** Reverse mortgages are almost always non-recourse meaning the lender cannot recover any deficiency from the homeowner if the loan balance exceeds the value of the property. Lenders manage the risk of such non-recourse loans by limiting the size of loans or their duration, or pooling actuarial risk among borrowers.

To protect elderly homeowners, Massachusetts regulations provide that reverse mortgages mature only upon death, default, a sale of the property or when the borrower moves out of the property. In addition, reverse mortgages are limited to owner-occupiers who are over age 60, who receive counseling, and are permitted a seven day rescission period. Reverse mortgages that are federally insured must also comply with federal regulations including limits on the amount of origination fees and closings costs.

In the late 1990s and early 2000s, subprime mortgage lending, another non-traditional form of mortgage, expanded. These mortgage products were marketed nationwide to people with limited access to mainstream loans, often by nonbank entities to avoid oversight. Loans were offered against the value of the home with no regard to or investigation into the borrower's ability to pay the loan. These loans were called "low doc" or "no doc" loans. The mortgages were often sold onto the secondary mortgage market to offload risk. Subprime lenders would also repeatedly refinance loans in short periods of time to generate fees. Subprime loans also often included the following features: negative amortization, interest-only periods, higher rates than disclosed initially, and balloon payments requiring repayment of the principal in a single payment at the end of the loan.

Subprime mortgages led to a mortgage crisis with millions of homeowners unable to pay their mortgages and ultimately losing their homes in a wave of foreclosures. The crisis ultimately led to a nationwide recession.

The Commonwealth enacted regulations to limit subprime loan practices including limiting high cost loans, limiting adjustable-rate subprime loans, allowing borrowers to cure defaults, and permitting borrowers to modify certain loans.

## B. Hometap's HEI

Hometap, founded in 2018, originates, advertises and markets HEIs in Massachusetts. The Commonwealth alleges that HEIs include four key features: an upfront cash payment without underwriting to assess income, jobs or other assets; acquisition of a percentage interest in the homeowner's equity at two times the value of the cash payment; a return that can and does exceed a twenty percent annual interest rate; and a ten-year balloon payment.

*HEI Structure*. Hometap uses a form Option Purchase Agreement (Option Agreement). It provides that the homeowners sell Hometap an "exclusive and irrevocable option to acquire an undivided percentage interest of a fee simple title ownership" in the borrower's property (Option) in exchange for an "Investment Amount" which is a cash payment less fees and costs, some of which Hometap retains. The percentage equity option in the premises that Hometap holds is two times the amount the Investment Amount (Hometap Percentage). [1] When a homeowner signs the Option Agreement, the value of the Hometap Percentage exceeds the Investment Amount. Thus, as described in the Complaint, with an Investment Amount of $100,000, the homeowner would receive approximately $97,000 and Hometap would hold the option to purchase home equity of $200,000.

1 The Commonwealth alleges Hometap does not adequately disclose the 2x delta between the Investment Amount and the Hometap Percentage.

***3** The homeowner must repay the Investment Amount (settle) within ten years, or earlier if title is transferred or other events of default occur. The value of Hometap's share in the property (Hometap Share) at settlement is calculated by multiplying the Hometap Percentage by the property's value when the option is exercised, determined by an appraisal. According to the Commonwealth, Hometap's profit is driven by equity devaluation and not home value appreciation because the homeowner must pay Hometap twice the Investment Amount before factoring in appreciation. “Thus, it is Hometap's devaluation of homeowner's equity rather than home appreciation that is truly responsible for Hometap's profit,” to the detriment of the homeowner.

The Option Agreement caps the annualized rate of return at twenty percent of the Investment Amount by limiting the total value of the Hometap Share to an amount equal to that annualized rate of return (Hometap Cap). According to the Commonwealth, the Hometap Cap “functions as a compounding interest rate” and is applied against the total Investment Amount, including fees that Hometap retained. Thus, HEIs that settle at the Hometap Cap “uniformly exceed a 20% simple interest rate on the amount advanced.”

Hometap protects its “contractual and economic interest in the Option” through a Mortgage and Security Agreement recorded when the Option Agreement is executed. The Mortgage provides that, upon an event of default, Hometap may take possession of the property without any foreclosure action and have the right to sell the property at a nonjudicial foreclosure sale.

Homeowners can settle before the ten-year window. In addition, property values can decline. But even in these scenarios, the homeowner's equity is still devalued - at a rate of 33% rather than 50%. Hometap ensures it will be repaid the Investment Amount because the average home “would need a realized decline of 25% before Hometap would lose its first dollar of principal.” Thus, “regardless of what happens to property values, homeowners will pay back vastly more than they receive from Hometap” and Hometap's principal would never be at risk. Included within the Complaint is an analysis of the anticipated repayment amounts and effective interest rates based on a $100,000 Investment Amount, using various assumptions in the change in home value showing that, even in the worst real estate market, Hometap would earn a six percent return on its Investment Amount. Thus, Hometap is not investing in equity because its investment is never meaningfully at risk.

*Marketing and Sales.* Until at least the spring of 2024, Hometap claimed on its website that it would “invest alongside homeowners” and would do so “without any … interest over the life of the investment,” which would lead homeowners to believe that only home appreciation drives Hometap's returns. To its investors, however, Hometap, markets the HEI as providing downside protection “even during times of declining home values” and that it includes “an adequate cushion” to minimize potential losses. The cushion is, in fact; equity devaluation which insures Hometap against any risk of loss of its investment. Such advertising would lead an average homeowner

to believe that Hometap's investment is equal to its equity option and not twice the value of its investment.

Hometap employs sales representatives who use scripts to explain the HEI to homeowners. At times, these representatives explain to homeowners that Hometap would share in any loss if the property were to depreciate. The representatives also imply they are neutral "guides," not employed to convince the homeowner to take out an HEI when they are, in fact, employed by Hometap to sell HEIs. They also do not explain that the homeowner may be eligible for less costly loans or that the HEI might make it more difficult to refinance in the future. Nor are homeowners provided the actual cost of the HEI - such as by including an Annual Percentage Rate or effective interest in various scenarios - such that homeowners can comparison shop. "The representations in Hometap's Marketing and made by its Investment Managers had, on net, a tendency to obscure the true cost of the Hometap HEI and the reality that the Hometap HEI is dramatically more costly to homeowners than other mainstream mortgage products or that Hometap's marketing materials and sales scripts communicated."

***4** *Subsequent HEIs.* Hometap offers homeowners an option to pay off the first HEI with a new larger HEI to obtain additional cash, initially called a "double tap" and later an "investment increase." In those circumstances, Hometap charges the homeowner the same fees charged earlier. Changing the name from "double tap" to "investment increase" falsely implies the new HEI is only an increase and thus, the homeowner will not have to pay all the fees and costs. The Commonwealth described a scenario where a homeowner entered into an HEI for $227,950, and less than a year later entered into a second for an additional $29,000. Hometap charged and the homeowner paid nearly $4,000 in fees plus a 23.9% effective interest rate on the first HEI. Hometap, as a result, owned the right to 50% of the value of the homeowner's $1 million home having paid the homeowner only $257,000 after fees.[2] Further, Hometap did not always disclose it - would charge additional fees.

2 The Complaint alleges another homeowner entered into a double tap that resulted in Hometap owning fifty percent of the homeowner's home value even though it paid less than twenty percent of the value.

*Third Party Costs.* Hometap misleads homeowners in connection with alleged third party costs for appraisals. First, because Hometap refers to the costs as "third-party" costs, the homeowners believe the amount is paid to a third party whereas Hometap retains the vast majority of the fee. Second, although Hometap charges $299 for a virtual appraisal, the appraisal it conducts costs less than $100. The same is true with respect to the $599 Hometap charges for a traditional, physical appraisal -Hometap keeps most of the fee. Hometap thus profits, significantly, from both types of appraisals. Further, Hometap requires a formal appraisal when the HEI is paid off, but not when

the HEI is generated. Because physical appraisals result in higher valuations, Hometap receives a higher profit if it does not use the same valuation at the beginning and end of the HEI.

Renovation Adjustments. Hometap markets the HEIs as a financing source for renovations and offers a "renovation adjustment" to allay concerns homeowners may have about giving Hometap a percentage of equity prior to a renovation. For renovations of at least $25,000, the renovation adjustment is advertised as an appraiser determined value of the property post renovation compared to an appraisal without the renovation. But Hometap does not disclose that the amount of the adjustment is limited to the lesser of the amount actually spent or the difference. Thus, if a homeowner spent $50,000 on a renovation resulting in $100,000 in increased value the homeowner would be entitled to only the $50,000. The restriction is disclosed only in the lengthy contract which is provided only after the application and underwriting is complete.

Targeted Homeowners. "A substantial fraction of Hometap's customers are homeowners facing financial vulnerability such as lack of income, high debts, or high expenses." That is because Hometap markets HEIs' to homeowners who cannot qualify for a traditional loan, retirees, and the unemployed. Hometap also markets to consumers seeking to pay off debt and has persuaded customers to use higher cost HEI's to pay off lower cost unsecured debt. Hometap also markets HEIs' to homeowners who had obtained COVID forbearances without disclosing other, lower cost options.

Lack of Underwriting. Hometap does not determine whether a homeowner can repay the HEI using income or assets and makes no assessment of the homeowner's ability to pay taxes, insurance, maintenance expenses, or existing mortgage payments, "even though failure to make these payments" triggers the homeowner's obligation to repay the HEI. The only evaluation Hometap conducts is whether the homeowner can repay the HEI through a sale or refinancing of the property. The lack of assessments result in the homeowner's ability to get money quickly, and without documentation, and may lead them to choose an HEI over loans that cost less and have safeguards.

***5** Hometap can only provide cash quickly if the HEI product is not governed by the regulations put in place with respect to reverse and subprime mortgages. Thus, in marketing the HEI, Hometap neither insures that it provides money only to homeowners with the ability to repay, as with traditional mortgages, nor complies with the strict regulatory limits on reverse mortgages.

Structural Unfairness. *A* significant percentage of Hometap customers will not be able to afford the purchase repayment when due after ten years through income, assets or a refinancing because their income and credit history will not support a loan large enough to pay off an original mortgage plus the HEI. In that event, Hometap can take joint ownership and exercise its right to foreclose or sell the property.

## DISCUSSION

In evaluating a motion brought under Mass. R. Civ. P. 12(b)(6), I "look beyond the conclusory allegations in the complaint," Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded "factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief." Iannacchino, 451 Mass. at 636 (quotations omitted). In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true "such inferences as may be drawn [from those facts] in the plaintiff's favor." Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). Applying this standard, I. conclude that the Commonwealth has alleged sufficient facts to state plausible entitlements to relief on all counts.

### I. Counts I, II, and IV

Counts I, II, and IV all allege violations of G. L. c. 93A based on the illegal provision of unlawful mortgage loans. Count I alleges that HEIs are illegal reverse mortgage and high-cost mortgage home loans that do not comply with Massachusetts law. Count II alleges the HEIs are usurious loans that violate G. L. c. 271, § 49. And Count IV alleges deceptive marketing related to the provision of loans. Hometap argues that Counts I, II, and IV must be dismissed because they are all based on the incorrect premise that the HEI is a loan.

The parties' respective positions center on whether the HEI is an option or a loan. Hometap argues the HEI is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment. [3] Hometap argues that options to compel the conveyance of real property are common and generally permissible. No one disagrees. See Certified Corp. v. GTE Prods. Corp., 392 Mass. 821, 824 (1984) ("An option to purchase property which binds the successors and assigns of each party, and which includes mutual covenants involving the property, creates a contingent equitable interest in the option holder."). With that understanding, Hometap argues the HEIs are options because Hometap pays homeowners for the right to obtain a percentage possessory interest in the homeowner's property in the future upon the occurrence of various contingencies, including the homeowner's failure to repay (settle) the option payment (Investment Amount) within ten years.

3 Hometap asserts that it has offered HEIs in the Commonwealth for years; the Massachusetts Division of Banks (DOB) publicly recognizes that HEIs are critically distinct from loans and has. indicated that it does not have the legislative authority to regulate such shared equity products; state legislators have recognized the HEI product is not a loan; and

that bills are pending before the legislature that would allow the creation of a-regulatory framework for products such as HEIs. Hometap also asserts that prior to offering HEIs in the Commonwealth, Hometap met with both the DOB and the Attorney General's Office (AGO) and neither expressed concern. Thus, the AGO "sat on its hands for years" permitting Hometap to invest significant sums in the Commonwealth prior to determining the product was unfair.

Against that backdrop, Hometap argues that the AGO's pursuit of G. L. 93A claims in this case "short-circuits" and "contravenes" the legislative process and violates Hometap's due process rights. Those issues, however, are not squarely presented before me on the instant motion. And, to the extent I accept Hometap's assertions without converting the motion to one for Summary Judgement, see Mass. R. Civ. P. 12(b), the argument that the AGO is ahead of the DOB or the legislature in taking steps to protect consumers from a product the AGO believes, and alleges is unfair and unconscionable, or has perhaps reached a different conclusion as to the fairness of HEIs after they were offered to Massachusetts consumers is not a basis on which to grant a Motion to Dismiss. Today, I evaluate only whether the Commonwealth has stated claims for relief ultimately subject to judicial review.

***6** The Commonwealth responds that the HEIs are merely disguised loans, and that the nomenclature does not control, because Hometap delivers money with the expectation that it will be repaid via settlement or through a forced sale of the property. See Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 746 (1980) (defining a "loan" as "(d)elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it, with or without interest."), quoting Black's Law Dictionary 844 (5th ed. 1979).

Assuming the facts asserted in the Complaint are true, as I must, the Commonwealth has sufficiently alleged that HEIs are, in substance, loans. The Commonwealth alleges that Hometap provides money to homeowners with a requirement that it be repaid and that the HEI structure ensures there is *no substantial risk* that Hometap will lose its principal. [4] The money is either repaid in ten years, with a substantial increase, which the Commonwealth alleges constitutes interest, or Hometap exercises its option and its right to foreclose or force a sale. The Complaint also alleges that Hometap explicitly markets its products to homeowners in need of cash *in the short term* who will, therefore, be unlikely to be able to settle in ten years. And, neither the homeowner nor Hometap anticipate that Hometap will actually retain a possessory-interest in the property. Put elsewise, Hometap never intended to be a joint equity owner with any homeowner. Those allegations make the HEI - in substance - more akin to a loan than an option to purchase real estate. [5] See In re J.G. Wentworth Originations, LLC, No. 17-2188-C, 2017 WL 3573537, at *1 (Mass. Super. Aug. 10, 2017) (Gordon, J.) (structured sale of personal injury payments at a 34.2% discount "is in function and economic substance—if not nominally in form—a loan" subject to usury law).

4 Hometap's insistence that the *contract* does not require repayment is simply another way of saying the loan is non-recourse because repayment would be required if the homeowner wished to continue to live in and own the property after ten years. See *infra.*

5 The possibility that Hometap may recover less than its investment amount may be provable. But on a Rule 12(b)(6) motion I must accept as true the Commonwealth's factual allegations that the equity devaluation inherent in the HEI's structure makes that possibility illusory because the property would have to decrease by more than 25% for that eventuality to occur.

That the HEIs are non-recourse does not necessarily mean they are not loans as a matter of law. See In re Stone St. Cap., LLC, No. NOCV2012-01891, 2013 WL 3341052, at *3 (Mass. Super. May 10, 2013) (Salinger, J.) ("A loan of money made on a non-recourse basis - meaning that the borrower is not liable for repaying the lender and that the lender instead must rely on some collateral, other assets, or third-party obligation - is still a loan."), citing Commissioner of Internal Revenue v. Tufts, 461 U.S. 300, 313 (1983) ("a nonrecourse loan should be treated as a true loan" for purposes of applying Internal Revenue Code). See also G. L. c. 167E, § 7(h) (defining "non-recourse reverse mortgage loan" as "a reverse mortgage loan which limits the lender's recovery solely to the value of the property at the time the loan becomes due and payable").

Nor does labelling the transaction and operative agreement as an "option" control. It is the substance of the transaction that governs not the labels. See Singhal v. Unison Agreement Corp., No. 22-60656-CIV, 2023 WL 2734230, at *5 (S.D. Fla. Mar. 31, 2023) ("The law is clear that the substance of the transaction rather than the form is examined to determine whether the transaction should be considered a loan."). Indeed, more than a century ago, the Supreme Judicial Court (SJC) considered whether the transaction at issue - nominally a real estate purchase with an option to repurchase -was a real purchase or a "conveyance received by the defendants as security for a loan made by them to the plaintiff[.]" Southwick v. Bigelow, 237 Mass. 299, 304 (1921). Based on a master's factual findings that the parties "contemplated the payment within a year of the $12,000 advanced by the defendants, and that the deed and agreement were given as security therefor," the SJC held the purported sale was "not one in reality." Id. at 305. Rather, the transaction constituted a loan with a mortgage. Id. Thus, Southwick teaches two things - the substance and not the form controls - and the determination of the true nature of a transaction like the one at issue here is a question of fact. Id. Accord Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 152-153 (1920) (option to purchase real estate does not create an interest in real estate).

***7** The Commonwealth also is correct that a typical option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised. See, e.g., Thacher v. Weston, 197 Mass. 143, 146 (1908) (option contract provided that, in consideration of $25, plaintiff held option to purchase real property for

Com. v. Hometap Equity Partners, LLC, 2025 WL 2468564 (2025)

$10,000); FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, No. 1881CV00304-B, 2021 WL 2584131, at *2 (Mass. Super. June 16, 2021) (Salinger, J.), aff'd in part rev'd in part on other grounds, 489 Mass. 702 (2022) (option contract for land on which to build a casino included monthly payments of $100,000 "in exchange for acquiring and maintaining the right, but not any obligation, to buy the property for *$75* million" if option holder was awarded a casino license) Here, the Commonwealth alleges that all the value for the percentage possessory interest in the real property is paid as consideration for the alleged option and not when the option is exercised. As noted, it also alleges that the mortgage does not secure the option, as Hometap argues, but repayment because Hometap "has no intention of becoming a joint owner" of any homeowner's property. Those alleged facts would support a conclusion that the arrangement is not a true option but a loan.

At the end of the day, the Commonwealth's allegations, if true - that Hometap pays money to homeowners who are subject to foreclosure and a forced sale if they fail to repay Hometap approximately two times Hometap's investment - would support the conclusion that the transaction at issue is not an option but a loan. At this stage of the litigation, it is premature to conclude one way or the other, but the Commonwealth has alleged facts which plausibly suggest the HEIs are loans and thus violate G. L. c. 93A because they are illegal mortgage loans (Count I), violate the criminal usury statute (Count II), and violate required state and federal loan disclosures (Count IV).

Hometap's other arguments are not persuasive at this stage of the litigation. First, Hometap relies on In re Yang, No. 23-00075-RLM-11, 2023 WL 7104764, at *1 (Bankr. S.D. Ind. Oct. 23, 2023) for the proposition that a "home equity sharing agreement" in which a company paid cash to acquire an option for a future interest in real property was an option contract. Again, there is no dispute that real estate option contracts can be valid. Indeed, In re Yang involved a more traditional option contract, as discussed above, where the company paid "paid $54,250.00 for the future right to purchase a 70.00% interest in the property for *an additional payment of* $157,325.00." Id. (emphasis added). There, unlike here, most of the consideration for the acquisition of the property interest (three times the option amount) was paid upon exercise of the option.

Hometap argues next that its return on investment is not interest because it is not a charge calculated as a product of principal, interest, and length of loan. But additional compensation to a lender need not be calculated in any particular way to constitute interest. "The word interest in its usual sense is the compensation fixed by the parties or allowed by law for the use of money or as damages for its detention." Begelfer v. Najarian, 381 Mass. 177, 181 (1980), citing Hayes v. Commissioner of Corps. & Taxation, 261 Mass. 134, 136 (1927). See G. L. c. 271, § 49(a) (defining "interest or expenses" for purposes of criminal usury to include "all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan").

Next, Hometap's reliance on Foster v. Equitykey Real Est. Invs. L.P., No. 17-CV-00067-HRL, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017) does not require dismissal. The option at issue there was a payment of "$196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000." Id. at *3. While recognizing that the intent of the parties is "an important factor in determining whether a loan was created," the court held the payment was not a loan but an option because there was "no guarantee that the payment received by Mr. Foster need ever be returned." Id. at *4. The differences are clear. In Foster, return of any portion of the money was entirely contingent on an increase the property appreciating in value. Here, the Commonwealth has alleged that the HEI's structure ensures a return to Hometap regardless of home appreciation because of the functional equity devaluation. For the same reason, Hometap's reliance on the comments to 12 Code. Fed. Regs. Part 1026 does not persuade me that dismissal is appropriate. Those comments note that the Federal Truth in Lending Act (TILA) does not apply to option contracts in which the party advancing money to a homeowner risks the loss of the capital advance. See 12 Code Fed. Regs. § 226, Supplement I, Subpart A, 2(a)(14)(vii) (TILA does not apply to "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced."). Here, as oft noted already, the Commonwealth alleges *as a matter of fact* that Hometap risks no such loss. The truth of that assertion will be tested in this case but is sufficient to avoid dismissal.

***8** Finally, Hometap argues that Count I must be dismissed because the Commonwealth alleges both that the HEI is an unlawful reverse mortgage that fails to comply with G. L. c. 167E, §§ 7, 7A, and a "high cost mortgage loan" as defined by G. L. c. 183C, § 2, and "no product can be both a reverse mortgage and a high cost home mortgage loan." The Commonwealth responds that it has alleged facts which would support the conclusion that HEIs are unlawful reverse mortgages. I agree. The Commonwealth alleges that the HEI is a non-recourse cash payment, secured by a mortgage, and any shared appreciation, principal, or interest are due only upon certain circumstances or at the end of a fixed term and that Hometap did not comply with the regulations governing such loans. (See Com. Mem. at 12-13). The Commonwealth also responds that it has alleged that the HEI is a high cost loan under G. L. c. 183C, § 2. I agree as well. [6] Based on the facts in the Complaint, the Commonwealth has alleged a loan secured by a homeowner's principal dwelling with an annual percentage rate that will exceed nine percent.

6 A plaintiff may plead alternative and overlapping theories of liability and any redundancy, if it exists, is more appropriately addressed on a full record via a motion in limine or pursuant to Rule *56.* See Massachusetts Port Auth. v. Turo, Inc., No. 1984CV01773BLS1, 2020 WL 2617169, at *4 (Mass. Super. Apr. 14, 2020) (Green, J.).

For all the above reasons, the Motion to Dismiss Counts I, II, and IV must be **DENIED.**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## II. Count III

Count III alleges deceptive marketing in connection with the HEI. The Commonwealth alleges that Hometap's marketing and sales communications would lead consumer to believe that Hometap's returns stem from the Hometap fee and from home price appreciation when, in actuality, Hometap's return comes from devaluing the homeowner's equity and purchasing it at below market value. In support of its motion, Hometap argues that the Hometap marketing graphic included in the Complaint discloses all the facts from which a reasonable consumer could understand that, at settlement, for a $100,000 payment, Hometap would be entitled to fifteen to twenty percent of the home's value which, in the footnote, is disclosed as home worth $1 million. Further, Hometap argues that the Option Agreement and Investment Term Sheet fully disclose the structure of the HEI and explain in detail how the Hometap Share would be calculated. As a matter of law, then, Hometap argues the marketing could not be deceptive.

This is a closer question. Homeowners are entitled to enter contracts of their choosing - so long as statutorily and regulatorily compliant - and are assumed to have read and understood the contracts and other material provided to them. However, marketing is deceptive if it "directly, *or by implication,* or by failure to adequately disclose additional relevant information, has the capacity *or tendency* or effect of deceiving buyers or prospective buyers in any material respect." 940 Code Mass. Regs. § 3.05(1) (emphasis added). Thus, advertising need not be "totally false in order to be deemed deceptive in the context of G. L. c. 93A.... The criticized advertising may consist of a half-truth, or even may be true as a literal matter, but still create an *over-all misleading impression* through failure to disclose material information." Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 320 (2018), quoting Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394-395 (2004) (emphasis added). Here, the ultimate price of the HEI is certainly material, and the Commonwealth has alleged that Hometap's marketing would mislead an objective homeowner as to the ultimate price he or she would have to pay or face foreclosure or a forced sale. Hometap argues that the Commonwealth's other alleged misleading material - related to third party costs, successive HEIs, and the renovation adjustment - are insufficient either because the disclosures or lack of disclosures were not material or because all were disclosed.

***9** After careful review of the Complaint the questions of deception and causation are ones that must be developed in discovery, as the "analysis of what constitutes an unfair or deceptive act or practice requires a case-by-case analysis … and is neither dependent on traditional concepts nor limited by preexisting rights or remedies." Exxon Mobil Corp., 479 Mass. at 316, citing Kattar v. Demoulas, 433 Mass. 1, 14 (2000), and Travis v. McDonald, 397 Mass. 230, 232 (1986). See Nei v. Burley, 388 Mass. 307, 313 (1983) ("This flexible set of guidelines as to what

should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms 'unfair and deceptive' to grow and change with the times.”).[7]

7 With respect to the allegations concerning Hometap's sales representatives, although puffery and statements of opinion will not support a G. L. 93A claim, see von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497 (2019), the Commonwealth has alleged more than mere puffery, including failures to disclose meaningful information. Reliance and causation must await resolution at a later stage.

For all the above reasons, the Motion to Dismiss Count III must be **DENIED.**

### III. Count V

Count V alleges that the HEI is an unfair, oppressive or otherwise unconscionable product. The claim is based primarily on the structure, as described above, and the allegation that Hometap markets to financially vulnerable consumers who are in debt and cannot qualify for traditional loans, without any investigation regarding whether those homeowners can settle the HEI. The Commonwealth asserts that conduct - whether or not an HEI is a loan - falls within the penumbra of unfairness protected by Chapter 93A.

Hometap argues that the Commonwealth cannot rely on mortgage lending regulations or the usury statute to allege unfairness because the HEIs cannot and should not be measured against regulations that govern loans. According to Hometap, it is not “logical to hold an equity product to the cost limitations of debt products because equity costs more than debt in the market because the equity investor takes on more risk” and “applying the usury limitation to an equity-based product is novel.” (Hometap Mem. at 16). I am not persuaded.

Chapter 93A, although more than a half a century old at this point, remains “a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.” Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 822 (2014), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). Further, “whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law.” H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (quotations and citations omitted). “To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury

to consumers or other businesses' " Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 587 (2024), quoting, H1 Lincoln, Inc. v. South Washington St.. LLC, 489 Mass. 1, 14 (2022).

It is not *inappropriate* to measure the HEI against statutes and regulations protecting homeowner mortgagees or other consumer borrowers. In Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 742 (2008), the Court rejected the argument that the defendant did not violate any established concept of unfairness when it originated its loans because "new rules or standards for defining what is unfair" could not be applied retroactively. The Court reiterated that Chapter 93A "creates *new* substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute," and that the concept of unfairness is not frozen in time because "[t]here is no limit to human inventiveness in this field.' " Id., quoting Kattar v. Demoulas, 433 Mass. 1, 13 (2000). Given G. L. c. 93A's flexibility, "[w]hat is significant is the particular circumstances and context in which the term is applied." Fremont, 452 Mass. at 743.

***10** Here, Hometap concedes that it created a new option for homeowners seeking to access their home's equity. It also concedes that the product is currently unregulated.[8] Therefore, it is not impermissible when considering whether the HEI is unfair or oppressive to consider the guardrails that are in place to protect homeowners who seek to access their equity through traditional or reverse mortgages, as well as the harms those provisions seek to prevent and remedy.

8 That bills may be "pending" is of no import in connection with a motion to dismiss for failure to state a claim.

The Commonwealth alleges that the HEI is unconscionably expensive because it provides Hometap a right to a home equity share worth more than twice what it paid the homeowner.[9] It alleges HEI features akin to those found to violate G. L. 93A in Fremont namely the failure to consider the homeowner's ability to repay or settle without losing their home, a balloon payment after ten years, and deliberate marketing to individuals with high debt and low credit, which make it highly likely that homeowners were/are doomed to "default" at the ten-year term.[10] Cf. Fremont 452 Mass. at 743. Characterized as debt or equity, the Commonwealth alleges that Hometap enters into contracts with homeowners knowing that the homeowners will not be able to satisfy their obligation to "settle" up with Hometap and will, therefore, lose their homes. Cf. Drakopoulos v. U.S. Bank Nat. Ass'n, 465 Mass. *775,* 786 (2013) (Chapter 93A "prohibits the origination of a home mortgage loan that the lender should recognize at the outset [ ] the borrower is not likely to be able to repay"). Those allegations support the claim that the HEI violates Chapter 93A.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

9 I do not view this argument as an attempt to amend the complaint where the factual allegations regarding the alleged excessive cost of the product are contained within the Complaint.

10 It is immaterial that some of Hometap's customers had better credit ratings or sought funds for purposes other than to pay off high interest, unsecured consumer debt.

Finally, whether the AGO will establish a right to recover penalties, costs or attorney's fees by establishing that Hometap knew or should have known that the HEI violated G. L. c. 93A cannot be decided at this stage.

**ORDER**

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint is **DENIED.**

<<signature>>

Debra A. Squires/Lee

Justice of the Superior Court

August 21, 2025

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1862527
Only the Westlaw citation
is currently available.
United States District Court, N.D. California.

Aaron FOSTER, Plaintiff,
v.
EQUITYKEY REAL ESTATE INVESTMENTS L.P., Defendant.

Case No. 17-cv-00067-HRL
|
Signed 05/09/2017

**Attorneys and Law Firms**

Pamela Dawn Simmons, William Joseph Purdy, III, Law Office of Simmons & Purdy, Soquel, CA, Daniel Joseph Mulligan, Jenkins, Mulligan & Gabriel , LLP, San Diego, CA, for Plaintiff.

Christopher Lynn Frost, Sarah Fleisig Powers, Eisner Jaffe, APC, Beverly Hills, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Re: Dkt. No. 8

HOWARD R. LLOYD, United States Magistrate Judge

***1** Plaintiff Aaron Foster ("Plaintiff"), as an individual and as Trustee of the Michael P. Foster Trust, sues defendant EquityKey Real Estate Investments L.P. ("EquityKey"). The complaint includes seven claims related to an agreement concerning real property between EquityKey and Plaintiff's father, Michael Foster ("Mr. Foster"), from whom Plaintiff inherited his interest in the real property at issue in this action. Dkt. No. 1, Ex. A. EquityKey moves to dismiss all of Plaintiff's claims on the grounds that they are time-barred and fail to state a claim upon which relief may be granted. Dkt. No. 8. For the reasons explained below, the court grants the motion to dismiss.

## BACKGROUND

Plaintiff alleges the following facts. In 2010, Mr. Foster, then in his early seventies and "still competent," was living alone at his residence at 28 Pennsylvania Avenue, Los Gatos, CA ("the property"). Dkt. No. 1, Ex. A., ¶ 12. Prior to 2010, a fallen tree had damaged Mr. Foster's beloved car, and he sought funds to restore the vehicle. *Id.*

Mr. Foster entered into a contract with EquityKey in June 2010. *Id.*, ¶ 13. The contract states that EquityKey will pay Mr. Foster a $196,000 "option payment" in exchange for Mr. Foster granting EquityKey the right to participate in 100% of the appreciation of his property, if any, for up to fifty years from the date of the agreement. *Id.*, ¶ 14. The contract is secured by a Performance Deed of Trust and confirmed in a Memorandum of Option (the latter dated March 20, 2012). *Id.* Both the contract and the Memorandum of Option state that the arrangement is an option payment and "not a loan." *Id.* Plaintiff asserts that Mr. Foster entered into this contract based on "false and deliberately misleading" representations by EquityKey, which Mr. Foster reasonably

believed "given his age and mental status," that the transaction was an option contract rather than, as Plaintiff claims, a "disguised ... high cost mortgage." *Id.*, ¶ 19-21. Given that EquityKey's intentionally deceptive efforts prevented Mr. Foster from understanding the true nature of the transaction, Plaintiff alleges, there was no meeting of the minds and no valid contract was formed. *Id.*, ¶ 21.

Mr. Foster passed away in 2016, and Plaintiff became the executor of his estate and the Trustee of the Michael P. Foster Trust. *Id.*, ¶ 15. Prior to his passing, Mr. Foster had told Plaintiff that he "had made a deal for essentially 'free money' and believed that he could not be forced from the home at any time or for any reason." *Id.*, ¶ 16. Only after his father's death, when Plaintiff was going through his late father's records, did he discover the EquityKey arrangement. *Id.*, ¶ 15. Plaintiff alleges that "[d]ue to Michael Foster's age and the complexity of the contract, as well as EquityKey's deliberate effort to hide the nature of the transaction, ... it was not possible for Michael Foster to understand and/or discover the true nature of the agreement with EquityKey...." *Id.*, ¶ 16. Plaintiff asserts that he himself only realized the "exact nature and terms" of the EquityKey agreement with the assistance of counsel. *Id.* If Plaintiff were to have sold the property at the time of the filing of the complaint, the amount due to EquityKey would have been approximately $705,000.00. *Id.*, ¶ 17.

***2** Plaintiff filed his complaint in Santa Clara Superior Court in November 2016. Dkt. No. 1, Ex. A. The complaint asserts that the contract is actually a high-interest loan secured by the property that was issued without the required disclosures or counseling and that EquityKey fraudulently concealed the nature of the agreement. *Id.*, ¶¶ 1-2. The complaint alleges claims for (1) Rescission for Fraud, (2) Declaratory Relief, (3) Elder Financial Abuse (Cal. Welf. & Inst. Code § 15610.30), (4) Cancellation of Instruments (Cal. Civ. Code § 3412), (5) Quiet Title, (6) Violations of the Truth in Lending Act ("TILA") (15 U.S.C. § 1601, *et seq.*), and (7) Unfair Business Practices (Cal. Bus. & Prof. Code § 17200, *et seq.*). Dkt. No. 1, Ex. A.

The contract itself, which Plaintiff attached to the complaint, is titled "Property Appreciation Option Agreement." Dkt. No. 7. It states that EquityKey will pay Mr. Foster an "Option Premium" of $196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000. *Id.* at pg. 1; pg. 2, ¶ 1. The grant of the option does not give EquityKey "any present ownership or possession rights with respect to the Property." *Id.*, ¶ 2. EquityKey's right to exercise its option only comes into play if (1) it is informed of a pending sale of the property "or a transfer, conveyance, assignment or other loss of [ ] ownership," (2) if Mr. Foster breaches the agreement, or (3) if neither of the prior events occurs within the 50-year term of the agreement, EquityKey may call or exercise its option within 90 days of the end of the term. *Id.* At such time, EquityKey may, but need not, exercise its option. If EquityKey decides not to exercise its option, the agreement terminates. *Id.*, ¶ 3. If EquityKey exercises the option at some point during the 50-year option period, Mr. Foster must pay it 100%

of the appreciation of the property, which will be calculated by multiplying the percentage change in the S&P/Case-Shiller Home Price Index (for the Metropolitan Statistical Area in which the Property is located) since the date of the agreement by the initial property value. *Id.*, ¶ 5. An Early Termination Charge—equal to the greater of (1) the Option Premium ($196,000) plus 3% of the initial property value plus 12% annual interest, [1] or (2) the amount of appreciation of the property at the time of the breach—applies if Mr. Foster (or his heirs) sells or otherwise transfers the property within 10 years of the date of the agreement. *Id.*, ¶ 11. The contract further states that Mr. Foster agrees to execute a Performance Deed of Trust and Memorandum of Option. *Id.*, ¶ 14. Finally, the agreement states that Mr. Foster "understand[s], acknowledge[s] and agree[s] that it is binding upon his estate, heirs, successors, and beneficiaries. *Id.*, ¶ 22."

1 The Early Termination Charge does not include 3% of the Initial Property Value if Mr. Foster dies and his heirs or estate elect to sell the Property within the first 10 years of the Agreement, but this modification does not apply if the Property is owned by a trust. *Id.*, ¶ 12.

As noted in the Plaintiff's complaint, the agreement states that it is "[n]ot a Loan or Security," and is instead "an option in real property." *Id.*, at ¶ 26. The contract also warns that EquityKey's option "may result in you [ (meaning Mr. Foster) ] (including your heirs, estate, beneficiaries and legal representatives) receiving less from your Property in a sale or other Property Transfer than if you did not enter into this Agreement. We recommend you thoroughly discuss this transaction with your heirs and beneficiaries, as well as your legal, tax and financial advisors to make certain you, and those who may be affected by this transaction, understand and are comfortable being bound by this Agreement." *Id.*, ¶ 4. A similar warning, advising Mr. Foster not to sign unless he has read the entire agreement and encouraging him to seek legal counsel and financial advice before signing, is included in capital letters above the signature line. *Id.*, ¶ 31.

***3** Defendant EquityKey removed this action to federal court in January 2017, Dkt. No. 1, and filed a motion to dismiss one week later, Dkt. No. 14. In its motion, EquityKey argues that all of Plaintiff's claims, each of which EquityKey asserts is founded on a claim of fraud, are time-barred, and that the complaint fails to state a claim upon which relief may be granted because the contract is not a loan as a matter of law. Dkt. No. 8. Plaintiff responds that the statute of limitations has not run on its claims, that the discovery rule or the doctrine of equitable tolling should apply, and that the true nature of the transaction reveals that it is a loan and not an option contract. Dkt. No. 14.

Both parties have consented to magistrate judge jurisdiction. Dkt. Nos. 10, 11.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Complaints that merely recite the elements of a cause of action are insufficient. *Id.* In considering a motion to dismiss, a court accepts all of the plaintiff's factual allegations as true and construes the pleadings in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). Dismissal may also be based on the absence of a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## DISCUSSION

The court begins its discussion with an analysis of the federal claim.

### I. TILA.

"Congress enacted TILA to promote 'the informed use of credit' by consumers." *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 3d 862, 872 (N.D. Cal. 2010) (quoting 15 U.S.C. § 1601(a)). Thus, the Act seeks to "assure a meaningful disclosure of credit terms" to aid consumers in making informed decisions and protect them from unfair credit practices. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f); *see also* 12 C.F.R. § 226.2(14). A "creditor" under TILA is one who regularly extends consumer credit. 15 U.S.C. § 1602(g). 15 U.S.C. Section 1639 requires creditors to make certain disclosures related to extensions or offers of credit.

TILA, however, does not apply to all transactions. In the commentary discussing Regulation Z, the regulations issued by the Federal Reserve Board to carry out Congress's purpose in enacting the statute, *see* 12 C.F.R. § 226.1 *et seq.*, the Board staff explains that certain situations are "not considered credit." 12 C.F.R. § 226, Supplement I, Subpart A, 2(a)(14). These situations include "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. § 226, Supplement I, Subpart A, 2(a)(14)(vii)-(viii).

To determine whether TILA applies to the agreement here, the court must examine its nature (which examination appears to be a matter of first impression, as counsel did not cite—and the court did not find—any decisions evaluating a transaction with these precise features). Is it, as Plaintiff asserts, a high-interest loan or reverse mortgage in disguise? Or is it, as EquityKey argues (and as stated on the face of the transaction documents), an option contract? In analyzing the terms of the agreement, the court must look deeper than its title and assess its substance to determine its true character. *Mahoney v. City and Cnty. of S.F.*, 201 Cal. 248, 258 (1927); *Burnett v. Ala*

*Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993).

***4** An option contract is an agreement in which the optionee, through the provision of consideration, "binds the optionor to perform an underlying agreement upon the optionee's performance of a condition precedent." *Palo Alto Town & Country Vill., Inc. v. BBTC Co.*, 11 Cal. 3d 494, 502 (1974). The optionor is obliged to perform his or her duties under the agreement because he or she has already accepted consideration. *Id.* at 503. The optionee, on the other hand, has no duties "until, and unless, he accepts the irrevocable offer proposed to him by the optionor." *Id.* For example, in an option contract for the purchase of real property, the optionor offers to sell property at a fixed price and pledges to keep that offer open for a set period of time in exchange for consideration. *See Steiner v. Thexton*, 48 Cal. 4th 411, 418 (2010). The optionee, having provided consideration, may then choose to exercise the option during the set period, in which case the optionor must sell the property at the agreed-upon price; or, the optionee can let the time lapse and the option expire. *Id.*

A loan, on the other hand, has been defined as "anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use [otherwise known as interest]." *In re Johnson*, 218 B.R. 449, 456-57 (8th Cir. BAP 1998) (quoting Black's Law Dictionary). Alternatively, the Second Circuit defined a loan as:

> [A] contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows. 'In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form.'

*In re Johnson*, 218 B.R. at 455 (quoting *In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914)). This definition was helpfully re-stated in a more recent case defining a loan as "(i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000). Loans do not require a sum certain to be stated in the contract. *McKay v. Ingleson*, 558 F.3d 888, 891 (9th Cir. 2009). Other courts have emphasized the intent of the parties as an important factor in determining whether a loan was created. *In re Johnson*, 218 B.R. at 456 (citing cases).

For the purposes of TILA, the agreement between Plaintiff and EquityKey is not a loan. Mr. Foster and Plaintiff (should he decide not to sell or transfer the property or otherwise breach the agreement) do not currently owe EquityKey any debt. Further, there is no guarantee that the payment received by Mr. Foster need ever be returned. If EquityKey elects not to exercise its option, Plaintiff will

not owe it any money. And as there is no way to know for certain whether calling the option at the end of the 50-year term will be profitable for EquityKey, there is no way to know whether Plaintiff will *ever* be required to pay.[2] Phrased in terms of the definition of a loan from *In re Grand Union Co.*, Mr. Foster did not agree to "repay absolutely" the option premium payment. Finally, contrary to Plaintiff's arguments, the potential return to EquityKey (should EquityKey exercise the option) cannot be characterized as an effective interest rate. The return—based on the increase, if any, in value of the homes in Mr. Foster's Metropolitan Statistical Area—is more akin to a capital gain, like the gain one would realize upon the sale of a stock that has increased in value.

2 It appears *likely* that housing values in fifty years will be greater than they were in 2010, and that EquityKey will call the option. But this is not certain.

***5** Rather than being a loan, the agreement is as EquityKey describes it: it is an option contract. EquityKey has paid Mr. Foster valuable consideration ($196,000) to secure an option to participate in the appreciation of Mr. Foster's property. EquityKey is not obliged to exercise its option. In fact, if home prices decrease, it would have little reason to do so. If home values increase, but at a rate that is slower than inflation (or at a slower rate than the rate of return one could receive from a prudent investment of the option premium), then even if EquityKey calls the option, it would ultimately lose money on the deal. On the other hand, if Plaintiff elects to sell the Property, and home values in the area have increased, EquityKey can call its option and oblige Plaintiff to perform his duties under the terms of the agreement.

Though the ability to call or decline to exercise the option makes an option contract a better characterization of the transaction, the agreement also has many features of an "investment plan" as described by the Federal Reserve Board in the Commentary to Regulation Z. Commentary to 12 C.F.R. § 226.2(a)(14)-1. An investment plan is defined as a transaction "in which the party extending capital to the consumer risks the loss of the capital advanced. This includes, for example, an arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in any gain or loss of property value." 12 C.F.R. § 226, Supplement I, Subpart A, 2(a)(14)(vii)-(viii). Regulation Z excludes such transactions from "credit," which is defined as "the right to defer payment of debt or to incur debt and defer its payment." 12 C.F.R. § 226.2(a)(14). In the present transaction, EquityKey risked the loss of the capital it advanced. Though property values in the Bay Area have increased since 2010 in a manner that at times has seemed inevitable, the real estate market could have stagnated or declined (and indeed, the painful lessons of the recent economic past warn against assuming that housing prices will only increase). While a decrease in home values would not help Plaintiff today (as he would owe an early termination charge if he transferred the property before 2020), if housing prices are down in four years and Plaintiff sells the

property at that time, then EquityKey would lose money on the deal.

Through the provision of consideration, EquityKey has bound Mr. Foster to perform an underlying agreement (to share the appreciation of the property) upon EquityKey's performance of a condition precedent (calling the option). The agreement has all the features of an option contract described above. The court's characterization of the transaction as an option contract and not a disguised loan is fatal to Plaintiff's TILA claim. Since the agreement was not subject to TILA's disclosure requirements, EquityKey did not violate the statute for not making TILA disclosures.

**II. Limitations Issues: TILA, Fraud, Financial Elder Abuse, Unfair Business Practices.**

Even if TILA applied to the transaction at issue here, the claim would be barred by the statute of limitations. For similar reasons, Plaintiff's claims for fraud, financial elder abuse, and unfair business practices are also time-barred.

There are two relevant limitations periods for TILA claims: one year for claims seeking damages and three years for claims seeking rescission. 15 U.S.C. §§ 1640(e), 1635(f); *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 3d 862, 873 (N.D. Cal. 2010). The clock starts running on actions for damages upon a violation of TILA, which occurs when the consumer "becomes contractually obligated on a credit transaction." *Davenport*, 725 F. Supp. 3d at 872. As for claims for rescission, the limitations period "shall expire" three years after the transaction is consummated or the property is sold, whichever occurs first. *Id.* at 873. The three-year rescission period is absolute and cannot be tolled. *Id.; Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). Mr. Foster became contractually obligated on the transaction in June 2010, when he executed the contract and consummated the agreement. Thus, unless Plaintiff can argue that the limitations period should run from another date due to the discovery rule or (for the damages claim) should be tolled, the TILA claim for damages expired in 2011 and the claim for rescission expired in 2013.

***6** As for Plaintiff's three state-law claims mentioned above, under California Code of Civil Procedure Section 337, the limitations period for rescission for a contract in writing on the basis of fraud is four years from the date upon which the aggrieved party discovers the facts constituting the fraud or mistake. "A party alleging fraud has a duty to exercise diligence in discovering the fraud, such that the ... limitation begins to run when that party 'has the opportunity to obtain knowledge from sources open to his investigation.' " *Rivera v. BAC Home Loans Servicing, LP*, 756 F. Supp. 2d 1193, 1200 (quoting *Lee v. Escrow Consultants, Inc.*, 210 Cal. App. 3d 915, 921 (1989)). Similarly, the limitations period for actions for damages for financial elder abuse is "four years after the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." *Giordano v. Wachovia Mortg., FSB*, No. 5:10-cv-04661-JF, 2011 WL 1130523, at *3 (N.D. Cal. Mar. 25, 2011) (quoting Cal. Welf. & Inst. Code § 15657.7). Finally, the limitations period for an unfair

business practices claim is "four years after the cause of action accrued." Cal. Bus. & Prof. Code § 17208. As with the previous claims, the discovery rule may postpone accrual "until a plaintiff discovers or has reason to discover" the unfair competition law claim. *Glue-Fold, Inc. v. Slauterback Corp.*, 82 Cal. App. 4th 1018, 1029 (2000).

**a. The Discovery Rule.**

Plaintiff argues that the discovery rule should apply, and that the clock should not have started running on his TILA, fraud, financial elder abuse, and unfair business practices claims until he discovered the true nature of the transaction in 2016. Under the discovery rule, "the limitations period does not begin to run until the plaintiff discovers (or reasonably should discover) that he has been injured." *Perez v. Wells Fargo Bank*, No. C-11-02279 JCS, 2011 WL 3809808, at *14 (N.D. Cal. Aug. 29, 2011). Plaintiffs asserting the discovery rule must plead facts adequate to support its application. *Id.*

Plaintiff alleges that Mr. Foster could not discover the true nature of the agreement because of "false and deliberately misleading" representations by EquityKey that the contract was not a loan and because of Mr. Foster's "age and mental status." Plaintiff asserts that he only discovered his claims after his father's death and with the assistance of counsel.

Plaintiff's argument that the discovery rule should apply fails for several reasons. First, the facts relevant to the discovery of the claims at issue here were included on the face of the contract signed by Mr. Foster. Thus, Mr. Foster had all of the information necessary to discover his claims through the exercise of diligence in 2010, a time at which Plaintiff concedes he was competent. Allegations that Mr. Foster did not understand the terms of the contract he signed or did not consult with legal counsel do not establish that he could not reasonably have learned of his claims had he been diligent. *Nevarez v. Wells Fargo, N.A.*, No. C-12-1660 JCS, 2012 WL 2428233 (N.D. Cal. June 26, 2012); *Perez v. Wells Fargo Bank*, No. C-11-02279 JCS, 2011 WL 3809808, at *14 (N.D. Cal. Aug. 29, 2011). Second, defendant's allegedly deceptive statements do not excuse Plaintiff's delay, as the transaction documents expressly discussed and disclosed the terms of the agreement. *Hague v. Wells Fargo Bank, N.A.*, No. C11-02366 THE, 2012 WL 1029668, *5 (N.D. Cal. Mar. 26, 2012) (citing *Parsons v. Tickner*, 31 Cal. App. 4th 1513, 1525 (1995)) ("Where there existed, from the time the loan was made, papers which disclosed the terms of the loan, it would seem that reasonable diligence would have enabled Plaintiff to discover the problem."). Additionally, despite Plaintiffs' allegations of EquityKey's deceptive statements, the agreement itself encourages the exercise of diligence, advising potential signatories to seek the counsel of an attorney or financial advisor before signing.

Mr. Foster's failure to discuss the transaction with Plaintiff also does not excuse his delay. Plaintiff's claims are the same as Mr. Foster's, so the limitations clock does not start fresh upon Mr. Foster's death. And Mr. Foster's statement to Plaintiff that "he had made a deal for essentially 'free money' " demonstrates that Plaintiff was on notice of the transaction

(and its potentially suspect nature) during Mr. Foster's life. These allegations do not support the application of the discovery rule here, and, as a result, Plaintiff's claims are time-barred unless the doctrine of equitable tolling applies.

**b. Equitable Tolling.**

***7** “[E]quitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of [a] TILA action.” *King v. Cal.*, 784 F.2d 910, 915 (9th Cir. 1986). Equitable tolling applies where “despite all due diligence, [plaintiff] is unable to obtain vital information bearing on the existence of the claim.” *Hensley v. United States*, 531 F.3d 1052, 1057-58 (9th Cir. 2008). “The doctrine is not available to avoid the consequences of one's own negligence and does not apply when a late filing is due to claimant's failure to exercise due diligence in preserving his legal rights.” *Id.*, at 1058 (quoting *Scholar v. Pac. Bell*, 963 F.2d 264, 268 (9th Cir. 1992)). A motion to dismiss on statute of limitations grounds should be granted only when the assertions of the complaint, read liberally, do not permit the plaintiff to prove that the limitations period was tolled. *Alakozai v. Valley Credit Union*, No. C10-02454 HRL, 2010 WL 5017173, at *4 (N.D. Cal. Dec. 3, 2010).

Plaintiff does not state any plausible allegations suggesting that Plaintiff and Mr. Foster were unable to obtain vital information about their claims despite the exercise of due diligence beyond (1) the conclusory assertions that EquityKey made deceptive and misleading statements about the transaction and (2) the claim that Mr. Foster did not understand the transaction. As stated above, however, the information Plaintiff needed to discover his claims was available on the face of the transaction documents, regardless of any misleading statements made by EquityKey. And Mr. Foster's lack of understanding of the contract could have been addressed by the exercise of due diligence in consulting counsel earlier, during the limitations period. *See Finuliar v. BAC Home Loans Servicing*, No. C-11-02629 JCS, 2011 WL 4405659, at *8 (N.D. Cal. Sept. 21, 2011) (declining to apply the equitable tolling doctrine where the plaintiff alleged that she could not understand the express terms of her loan and where she did not discover her claims until she retained counsel). For these reasons, and the reasons stated in the discussion above concerning the discovery rule, Plaintiff's argument that equitable tolling should apply fails.

Since neither the discovery rule nor equitable tolling applies, Plaintiff's TILA, fraud, financial elder abuse, and unfair business practices claims had each expired by 2014, and each is time-barred.

**III. Quiet Title, Cancellation of Instruments, Declaratory Relief.**

The California Supreme Court has explained that “no statute of limitations runs against a plaintiff seeking to quiet title while he is in possession of the property.” *Muktarian v. Barmby*, 63 Cal. 2d 558, 560-61 (1965). As Plaintiff remains in exclusive and undisputed

possession of the property, the limitations period—regardless of which period applies—has not started to run on his claim for quiet title. *See id.* (holding that the three-year statute of limitations for fraud or mistake did not bar an action for quiet title while the plaintiff was still in possession). Defendant's reliance on *Ankoanda v. Walker-Smith*, 44 Cal. App. 4th 610 (1996), to argue that *Muktarian* does not apply here is unavailing. In *Ankoanda*, unlike in *Muktarian*, the plaintiff was a co-tenant and lacked exclusive possession of the property. 44 Cal. App. 4th at 618. Here, as EquityKey acknowledges in the transaction documents, Plaintiff is in exclusive possession of the property. *See* Dkt. No. 7, Ex. 1, § (A)(1) ("Your grant of the option to [EquityKey] does not give us any present ownership or possession rights with respect to the Property."); *see also* *Salazar v. Thomas*, 236 Cal. App. 4th 467, 469-482 (discussing possession). EquityKey's cloud on Plaintiff's title does not dispute or disturb Plaintiff's possession, and so the statute of limitations has not started running. *See* *Salazar*, 236 Cal. App. 4th at 478 ("mere notice of an adverse claim is not enough to commence the owner's statute of limitations").

***8** As the quiet title claim is not time-barred, the court considers EquityKey's argument that Plaintiff fails to state a claim for quiet title upon which relief may be granted.

To state a claim for quiet title, a plaintiff must allege "that he is the owner of certain described real property, that defendants claim an interest therein adversely to him, that such claim is without right, and that the defendants have no estate, title or interest whatever in said premises or any part thereof...." *Ephraim v. Metropolitan Trust Co. of Cal.*, 28 Cal. 2d 824, 833 (1946); *see also* *Wolfe v. Lipsy*, 163 Cal. App. 3d 633, 638 (1985), *disapproved of on other grounds by* *Droeger v. Friedman, Sloan & Ross*, 54 Cal. 3d 26 (1991). "[W]here the plaintiff seeks to have his title to property quieted as to an instrument which is attacked on the ground of fraud, then ... the defrauded party must plead the pertinent facts relied upon as grounds for setting aside said instrument." *Borneman v. Salinas Title Guar. Co.*, 66 Cal. App. 2d 500, 503-04 (1944); *see also* *Markowicz v. J.P. Morgan Chase Bank, N.A.*, No. B233602, 2012 WL 3716889, at *3 (Cal. Ct. App. Aug. 29, 2012) (dismissing a quiet title claim brought on the basis of the cancellation of an instrument because the plaintiff did not adequately plead the fraud needed to justify cancelling the instrument); 11A Cal. Jur. 3d Cancellation and Reformation § 4 (Feb. 2017) ("[W]hen, in an action to quiet title, the plaintiff adds to the usual allegations averments showing a deed from the plaintiff to the defendant, the plaintiff must, in order to show that the deed was procured by fraud, plead the facts constituting the fraud.").

Here, EquityKey argues that Plaintiff has failed to plead that the cloud on his title cast by the performance deed of trust was procured by fraud, because the alleged misrepresentations in the transaction documents are not false or misleading. The court confines its analysis to the statements in the transaction documents, as Plaintiff admitted at the hearing on this motion that he was not aware of any misrepresentations beyond those statements.

The complaint alleges that EquityKey misrepresented the nature of the agreement, calling it an option contract (and affirmatively representing that the transaction is "not a loan") when it was, in reality, a disguised high-interest loan or mortgage. Dkt. No. 1, Ex. A, ¶¶ 1, 14, 19, 20, 21. The court has already concluded that the transaction is excluded from the coverage of TILA. This conclusion does not inevitably mean that the transaction is "not a loan" under state law. *Cf.* *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1095 (N.D. Cal. 2011) (noting that TILA's preemptive reach is limited to required disclosures and that the statute does not "otherwise regulate the particulars of a loan agreement."). The court, however, also concludes that the transaction is "not a loan" within the meaning of California law.

The California Supreme Court has distinguished loans from sales. A sale, the Court has explained, "is the transfer of the property in a thing for a price in money." *Milana v. Credit Discount Co.*, 27 Cal. 2d 335, 339-40 (1945); *see also* *West Pico Furniture Co. of L.A. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 671-72 (1970). A loan, in contrast, is "the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use." *Milana*, 27 Cal. 2d 335, 339-40; *see also* Cal. Civ. Code § 1912. Though a court's determination of whether a transaction is a sale or a loan is usually a question of fact, where, as here, the details of the transaction are not in dispute, this determination is a question of law. *See* *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 255-56 (2003); *cf.* *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 799-801 (1994) (determining that whether a particular transaction was a loan subject to usury law or an exempt transaction of a different character was a question of law).

***9** Mr. Foster sold EquityKey an option. An option is not an interest in real property, but rather a contractual right, one that may become an interest in property when it is exercised. *Cyr v. McGovran*, 206 Cal. App. 4th 645, 648 (2012). If exercised, EquityKey's option becomes an interest in the appreciation in value of Mr. Foster's property (as determined by the aggregate increase in value of homes in his area). EquityKey may ultimately choose not to exercise its right; but this does not change the fact that Mr. Foster conveyed to EquityKey a valuable right to claim, if it chooses, an interest in real property in exchange for money (i.e., the option premium). This was the essence of the transaction—the sale of a thing for a price in money. Plaintiff might argue that the "thing" transferred was the right to recover the option premium at a later date, with or without interest. But the features of the transaction—especially the fact that EquityKey might not recover the full option premium—makes this characterization unreasonable.

The transaction is at is described—it is the sale of an option, and not a loan. As a result, Plaintiff—whose only allegations that EquityKey's claim to title is "without right" rely on the (rejected) assertion that the transaction is a loan—has not plead that EquityKey's claim to title is "without right" and has not adequately plead a claim for quiet title upon which relief may be granted. For the same reasons—the absence of allegations as to any basis for

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the invalidity of the transaction (and thus of any actual controversy regarding it)—the court concludes that the cancellation of instruments and declaratory relief claims must also fail.[3]

3 As the court dismisses the cancellation of instruments and declaratory relief claims because it is unclear what underlying wrongful conduct they rely on, the court declines to reach whether these claims are barred by the statute of limitations (as which limitations period applies depends on the substantive nature of these claims).

## CONCLUSION

As Plaintiff's TILA claim fails because the transaction is excluded from that statute's disclosure requirements, amendment would be futile and the court grants the motion to dismiss as to this claim without leave to amend. The fraud, financial elder abuse, and unfair competition law claims are dismissed on the grounds that they are time-barred. A plaintiff who fails to plead facts to support equitable tolling "normally should be permitted to amend his or her complaint" to plead such facts. *Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 641 (2003). As the facts giving rise to these claims were apparent on the face of the transaction documents and discoverable through the exercise of due diligence, however, the court is persuaded that amendment would be futile and grants the motion to dismiss as to these claims without leave to amend.

Finally, the quiet title, cancellation of instruments, and declaratory relief claims are dismissed on the grounds that Plaintiff failed to allege a basis for invalidating the performance deed of trust. As the court is not persuaded that amendment to cure this defect would be futile, the court dismisses these claims with leave to amend. Plaintiff may file an amended complaint within 21 days of the date of this order. Failure to do so will result in dismissal of the complaint with prejudice. Plaintiff may not add any new claims without first obtaining leave of the court.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2017 WL 1862527

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Olson v. Unison Agreement Corporation, Not Reported in Fed. Rptr. (2025)

2025 WL 2254522
Only the Westlaw citation
is currently available.
United States Court of Appeals, Ninth Circuit.

Charles Boyd OLSON; Janine
Olson, Plaintiffs-Appellants,
v.
UNISON AGREEMENT
CORPORATION, Defendant-Appellee,

No. 23-2835
|
Argued and Submitted October
23, 2024 San Francisco, California
|
FILED AUGUST 7, 2025

Appeal from the United States District Court for the Western District of Washington, Richard A. Jones, District Judge, Presiding, D.C. No. 2:22-cv-01859-RAJ

**Attorneys and Law Firms**

Thomas Scott-Railton, Matthew W.H. Wessler, Gupta Wessler, LLP, Washington, DC, Beth Ellen Terrell, Blythe H. Chandler, Elizabeth A. Adams, Terrell Marshall Law Group, PLLC, Seattle, WA, Joseph W. Moore, Cascade Law, PLLC, Everett, WA, for Plaintiffs-Appellants.

Brent Caslin, Kelly Morrison, Jenner & Block, LLP, Los Angeles, CA, Jeremy Creelan, Joseph L. Noga, Jenner & Block, LLP, New York, NY, Michael Rosenberger, Gordon Tilden Thomas & Cordell, LLP, Seattle, WA, for Defendant-Appellee.

Julia Eisentrout Assistant Attorney General, AGWA - Office of the Washington Attorney General, Olympia, WA, for Amicus Curiae Washington Department of Financial Institutions.

Brendan Donckers, Breskin Johnson & Townsend PLLC, Seattle, WA, for Amicus Curiae Northwest Consumer Law Center.

Before: S.R. THOMAS, WARDLAW, and COLLINS, Circuit Judges.

MEMORANDUM [*]

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

***1** In this putative class action, Plaintiffs Charles Boyd Olson and Janine Olson appeal the district court's dismissal, for failure to state a claim, of their complaint alleging violations of Washington's Consumer Protection Act (“WCPA”). We have jurisdiction under 28 U.S.C. § 1291, and reviewing the dismissal *de novo*, *see* *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001), we reverse.

**I**

The Olsons have resided in their home in Kent, Washington, since their marriage in 1990. In early 2019, at a time when they were experiencing financial difficulties, the Olsons received a flyer in the mail from Unison that offered a way to obtain needed cash. The flyer stated, in relevant part (footnotes and emphasis omitted):

> Great news! You're pre-approved to access the equity locked in your home.
>
> With Unison, you can receive $79,850 and use that money for any purpose you choose—with no monthly payments and no interest. Yes, you read that correctly. It's almost too good to be true.
>
> This offer is possible because Unison invests in your home—with you. We pay you a percent of your home's current value. You make no payments to us until you sell. If the value of your home increases from its current value, when you sell, Unison will share in a portion of the increase and make a profit. If the value decreases, we incur a loss. It's that simple.
>
> It's quick and easy. Unison can provide the funds you need without the burden of additional debt. Contact us today!

In three side boxes, the flyer also stated: (1) "NO INTEREST CHARGES Unlike a home equity loan or home equity lines of credit, you'll pay no interest with Unison."; (2) "NO MONTHLY PAYMENTS Use the money now, for up to 30 years, and pay nothing until you decide to sell."; and (3) "NO ADDED DEBT By partnering with Unison you do not take on any additional debt."

After inquiring about the offer, the Olsons signed a "HomeOwner Agreement" with Unison, as well as other related documents, on March 26, 2019. Under the terms of the agreement, Unison provided an advance of funds in the amount of $64,750 in exchange for "an option to purchase," in the future, an undivided "70.00% ownership" of the Olsons' home (which was then valued at $370,000) for another payment of $194,250.[1] The Olsons were also required to pay $2,525 in fees to complete the transaction and obtain the funds. Unison's rights under the contract, and the Olsons' obligations, are secured by a deed of trust recorded on the property.

1 That payment would be reduced, however, if the Olsons had "Unpaid Owner Obligations," which might occur if Unison was required, by default of the Olsons, to expend money to maintain the condition of the home or to procure appropriate insurance. Such expenditures were referred to, in the relevant agreement papers, as "Protective Advances." The complaint contains no allegations that Unison ever incurred any Protective Advances with respect to the Olsons' home.

Unison's option can be exercised upon the following triggering events: (1) the expiration date of the contract in 30 years, (2) the sale of the property, (3) the death of the last surviving owner, or (4) "following a material and uncured event of Owner default." If the triggering event is expiration of the contract or death of the owners, then upon exercise of the option and recording of Union's 70% interest as a co-owner, the property is to be promptly sold in order to pay Unison the value of its 70% interest in the property and any other amounts due to it. If the triggering event is an uncured default, then Unison can either conduct a nonjudicial foreclosure sale or, with the Olsons' agreement, elect to conduct an "orderly market sale." The agreement thus contemplates that, upon

exercise of the option, the property in all events would be promptly sold and Unison would be paid what was owed to it. In the event of a sale, all expenses and closing costs would be paid entirely from any sales proceeds owed to the Olsons and not those owed to Unison.

***2** Because exercising the option would give Unison a percentage interest in the property and not a fixed sum, the actual amount due to Unison after an exercise of the option and a sale could vary. A table provided to the Olsons showed some of the possible scenarios. For example, if the appraised value at the time the option was exercised was $518,000, a 70% equity interest would equal $362,600, and by purchasing that equity interest for $194,250, Unison would earn $168,350 in net proceeds, which would amount to a $103,600 gain on its initial payment of $64,750. But if the home was still worth only $370,000, a 70% equity interest would be $259,000, and Unison's payment of $194,250 would net $64,750, which would mean a $0 return on its then-recouped initial payment. But because the decision to exercise the option would rationally depend on the *marginal* value of exercising it, Unison would be expected to do so unless and until the value of its 70% share dropped below the marginal option exercise price of $194,250. That could occur only if the value of the house dropped by more than 25%, *i.e.*, to less than $277,500; at that point, a 70% interest would be worth $277,500 x 70%, which equals $194,250.

The agreement stated that Unison's product "is not designed for use as short-term financing," and it therefore provided that if the Olsons decided to sell the house within three years and the house value has declined, the Olsons would have to pay Unison back its initial $64,750 payment and any unpaid owner obligations. After the third anniversary of the HomeOwner Agreement, the Olsons can terminate the contract, without a sale, only by paying a "Special Termination Price" that would be the *greater* of (1) the sum of Unison's initial $64,750 payment and any additional owner obligations that had accrued; or (2) the amount that Unison would obtain if the house were to be sold at that time. Thus, unless and until a triggering event occurred, the Olsons could get out of the agreement only by paying back the full $64,750 plus Unison's share of any increase in the home's value. In other words, so long as the Olsons wished to stay in their home, they could only cancel the agreement by paying Unison back the full $64,750 they had received (plus, possibly, more).

In 2021, the Olsons thought about selling their home, but they realized that, in light of the HomeOwner Agreement and their pre-existing conventional mortgage, "they would receive almost nothing from the sale" of the property. In December 2022, the Olsons brought a class action complaint in state court against Unison, alleging that "Unison's HomeOwner Agreement product meets nearly all of the criteria for a reverse mortgage loan and functions as a reverse mortgage," and is therefore "subject to Washington law regulating such loans." The complaint asserted that, by failing to comply with such laws, and by engaging in unfair and fraudulent practices, Unison had violated the WCPA. The district court granted Unison's motion to dismiss, holding that Unison's HomeOwner Agreement was not a "loan" and that all of the

Olsons' WCPA claims failed. Plaintiffs timely appealed.

## II

We separately address the three causes of action asserted by the Olsons under the WCPA.

### A

In their first WCPA cause of action, the Olsons allege a predicate violation of the Washington Consumer Loan Act ("WCLA"), which, under Revised Code of Washington § 31.04.208, is a "per se unfair trade practice" that is actionable under the WCPA if the practice caused injury to the plaintiffs in their business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533, 535–39 (Wash. 1986). Specifically, the Olsons allege that their transaction with Unison involves a "reverse mortgage loan" under RCW §§ 31.04.501–31.04.540, which is a portion of the WCLA that is known as "the Washington state reverse mortgage act" ("WRMA"), *id.* § 31.04.500. The Olsons allege that the HomeOwner Agreement violates the WRMA because (1) Unison lacks the necessary state approval to provide such loans, *id.* § 31.04.525; (2) the loan requires the Olsons to maintain insurance as specified by Unison, *id.* § 31.04.515(7), (8)(b); and (3) the loan was issued without following the WRMA's counseling requirement, *id.* § 31.04.515(9)–(10). The Olsons further allege that, even if the transaction did not involve a "reverse mortgage loan" within the meaning of the WRMA, it still constituted a "loan" within the meaning of the WCLA, and that loan violated the WCLA because Unison lacks the requisite license to issue it. *See id.* § 31.04.035(1).

***3** In addressing these contentions, we begin with the WRMA's definition of the crucial term "reverse mortgage loan." The WRMA provides:

> (5) "Reverse mortgage loan" means a nonrecourse consumer credit obligation in which:
>
> (a) A mortgage, deed of trust, or equivalent consensual security interest securing one or more advances is created in the borrower's dwelling;
>
> (b) Any principal, interest, or shared appreciation or equity is due and payable, other than in the case of default, only after:
>
> (i) The consumer dies;
>
> (ii) The dwelling is transferred; or
>
> (iii) The consumer ceases to occupy the dwelling as a dwelling; and
>
> (c) The broker or lender is licensed under Washington state law or exempt from licensing under federal law.

RCW § 31.04.505 (indentation added). Unison contends that its arrangement with the Olsons does not involve a "consumer *credit* obligation" and therefore falls outside the statutory definition. That is true, according to Unison, because "the homeowner does not borrow any money and is not obligated to pay any money or interest back." In particular, Unison argues

that there is no guarantee that the initial $64,750 payment received by Plaintiffs need ever be returned.

The WCLA does not define the term "credit." "[I]n the absence of a statutory definition, [Washington courts] give the term its plain and ordinary meaning ascertained from a standard dictionary." *American Cont'l Ins. Co. v. Steen*, 91 P.3d 864, 867 (Wash. 2004). As relevant here, the term "credit" broadly refers to "[a]n arrangement for deferred payment of a loan or purchase." *Credit*, AMERICAN HERITAGE DICTIONARY 428 (5th ed. 2018); *see also Credit*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 532 (1981 ed.) ("an amount or limit to the extent of which a person may receive goods or money for payment in the future"). Accordingly, in order for a given arrangement to count as a "credit obligation," it must involve, at a minimum, an initial advance of funds or goods coupled with an obligation to make future payment to the person providing that advance. *Cf.* RCW § 31.04.015(14) (broadly defining a "loan," for purposes of the WCLA, as "a sum of money lent at interest or for a fee or other charge"). That understanding of "credit obligation" coheres with the remainder of § 31.04.505(5), which proceeds to address (1) the type of "advances" that are covered (*i.e.*, ones secured by a security interest in the consumer's home); and (2) the types of future payments that are covered (*i.e.*, "[a]ny principal, interest, or shared appreciation or equity [that] is due and payable" after certain future events). *See* RCW § 31.04.505(5)(a), (b).

Here, Unison supplied an advance of funds—it gave the Olsons, up front, $64,750 (less certain fees). Unison contends, however, that, because its agreement with the Olsons only grants it an option, the additional essential ingredient of an *obligation* to make future payments back to Unison is missing. Whatever force this argument might have in other contexts, we conclude that it is unavailing here.

In construing the range of "consumer credit obligation[s]" covered by the statute, we cannot ignore what the statute itself says about the type of arrangements it covers. One example of a "credit obligation" the statute expressly covers is a secured obligation to pay over "shared appreciation or equity," RCW § 31.04.505(5)(b), and the statute further specifies that this obligation must be "nonrecourse," *id.* § 31.04.505(5), *i.e.*, that the obligation can only be enforced to the extent of the security interest granted in the deed of trust, *Milkovich v. United States*, 28 F.4th 1, 4 (9th Cir. 2022). But where the home secured by the deed of trust falls significantly in value, a nonrecourse obligation to pay over "shared appreciation" will not result in any payment to the beneficiary of the deed of trust. The statute thus expressly contemplates that a "consumer credit obligation" may exist even though the actual future obligation to pay back sums may be entirely contingent upon future events, including sufficient "shared appreciation or equity."

***4** Here, the future contingency is *Unison's election* to exercise its option, rather than merely an appreciation or decrease in the value of the home. We agree that, as a general matter, a consumer's grant of a purchase option in exchange for cash would not ordinarily be thought of as creating a "credit obligation," because it does not involve an advance of

money in exchange for an expectation of future payments by the consumer back to the option holder. But given the details of the particular structure of *this* overall arrangement, which includes a formal option as one component but effectively creates the substance of a shared-appreciation reverse mortgage, we conclude that Unison's agreement with the Olsons sufficiently gave rise to a "credit obligation" to fall within the statute.

As we have explained, Unison's agreement with the Olsons is structured such that, unless the home falls in value by a substantial amount, the option will have marginal value and would be expected to be exercised when Unison is eligible to do so. At that point, the agreement contemplates that the house will promptly be sold, so that Unison will receive the cash payment then due (rather than retain the house as a co-owner). Unison will thereby recoup some or all of its initial payment to the Olsons—and potentially much more—depending upon how much the value of the home at the time of sale exceeds 75% or so of its original value. Moreover, in the absence of a sale, the only way that the Olsons can remove the deed of trust on their home is by paying back the full amount of the initial payment ($64,750), plus any additional share of equity that may be due to Unison if the house has appreciated in value. The entire structure of the arrangement is designed to put Unison in the same position, and to have the same right to payment, as an unadorned nonrecourse obligation to pay Unison 70% of the home's equity, less $194,250. The fact that Unison must elect to receive that payment, by exercising the option, does not detract from the fact that, even prior to the exercise of the option, the Olsons have a very real set of contingent obligations to make future payments to Unison. Economically speaking, the only operative contingency is whether the value of the home's equity will decline, and, as we have noted, the statute clearly covers obligations to pay over future equity that are contingently recoverable only if the property does not depreciate in value.

Unison also argues that, even if its arrangement with the Olsons entails a "consumer credit obligation," it does not meet the statute's additional requirement that "one or more advances" be secured by a "mortgage, deed of trust, or equivalent consensual security interest" in the consumer's home. RCW § 31.04.505(5)(a). That is wrong. Unison relies on the fact that the deed of trust recites that the Olsons are not obligated to pay back the "Unison Investment Payment" (referring to the initial $64,750 payment) and that the deed of trust consequently does not secure any such obligation. But the same clause of the deed of trust goes on to say that "[t]he foregoing shall not, however, in any way limit any payment calculated and agreed by [the Olsons] to be paid" under the agreement, including both the earlier-described 70%-of-equity payment and the "Special Termination" payment. The deed thus *does* secure all of the payments that Unison expects in the future in order to recoup the value of its $64,750 advance, including a potential payment (the "Special Termination Price") that specifically cannot be less than the $64,750 initial payment. *See supra* at 5. The Olsons' deed of trust thus does secure the "advance[ ]" within the meaning of the statute. [2]

2 Unison has not contended that the further elements in § 31.04.505(5)(b) and (c) are not met here.

***5** Unison contends that, because the wording of the definition of "reverse mortgage loan" in § 31.04.505(5) closely matches the definition of "reverse mortgage transaction" in Regulation Z (issued by the Consumer Financial Protection Bureau ("CFPB") under the Federal Truth in Lending Act ("TILA")), *see* 12 C.F.R. § 1026.33(a), the Washington statute should be construed to follow the CFPB's "official interpretation" of that regulation, which states that it does not apply to "option contracts." *See* 12 C.F.R. Part 1026, Supp. I, cmt. for § 1026.2(a)(14), cmt. 1.vii (stating that an "option contract[ ]" is not "considered credit for purposes of the regulation"). As noted earlier, we agree that option contracts generally do not constitute credit obligations, but that does not mean that the mere embedding of a formal option in a highly complex overall arrangement automatically exempts that arrangement from being classified as a "credit obligation." Moreover, the Washington law does not include any provision stating that § 31.04.505 should be interpreted consistently with the TILA, much less with the interpretations of that statute given by the CFPB. In enacting the WCLA, the Washington Legislature expressly cross-referenced, as applicable to that statute, several different definitions in the TILA, *see, e.g.*, RCW §§ 31.04.015(24),[3] 31.04.025(4)(g), but it did not do so here. *See* *State v. Delgado*, 63 P.3d 792, 795 (Wash. 2003) (stating that the exclusion, in one statute, of language that was included in a related statute should generally be presumed to be intentional).

3 This section defines "residential mortgage loan" to mean "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other consensual security interest on a dwelling, *as defined in the truth in lending act*, or residential real estate upon which is constructed or intended to be constructed a dwelling." RCW § 31.04.015(24) (emphasis added). Contrary to what Unison contends in its brief, the referent of the phrase "as defined in the truth and lending act" is clearly "dwelling." *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS §§ 18, 20 (2012) (describing the related canons applying a modifier only to the nearest reasonable referent or the last antecedent).

For these reasons, we conclude that Unison's arrangement constitutes a "reverse mortgage loan" within the meaning of § 31.04.505(5). And for substantially the same reasons, it is also a "residential mortgage loan" under § 31.04.015(24) and a "loan" under § 31.04.015(14). We therefore reverse the dismissal of the Olsons' first cause of action.[4]

4 We agree with Unison that, because the result in this case turns on "Appellants['] conten[tion] that the particular characteristics of Unison's contracts render them 'reverse

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

mortgage loans' under Washington law," certification of this issue to the Washington Supreme Court is unwarranted.

### B

In their second cause of action, the Olsons alternatively allege that, even if their transaction with Unison did *not* involve a "reverse mortgage loan" within the meaning of the WCLA, it still involved an "unfair" practice in violation of the WCPA because Unison "purposely attempt[ed] to avoid reverse mortgage lending laws." Because we have concluded that the Olsons' arrangement *did* involve a "reverse mortgage loan" and that the Olsons have therefore stated a claim for a per se "unfair" trade practice under the WCPA, this alternative theory for stating an unfair practice is moot. That is, we do not understand the Olsons to be contending that, even if their agreement with Unison involves a reverse mortgage loan, they may maintain an additional, essentially duplicative WCPA "unfair" practices claim rooted in the same reverse mortgage lending laws. On that basis, we affirm the dismissal of this claim, but without prejudice.

### C

In their third cause of action, the Olsons allege that certain statements made by Unison in connection with its marketing of the agreement were "deceptive" in violation of the WCPA. Unlike the Olsons' second cause of action, this one is based on different underlying conduct and a distinct theory of liability. Specifically, the Olsons allege that it was deceptive for Unison to market this arrangement as involving no "debt," "no monthly payments and no interest," and no "loan."

"[A] claim under the Washington CPA may be predicated upon ... an act or practice that has the capacity to deceive substantial portions of the public." *Klem v. Washington Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013). "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 894 (Wash. 2009). "Deception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." *Id.* at 895 (quoting *Southwest Sunsites, Inc. v. F.T.C.*, 785 F.2d 1431, 1435 (9th Cir. 1986)). In view of our earlier discussion, the Olsons have adequately alleged that the assertions that the transaction did not involve a "loan" or "debt" have the capacity to deceive. Moreover, because the WRMA expressly includes an "interest" payment "that is contingent on the value of the property upon execution of the loan or at maturity, or on changes in value between closing and maturity," within its concept of "interest" in the context of a reverse mortgage, RCW § 31.04.515(2), we conclude that the Olsons have adequately alleged that the statement that "no interest" was involved is deceptive. By contrast, the Olsons' complaint pleaded no facts to support the assertion that it is deceptive to say that the arrangement involved "no monthly payments." Finally, although the Olsons attempt to raise additional alleged deceptive statements in their appellate briefing, these allegations were not in

the complaint, and we decline to consider them for the first time on appeal.

* * *

***6** For the foregoing reasons, we reverse the district court's dismissal of this action, and we remand for further proceedings consistent with this memorandum.

**REVERSED AND REMANDED.**

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 2254522

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.